IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ANN L. BRESLIN, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 05-290-GMS |
| | ) | |
| STATE OF DELAWARE, DEPARTMENT | ) | JURY TRIAL DEMANDED |
| OF NATURAL RESOURCES AND | ) | |
| ENVIRONMENTAL CONTROL, | ) | |
| | ) | |
| Defendant. | ) | |

**CORRECTED VERSION**
**DEFENDANT DNREC'S OPENING BRIEF IN SUPPORT**
**OF ITS MOTION FOR SUMMARY JUDGMENT**

STATE OF DELAWARE
DEPARTMENT OF JUSTICE

Valerie S. Csizmadia, I.D. No. 3937
Deputy Attorney General
102 W. Water Street, 3rd Floor
Dover, DE 19904
(302) 739-4636
Attorney for State of DNREC

Dated:  August 28, 2006

<u>TABLE OF CONTENTS</u>                                    <u>PAGE NO.</u>

TABLE OF CITATIONS ....................................................................................................... iii

STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING..................................1

SUMMARY OF ARGUMENT....................................................................................................2

STATEMENT OF UNDISPUTED MATERIAL FACTS ............................................................4

ARGUMENT ...........................................................................................................................19

I.   THE BREACH OF THE IMPLIED COVENANT OF GOOD FAITH & FAIR DEALING
CLAIM MUST BE DISMISSED

      a        The Doctrine of Sovereign Immunity Deprives This Court of Subject Matter
              Jurisdiction for this State Law Claim ...................................................................19
      b.       State Law provides an Exclusive Remedy for Misapplication of the State Merit
              Rules and Laws ..................................................................................................19
      c.       Breslin Cannot Point to any Acts that Could Constitute Fraud or Deceit Sufficient
              to Prove the Elements of the Claim......................................................................22
      d.       It is Barred by the Statute of Limitations in 10 *Del. C.* §8111 ............................25

II.  BRESLIN'S TITLE VII CLAIM IS BARRED BY THE STATUTE OF LIMITATIONS

      a.       To the Extent that Breslin's Title VII Claim Rests on DNREC's Decision to Deny
              Her Advanced Salary Request Effective November 16, 1996, it is Barred by the
              Statute of Limitations .........................................................................................27
      b.       Unless Ramsey Discriminated Against Breslin Based on Her Gender When She
              Determined that Breslin Was Being Paid in Accordance With the Merit Rules in
              2002, Count II the Title VII Claim is Barred by the Statute of Limitations.........28

III. BRESLIN'S EQUAL PAY ACT CLAIM IS EITHER BARRED OR LIMITED BY THE
STATUTE OF LIMITATIONS

      a.       Unless DNREC Willfully Paid Breslin in Violation of the Equal Pay Act, Count
              II is barred by the Statute of Limitations..............................................................30
      b.       If DNREC Willfully Paid Breslin in Violation of the Equal Pay Act, the Scope of
              Any Available Recovery is Limited to Wages Between May 14, 2002, and
              February 24, 2003 .............................................................................................30

IV.  DNREC IS ENTITLED TO SUMMARY JUDGMENT ON COUNT 1, TITLE VII
GENDER DISCRMINATION CLAIM ......................................................................................31

V.   DNREC IS ENTITLED TO SUMMARY JUDGMENT ON COUNT II, EQUAL PAY ACT
CLAIM ...................................................................................................................................35

PAGE NO.

VI.    BRESLIN'S CLAIMS FOR PUNITIVE DAMAGES UNDER COUNT I (TITLE VII)
AND COUNT II (EQUAL PAY ACT) MUST BE DISMISSED

      a.    The Equal Pay Act does not provide for Punitive Damages ................................37

      b.    Title VII Expressly Exempts Governmental Agencies From Punitive Damages .37

CONCLUSION ....................................................................................................................38


UNREPORTED CASE – ATTACHED                                           ATTACHMENT


*Kopicko v. State, Dept. of Services for Children and their Families,*
    slip op, 2004 WL 1427077 (Del. 2004)......................................... ATTACHMENT 1


APPENDIX – ATTACHED

Affidavit of Merrilyn E. Ramsey........................................................ ATTACHMENT 2

Affidavit of Linda McCloskey .......................................................... ATTACHMENT 3

Affidavit of Debra Lawhead.............................................................. ATTACHMENT 4

## TABLE OF CITATIONS                    PAGE NO.

**CASES**

*Anderson v. McIntosh Inn*, 295 F.Supp.2d 412, (D.Del. 2003) ......................................33

*Goldman v. Braunstein*, 240 A.2d 577, 578 (Del. 1968) ...............................................25

*Kopicko v. State, Dept. of Services for Children and their Families,*
    slip op, 2004 WL 1427077 (Del. 2004) ..............................................................21,22

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 ..............................................31

*Merrill v. Crothall-American*, 606 A2d 96, 1001 (Del. 1992) ....................................22

*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) ...............................30

**STATUTES**

10 *Del. C.* §8106 .............................................................................................................18

10 *Del. C.* §8111 .......................................................................................................2,25,26

18 *Del. C.§ 6511* ...........................................................................................................19

29 *Del. C.* Chapter 59 ..............................................................................................19,35

29 *Del. C.* §5902 ......................................................................................................19,35

29 *Del. C.* §5903 .............................................................................................................4

29 *Del. C.* §5906 .............................................................................................................16

29 *Del. C.* § 5915(a) .........................................................................................................6

29 *Del. C.* §5914 .............................................................................................................19

29 *Del. C.* §5931 .............................................................................................................15

29 *Del. C.* §5943(a) ....................................................................................................2,9,19

29 *Del. C.* §5943(i) .........................................................................................................26

29 *Del. C.* Chapter 80 .....................................................................................................19

29 *U.S.C.* §216(b) ...........................................................................................................35

## TABLE OF CITATIONS (CONT)            PAGE NO.

29 *U.S.C.* §255(a) ...........................................................................................................30

42 *U.S.C.* §1981a(b)(1) ..............................................................................35

33 *U.S.C.* §206(d)(1), *The Equal Pay Act of 1963* ...........................................1,2,3,28,29,33,34,35

42 *U.S.C.* §2000e-5(e) (1994), *Title VII of the Civil Rights Act* .........1,2,3,24,25,26,27,28,29,32,35

42 *U.S.C.* § 9601 et seq. Comprehensive Environmental Responses,
  Compensation & Liability Act ...........................................................................4

## <u>RULES</u>

Merit Rule 3.0100.....................................................................................5

Merit Rule 5.0710.....................................................................................6,19,20

Merit Rule 5.0711.....................................................................................7,12,20,31

Merit Rule 5.0712.....................................................................................13,20

Merit Rule 5.0720.....................................................................................12

Merit Rule 5.0900 ....................................................................................10,11

Merit Rule 13.0110....................................................................................11

.

## STATEMENT OF THE NATURE AND STAGE OF THE PROCEEDING

Plaintiff Ann L. Breslin ("Breslin") is a female former employee of the State of Delaware Department of Natural Resources & Environmental Control ("DNREC"). DNREC hired Breslin to work as an environmental scientist in the Division of Air & Waste Management within the Site Investigation and Remediation Branch in 1994. Breslin resigned from employment with the DNREC on February 24, 2003. On May 14, 2005, Breslin filed a complaint stating that DNREC paid her less than male employees allegedly because she was a female, in violation of the Title VII of the Civil Rights Act, the Equal Pay Act and Delaware state law.

Pursuant to this Court's Rule 16 Scheduling Order, the DNREC filed a Motion for Summary Judgment on August 28, 2006. The ground for the motion is that there are no genuine issues of material facts, and DNREC is entitled to judgment as a matter of law. This is the DNREC's Opening Brief in support of its Motion for Summary Judgment.

## SUMMARY OF ARGUMENT

1.      The doctrine of Sovereign Immunity prevents this Court from exercising Subject Matter Jurisdiction over Breslin's state law claim for breach of the implied covenant of good faith and fair dealing.  Another bar is the Delaware law (29 *Del. C.* §5943(a)) providing that a grievance is Breslin's exclusive remedy for any complaint that she was not being paid in accordance with the Delaware State Merit Rules and law.  Breslin voluntarily abandoned that process, leaving standing the decision of State Personnel Hearing Officer LaTonya B. Ashley that the State did not misapply the Merit Rules or System in paying Breslin.  It is further barred by the one year state law statute of limitations for wages (10 *Del. C.* §8111).  Finally, a breach of this state law claim cannot be proven without some evidence of bad faith, fraud and deceit, and Breslin cannot prove that element.

2.      Breslin's Title VII claim is barred by the statute of limitations to the extent it relies on action prior to March 24, 2002.   Based on her complaint, then, Breslin must be alleging that the female Director of DNREC's Human Resources Office made Breslin's female gender a factor in her assessment in 2002 that both Breslin's pay and Robertson's pay had been the result of a proper application of the Merit System.  Otherwise, she has not alleged any actions within the Statute of Limitations.

3.      Unless DNREC willfully paid Breslin in violation of the Equal Pay Act, that claim is barred completely by the 2 year statute of limitations, because Breslin's complaint was filed on May 14, 2005, (more than 3 years after she voluntarily left DNREC employment on February 24, 2003).  Assuming arguendo that DNREC violated the Equal Pay Act, the only wages within the application statute of limitations are those accruing within 3 years prior to the filing of her complaint (wages accruing between May of 2002 and February of 2003).  Thus, Breslin's Equal Pay Act claim should be wholly dismissed or the scope of it limited to claims within the statute of limitations.

4.     DNREC has asserted the affirmative defense that any difference between the salary of Breslin and others was due to the proper application of the State Merit System.  There is substantial evidence to support this decision and no evidence to bolster any claim that Ann L. Breslin's female gender played any role in the decision.  The defense is supported by the uncontested ruling made in the Grievance Process by a State Personnel Hearing Officer, who is a female and has no inherent reason to want to discriminate against Breslin.  It is further supported by Ramsey's evidence that she reviewed the advanced salary (sometimes also called "advanced hire") documentations and found differences sufficient to justify both the denial of Breslin's request and the granting of Robertson's request.  Merrilyn E. Ramsey is also a female with no inherent reason to discriminate against females.  The decision is further supported by the survey of the employees in the ES3 classification in Breslin's Division of Air & Waste Management during the grievance process that indicated that females in Breslin's ES3 classification were being paid on average slightly higher levels than males.  It is further supported by the fact that six males in Breslin's Division of Air & Waste Management were being paid the same as Breslin.  Given the substantial evidence supporting the defense and the lack of evidence indicating that gender was any consideration, Breslin cannot prove this claim.

5.     DNREC presents the same evidence in support of its affirmative defense under the EPA that Breslin was being paid in accordance with the merit rules to that it raises to support the defense to the Title VII claim.  For the same reason, Breslin cannot prove that claim.

6.     Even if the Equal Pay Act claim survives it does not provide for the recovery of punitive damages and Title VII expressly exempts governmental agencies from having punitive damages assessed against them.  Consequently, any demand for punitive damages on the federal claims must be dismissed.

## STATEMENT OF UNDISPUTED MATERIAL FACTS

The State of Delaware has adopted by law a Merit System related to employee relations whose purpose is to establish a system of personnel administration based on merit principles and scientific methods.  29 *Del. C.* §5903.  Pursuant to the Merit System set out in 29 *Del. C.* Ch. 59, employees in "classified service" or "state service" are covered by the requirements of the Merit System laws and regulations.  The State Personnel Office oversees the Merit System.

On November 1, 1994,[1] Breslin was hired by DNREC in a position in the classified service.  DNREC is an administrative agency overseeing the environmental laws in Delaware. DNREC has six major Divisions (Office of the Secretary, Air & Waste Management; Water Resources; Soil & Water Conservation; Fish & Wildlife and Parks & Recreation).  Ramsey *Aff.*¶3.  Breslin was hired as an Environmental Scientist 2 position.  The position was in the Environmental Scientist Series ("ES Series").  The ES Series is, for the most part, unique to DNREC *Id.* ¶4.[2]  There have been ES Series positions in all DNREC's Divisions, except Parks & Recreation.  *Id.*  Breslin began working for the Division of Air & Waste Management ("DAWM") in what is now known as the Site Investigation and Restoration Branch ("SIRB"). Compl.¶6.  SIRB administers and oversees hazardous waste cleanups and remedial actions related to federal CERCLA, 42 *U.S.C.* §9601, et seq., and state statutes.  Ramsey Aff.¶5.

The ES Series at DNREC was established as part of an Authorized Career Ladder. McCloskey Aff.¶4.  The Merit Rules define the term authorized career ladder:

> A hierarchy of classifications within a series, established and approved by the Office of State Personnel, to provide recognition of attainment of specific levels of technical and/or administrative competence.  Movement within the series will be based upon pre-established performance criteria relative to increasing levels of know-how, problem-solving and accountability."

---

[1] Breslin had worked as a seasonal in a position of limited duration, outside the merit system, for DNREC from January 18, 1994, through the time of her initial hire in the Merit System on November 1, 1994.

[2] At present, the only ES series positions outside DNREC are 2 ES4s in Public Health and 1 ES3 in Department of Transportation.

There are 4 levels in the ES series:  ES 1, ES 2, ES 3, and ES4.  Ramsey Aff..¶4.  The ES Series

positions were established pursuant to 29 *Del. C.* §5915(a) which provides:

> "The [merit] rules shall provide for the preparation, maintenance and revision of
> a position classification plan for all positions in the classified service and all
> merit comparable positions, based upon similarity of duties performed and
> responsibilities assumed so that uniform qualifications and pay ranges shall apply
> to all positions in the same classification."

The language of Merit Rule 3.0100, although revised over the years, has required the Director of

State Personnel to establish and maintain a method of classifying and reviewing all state positions

so those substantially alike in duties and responsibilities and requiring essentially the same skills,

knowledge and abilities are grouped into the same class and paygrade.  McCloskey Aff.¶3,4.

Under the Merit Rules, classifications are assigned minimum qualifications that an

applicant must possess in order to qualify for a position.  McCloskey Aff.¶5.  In Approved Career

Ladders such as the ES Series, certain minimum qualifications will differ between each step. *Id*.

The intent is for higher level positions to complete higher level duties, and employees must

posses or acquire the skills necessary to meet the higher level before promotion.  *Id*.

The Minimum Qualifications at the time for the ES 2 series were:

> Applicants must have education, training and or experience demonstrating
> competence in each of the following areas
> 1. Possession of a Bachelor's degree in one of the life, natural or physical sciences.
> 2. Experience applying the methods and techniques used in assembling and interpreting
>    scientific or technical data, and the preparation of reports.
> 3. Knowledge of environmental laws, rules and regulations.
> 4. Knowledge of computers and computer information systems.
> 5. Ability to communicate effectively both orally and in writing.  *Id*. ¶6.

While, the Minimum Qualifications at the time for the ES 3 series were:

> Applicants must have education, training and or experience demonstrating
> competence in each of the following areas
> 1. Possession of a Bachelor's degree in one of the life, natural or physical sciences.
> 2. Experience analyzing data.
> 3. Experience in environmental/natural resources program or project management.
> 4. Experience in interpreting and applying environmental laws, rules and regulations.
> 4. Experience with computers and computer information systems.
> 5. Ability to communicate effectively both orally and in writing. *Id*. ¶7.

Each position has a rate of pay (numerical paygrade) assigned to it.  *Id*. ¶8.  The numerical

paygrades are assigned a range of salary (showing 80; 100; and 120 percent of midpoint for 37.5 and 40 hour pay plans; 75; 100; and 125 percent of midpoint for Selective Market Variation Plans).  *Id.* ¶8.  The percentages of midpoint were designed with an intent to start an employee at the lowest percentage of midpoint[3] and to move all satisfactorily performing employees upwards through the pay range.  *Id.* ¶9.  The State's pay plan was based on the concept that 100 percent midpoint is the "competitive market rate" and based on an annual salary survey, the 100 percent midpoint would be adjusted each fiscal year based on the established labor market comparators.  *Id.* ¶10.  In addition, the pay structure was designed in concept so that all state employees would receive an annual pay increase in July of each year.  *Id.*  Then, in January of each year, satisfactorily performing employees would also receive a "movement though the pay range increase" until they reached 100 percentage of midpoint.  *Id.*  Proposals were developed for consideration by the Governor and General Assembly in 1987/1988 to provide "movement" opportunities in addition to the general salary increase for employees above the 100 percent midpoint; however, no proposal was accepted and implemented.  *Id.*  Thus, budget constraints almost immediately did away with the expected movement through the payrange (January) increases for all State of Delaware employees.  *Id.*  Consequently, employees hired today are quite likely, and almost expectedly, being paid the same annual salaries as persons in the same classification who have worked for the State of Delaware for years.  *Id.*  While this is neither the idea nor the intended situation, state service brings with it both benefits and detriments.  It is apparently, though, the crux of Breslin's distress, as she describes being paid at 80 percent of midpoint as "entry level"[4] despite the fact that she has received numerous salaries increase.

---

3 Merit Rule 5.0710 entitled "Starting Rate on Initial Appointment" provides that "[u]pon initial appointment to any position in the classified service, on or after July 1, 1986, an employee shall be paid a salary equal to the minimum percentage of midpoint for the assigned paygrade, except as hereinafter provided." McCloskey Aff.¶9.

4 **A41-42**: "Q: So why didn't you grieve the denial of the advanced hire request in '96.? A: Well, there's two reasons.  When I signed accepting that salary, if the letter had said–in fact, I have the original letter here–Dear, Ann Breslin, by signing on the dotted line, you accept that forever and above, six years down the road, you will continue to make entry level and you will

6

The Merit Rules provide a mechanism for starting an employee at a higher rate than the minimum. *Id.* ¶12.  Merit Rule 5.0711 provides that:

> The Appointing Authority, may approve a starting rate higher than the minimum for the paygrade up to 80 percent of midpoint where the applicant's qualifications are clearly over and above those required as minimum by the class specification.  The Director may approve a starting rate higher than the 80th percentile provided that such higher rate is requested in writing by the appointing authority and is clearly justified and contains applicable documentation of the applicant's qualifications.

*Id.*  The term used to describe this process is to receive "an advanced salary."  *Id.*

Breslin began her seasonal employment as an ES 1 comparable on January 18, 1994. Compl.¶6.  On February 1, 1994, Keith Robertson ("Robertson") became employed by DNREC as an ES 2 in a merit position.  Compl./Ans.¶7.  Robertson is the employee that Breslin points to beginning in 2002 as being paid more for equal work.  **A40**,**A36-37**.[5]

In the summer of 1995, Robertson's female supervisor Jamie Rutherford prepared paper-work to achieve a career ladder promotion to an ES 3 position for Robertson.  Compl./Ans.¶10. DNREC's longstanding, consistent practice at the time was that to qualify for a career ladder promotion to ES 3, an employee needed to have worked at the ES 2 level for at least one year. Ramsey Aff. ¶6.  A request for an advanced salary was submitted on Robertson's request.  Ans.

---

never be paid any more than entry level, I would never have signed it.  The assumption is, once you get into your job, once you move through the ranks, your salary goes up from entry level. First assumption."

[5]**A29**:  Q:  I believe your characterization from your complaint is that your concern was you were still going to be paid entry-level salary.  Is that correct?  A:  Yes.  Q:  You find that somewhat insulting; don't you?  A:  "Well, I believe considering I was doing the same work as Keith, it was unfair.  I should be compensated, as Keith was being compensated."
**A36-37**:  "Q:  And in your memo you talk about Qazi and Keith?  A:  Yes.  Q:  But today you're telling me that you're concerning yourself with Keith Robertson and not Qazi.  Correct?  A: Well, Qazi has a Ph.D.  He's not a manager.  Whether a Ph.D.  is worth $20 a month more is not something I can discuss.  But Keith was hired with a Master's degree two weeks after me.  He is doing the same job. . . . Q:  You actually abandon your complaint about Qazi during the grievance process.  Isn't that correct?  A:  I didn't abandon it, per se.  My attorney thought that the best thing to do is just to concentrate to the person that was equal to me.  Q:  And that's still your position?  A:  Yes.
**A39-40**:  "Q:  In Paragraph 21 of your complaint you refer to three similarly situated males.  Who are you referring to there?  A:  Keith and Qazi.  And don't ask me how to spell his last name. Salahuddin, or something to that effect.  Q:  We already ascertained that you are talking about Keith now.  Right?  A:  Specifically about Keith for purposes of the quality.

¶12.  Supplemental information was also submitted, and Robertson's advanced salary request was granted.  Ans. ¶12.

DNREC Human Resources Office ("Human Resources") reviewed Robertson's advanced salary request.  Ramsey Aff. ¶7.  In 1996, Sharon Tazelaar reviewed all the advanced salary requests.  *Id*.  Merrilyn Ramsey, manager of Human Resources, oversaw Tazelaar's performance.  *Id*.  Tazelaar has since suffered a dehabilitating brain aneurism and received a disability pension.  *Id*.  Thus, Tazelaar is unable to testify.  *Id*.  However, it was the longstanding, consistent practice of the DNREC at that time that when a job classification called for "experience" in a particular area, only actual work experience would count in calculating 1) whether a person would meet the minimum qualifications for a position, and 2) whether a person would be credited with "experience" related to an advanced salary determination.  *Id*.  Further, DNREC practice did not allow substitution of a graduate or post graduate degree for qualifying experience.  *Id*. ¶8.

After Breslin had worked for DNREC in the classified service for about a year, a vacancy occurred in an ES 3 position in the SIRB.  Ans.¶11.  A male DNREC employee, Karl Kalbacher ("Kalbacher") interviewed and hired Breslin for that position, effective November 16, 1996.  Compl./Ans.¶11,12.  Breslin and Kalbacher collaborated on a request for an advanced salary request asking for more than the minimum starting salary for Breslin.  **A35/A54-56**.[6]  Breslin prepared the request using Robertson's request as a form.  *Id*.  At that time, the Appointing Authority for purposes of the required Merit Rule approvals for Breslin's advanced salary request was the DNREC and the Director was State Personnel.  Ramsey Aff.¶7.

Tazelaar in DNREC Human Resources, overseen by Ramsey, also reviewed Breslin's advanced salary request.  *Id*. ¶7.  Additional information was provided by Kalbacher (after consultation with Breslin) in an attempt to substantiate the advanced salary request.  **A27-28/A57-**

---

[6]**A35:** Q:  I asked you who wrote the advanced hire request before, and you gave me a similar explanation? A: Oh.  You mean the 1996 advanced hire request?  Q:  Yes.  A:  The 1996 advanced hire request was written using Keith's template from Jamie and Karl and I wrote it together.  Karl approved it, signed and sent it down, as he did with this.

**64**. The advanced salary request was orally denied, which Breslin knew when she accepted the

ES 3 position. **A42-42**. 29 *Del. C.* §5943(a) states in pertinent part:

> The exclusive remedy available for the redress of an alleged wrong, arising under
> a misapplication of any provision of this chapter, the merit rules or the Director's
> regulations adopted thereunder, is to file a grievance in accordance with the
> procedure stated in the merit rules…

Breslin was aware that she could follow the Merit Rule procedures and ask the State of Delaware

to review the denial of her advanced salary request decision if she believed the denial had been in

violation of the Merit Rules. **A41-42**. Breslin chose not to decline the position, accepted it at the

salary offered, and decided not to file a grievance. *Id*.

The Merit Rules provide for a "Selective Market Variation." McCloskey Aff.¶13.

Selective Market Variation ("SMV") is a process used to increase the salary range for job

classifications where severe market competition makes it difficult for the State to recruit and

retain qualified employees. *Id*. As job markets increase rapidly, the ability to recruit skilled

employees is sometimes diminished. *Id*. (Environmental regulation essentially began in the

1960s and at times it has been hard to recruit environmental scientists in Delaware.) The SMV

process allows adjustments to the salary ranges (minimum-midpoint-maximum) of a class

without changing the official pay grade assignment. *Id*. Prior to July 1990, State Personnel

determined that due to difficulties in recruiting and retaining qualified persons in the ES Series, a

selective market variation needed to be applied to the payranges in order to fill the ES Series

positions. *Id*. ¶14. Prior to Breslin's initial hire in the ES3 position, State Personnel determined

it was no longer necessary to utilize a selective market variation to recruit and retain qualified

applicants in the ES Series. *Id*. ¶14. Effective July 1, 1990 the Selective Market Variation pay

ranges for the ES series remained frozen at the 1989 level. *Id*. In July 1, 1991, maintenance

review results lowered the assigned paygrades for the ES series and at the same time, the SMV

ranges were lowered according to survey data related to their work. *Id*. The SMV result, rather

9

than the paygrade assigned, is the reason that the ES series had a lower pay range. *Id*. The Fiscal

Year 1996 Budget Epilogue stated:

> All classes assigned to selective market variation who have not met the criteria to qualify for an adjustment for two consecutive years effective in Fiscal Year 1995, shall have their midpoints reduced by seven percent effective July 1, 1995. All classes whose midpoint is less than or equal to the midpoint of the regular merit State of Delaware payscale once the general increase has been applied shall move back on to the State of Delaware pay plan. The process by which job classes are removed from selective market variation to the regular merit State of Delaware pay plan will not result in a reduction of salary for current incumbents who will move from selective market to the regular merit State of Delaware pay plan"

*Id*. Accordingly, the ES series was removed from the Selective Market Variation program

effective July 1, 1995. *Id*. Many DNREC ES Series employees were unhappy about the removal

of the Selective Market Variation and with what they perceived were inequities in compensation.

Ramsey Aff ¶9. Breslin's hire date in the ES 3 position was November 11, 1996, after the

removal of the Selective Market Variation. So, when Breslin was hired, employees with seniority

in their positions were making more than new hires, such as her.

DNREC's Human Resources formed a Committee in 2001. The Committee was formed

to review DNREC's existing process, criteria and methodology for advanced salaries with a goal

of modifying the current methodology or developing a new method that would take into

consideration the status of incumbents against the candidate and which would give

acknowledgement for DNREC related experience. *Id*. The Committee identified four major

issues they believed had been created by the advance hire process: inequities, retention/morale,

compensation and process. *Id*. The greatest inequities to surface were among Divisions due to

the frequent use of advanced salaries in some Divisions (such as Water Resources and Air &

Waste Management) while other Divisions utilized it infrequently. *Id*. The causes were found to

be lack of knowledge of the process, and budgetary and fiscal resources. *Id*. A proposal and

recommendations to the Executive Team were drafted, but nothing ultimately resulted because

State Personnel at that point had developed a uniform guideline for all agencies to use. *Id*.

State Personnel also instituted a limited maintenance review of the DNREC ES Series pursuant to its obligation under the Merit Rules. McCloskey Aff.¶16. As a result of the limited maintenance review, the State Personnel did not reinstitute the Selective Market Variation, but it did apply higher paygrades to the ES Series, effective July 1, 2000. *Id*./Ramsey Aff.¶11. Merit Rule 5.0900 entitled "Pay Rates after Reclassification or Grade Change" provides: "In the event that a position is reclassified to a higher classification/paygrade, the rules concerning promotional pay rates shall apply in the same manner as if the incumbent had been promoted." *Id*. at ¶17. Merit Rule 13.0110 entitled "Pay Rate Upon Promotion" states: "Whenever an employee is promoted, the salary rate shall be the minimum entry level of the higher paygrade or the lowest level of the higher paygrade that provides an increase of at least five percent (5). In exceptional circumstances, [the advanced salary language is repeated here.]. *Id*. at 18. This Merit Rule provides for an increase to the minimum of the new paygrade on any promotion, or an increase of 5 percent, whichever is greater. *Id*. When the paygrades increased, all employees in the ES 3 position received a salary increase. Thus, Breslin and the other similarly situated employees were reassigned a higher paygrade effective July 1, 2000. Breslin then received an increase to the minimum level of the new paygrade because the minimum constituted more than a 5 percent increase. Ramsey Aff.¶11. Other ES Series employees who had received an advanced salary and were beyond the minimum of the paygrade received a 5 percent increase in accordance with the Merit Rules. *Id*. Further, the salaries of the employees who originally had selective market pay (who had retained their higher salaries), received a 5 percent increase because they were above the minimum. *Id*. For the most part, this did not decrease the gap between the older employees and the newer employees. *Id*. Thus, persons with significant seniority or who were granted advanced salaries (due to exceeding the minimums at the time of hire) were still making more than employees they worked alongside. This applied to all persons in the ES Series at DNREC, and while many were happy to have received a pay increase, many were not happy with what

11

they saw as inequities caused by application of the Merit Rules and the state salary plan.  *Id.*

**A92-93**.[7]

In September 1999, Robertson resigned.  On November 16, 2000, Robertson was rehired by SIRB as an ES 3.  Ans.¶18.  Merit Rule 5.0720 on starting rates for reinstatement provides:

> When an employee is rehired into the same class in the classified service after separation from the State service of not more than two years, which separation was not due to discreditable circumstances, such employee shall be paid the same salary he/she received at the time of separation, plus any general salary increase since his/her separation.  A salary in excess of this amount would have to be justified an authorized in accordance with 5.0711 and/or 5.0712.

McCloskey Aff.¶17.  Robertson asked for a higher rate of pay.  Ramsey Aff. ¶13/**A34**.[8]  Human Resources denied the higher rate, determining that MR 5.0720 required Robertson to be paid at a reconstructed salary equivalent to the amount he would have been receiving had he not left state service for the period of less than 2 years.  *Id.*

The ES Work Group began to use the term "leveling up," as a possible means of increasing their salaries.  **A32**.  Breslin acknowledges there were both males and females on the

---

[7] **A92-93**:  Q:  When you said that you lost lots of talented people, experienced people like Ann, because of the maintenance review, were some of those people females?  A:  Due specifically to the maintenance review or just because of the state compensation system?  Q:  Due to the state compensation system, did you lose people that were just females or just males or both?  A:  We lost both.  Q:  When you said you supported people's efforts to get a higher salary than entry level, did you support the efforts of males to get in the environmental scientist series III who had been here longer to get more than the entry level?  A:  I supported all of the environmental scientists regardless of gender, race.  All environmental scientists [in getting] additional compensation.  Q:  And the environmental scientists that were in SIRB?  A:  Yes.  Q:  Did you think that Ann's pay was lower because she was female?  A:  No.

[8] **A33-34**:  "Q:  In paragraph 18 of your complaint, you state that Paul Will, Alex Rittberg and Christina Wirtz agreed that the rehiring of Mr. Robertson to his original position was the perfect opportunity to attempt to amend the salary disparity.  Can you please explain the basis of that statement?  A:  We were discussing Keith coming back, being very glad Keith was coming back, because no one wanted to deal with Dover Air Force Base.  And Alex brought up or said that he was going to try to get a little bit more money for Keith because there were some issues with another gentleman being paid $20 more a month than him and it bothered him.  We had already been working though this issue, the fact that I was entry level after all of those years.  It was a natural progression of the conversation.  Q:  So, Keith, you were saying Keith was bothered by the fact that someone else was making $20 a month more than him?  A:  It was kind of a joke.  Alex was trying to get him a bit more money when he came back.  Q:  Did it work?  A:  No.  Q:  Do you know why it did not work?  A:  Actually, I only know what Keith told me.  Q:  What did Keith tell you?  A:  It just did not work.  Q:  Who did he say made it not work?  Apparently, his manager wanted it to work?  A:  Personnel?  Q:  Human Resources?  A:  Yes.

ES Work Group whose purpose was to gain increases for persons in the entire ES Series.[9]  Merit

Rule 5.0712 is the only Merit Rule provision regarding leveling up. It provides:

> The appointing authority may request, and the State Personnel Director may
> approve, a starting rate higher than the minimum for the paygrade where a
> critical shortage of applicants exists.  The State Personnel Director, in
> concurrence with the State Budget Director and the Controller General, after
> specifying all equally qualified incumbents of the same classification within the
> same geographic area receiving a lower rate, may provide that these employees
> shall also have their rates increased to the rate established for entrance if their
> performance is satisfactory.

McCloskey Aff.¶18.   The leveling up rule was intended to address a situation where the State

was unable to fill a position due to a critical shortage of applicants, and was required to pay a new

employee a higher salary in order to fill a position.  *Id.*  Thus, the Merit Rules provide a

mechanism where the State can address pay inequities caused by the necessity of hiring a new

employee at a higher rate in order to fill a state need.  *Id.*  However, application of this leveling

up rule would cause the State to have to increase the salaries of all employees in the same

classification in the same geographic area (which has never been interpreted more narrowly than

in the same county).  *Id.*  Merit Rule 5.0712 has never been applicable to the ES Series (after the

removal of the Selective Market Variation) because the State has **not** been faced with a critical

shortage of applicants for the ES Series.  *Id.*

Despite her higher paygrade, Breslin remained unhappy with her salary.  As she stated in

her deposition, her assumption was that over the years her salary percentage of midpoint would

increase above entry level.  **A41-42**,**A50**.[10]  Breslin talked to her supervisor, Paul Will, ("Will")

---

[9] **A30-31:** "Q:  Who is "we?"  Who is in the ES workgroup?  A:  Right now, the only person I can
remember – I can't remember – I can't believe I forgot her name.  Q:  Marjorie Crofts?  A:  Yes.  Marjorie
Crofts. … Q:  Were there other people that you can't remember the names of?  A:  Certainly.  We were not
the crew, the two of us.  I know there were quite a few people on it.  There were a couple of guys from
RCRA on it.  I can see their faces, but I can't come up with there names.  Q:  You say you met formally
and informally because you were bleeding Environmental Scientist[s].  What was the purpose of the group?
A:  Basically, to try to bring out salaries up to within the shooting range of Environmental Scientists in the
real world.  So, we would keep people in.  We would entice people to apply.  We would keep them longer
than 3 to 5 years."

[10] **A50:**  "Q:  What work is it that you believe met the criteria of clearly over and above those required by
the minimum of the class specification?  A:  Meaning my job?  Q:  Yes.  A:  Everything I was doing.  I

another male supervisor, Alex Rittberg ("Rittberg"), and their supervisor Christina Wirtz ("Wirtz").   Ans.¶18.   In May of 2001, Breslin presented Will with a memorandum to seek a salary increase for her.   Ans.¶19.   Will signed the memorandum and forwarded it to DAWM Director's Office, who declined to forward the request to Human Resources.  Compl.¶20.

Thereafter, Breslin and Christina Wirtz drafted a memorandum seeking an increase in Breslin's salary.  Wirtz thought that Robertson's advanced salary requests might have been treated differently for some reason than Breslin's request.  **A104-106**.[11]  In December of 2001, Christina Wirtz sent a memorandum to John Blevins the Director of DAWM saying she believed that the Department could be "in a vulnerable position based on sex discrimination."  Compl.¶22. Blevins responded on December 10, 2001, by asking Human Resources to review Breslin's salary to determine if there was any pay inequity.  **A1-3**.  Blevins also submitted a more detailed memo to Human Resources dated December 17, 2001, indicating that he was taking Wirtz's concerns seriously and that if an honest mistake had been made, he wanted to address the situation and remedy it by modifying her pay.  **A4-5**.  By memo dated August 16, 2002, Ramsey of Human Resources conveyed in writing that the salaries of Breslin and Robertson had been reviewed, Robertson had more creditable applicable experience, and both were within the appropriate ranges for their experience.  **A6-7**.

---

have a list in 2001 of the 12 projects that I was working on.  I was not entry level.  I was barely entry level when I was entry level.  I wasn't on the learning curve.  * * * Definitely not entry level.

[11] **A104-105**: "Q: Yes.  And I'm simplifying what you said before.  And if I get it inaccurately, please, correct me.  But is it fair to say that you thought  because Ann was paid less than Keith and you thought they were doing the same work that you thought she was being discriminated against because of her sex. Ms. Brewington:  I'm going to object to form .  The Witness:  I would also throw in the fact that the way her advanced hire had been treated and Keith Robertson's advanced hire had been treated was different. By Ms. Csizmadia.  Q:  Can you explain that a bit more?  A:  I think, based on my review o f both advanced hire packages that were completed in 1996, that Ann's advanced hire request was treated differently for some reason than Keith Robertson's.  Q:  And do you think the reason that it was treated differently was because she was female and he was male?  A:  I think that, though it may not have been intentional.  I do believe that may have occurred.  Q:  Did you get an advanced hire?  A:  I did get an advanced hire."

**A106**:  "Q: And I know that there was discussion with Miss Csizmadia about the merit rules.  And I believe both you and Miss Csizmadia mentioned that the merit rules prohibit discrimination on the basis of gender; is that correct? A: That is correct. Q: In your opinion, did you feel that the department may have been in violation of this part of the merit rules with respect to Ann and Keith Robertson? A: In my opinion, yes."

Finally, Breslin sought to invoke the exclusive remedy for misapplication of the Merit Rules by filing a grievance. **A8**. Breslin's attorney requested a leveling up of her salary according to the Merit Rules. *Id.* Breslin was represented by her attorney at the first step Grievance Hearing. **A45**. The Hearing Officer was the same Division Director, Blevins, who had initiated an inquiry in an effort to ensure "the right thing" was done for Breslin (**A46-47**) and whom Breslin says was supportive of her in this process. **A20**.[12] Evidence at the hearing showed that in DAWM, female ES3s had a slightly higher average salary than male ES3s. **A45-47**. There was also evidence that six male ES3s in DAWM were being paid the same salary as Breslin. *Id.* After a full hearing concerning the application of the Merit Rules, Blevins himself determined DNREC had not engaged in sexual discrimination. **A47/A66**.

Breslin appealed this decision to the next level, and had a hearing where she was represented by her attorney before the Deputy Secretary of DNREC. **A47**. There was evidence at that hearing from which the Deputy Secretary of DNREC found that Keith Robertson's qualifications were distinguishably different than Breslin's qualifications. Breslin **A47-48**. The Deputy Secretary's decision states: "The Department's analysis provided herein shows that there are distinguishable and supporting differences in the qualifications of her colleagues which justify their current salaries." **A48/A10-11.**

Breslin appealed this decision to the next level, and she had a hearing where she was represented by her attorney before a female State Personnel Hearing Officer. **A48-49.** After the hearing, she concluded: "Based on all the evidence and the testimony introduced at the hearing, I am persuaded that the Department has not discriminated against Grievant as a result of her gender when it denied her request to have her salary leveled up. **A49/A12-15.**

Breslin appealed this decision to the next level, where she would have had another full fledged hearing before the Merit Employee Relations Board ("MERB"). A16. MERB was

---

[12] **A20**: "A: What about John Blevins? You are including him in the list of people who were supportive under your definition? A: To my face, and in every conversation we had, he was supportive."

established by 29 *Del*. *C*. §5906, its 5 board members are appointed by the Governor with Senate

approval.  Two members are management representatives, two are labor representatives and the

third is the chairperson.  Pursuant to 29 *Del*. *C*. §5931, the final steps of the grievance process

shall provide for a hearing before the MERB.  The MERB (and the step below at the State

Personnel Office) have the authority to "grant back pay, restore any position, benefits or rights

denied, place employees in a position they were wrongfully denied or otherwise make employees

whole, under a misapplication of any provision of this chapter or the Merit Rules."  *Id*.

 After three findings through the Delaware Grievance process, the exclusive remedy for

misapplication of the Delaware Merit Rules, Breslin suddenly withdrew her Grievance two days

before the hearing.  **A53**.  Her attorney stated that she was choosing to concentrate her efforts

where the Merit System limitations "do not have the same significance" and where available

remedies "are far superior."  **A53**.

McCloskey is currently the Human Resources Administrator in the Classification-

/Compensation/Employment Services Section of Human Resource Management (formerly called

State Personnel).  McCloskey Aff.¶1.  She has reviewed the salary increases for Robertson and

Breslin.  *Id*.¶19.  McCloskey states they received all appropriate state increases. *Id*.

Ramsey is the Administrator DNREC Human Resources.  Ramsey Aff.¶1.  She reviewed

the advanced salary packages for Robertson (**A88-93**) and Breslin (**A54-64**) and identified a

creditable difference in the amount of experience demonstrated with respect to project

management prior to being employed by DNREC.  *Id*. at ¶19/**A88-93; A56-64**.  It is perhaps

significant that Breslin only reports in the minimum qualifications summary attached to her

employment application for the ES 3 position that she has prior experience in environmental-

/natural resources program or project management from DNREC.  **A54-64**.  The only reference to

outside experience in her paperwork at that time is limited to the advanced salary package, but the

claim the work was project management is undercut by statements in the reference describing her

work.  Ramsey Aff. ¶14.  DNREC longstanding, consistent practice at the time was that to

receive an advanced salary the paperwork had to prove a person had actual prior working experience at the advanced level (in this case project management). *Id.* Further, at that time DNREC longstanding, consistent practice was that advanced degrees would not substitute for, or count as, experience. *Id*. Ramsey believes that Breslin's advanced salary paperwork demonstrates substantially less experience in project management than Robertson's advanced salary paperwork. *Id.* Most of the focus of Robertson's advanced salary memo and supplement is on his coastal geology work, which is where credit would have to have been given for his prior experience in project management work. *Id*. **A88-91**. In Ramsey's opinion, Breslin's submission and supplement is on their faces lacking in this criteria. *Id.* ¶14. Breslin's request cites experience as a laboratory assistant and a teaching assistant, which is not equivalent to project management. *Id*. The other experience which Breslin and her supervisor Karl Kalbacher characterized as a wetlands scientist with the Chesapeake Bay Foundation might have been creditable if that work was project management. *Id*. However, the letter submitted as part of the supplement indicates that the majority of her time was spent composting data review requests and scheduling file review times. *Id*. In Ramsey's opinion the letter does not refer to experience that would have been creditable as advanced experience, because it does not appear to be project management level work. *Id*.

According to Ramsey, part of the advanced salary process is to evaluate whether granting an advanced salary would create a disparity between the employee requesting the advanced salary and existing employees. *Id*. Robertson had just been granted an advanced salary of the same increment requested by Breslin's manager. *Id*. Given that no credit would have been given for the advanced degrees, and given that Robertson had considerably more experience in project management, it would have also likely been inequitable to Robertson and possibly others to grant the advanced salary requested by Breslin. *Id*. Ramsey has reviewed Breslin's records, and opined she received all wages due to her. *Id*.¶15.

17

Breslin resigned her employment on February 24, 2003. **A107**.  Breslin filed her complaint in this Court on May 13, 2005.

Deborah Lawhead, Insurance Coverage Administrator for the State of Delaware confirms that the State nor DNREC have purchased insurance nor appropriated funding for insurance applicable to the circumstances alleged in Breslin's Complaint.  Lawhead Aff.¶1-8.

**I.      THE BREACH OF THE IMPLIED COVENANT OF GOOD FAITH & FAIR DEALING CLAIM MUST BE DISMISSED**

 **a.      The Doctrine of Sovereign Immunity Deprives This Court of Subject Matter Jurisdiction for this State Law Claim**

        DNREC is an administrative agency of the State of Delaware established by 29 *Del*. *C*.

Chapter 80, et seq.  Breslin's state law claim is barred by the Doctrine of Sovereign Immunity, in

that State may only be sued when it consents to suit through an act of the General Assembly.  The

State has not waived its sovereign immunity pursuant to the Delaware Tort Claims Act in

18 *Del. C.§ 65*11 by procuring insurance against the claim.  Aff.Lawhead¶1-8.  Since the doctrine

of Sovereign Immunity deprives this Court of subject matter jurisdiction, DNREC's failure allege

it in its Answer to Breslin's Complaint is not a fatal flaw.

**b.      State law provides an exclusive remedy that does not rest in this court for misapplication of the State Merit Rules and Laws**

        Without waiving the arguments above, Delaware law also bars this claim.  DNREC is

bound to follow the Merit System laws in 29 *Del*.*C*., Ch.59 to ensure Delaware's personnel

administration is based on merit principles and scientific methods.  29 *Del*. *C*. §5902.  Breslin's

ES 3 position was covered by this Merit System.  The System is also governed by "Merit Rules,"

adopted pursuant to 29 *Del*. *C*. §5914.  All DNREC officers and employees are obligated "to

comply with and aid in all proper ways in carrying out this chapter and the rules, regulations and

orders thereunder."  Since the State is the largest employer in Delaware, a substantial portion of

its annual operating budget funds the state salaries.  Delaware's interest in paying its employees is

balanced with its obligation to be good stewards of state funds.  Thus, Merit Rule 5.0710 provides

that all employees are to start at the minimum percentage of midpoint salary, unless their

qualifications before they accept the position exceed the minimum qualifications established for

each position.  Disagreements can arise when person disagree as to whether the rules regarding

their employment have been followed.  Delaware has provided an exclusive remedy to determine

the proper application and interpretation of the Merit Rules.  Twenty-nine *Del. C.* §5943(a)

provides in pertinent part:

> The exclusive remedy available to a classified employee for the redress of an
> alleged wrong, arising under a misapplication of any provision of this chapter,
> the merit rules or the Director's regulations adopted thereunder, is to file a
> grievance in accordance with the procedure state in the merit rules…

In this instance, Breslin filed a grievance on or around September 11, 2002, after the DNREC's

Human Resources reviewed the salaries of Breslin and Robertson and determined that Breslin

was being paid in accordance with state law and the Merit Rules.  After that, Breslin appealed the

denial of the request to utilize the Merit Rules to level up her salary to Robertson's rate.  The

resulting decisions in at all levels of the Grievance process were that the Merit Rules had been

followed in paying Breslin and that she had not been discriminated against.   The January 29,

2003, final ruling of the State Personnel Hearing Officer stated in pertinent part:

> Despite the timely filing of the grievance, the Grievant does not prevail on the merits
> of this case.  Merit Rule 5.0710 establishes a presumption that new employees will be
> hired at the minimum percentage of midpoint for the paygrade.  The Grievant was hired
> as an Environmental Scientist III at the minimum percentage of the paygrade.  The male
> employee in question was already an Environmental Scientist who had benefited from a
> promotion through the career ladder process and received an advanced starting salary at
> the time.  Merit Rule 5.0711 accords the Department discretion for seeking advanced
> starting salaries based on qualifications that exceed the minimum required by the class
> specification.  This is at the Department's discretion, it is not required.  Therefore, the
> Department did not have to approve the Grievant's advanced starting salary request.
> Merit Rule 5.0712 also gives the Department discretion to seek a rate higher than the
> minimum and to level up the salaries of incumbents under certain circumstances, i.e., if
> there is a critical shortage of applicants.  It was not determined that there was a critical
> shortage of Environmental Scientist applicants, and the Department was not obligated to
> seek a starting rate higher than the minimum.  Accordingly, there has been no violation of
> the Merit Rules.
> Based on all the evidence and testimony introduced at the hearing, I am persuaded
> that the Department has not discriminated against Grievant as result of her gender when it
> denied her request to have her salary leveled up.  A14-15.

Breslin's attorney withdrew the appeal of this decision that had been filed with MERB.  He gave

her reasons in a letter dated August 23, 2004:

> The grievant in the above matter, presently scheduled for a hearing on
> August 25, 2004, has decided to concentrate her energies on the finding of
> probable cause issued by the Delaware Department of Labor.  Accordingly, I am

> instructed to withdraw the above grievance, making the scheduled hearing
> unnecessary.
>    Therefore, please remove the above matter from your dockets.  It is
> unfortunately, but true that both the available remedies (counsel fees, interest,
> punitive damages, etc.) in the alternative action are far superior, as are the
> discovery procedures.  Nor do the Merit Rule System limitations have the same
> significance.
>    Trusting that this letter, sent by fax and hard copy, resolves this matter in this
> forum, I am Very truly yours.  **A-53**

Based on the above, the Breslin chose to abandon her claim that she was not being paid in

accordance with the Merit Rules.

The Delaware Supreme Court has held that when an employee had exhausted his

administrative remedies with respect to the State Merit System, the employee could not relitigate

the same issue as the basis for in a breach of contract action.  *Kopicko v. State, Dept. of Services

for Children and their Families, slip op.*, 2004 WL 1427077 (Del. 2004).  In the case at bar,

Breslin availed herself of the exclusive remedy set out in the Merit Rules for determining whether

or not the Merit Rules had been misapplied.  Breslin withdrew her appeal, choosing not to

continue to contest the standing decision of the State Personnel Officer Hearing Officer that the

DNREC had followed the State Merit Rules and laws in paying her.

The facts in *Kopicko* are sufficiently analogous.  Kopicko was terminated from her state

employment.  *Id*. at *1.  Kopicko pursued the exclusive remedy provided by the State Merit

Rules. *Id*.  A hearing before the MERB was held and the Department's decision to terminate her

was upheld.  *Id*.  Kopicko then appealed to the Delaware Superior Court who upheld the MERB's

decision.  *Id*. at *2.  Kopicko then appealed to the Delaware Supreme Court who affirmed that the

MERB's decision was supported by substantial evidence and free from legal error.  *Id*.

In Breslin's case, she availed herself of the State Merit Grievance process until she

decided to withdraw her appeal and litigate in a Court where she believed the Merit System

limitations did not have the same significance.  This statement is confusing since it is a Defense

in this Court that the Merit Rules had been followed.  One logical inference is that she wanted to

avoid yet another decision that the Merit Rules had been followed.  For whatever reason, Breslin

waived her opportunity to continue to challenge the decision.  Consequently, this Court should

take the same action in this case that the Delaware Supreme Court took in *Kopicko*, which is to

find that Breslin's state law claim is barred because sustaining that charge requires proving an

element of bad faith that cannot be present if the State Merit Rules were followed.

**c.      Breslin cannot point to any action of DNREC that could constitute fraud or deceit sufficient to prove the elements of the claim.**

Without waiving the arguments above, the DNREC will address the merits of the claim.

The Delaware Supreme Court had established that "every employment contract made under the

laws of this State, consonant with general principles of contract law, includes an implied covenant

of good faith and fair dealing."  *Merrill v. Crothall-American*, 606 A2d 96, 1001 (Del. 1992).

The Court then stated what is required to prove a breach of that covenant:

> What is required for a showing that in implied covenant of fair dealing has been
> breached is another matter.  It has been said that "to constitute a breach of the
> implied covenant of good faith, the conduct of the employer must constitute 'an
> aspect of fraud, deceit or misrepresentation.' " *Magnan,* 429 A.2d at 494 (quoting
> *A. John Cohen Ins. v. Middlesex Ins. Co*., 8 Mass App.178, 392 N.E.2d 862
> (1979)).  We think this characterization of an employer's duty under the covenant
> is accurate.  The lodestar here is candor.  An employer acts in bad faith when it
> induces another to enter into an employment contract through actions, words, or
> the withholding of information, which is intentionally deceptive in some way
> material to the contract.  Such conduct constitutes, "an aspect of fraud, deceit or
> misrepresentation.

*Id*. At 102.  In *Merrill*, the Delaware Supreme Court found that the employer induced Merrill to

enter into an employment contract by concealing the fact that it was employer's intention to

employ Merrill only temporarily, which allowing Merrill to proceed under the belief that the

duration of the employment was at least indefinite.  *Id*.  at 103.  The Court found that such facts if

believed by a jury could support a finding of breach of the implied covenant of good faith. *Id*.

In this case, Breslin has failed to aver and cannot prove the fraud or deceit element of a

claim for breach of the implied covenant of good faith and fair dealing.  Conversely, the facts

show good faith on part of the various State employees.  Both Wirtz and Blevins indicated a

desire to ensure that Breslin was not being wronged and requested a review by Human Resources

of the impact of the Merit Rules on Breslin's pay.  Human Resources could have been more prompt in responding in writing to Breslin; however, there is not evidence that the amount of time was so extreme as to constitute an indifference to her plight, especially given that the conclusion that Breslin was being appropriately paid had been conveyed orally to Blevins.  Since the Department had determined the Merit Rules were followed at the time, it lacked a mechanism to adjust her pay.  Further, for state law purposes, the final adjudicator of whether the Merit Rules have been followed is the Grievance process.  Breslin had appealed, and after three hearings were three findings that the State Merit Rules had been followed.  The last ruling remains undisturbed.

Breslin notes 13 people at DNREC that fit her characterization of "supportive of her." **A18-20**.  The only person she points to in DNREC management that she says was not supportive of her was Ramsey, the Human Resources Administrator. **A20**.  Breslin indicates that was not acquainted with Human Resource people (Sharon Tazelaar.) **A22**. And she suggests nothing to indicate that Merrilyn or Sharon would have any motive to discriminate against her.

Breslin points to only one person who she says discriminated against her, Karl Kalbacher. **A43-44**[13]  The basis she cites for this belief is that "he did not fight for me" to get her advanced salary approved.  *Id.*  She points to no actions to suggest that she was treated differently because of her gender.  Breslin admits in her deposition that she does not know of any instance when Kalbacher lied to her or deceived her when he hired her.  **A24**.  This is consistent with Kalbacher, who confirms that he did not lie to or mislead Breslin with respect to her taking the ES 3 position. **A112-113**.  Both acknowledge the advanced salary issue had been settled when she signed accepting the position.  Further, Kalbacher denied under oath that he discriminated against

---

[13]**A43**:  "Q:  I'm trying to understand when you were discriminated against.  Can you tell me when you were discriminated against?  A:  I think at the beginning.  Q:  At the very beginning?  A:  And continuing on with the management.  Q:  Which management?  A:  With Karl.  Q:  You believe Karl discriminated against you?  A:  Yes.  Of course.  He did not fight for me as he should have done.  Q:  Anyone else?  A:  I just talked about Karl.  That's all.  Q:  And you believe Karl did that because you were female?  A:  Yes.  Q:  And you're referring all the way back to when you were hired as an ES3?  A:  When I was competitively hired.  Yes.  '96/'97 tie frame.  Q:  It wasn't the human resources office that discriminated against you?  A:  That I can't say.  I never had any dealing with them at that point in time.  And it's impossible to ask Sharon what she was thinking.  Sad for her is good for you guys."

Breslin.  **A110-111**[14]  The facts do not support Kalbacher discriminated against Breslin.  He is the one who actually approved and forwarded to Human Resources the initial advanced salary request.  **A35**.  Further, Kalbacher and Breslin made positive comments about each other in the performance review attached to substantiate the advanced salary request. A113.[15]  Finally, when asked in her deposition what other experience Breslin had that Kalbacher could have used to support the request, Breslin did not point to any additional experience.  **A50**[16]

The great weight of evidence demonstrates a State Agency dutifully attempting to follow its legal obligations to abide by the Merit Rules and Laws and the policies and practices it applied at the time.  It really comes as no surprise that the Human Resources Administrator charged with overseeing the office that makes those difficult decisions is seen by an employee "as not being supportive" or that its decisions in applying the merit rules were always thought to be fair.[17]  Breslin admits that she has heard complaints about the DNREC Human Resources Office over the years, from both men and women.  **A22-23**.  That is not surprising, since Breslin's peer group of employees in ES the Series (doing equal work) felt misused because the Selective Market Variation which garnered them a specially increased pay range was taken away due to the

---

[14] **A110-111**:  "Q:  Did you treat Ann any differently because she was female than any of your other employees?  A:  No.  Do you have any reason to believe that anyone else did?  A:  No.

[15] **A110**:  "Q:  And Ann's comment?  A:  Karl has helped to bolster my confidence by giving constant positive and corrective feedback."

[16] **A51-52**:  "Q:  Were you expecting Mr. Kalbacher – should Karl Kalbacher have done something when you chose not to pursue your remedy?  A:  I have no idea.  Q:  You think it is discrimination that he did not?  A:  I believe he did not fight for me like he should have.  Q:  What did you have, at that point, I'm not talking about later, but at that point what did you have that he could have fought with?  A:  That was quite an insult.  It was pretty good.  Right to the ribs?  Q:  I did not mean it as an insult.  A:  It really was.  You are saying my experience is like shit, and it's not.  Q:  No.  I am not saying that. A:  But the fact of the matter is this, Jamie, again even had to talk to personnel, even when the supplement when down, she again had to sit there and argue with him on the phone.  She argued for a long time until finally it was okay.  I have this one piece of paper that I have, I've gotten from her and from Sharon, which has all kind of scribble going around whether or not we could do it.  Whether or not it was applicable or whether the money was there.  Whatever.  She fought.  She fought long and hard.  Good for me.  Q:  You're saying Jamie fought for Keith?  A:  Long and hard.  Karl did not fight for me.

[17] **A100-101**:  "Just one more question, I believe.  Lori asked you whether you felt it was personally fair the situation with Ann's pay.  Has it been your experience that in your personal interpretation of fairness, has the application of the merit rules always resulted in fair results to you?  A:  Personally?  Have they always resulted in fairness?  No.  Q:  Why do you say that?  A:  Just personal preference.  My belief of a person whose work abilities could be sometimes higher than that Human Resources might think for whatever reason."

increased numbers of applicants qualified for the positions. Breslin's friend, Keith Robertson,[18] (presumably not content with the "reconstructed salary" he was to be paid upon rehire) even attempted to gain an advanced salary at a higher rate than he would have been making if he had stayed in his position. **A33-34**. What is evident from the facts is that Breslin and her peer group of environmental scientists, regardless of sex, were not content with their pay and did not like the Human Resources Offices that administered the Merit Rules. In particular, it appears, Breslin's complaint is that after several years she felt she should have made more than "entry level." But this does not constitute fraud, deceit or misrepresentation on behalf of DNREC. Breslin can present no evidence of fraud or deceit, so her claim must be dismissed.

> **d.        It is Barred by the Statute of Limitations in 10 *Del. C.* §8111**

Breslin resigned from DNREC on February 24, 2003. **A107**. Breslin filed her complaint in this Court on May 13, 2005. State law statute of limitations control state law claims. Thus, Count III is barred by the 1 year statute of limitations for wages in 10 *Del. C.* §8111. *See Goldman v. Braunstein*, 240 A.2d 577, 578 (Del. 1968). It provides:

> No action for recovery of wages, salary or overtime for work, labor or personal services performed, or for damages (actual, compensatory or punitive, liquidated or otherwise), or for interest or penalties resulting from the failure to pay any such claim, or for any other benefits arising from such work, labor or personal services performed or in connection with any such action, shall be brought after the expiration of one year from the accruing of the cause of action on which such action is based.

10 *Del. C.* §8111. Ten *Del. C.* §8106 has a statute of limitations for "actions based on a promise," and the Delaware Supreme Court has held that certain employment contract disputes may be governed by that 3 year timeframe. However, Delaware has provided that 1 year statute applies to wages disputes for State employees by providing in 29 *Del. C.* §5943i(i) that, "Section

---

[18] **A21**: "Q: Which of these individuals or which individuals currently or formerly working for DNREC do you consider your friends? A: What is your definition of friends? Q: Do you still maintain contact with any of these people? A: I do. Q: Who? A: Larry Jones. Karissa Hendershot. And Keith Robertson. Q: Anybody else? A: Most of those folks I still would have lunch with. But as far as associating with them outside of work situation, no. Q: What about Christina [Wirtz]? A: Christina, I consider her a friend, but we don't socialize…."

8111 of Title 10 shall be applicable to employment between a person and the State." *Id.*

Consequently, the claim is time barred.

## II.   BRESLIN'S TITLE VII CLAIM IS BARRED BY THE STATUTE OF LIMITATIONS

**a.      To the Extent that Breslin's Title VII Claim Rests of DNREC's Decision to Deny Her Advanced Salary Request Effective November 16, 1996, it is Barred by the Statute of Limitations**

According to 42 U.S.C. §2000e-5(e) (1994), a claim of employment discrimination under Title VII must be filed with the Equal Opportunity Commission within 180 days of the last alleged discriminatory act.  Breslin filed her Complaint No. 0210667 with the Delaware Division of Labor on September 24, 2002.  Thus, in order to be timely filed, an alleged discriminatory act must have occurred within 180 days prior to September 24, 2002.  Thus, Breslin must point to a discriminatory action that occurred roughly between March 24, 2002, and September 24, 2002.

The Title VII Gender Discrimination Claim must be brought within the applicable statute of limitations.  Breslin does not claim that she did not receive any applicable state wage increases.  McCloskey has reviewed Breslin's salary and has determined that Breslin did, in fact, received all applicable state wage increases.  McCloskey Aff ¶19.  All of these raises were based on the rate Breslin was making at the time.  Thus, the origin of Breslin's complaints concerning her salary stem from the salary that she was afforded when Breslin was hired into the position of ES 3 effective November 16, 1996.  Breslin acknowledges she knew the advanced salary was denied when she accepted the ES3 position, effective November 16, 1996.  Further, she was unhappy at that time of the denial of her advanced salary request, and she knew Keith's had been granted, because she used his documents as a form to prepare her documents.  At that time, Breslin voluntarily decided not to pursue a merit system grievance that the decision was wrong or improper.  Consequently, by failing to file a timely grievance in 1996, Breslin failed to exhaust the exclusive remedy afforded to her to remedy misapplications of the Merit Rules.   Breslin has alleged no facts that would toll the statute of limitations that began to run over 10 years ago.  Consequently, the statute of limitations has run to the extent that Breslin's Title VII claim relates to the November 16, 1996, denial of the advanced salary request.

**b.      Unless Ramsey Discriminated Against Breslin Based on Her Gender When She Determined that Breslin Was Being Paid in Accordance With the Merit Rules in 2002, Count II the Title VII Claim is Barred by the Statute of Limitations.**

Breslin's 51 paragraph long complaint contains only 3 paragraphs (¶ 24-26) covering the timeframe between March 24, 2002, and September 24, 2002.  In paragraph 24, Breslin alleges she requested a decision in writing concerning Wirtz's 2001 memorandum asking DNREC to revisit the advanced salary request denial (that occurred in November of 1996).  In the same paragraph, Breslin alleges she attempted to get a written response to the memo in or around July of 2002 and the Division Director told Ms. Wirtz not to "hold her breath" about getting a written response.  Paragraph 25 alleges that on July 30, 2002, Ramsey asked her to resubmit another copy of the memo and documentation.  Paragraph 26 alleges that on September 3, 2002, Breslin received copy of a memo dated August 16, 2002, from Ramsey.  The August 16, 2002, memo (**A6-7**) states in full:

> This is in response to your written request of January 31, 2002, for a formal review of documents associated with the salaries of two employees, Ann Breslin and Keith Robertson.  Both Ann and Keith are Environmental Scientist IIIs.  Ms. Breslin has asked that HR revisit this issue.
>
> As was relayed several months ago to the Division Director, John Blevins, throughout their tenure with the department, the salary for these employees has been in accordance with the Budget Act as well as applicable merit rule provisions. In addition, they have both received the benefit of Selective Market Variation and the limited Maintenance Review.  Ms. Breslin was promoted to an Environmental Scientist III retroactively in November 1996 and signed an acceptance letter for the position on January 9, 1997, acknowledging that the request for advanced salary had not be approved.
>
> With regard to the issue of equity, there are many variables that impact an employee's salary (i.e. timing into State employment, the number and amount of general increase, whether there was an advanced salary, Selective Market Variation and the incumbent's experience date, etc.).  All of these are taken into account when Human Resources does salary analyses and any one of them can make a difference in an individual's salary.
>
> While these two employees have similar experience and credentials, Mr. Robertson has more creditable, applicable experience, one of the factors attributable to his current salary.  Ms. Breslin's salary falls within the range of others with her experience and credentials.
>
> While I certainly appreciate your concern for your employees, I also assure you that HRO historically and will continue to do all that we can to ensure internal equity.  As you are aware, we recently implemented a new advanced salary policy (as well as procedures that are required by the State Personnel Office) that will further assist us in ensure internal equity.

28

In order for Breslin's Title VII Claim to be timely and survive the Statute of Limitations, it must be Ms. Ramsey's review of the salary and documentation concerning Robertson and Breslin and her determination that Ms. Breslin was being paid in accordance with the Merit Rules that Breslin must show was a discriminatory act that occurred due to gender.  Consequently, any timely filed Title VII Gender Discrimination claim must hinge on the female manager of DNREC's Human Resource Office discriminating against Breslin, because Breslin was female.   For the reasons set out below in the argument pertaining to DNREC's Affirmative Defense of any pay discrepancy resulting from DNREC following the Merit Rules, Breslin cannot make any showing that Ramsey's actions constituted discrimination.  Consequently, the applicable statute of limitations bars this claim.

### III.    BRESLIN'S EQUAL PAY ACT CLAIM IS EITHER BARRED OR LIMITED BY THE STATUTE OF LIMITATIONS

**a.    Unless DNREC Willfully Paid Breslin in Violation of the Equal Pay Act, Count II is barred by the Statute of Limitations.**

Twenty-nine U.S.C.A. §255(a) provides the applicable Statute of Limitations for

Breslin's Equal Pay (Fair Labor Standards) Act Claim.  It states:

> "Any Action commenced on or after May 14, 1947, to enforce any cause of action for unpaid minimum wages, or unpaid overtime compensation, or liquidated damages, under the Fair Labor Standards Act of 1938, as amended [29 U.S.C.A. §201 et seq.], the Walsh-Healy Act [41 U.S.C.A. §35 et seq.], or the Bacon Davis Act [40 U.S.C.A. §276 et seq.] –
>
> (a) if the cause of action accrues on or after May 14, 1947—may be commenced within two years after the cause of action accrued, and every such action shall be forever barred unless commenced within two years after the cause of action accrued, except that a cause of actions arising out of a willful violation may be commenced within three years after the cause of action accrued.

29 U.S.C.A. §255(a).  Breslin filed her Complaint with this Court on May 14, 2005.  Breslin's

employment with the DNREC ceased on February 24, 2003.  **A107**.  Consequently, Breslin's

claim is barred unless DNREC willfully violated the Equal Pay Act when it paid Breslin.

**b.    If DNREC Willfully Paid Breslin in Violation of the Equal Pay Act, the Scope of Available Recovery is Limited to Wages Between May 14, 2002, and February 24, 2003.**

Were this Court to hold that DNREC willfully violated the Equal Pay Act, the statute of

limitation bars recovery for any wages accrued more than 3 years prior to the filing of her cause

of action.  In this case, Breslin's complaint was filed on May 14, 2005.  She had voluntarily

terminated her employment with DNREC on February 24, 2003.  Thus, the only wages accruing

within the applicable statute of limitations are those accruing between May 14, 2002 (and ending

with the conclusion of her employment on February 24, 2003).

**IV.     DNREC IS ENTITLED TO SUMMARY JUDGMENT ON COUNT I, THE TITLE VII GENDER DISCRMINATION CLAIM**

Discrimination claims under Title VII are analyzed under the framework set forth by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this burden-shifting framework, the plaintiff must first establish a prima facie case of discrimination or retaliation.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133,142 (2000). Once a prima facie case is established, the burden of production shifts to the defendant to produce a legitimate non-discriminatory reason for the adverse or retaliatory employment action taken against the plaintiff. *Id.* Because the burden of persuasion does not shift at this stage, the employer's legitimate non-discriminatory reason is not evaluated insofar as its credibility is concerned. *Id.* Once a legitimate nondiscriminatory reason is proffered, the presumption of discrimination or retaliation created by the prima facie case "drops away." *Id.* at 43 At this point, the plaintiff must proffer sufficient evidence for the fact finder to conclude by a preponderance of the evidence that the legitimate non-discriminatory reasons offered by the employer were not true, but were a pretext for unlawful discrimination or retaliation. Although the prima facie case and the inferences drawn therefrom may still be considered at the pretext stage, this evidence must be combined with sufficient evidence to permit the trier of fact to conclude that the employer intentionally discriminated or retaliated against the plaintiff. Id. To this effect, it is not enough for the fact finder to disbelieve the defendant's legitimate non-discriminatory reason. Rather, even if the fact finder finds the defendant's reason unpersuasive or contrived, there must still be sufficient evidence for the fact finder to believe the plaintiff's explanation for the adverse action, i.e. that the defendant intentionally discriminated or retaliated against the plaintiff. *Id.* at 146.

Assuming, for the sake of deciding whether summary judgment should be granted, that Breslin can make out her prima facie case, the burden shifts to DNREC to demonstrate non-discriminatory reasons for the decision or difference in pay.  The defenses applicable to the Equal

Pay Act are likewise applicable to the Title VII Gender Discrimination Claim. DNREC's

affirmative defense is that the difference in pay between Ann Breslin and any other employee

(including Keith Robertson) was caused by the application of the State of Delaware Merit Rules.

According to *Anderson v. McIntosh Inn*, 295 F.Supp.2d 412, (D.Del. 2003), to defeat a

motion for summary judgment, Rule 56(c) requires the non-moving party to: "

> do more than simply show that there is some metaphysical doubt as to the
> material facts···· In the language of the Rule, the non-moving party must come
> forward with 'specific facts showing that there is a genuine issue for trial.' ···
> Where the record taken as a whole could not lead a rational trier of fact to find
> for the non-moving party, there is 'no genuine issue for trial.' *Matsushita Elec.
> Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986).
> Accordingly, a mere scintilla of evidence in support of the non-moving party is
> insufficient for a court to deny summary judgment. *Anderson v. Liberty Lobby,
> Inc.*, 477 U.S. 242, 252 (1986).

*Id*. at 417, 417. Breslin's pay increases as long as she remained in the ES 3 position hinged on

her existing ray of pay, effective November 16, 1996. Nonetheless, it appears that the only act

falling within the applicable statute of limitations is the Director of the Delaware Human

Resource's Office's (Ms. Ramsey's) official written opinion in 2002 that after a review of the

documentation relating to the initial advanced salary request, Ramsey believed Breslin was being

paid in accordance with the Merit Rules. This decision is supported by the later and controlling

decision of the State Personnel Hearing Officer (also a female) that Breslin was being paid in

accordance with the Merit Rules. Further, McCloskey (the Human Resources Administrator in

the Classification/Compensation/Employment Services Section of State Personnel, who also

happens to be female) reviewed the salary increases that Breslin received throughout her tenure

with DNREC and confirmed that Breslin received all applicable increases.

Breslin has quite ably attempted to bootstrap a claim concerning the denial of the

advanced salary request from 1996 into the equation by asking the decision to be reviewed

approximately 5 years later. That tactic should not succeed. Nor should she be allowed to second

guess that result through the application of a continuing violation theory. Nonetheless, assuming

arguendo that the denial of her advanced salary request in 1996 were within the reach of this

Court, the DNREC has still proved the affirmative defense that Breslin was being paid in accordance with a merit system of pay with respect to that event.

Breslin can articulate no reason Sharon Tazelaar would have discriminated against her based on her sex. (Indeed, Tazelaar initially denied the advanced salary request for both Breslin and Robertson.) While Ms. Ramsey cannot recall any specific conversation with Tazelaar concerning the merits of the advanced salary, Ramsey reviewed the documentation in 2002 and in her opinion DNREC followed the applicable policies at the time. Moreover, Ramsey expressly denies discriminating against Breslin. Ramsey Aff.¶18.

The Merit Rules do provide a mechanism for starting an employee at a higher rate than the minimum. Rule 5.0711 provides that:

> "The Appointing Authority, may approve a starting rate higher than the minimum for the paygrade up to 80 percent of midpoint *where the applicant's qualifications are clearly over and above those required as minimum by the class specification.* The Director may approve a starting rate higher than the 80th percentile provided that such higher rate is requested in writing by the appointing authority and is clearly justified and contains applicable documentation of the applicant's qualifications." [Later enacted Budget Epilogue language changed Appointing Authority approval to 85 percent.] (emphasis added)

A comparison of the minimum qualifications for the ES 2 and the ES3 positions demonstrate that the hallmark of the ES 3 position is experience in the area of environmental project or program management. Ramsey explains that DNREC's longstanding, consistent practice at time of both Breslin and Robertson's requests for advanced salaries were made was that graduate and post graduate degrees would not substitute for experience and experience had to be actual experience at the higher level. Ramsey Aff.¶8,14. Ramsey has examined both advanced salary requests and supplements and believes that Breslin's documentation either demonstrated very little or no prior experience in the critical area of project management (the distinguishing feature of the ES3 position). Ramsey Aff.¶9. In contrast, Ramsey believes Robertson's advanced salary request does demonstrate substantial prior experience in project management sufficient to justify an advanced salary. *Id* . Ramsey also describes that the advanced salary process includes a survey

of similar employees in similar positions, in order to determine that granting the higher amount to the newer employee would not create an inequity by hiring a newer employee with less or no experience at the same rate of pay. *Id.* Breslin's request was made very shortly after Robertson's was granted, and both asked for the same increased percentage of midpoint. *Id.* Further, granting Breslin's request would have been inequitable to Robertson, whose credential's demonstrated significant prior experience in the critical area of project management. *Id.* Ramsey did not consider gender in her review of those documents. Ramsey Aff.¶18. Simply put, Robertson's experience was superior to Breslin's at the time of hire.[19] *Id.* Breslin has numerous friends at DNREC from her tenure there. She has been afforded three full fledged hearings with witnesses, where she was represented by counsel. Six depositions have taken place in discovery. She still has produced not even a scintilla of evidence anyone at DNREC considered her gender in a manner that affected her pay. Since Breslin cannot point to credible evidence that DNREC treated her disparately based on her gender, DNREC is entitled to summary judgment on Count I, the Title VII claim, of Breslin's complaint.

---

[19] Saying that Robertson's experience level in the area of project management was superior to Breslin's at the time of hire is not the same as saying that his job performance in that area was superior to Breslin's job performance in that area in 2002, when the request was reviewed. Indeed, if the "movement within the pay range" increases that had been intended were funded by the General Assembly, Breslin would have likely moved up in the pay range. Faced with this information, it might have been tempting to agree that Breslin should have been earning more than 80 percent of midpoint (in her words "entry level") six years later and to raise her salary to move her up higher in the pay range. It may have been even more tempting when faced with the threat of a discrimination lawsuit. Nonetheless, DNREC is bound to follow the law and the Merit Rules that do not provide a mechanism to increase Breslin's salary when the rules have been fairly applied. Further, it would not have been fair to all of the rest of the State of Delaware employees who are similarly situated at the "entry level" of midpoint after years of state service to increase Breslin's salary because she was a female. Application of a merit rule may not always result in an outcome that individual employees consider "fair," but it is the consistency of application to everyone that make it just (and the reason why it is a defense in these type of actions where there no evidence of any motive to treat people unjustly).

**V.     DNREC IS ENTITLED TO SUMMARY JUDGMENT ON COUNT II, THE
EQUAL PAY ACT CLAIM**

The *Equal Pay Act of 1963,* 29 *U.S.C.* §206(d)(1), provides in pertinent part:

No employer having employees subject to any provisions of this section shall
discriminate , within any establishment in which such employees are employed,
between employees on the basis of sex by paying wages to employees in such
establishment at a rate of less than the rate at which he pays wages to employees of the
opposite sex in such establishment for equal work on jobs the performance of which
requires equal skill, effort, and responsibility, and which are performed under similar
working conditions, except where such payment is made pursuant to (i) a seniority
system; (ii) a merit system; (iii) a system which measures earnings by quantity or
quality of production; or (iv) a differential based on any factor other than sex:  ….

Breslin alleges that she was paid less than similarly situated male employees, ignoring the fact

that in DAWM females ES3s were paid on average slightly more than males.  (Ramsey Aff ¶17).

Assuming, arguendo, that Breslin can establish a prima facie violation of the EPA, the

DNREC has alleged the affirmative defense that the difference in pay was due to the State being

required by law to follow the State of Delaware Merit System laws and rules.  The State Merit

system is a bona fide system, established by the Delaware General Assembly in 29 *Del. C.*

Chapter 59.  The General Assembly's purpose in establishing the Merit System was "to establish

for this State a system of personnel administration based on merit principles and scientific

methods governing the employees of the State… ."  29 *Del. C.* §5902.  In accordance with the

law, the Merit Rules provide for keeping performance records which may be "considered in

determining salary increases or decreases, promotion, layoffs and reinstatement, demotions,

discharges and transfers."  The Merit System provides for a grievance process which is available

to employees to ensure that they are consistently and even-handedly applied.

In 2002, it was brought to the attention of Ramsey, the female Director of the Human

Resources office for DNREC, by Christina Wirtz and John Blevins that Breslin had a concern

about the equity of her salary in comparison with the salary of Robertson.  About 5 years had

passed since the advanced salary request had been denied.  Tazelaar, the female employee who

had denied the advanced salary request in 1996 (which was the basis for all of Breslin's later

35

increases), was now disabled and unable to share her rationale for denying the request. Consequently, Ramsey who had been Tazelaar's supervisor at the time independently reviewed the documentation related to the denial of the advance salary request. She concluded that Breslin's and Robertson's documentation supported pay that was in accordance with the State Merit Rules. Ramsey Aff.¶14,15. Ramsey had no reason to discriminate against Breslin. Ramsey Aff.¶18. And if the Merit Rules were followed, Breslin was being paid as required by state law.

Ramsey as the Director of the Human Resources office for DNREC is required to follow the State Merit laws and rules. Breslin further acknowledges that she voluntarily abandoned her Merit System Grievance, when her attorney dismissed her final appeal to the State Merit Employees Grievance Board ("MERB") by letter dated August 23, 2004. In so doing, she left standing as final the decision dated January 29, 2003, of the State Personnel Hearing Officer Laytonya B. Ashley.

Throughout the Grievance process which resulted in those findings, Ramsey's office had surveyed the salaries of the female employees in the ES 3 position in Breslin's Division of Air & Waste Management. The employees in the ES 3 series in the Division of Air & Waste Management are those who are most likely to perform equal work with Breslin, as the identifying feature of the ES 3 classification is environmental program management, and the employees in Breslin's Division would be managing environmental programs in the most related areas within the Department. The result was information that females in the ES 3 classification within the Division of Air & Waste Management were being paid on average slightly higher than the males. Ramsey Aff.¶17. Further, there were six male ES 3s in the Division of Air & Waste Management who were being paid the same salary as Breslin on or about October 31, 2002. Breslin Doc.Res. p.0115. This evidence supports the undisturbed Grievance decision and the opinion of Ramsey that any difference in Breslin's pay was due to her being paid in accordance with the Merit Rules. Given that Breslin has no probative evidence to support that she was being treated differently due to her gender, DNREC is entitled to summary judgment on the Equal Pay Act claims.

36

## VI.    BRESLIN'S CLAIMS FOR PUNITIVE DAMAGES UNDER THE EQUAL PAY ACT AND THE TITLE VII CLAIM MUST BE DISMISSED

### a.    The Equal Pay Act does not provide for Punitive Damages

Assuming arguendo that the Count II, is not dismissed for other reasons, punitive

damages are not available.  Congress expressed the relief that is available for violations of the

Equal Pay Act.  Twenty-nine *U.S.C*. §216(b) entitled "Penalties" provides in pertinent part:

> (b)  Damages; right of action; attorney's fees and costs; termination of right of action
> Any employer who violates the provisions of section 206 or section 207 of this title shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation, as the case may be, and in an additional equal amount as liquidated damages.  * * * The court in such action shall, in addition any judgment awarded to the plaintiff or plaintiffs, allow a reasonable attorney's fee to be paid by the defendant, and costs of the action."

No punitive damages are available, so summary judgment should be granted on that claim.

### b.    Title VII Expressly Exempts Governmental Agencies From Punitive Damages.

Assuming arguendo that the Count I, is not dismissed for other reasons, punitive damages

are not available.  The availability of punitive damages in the context of Title VII Gender

Discrimination actions is clearly set out in 42 U.S.C. §1981a.  Section (b)(1) is entitled

"Compensatory and punitive damages (1)  Determination of punitive damages.  It reads:

> A complaining party may recover punitive damages under this section against a respondent (other than a government, governmental agency or political subdivision) if the complaining party demonstrates that the respondent engaged in a discriminatory practice of discriminatory practices with malice or with reckless indifference to the federally protected right of an aggrieved individual.

42 U.S.C. §1981a.(b)(1) .  DNREC is an administrative agency of the State established by 29 *Del*.

*C*. Ch. 80, et seq.  Since DNREC is a governmental agency, summary judgment should be

granted to bar punitive damages on the Title VII claim.

**<u>CONCLUSION</u>**

Accordingly, this Court should grant DNREC's motion for summary judgment and wholly dismiss Breslin's Complaint with prejudice or grant summary judgment on all grounds it finds applicable and dismiss those claims with prejudice.

Dated:  August 28, 2006

                                        **/S/**_____
                                        Valerie S. Csizmadia, I.D. No. 3937
                                        Deputy Attorney General
                                        102 W. Water Street, 3rd Floor
                                        Dover, DE 19904
                                        (302) 739-4636
                                        Attorney for State of DNREC

38