

DEPARTMENT OF NATURAL RESOURCES & ENVIRONMENTAL CONTROL
DIVISION OF AIR & WASTE MANAGEMENT
SITE INVESTIGATION & RESTORATION BRANCH

CONFIDENTIAL MEMORANDUM

TO:        John Blevins, Director, DAWM

FROM:      Christina Wirtz, Program Manager II ᒋᑭ 12/10/01

RE:        Review of Previous Advanced Hire Request for Ann L. Breslin

DATE:      December 10, 2001

---

Background and Previous Salary Request

This memorandum is to request a review of Ann Breslin's advanced hire request dated
November 13, 1996 (attached) on the basis of equal employment opportunity at DNREC. Ann
Breslin (Position # 60827) was selected via competitive interview process for an Environmental
Scientist III (ES III) position in November 1996. An advanced salary of 91.8% of midpoint was
requested for Ms. Breslin. According to conversations with her former manager at the time of
the original advanced hire request, her Master of Science Degree in Geo-Environmental Sciences
and related work experience as a Botany Laboratory Assistant and Wetlands Scientist were not
considered applicable to the position, and as such, her advanced hire request was denied.

However, during the same timeframe, Keith Robertson completed the career ladder process for
promotion to an ES III at SIRB, and was given an advanced hire (attached) on the basis of his
Master of Science Degree in Marine Geology and related archaeology and coastal geology
experience. Mr. Robertson attended graduate school for a longer period of time than Ms. Breslin
and was credited for all related experience. Ms. Breslin completed her graduate degree in 18
months, and was not credited for all related experience. However, both of their related
experiences were in life, natural and/or physical sciences, and directly applicable to field
sampling and data analysis techniques used in Superfund investigations. This created a
significant discrepancy between Mr. Robertson's and Ms. Breslin's salaries (now approximately
$4,600/year).

Currently, Ms. Breslin is the only female Environmental Scientist III in SIRB and is being
compensated significantly less than all of her male counterparts. In addition, Ms. Breslin has
several more years of seniority in State of Delaware service than two of the male ES IIIs at SIRB.
This disparity may place the Department in a vulnerable position based on sex discrimination.

In addition, another equity issue was created as a result of a limited maintenance review within
the Department. The results of the limited maintenance review of the Environmental Scientist I,

II, and III classes were distributed to affected staff and their supervisors on May 22, 2000. The limited maintenance review resulted in Ms. Breslin's salary being increased to the minimum salary of a Paygrade 15. Though this was a considerable increase, and was greatly appreciated, it created a situation in which a new hire with no State experience as an Environmental Scientist III could be hired and immediately make as much money as Ms. Breslin who has over 5 years of experience at the ES III level in SIRB.

<u>Justification</u>

In November 1996, Ann Breslin's experience and knowledge clearly exceeded the minimum requirements for an ES III. She had completed a Master of Science degree in Geo-Environmental Studies and a Bachelor of Arts degree in Biology/Environmental Science. In addition, she had 2.916 years of environmental scientist experience with SIRB at the time of her request. Ms. Breslin also had 2.243 years of related experience as follows:

- 0.583 years - Chesapeake Bay Foundation - Wetland Scientist
- <u>1.66 years</u> - Houghton College - Laboratory Assistant
  2.243 years

Ann's 7 months work experience at the Chesapeake Bay Foundation as a Wetlands Scientist was directly applicable to the work performed at the SIRB. Ann performed wetlands delineation research projects, which included field research and an overview of the wetlands permitting process in Pennsylvania. Emphasis was directed towards discovering if the net loss of wetlands was comparable to net gains during wetland mitigation/reconstruction.

Ann also worked for 1.66 years as a Laboratory Assistant at Houghton College during the completion of her Biology Degree. Her duties included teaching field and laboratory sessions, tutoring, cataloguing and preparing a herbarium of present and historic flora for the College archives and assisting in research projects.

At the time of her request, Ms. Breslin was handling an extensive workload at full ES III responsibility level. She demonstrated excellent project management and organization skills in managing her assigned Federal Superfund and State HSCA Sites. She also communicated effectively both orally and in writing. Based on her work experience, Ann Breslin should have been credited for her Masters Degree and a minimum of 5.159 years of related experience performing at the Environmental Scientist III level.

In summary, Ms. Breslin's professional and technical skills should have been considered fully adequate and relevant, and far beyond the entry-level requirements for an ES III level for which she is now still being compensated.

CAW:ALB:slb:alb
CAW01111.doc
ALB01034.doc
AD 001 I

DEPARTMENT OF NATURAL RESOURCES & ENVIRONMENTAL CONTROL
DIVISION OF AIR & WASTE MANAGEMENT
SITE INVESTIGATION & RESTORATION BRANCH

CONFIDENTIAL MEMORANDUM

DEPOSITION
EXHIBIT
Wirtz 8

TO:        John Blevins, Director, DAWM

FROM:      Christina Wirtz, Program Manager II

RE:        Review of Previous Advanced Hire Request for Ann L. Breslin – Supplemental
           Information

DATE:      January 31, 2002

---

Pursuant to Merrilyn Ramsey's request, we are providing additional information regarding Ann
Breslin's advanced hire request dated November 13, 1996. Enclosed with this memorandum are
the following documents:

- Request for Advance Promotion for Competitive Hire of Ann L. Breslin, November 13,
  1996

- Ann Breslin Advance Hire Request, Supplemental Information, December 10, 1996

- Position Acceptance Letter, January 9, 1997

As also requested, I have enclosed the following correspondence regarding Mr. Keith
Robertson's approved advance hire request:

- Request for Advance Promotion for Career Ladder Promotion of Keith J. Robertson,
  September 17, 1996

- Additional Information for Justification of Applicable Work Experience for Advance
  Promotion of Keith J. Robertson, September 13, 1996

- Advanced Promotion Approval, October 9, 1996

Ms. Breslin and Mr. Robertson currently are responsible for an extensive project management
workload as Environmental Scientist IIIs. Ms. Breslin particular area of expertise within SIRB,
in addition to her project management responsibilities, is in the area of Wetlands, Natural
Resource Damage Assessment and Botany. Mr. Robertson area of expertise within SIRB, in
addition to his project management responsibility, is in the area of Geology and Hydrogeology.
Both individuals are members of the SIRB Technical Assistance Group, which reviews all

John Blevins, Director
January 31, 2002
Page 2

members of the SIRB Technical Assistance Group, which reviews all reports received by SIRB. Both are SIRB representatives to the Whole Basin Management Team.

We would greatly appreciate a formal review of these documents by the Human Resource Office to resolve any equity issues.

CAW:slb
CAW02001.doc
AD 002 I G

← Unable to find a copy of this, but earlier salary request was approved

To: Christina Wirtz@NCAWM@DNREC
From: Ann L. Breslin@NCAWM@DNREC
Cc:
Subject: Status
Attachment:
Date: 3/19/2002 2:44 PM

take 2...

Christina -


I emailed John asking about the status of my request to DNREC Personnel. He has not replied yet - most likely he is swamped with life in general. I don't want to be forgotten. I have a good idea what the answer will be but I need it in WRITING from them detailing their decision. I do not want to swept under with all the budget cuts etc...this is a totally different issue - of what is fair. Could you please follow up on this soon? Maybe John will allow you to contact Merrilyn directly. Thanks


Ann L. Breslin - Environmental Scientist III
Delaware Department of Natural Resources and Environmental Control
391 Lukens Drive, New Castle, Delaware 19720
Phone - (302) 395-2610, Fax - (302) 395-2611



**Breslin Ann L. (DNREC)**

| | |
|---|---|
| **From:** | Wirtz Christina (DNREC) |
| **Sent:** | Friday, June 28, 2002 11:06 AM |
| **To:** | Blevins John B. (DNREC) |
| **Cc:** | Breslin Ann L. (DNREC) |
| **Subject:** | FW: Personnel issues |

John, I talked to Merrilyn last week about this, when I had her on the
phone regarding other HRO issues. She said she thought that this had
been addressed already and would look into it for us. Although you have
told us that there is not much that can be done about it at this time,
we would really like something in writing from Merrilyn giving us HRO's
official position on it. Ann would like to contact her directly. I'm
fine with it, HRO should serve the employees' needs.

Christina Wirtz
Environmental Program Manager
Site Investigation and Restoration Branch
phone: 302.395.2638
fax: 302.395.2601
christina.wirtz@state.de.us

-----Original Message-----
From: Breslin Ann L. (DNREC)
Sent: Friday, June 28, 2002 10:55 AM
To: Wirtz Christina (DNREC)
Subject: Personnel issues


Morning -

Trying to find an apt that I can afford - and the fact that my 6 year
anniversary as an ES III is coming up - has brought this to the
forefront again.  Would you please follow up on the advancement issue
with Merrilyn?  I found the memo and it was signed by you on January 31,
2002.  Either that or I would like to have permission to contact her
myself.  With the 2002 2% pay raise, the pay gap to the next lowest paid
ES III is now greater than $5000.  Per month that is approx $350 more
that would make a quality of life difference for me that would keep me
from having to depend on my parents for money during certain times.
Thanks  - Ann

Ann L Breslin
Environmental Scientist
Delaware Department of Natural Resources
Site Investigation & Restoration Branch
Ph (302)395-2610 Fax (302)395-2611



**Breslin Ann L. (DNREC)**

| | |
|---|---|
| **From:** | Breslin Ann L. (DNREC) |
| **Sent:** | Wednesday, July 24, 2002 2:26 PM |
| **To:** | Ramsey Merrilyn E. (DNREC) |
| **Cc:** | Wirtz Christina (DNREC) |
| **Subject:** | Personnel Issues |

Good Afternoon -

I am following up on Christina's call to you the last week of June
concerning my memo of January 2002 regarding pay equity issues.

I was wondering when I would receive a written response from DNREC
Personnel.

Thanks - Ann

Ann L Breslin
Environmental Scientist
Delaware Department of Natural Resources
Site Investigation & Restoration Branch
Ph (302)395-2610 Fax (302)395-2611

| Tracking: | Recipient | Delivery | Read |
|---|---|---|---|
| | Ramsey Merrilyn E. (DNREC) | Delivered: 7/24/2002 2:26 PM | Read: 7/25/2002 10:54 AM |
| | Wirtz Christina (DNREC) | Delivered: 7/24/2002 2:26 PM | Read: 7/24/2002 2:55 PM |


DEPOSITION
EXHIBIT
Wirtz 11
PENGAD 800-631-6989

B-0053

**Breslin Ann L. (DNREC)**

| | |
|---|---|
| **From:** | Breslin Ann L. (DNREC) |
| **Sent:** | Tuesday, July 30, 2002 2:45 PM |
| **To:** | Wirtz Christina (DNREC) |
| **Subject:** | Personnel Issues |

Christina –

Thanks for talking to me – I am going to contact State Personnel to see
if they can help me –

Ann

Ann L Breslin
Environmental Scientist
Delaware Department of Natural Resources
Site Investigation & Restoration Branch
Ph (302)395-2610 Fax (302)395-2611



DEPOSITION
EXHIBIT
Wirtz 12
6/27/06

B-0054



STATE OF DELAWARE
DEPARTMENT OF NATURAL RESOURCES
AND ENVIRONMENTAL CONTROL
89 KINGS HIGHWAY
DOVER, DELAWARE 19901

HUMAN RESOURCES OFFICE

TELEPHONE: (302) 739-5823
FAX: (302) 739-7571

TO:        Christina Wirtz

THRU:      John Blevins

FROM:      Merrilyn Ramsey  ᴛᴍᴄᴇʀ ᴍᴿ
           Human Resources Manager

CC:        Ann Breslin
           Ali Mirzakhalili
           Paul Will
           Marjorie Crofts



DATE:      August 16, 2002

This is in response to your written request of January 31, 2002, for a formal review of documents associated with the salaries of two employees, Ann Breslin and Keith Robertson. Both Ann and Keith are Environmental Scientist IIIs. Ms. Breslin has asked that HRO re-visit this issue.

As was relayed several months ago to the Division Director, John Blevins, throughout their tenure with the department, the salary for these employees has been in accordance with the Budget Act as well as applicable merit rule provisions. In addition, they have both received the benefit of Selective Market Variation and the limited Maintenance Review. Ms. Breslin was promoted to an Environmental Scientist III retroactively in November 1996 and signed an acceptance letter for the position on January 9, 1997, acknowledging that the request for advanced salary had not been approved.

With regard to the issue of equity, there are many variables which impact an employee's salary (i.e. timing into State employment, the number and amount of general increases, whether there was an advanced salary, Selective Market Variation the incumbent's experience date, etc.). All of these are taken into account when Human Resources does salary analyses and any one of them can make a difference in an individual's salary.

While these two employees have similar experience and credentials, Mr. Robertson has more creditable, applicable experience, one of the factors attributable to his current

salary. Ms. Breslin's salary falls within the range of others with her experience and credentials.

While I certainly appreciate your concern for your employees, I also assure you that HRO historically and will continue to do all that we can to ensure internal equity. As you are aware, we recently implemented a new advanced salary policy (as well as procedures that are required by the State Personnel Office) that will further assist us in ensuring internal equity.

BreslinSalaryMemo.doc

B-0056

# CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974

| ENTER CHARGE NUMBER | |
|---|---|
| ☐ FEPA | 0210667 |
| ☐ EEOC | 17CA300024 |

| Delaware Department of Labor | and EEOC |
|---|---|
| (State, or local Agency, if any) | |

| NAME (Indicate Mr., Mrs., Ms) | HOME TELEPHONE NO. (Include Area Code) |
|---|---|
| Ms. Ann L. Breslin | (610) 627-1131 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | COUNTY |
|---|---|---|
| 327 Meetinghouse Lane #1 | Media PA 19063  Delaware | |

NAMED IS THE EMPLOYER, LABOR ORGANIZATION, EMPLOYMENT AGENCY, APPRENTICESHIP COMMITTEE, STATE OR LOCAL GOVERNMENT AGENCY WHO DISCRIMINATED AGAINST ME (*If more than one, list below.*)

| NAME | NO. OF EMPLOYEES OR | TELEPHONE NUMBER (Incl. Area Code) |
|---|---|---|
| State of Delaware/Dept. of Natural Resources | MEMBERS 500+ | (302) 395-2600 |

| STREET ADDRESS | CITY, STATE AND ZIP CODE | |
|---|---|---|
| 89 Kings Highway, Dover DE 19901 | | |

| NAME | TELEPHONE NUMBER (Include Area Code) |
|---|---|
| | |

| STREET ADDRESS | CITY, STATE AND ZIP CODE |
|---|---|
| | |

☐ RACE ☐ COLOR ☒ SEX ☐ RELIGION ☐ NATIONAL ORIGIN ☐ AGE

☐ RETALIATION ☐ DISABILITY ☐ OTHER (Specify)

| DATE DISCRIMINATION TOOK PLACE | |
|---|---|
| EARLIEST | 1/1/96 |
| LATEST | 9/23/2002 |
| ☒ CONTINUING ACTION | |

THE PARTICULARS ARE (If additional space is needed, attached extra sheet(s):

I began my employment with Respondent in 1996. I am a female. I am currently an Environmental Scientist III, who is earning a substantially less salary than similarly-situated male environmental scientists Lawrence Jones, Keith Robertson, and Qazi Salhuddin. In May of 2001, a request was made by Paul Will, Program Manager, for a salary justification for the positions. Marjorie Crofts, Director, informed me that the request would not be forwarded to Human Resources, stating that Respondent does not recognize inequities in pay created by the maintenance review. However, on January 31, 2002, Christina Wirtz, Program Manager, requested a review of my previous advance hire request, in order to bring my salary in line with my male co-workers. I was not informed of any decision until September 3, 2002, when Merrilyn Ramsey, Human Resources Manager, informed Wirtz that the salaries (of myself and Robertson) were within the parameters of the Budget Act and appropriate merit rule provisions, and that there are "many variables" taken into salary consideration. I was also informed by State Personnel that I should have grieved the situation in 1996.

I believe that, in violation of Title VII of the Civil Rights Act of 1964, as Amended, and Title 19 of the Delaware Code, Chapter 7, as Amended, I have been discriminated against based on my sex (female) due to my salary being substantially less than my similarly situated male co-workers (Jones, Roberts and Salhuddin) although both Robertson and Salhuddin were hired after I had already begun the position. Further, I am equally qualified to perform the position as any of my male co-workers, although Respondent Human Resources has provided clearly pretextual rationale for the disparity in pay. Although I have six (6) years in the position, I am currently earning the salary of an entry-level Environmental Scientist III, which is significantly lower salary than my male similarly-situated co-workers.

| ☒ I also want this charge filed with the EEOC. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | SIGNATURE OF COMPLAINANT |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |

| I declare under penalty of perjury that the foregoing is true and correct. | NOTARY - (When necessary to meet State and Local Requirements) |
|---|---|
| 9/24/02 | |
| Date     Charging Party (Signature) | Subscribed and sworn to before me this date          (Day, month, and year) |

EEOC FORM 5
REV 6/92     PREVIOUS EDITIONS OF THIS FORM ARE OBSOLETE AND MUST NOT BE USED

**B-0057**

Margolis Edelstein
Breslin v. DNREC
0061



STATE OF DELAWARE
DEPARTMENT OF LABOR
DIVISION OF INDUSTRIAL AFFAIRS
4425 NORTH MARKET STREET
WILMINGTON, DELAWARE 19802

TELEPHONE (302) 761-8200
FAX (302) 761-6601

*Winner, Delaware Quality Award of Merit*

## NOTICE OF REASONABLE CAUSE FINDING

RE: **Breslin v. State of DE/Department of Natural Resources**       **State Case No.: 0210667**

On September 24, 2002, Ms. Ann L. Breslin filed a charge of discrimination against State of Delaware/Department of Natural Resources and Environmental Control. The Charge of Discrimination is hereby incorporated by reference.

**Reasonable Cause Finding:**

On June 30, 2004, the Department of Labor concluded it investigation and now finds, based on the following facts, that there is reasonable cause to believe that a violation of the State Discrimination Act has occurred.

I.    Undisputed Facts:

    1.    Charging Party began her employment with Respondent on 1996 as a State Merit System Environmental Scientist III (ESIII).

    2.    Charging Party resigned from her position with Respondent on 2/22/03.

II.    Disputed Facts:

    1.    Charging Party alleges she was discriminated against based on her sex (female) due to her salary being substantially less than her similarly situated male co-workers who were hired after she began her position of ESIII. She further claims that after six years tenure, she earned the salary of an entry-level ESIII.

    2.    Respondent states that the pay disparity between Charging Party and her ESIII co-workers in the State Investigation and Restoration Branch (SIRB unit) is the result of the State's classification and the Delaware Code and the Merit Rules promulgated there under. Respondent further maintains that rather than use the 4 ESIII's in SIRB as the relevant employee pool, the inquiry should include the larger universe of ESIII's throughout the Department of Natural Resources and Environmental Control (DNREC).

Margolis Edelstein
Breslin v. DNREC
0207

Breslin v. State of DE/Department of Natural Resources
Case Number: 0210667
Page 2

III.    Resolution of Material Facts in Dispute:

1.  Charging Party submitted evidence that her salary did not increase at the same increments as her male comparators as indicated by their hire date and tenure. Charging Party's evidence indicated that she performed the same duties as her comparators but was paid at a lower salary.

2.  Respondent submitted evidence to demonstrate the universal salary ranges of male and female ESIII's, however Charging Party's unit performed a separate set of job duties that applied to the SIRB department. In addition, Charging Party's salary increase request was denied on two occasions while her comparators were granted increases. Consequently, the differences in the salaries related to request along with Merit reasons.

3.  Respondent provided evidence that the leveling-up Merit rule was considered upon Charging Party's second pay increase request, however Charging Party's request was based on her equal work requiring her equal skill, effort and responsibility under her specific working conditions.

IV.    Resolution:

The administrative process will now proceed to the conciliation phase pursuant to 19 Del. C. Section 712 (c).


6/30/04
DATE

6/30/04
DATE


Brenda Sands
LABOR LAW ENFORCEMENT OFFICER

JULIE CUTLER
LABOR LAW ENFORCEMENT SUPERVISOR

Margolis Edelstein
Breslin v. DNREC
0208

EEOC Form 161-B (10/96)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| | |
|---|---|
| To: Ms. Ann L. Breslin<br>327 Meeting Lane #2<br>Media, PA 19063 | From: Equal Employment Opportunity Commission<br>Philadelphia District Office<br>21 South Fifth Street<br>Philadelphia, PA 19106-2515 |

[    ]    *On behalf of person(s) aggrieved whose identity is*
*CONFIDENTIAL (29 CFR § 1601.7(a))*

| Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 17C-2003-00024 | Legal Unit | (215) 440-2828 |

*(See also the additional information attached to this form.)*

### NOTICE TO THE PERSON AGGRIEVED:

**Title VII of the Civil Rights Act of 1964 and/or the Americans with Disabilities Act (ADA):** This is your Notice of Right to Sue, issued under Title VII and/or the ADA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII or the ADA must be filed in federal or state court **WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on this charge will be lost. (The time limit for filing suit based on a state claim may be different.)

[ X ]    More than 180 days have passed since the filing of this charge.

[    ]    Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of the charge.

[ X ]    The EEOC is terminating its processing of this charge.

[    ]    The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

[    ]    The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

[    ]    The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of your charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

If you file suit based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

_____    _____
Marie M. Tomasso, District Director    February 14, 200..
                                                            *(Date Mailed)*

Enclosure(s)

cc:
        Ilona Kirshon, Esq. (State of Delaware)

EXHIBIT
B



STATE OF DELAWARE
DEPARTMENT OF NATURAL RESOURCES
AND ENVIRONMENTAL CONTROL
89 KINGS HIGHWAY
DOVER, DELAWARE 19901

OFFICE OF THE
SECRETARY

PHONE: (302) 739-4403
FAX: (302) 739-6242

STEP 2 HEARING DECISION

GRIEVANT:            Ann Breslin

HEARING OFFICER:     David Small
                     Deputy Secretary

HEARING DATE:        November 22, 2002

BACKGROUND: The Grievant seeks a leveling up of the pay received by other
Environmental Scientist IIIs in the branch in which she works. During the hearing, the
Grievant specifically excluded one of the incumbents from her comparison, saying that
she understood why his salary was greater than hers. Her representative also asked that
the Department provide the justification to support the salary differential between the
Grievant and the remaining two Environmental Scientist IIIs.

REMEDY SOUGHT: Grievant requests that her salary be the same as her colleagues.

DECISION: The grievance is denied. The Department's analysis provided herein shows
that there are distinguishable and supporting differences in the qualifications of her
colleagues which justify their current salaries being higher. Furthermore, the Grievant's
promotion to a III level was a competitive promotion, not a career ladder promotion; a
promotion she willingly and knowingly accepted at the time, without conditions, pending
an advanced salary request which was ultimately denied by the Department and not
appealed by Grievant at that time.

Attachment

Cc: John Blevins
    Ali Mirzakhalili
    Christine Wirtz
    Alex Rittberg
    Grievance File

Breslinstep2.doc

B-0061

*Delaware's Go        on you!*

A10

Margolis Edelstein
Breslin v. DNREC
0097

## Environmental Scientist III Comparison

| Initial Employment Date | Current Relevant Experience Date | Education | Advanced Salary (Yes or No) | At What Level Advanced Salary | Qualifications at Time of Request | Selective Market Timeframe |
|---|---|---|---|---|---|---|
| February 1, 1994 | April, 1993 | MS Geology, BS Geology | Yes | Environmental Scientist III | 10 months verifiable experience at ES III level **(Career Ladder Promotion to ES III was retroactive to January 16, 1996 (the department held this and all career ladder promotions during the time period until October of 1996)** | February 1, 1994 through June 30, 1995 |
| January 18, 2000 | October, 1989 | PhD Geology, MS, BS Geology, PG | Yes | Environmental Scientist II/ Environmental Scientist III | 10 years verifiable experience at ES III level **(Career Ladder Promotion to ES III on February 16, 2001)** | N/A |
| *January 18, 1994 | January, 1994 | MS Geo-Environmental Science, BS Biology/ Environmental Science | No | N/A | No verifiable experience at the ES III level **(Competitive Promotion to ES III on November 16, 1996)** | November 1, 1994 through June 30, 1995 |

*Grievant

**B-0062**

A11

Margolis Edelstein
Breslin v. DNREC
0098

DN REC
HUMAN RESOURCES
'03 FEB 6 PM 12 2

# STEP THREE GRIEVANCE DECISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Ann L. Breslin
("Grievant")

and

## STATE OF DELAWARE,
## DEPARTMENT OF NATURAL RESOURCES & ENVIRONMENTAL CONTROL
("Department")

02-00163-DNREC-ST3

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Hearing: January 29, 2003
Before: LaTonya B. Ashley

Appearances:

For the Department:
Merrilyn Ramsey
Susan Lee
Steve Karlsen

For the Employee:
Roy S. Shiels

B-0063

Margolis Edelstein
Breslin v. DNREC
0199

A12

Breslin
Page 1

## Nature of Dispute

The Grievant, an Environmental Scientist III, alleges that the Department has discriminated against her as a female, in violation of Merit Rule 19.0100, by not increasing her salary to that of a male employee who is in the same classification and has a similar experience and background. The Grievant requests that her salary be made equal to her male counterpart. The Department maintains that the Merit Rules have not been violated.

## Position of the Parties

The position of the Grievant is as follows:

The Department has denied the Grievant's legitimate request for her salary to be "leveled up" to that of a male employee who is in the same classification and has the same experience and background. In November 1996, the Grievant was selected via a competitive interview process for the position of Environmental Scientist III. She was hired at the minimum starting salary for the paygrade. At the time of her hire, the Grievant's request for an advanced starting salary was denied. In May 2000, the results of a limited maintenance review of the Environmental Class Series resulted in the Grievant's salary being bumped up to the minimum salary of Paygrade 15. This salary was not equal to her male counterpart. The Grievant believes that, based on her experience and qualifications, she should be paid as much as the male Environmental Scientist III and her salary should be "leveled up" to his salary since they do the same work.

The position of the Department is as follows:

The grievance is time-barred and should be denied. The Grievant had knowledge of the facts surrounding this grievance when she was denied her advanced starting salary request in 1996 and failed to file a grievance at that time.

Additionally, both the Grievant and the male employee were hired as Environmental Scientist II's. The male employee became a Environmental Scientist III through the promotional career ladder process and was granted an advanced starting salary at that time. However, at the time the Grievant became an Environmental Scientist III through the competitive promotional process, she was denied an advanced starting salary. At that time the Grievant's salary was lower than her male counterpart. In May 2000, both employees were part of a maintenance review of the Environmental Scientist Class Series. As a result of the maintenance review, all the incumbents, including the Grievant, received paygrade promotions and increases in their salaries in accordance with the Merit Rules (either a 5% promotion or being brought to the minimum of the paygrade, whichever is greater). The male employee received a 5% promotion while the Grievant was brought to the minimum of the paygrade.

Margolis Edelstein
Breslin v. DNREC
0200

Breslin
Page 2

The Grievant is seeking to have her salary "leveled up" simply because she and the other employee do the same work. The Merit Rules do not allow for or require the leveling up of salaries of other employees in the same classification simply on that basis. The Grievant has already received a substantial increase to her salary during the maintenance review process in May 2000.

*Discussion and Findings*

With respect to the threshold issue raised by the Department, I find that the grievance is not untimely. Merit Rule 20.6 states in pertinent part, "Grievants shall file, within 14 calendar days of the date of the grievance matter or the date they could reasonably be expected to have knowledge of the grievance matter, a written grievance which details the complaint and relief sought with their immediate supervisor." The Grievant filed her grievance within the aforementioned time limits after she received information that a second request to have her salary leveled up had been denied. The Department did not dispute that the Grievant was not aware of her second denial until sometime in October 2002, thus making her grievance timely filed.

Despite the timely filing of the grievance, the Grievant does not prevail on the merits of this case. Merit Rule 5.0710 establishes a presumption that new employees will be hired at the minimum percentage of midpoint for the paygrade. The Grievant was hired as an Environmental Scientist III at the minimum percentage of the paygrade. The male employee in question was already an Environmental Scientist III who had benefited from a promotion through the career ladder process and received an advanced starting salary at that time. Merit Rule 5.0711 accords the Department discretion for seeking advanced starting salaries based on qualifications that exceed the minimum required by the class specification. This is at the Department's discretion, it is not required. Therefore, the Department did not have the approve the Grievant's advanced starting salary request.

Merit Rule 5.0712 also gives the Department discretion to seek a starting rate higher than the minimum and to level up the salaries of incumbents under certain circumstances, i.e., if there is a critical shortage of applicants. It was not determined that there was a critical shortage of Environmental Scientist applicants, and the Department was not obligated to seek a starting rate higher than the minimum. Accordingly, there has been no violation of the Merit Rules.

B-0065

Margolis Edelstein
Breslin v. DNREC
0201

Breslin
Page 3

Based on all the evidence and testimony introduced at the hearing, I am persuaded that the Department has not discriminated against the Grievant as result of her gender when it denied her request to have her salary leveled up.

*Decision*

For the above stated reasons, the grievance is denied.

LaTonya B. Ashley
February 3, 2003

B-0066

Margolis Edelstein
Breslin v. DNREC
0202

A15

Ann L. Breslin

Page 1

IN THE UNITED STATES DISTRICT COURT

OF THE DISTRICT OF DELAWARE

ANN L. BRESLIN,
    Plaintiff,        :
                    :
    v.               :
                    : C.A. No. 05-290
STATE OF DELAWARE,      :
DEPARTMENT OF NATURAL    :
RESOURCES AND ENVIRONMENTAL:
CONTROL,              :
    Defendant.       :

Deposition of ANN L. BRESLIN taken
pursuant to notice before Gloria M. D'Amore, Registered
Professional Reporter, at the State of Delaware
Department of Justice, 102 W. Water Street, Third Floor,
Dover, Delaware, on Wednesday, April 12, 2006, beginning
at approximately 11:20 a.m., there being present:

APPEARANCES:

                MARGOLIS EDELSTEIN
                BY:  LORI A. BREWINGTON, ESQUIRE
                    1509 Gilpin Avenue
                    Wilmington, Delaware 19806
                Attorney for Plaintiff

                STATE OF DELAWARE
                DEPARTMENT OF JUSTICE
                BY:  VALERIE S. CSIZMADIA, ESQUIRE
                    102 W. Water Street, Third Floor
                    Dover, Delaware 19904
                Attorney for Defendant

                CORBETT & WILCOX
            Registered Professional Reporters
    1400 French Street     Wilmington, DE 19801
                (302) 571-0510

Ann L. Breslin

Page 2

1  Also present:
2
3       On behalf of the
        State of Delaware Department of Justice:
        DONNA SPERDUTO, PARALEGAL
4
5       On behalf of the
        Department of Natural Resources
        and Environmental Control:
6       MERRILYN RAMSEY
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 3

1           ANN L. BRESLIN, having first been duly
2   sworn according to law, was examined and testified as
3   follows:
4   BY MS. CSIZMADIA:
5       Q.  Would you state your full name for the record
6   and spell your last name?
7       A.  Sure. Ann Lynae Breslin. L-Y-N-A-E.
8       Q.  Would you be more comfortable if I called you
9   Ann or Ms. Breslin?
10      A.  Call me Ann.
11      Q.  My name, as you know, is Valerie Csizmadia.
12  I'm a Deputy Attorney General, and I represent the
13  Department of Natural Resources and Environmental
14  Control. I'm going to refer to The Department, probably
15  some of the time, as DNREC, a common acronym. DNREC is
16  the defendant in the case, and you are the plaintiff.
17          We are here today for what is called a
18  deposition.
19          Have you ever been deposed before?
20      A.  I have.
21      Q.  And as you may be aware, a deposition is
22  different from testifying in court. It is a little bit
23  more informal, but you are still testifying under oath.
24          I will ask you a series of questions

Page 4

1   today. I will try to be as specific as I can, but if you
2   don't understand my question, or if I ramble on, or if I
3   sometimes talk too fast, please let me know, and I will
4   try to rephrase the question or ask it in a different
5   way.
6           If, at any point, you want to take a
7   short break, just let me know, and we will take one.
8           During the course of my questioning,
9   there may be times when your attorney, Ms. Brewington,
10  may make an objection. There are two types of
11  objections. One is an objection as to form, which is the
12  way I asked the question, whether it's relevant and
13  things like that. And in those situations, your attorney
14  is making an objection for the record to be preserved at
15  a later date.
16          There are other objections that she may
17  make, in which she may go one step further and instruct
18  you not to answer in which case that's a privileged area
19  or something. So, please follow her instructions. She
20  and I may have some conversations about the objection,
21  but if she instructs you not to answer something, I know
22  you'll follow her advice.
23          MS. CSIZMADIA: So, with those sort of
24  ground rules, that about covers it; doesn't it?

Page 5

1           MS. BREWINGTON: I agree.
2   BY MS. CSIZMADIA:
3       Q.  I want to start off with the area of damages.
4   I recently received a letter from your attorney stating
5   that you were claiming damages of $87,500, plus money
6   compensation for your pain and suffering, plus attorney's
7   fees.
8           Is that correct?
9       A.  Correct.
10      Q.  How much money did you want, because you did
11  not specify, to compensate you for your pain and
12  suffering?
13      A.  I did not discuss that with my attorney at
14  this time.
15      Q.  We do need to talk about that, though, because
16  it's an obvious an issue. Let's talk about what we're
17  talking about with respect to your damages.
18          You state in Paragraph 44 of your
19  complaint that you suffered and continue to suffer
20  distress, humiliation, great expense, embarrassment and
21  damages to your reputation.
22          Does that sound right?
23      A.  Yes.
24      Q.  What do you mean by damages to your

CORBETT & WILCOX

Ann L. Breslin

3 (Pages 6 to 9)

Page 6

1 reputation?
2     A.  Well, specifically, I do have dealings still
3 with folks from DNREC.  And there are rumors that are
4 still coming through, which refer to this case, and some
5 comments that have been made.  Whether it's true or not,
6 if I get any sort of settlement or any sort of agreement
7 is reached, it will cause real serious damage to DNREC.
8           And to me, it makes it very difficult to
9 interact with those folks in DNREC that I still have a
10 working relationship with.
11    Q.  Who knew about this, other than the people
12 that you talked about it to?
13    A.  I heard it from several other folks.
14    Q.  About your pay complaints?
15    A.  I think because of the rumor now, pretty much
16 everybody knows now of the old guard.  There are a lot of
17 new folks that are there.
18    Q.  Do you remember who you told about it?
19    A.  Probably everybody that is listed in the --
20 the folks -- what was that document called?
21          MS. BREWINGTON:  Initial disclosure?
22          THE WITNESS:  Yes.  Thank you.  At least
23 that group of people.
24 BY MS. CSIZMADIA:

Page 7

1    Q.  I mean, DNREC has a lot of rumors.
2          Right?
3    A.  Yes, they do.
4    Q.  Tell me how that affects your reputation.
5    A.  It just makes it difficult because it's a
6 small part of the world.  DNREC and EPA do have dealings
7 with each other.
8    Q.  But my point is, your claim is that you were
9 treated unfairly.
10          How does that damage your reputation
11 that you're claiming that you were treated unfairly?
12    A.  Because of what's coming out of DNREC is that
13 I'm out to make some point, as opposed to recover damages
14 that I believe are due to me.
15    Q.  That's what you heard?
16    A.  Yes.  Somebody also told my former manager at
17 EPA, Jim McCreary, this was several years ago, he told me
18 after one of my reviews, he kind of chuckled and said,
19 Well, it's a good thing we decided to hire you anyway.
20 Ha, ha.  I had known him for years.  He said, Yeah, I
21 heard from DNREC not to hire you because you were a
22 troublemaker.
23          And I never followed up with him,
24 specifically asking what it was.  It was several years

Page 8

1 ago.  But the mere fact of any reaching into my federal
2 employment is completely unacceptable.
3    Q.  You did still get the job, though?
4    A.  I did.  Because they had known me for a while.
5    Q.  And when did the suffering, distress,
6 humiliation, embarrassment and damages to your reputation
7 begin?
8    A.  It would have to be when I started this whole
9 process, in 1999 to 2000 range.
10    Q.  Not as far back as 1996?
11    A.  There were some issues with management at that
12 point in time.
13    Q.  But they did not cause you suffering and
14 distress?
15    A.  I was very distressed in 1996 and early 1997
16 that I was considered entry level, even though I had been
17 working at that higher level for six months, which was
18 the rule at that point in time.  You had to be working at
19 the higher level for six months.  I felt like I was
20 carrying an equal workload.  So, there was some of that.
21 But definitely, when I started this process.
22    Q.  And have you sought any medical treatment for
23 your mental distress?
24    A.  No.

Page 9

1    Q.  Have you consulted a psychologist?
2    A.  Yes.
3    Q.  With respect to your distress from this issue?
4    A.  Yes.  As part of this.  Yes.
5    Q.  Can you explain how many times you have seen a
6 psychologist?
7    A.  I saw her about three times.
8    Q.  And when was that?
9    A.  Probably 2004, at some point.  I'm not 100
10 percent sure.  Because of my work schedule and the fact
11 that I travel so much, I was going to talk to a
12 counselor.  It never developed long term.
13    Q.  So, it was three times that you saw her, you
14 think?
15    A.  Two or three times.  I'm not exactly sure
16 when.  Obviously, I could find those things out.
17    Q.  Did you see a psychiatrist?
18    A.  I don't think she was both.  No.
19    Q.  Is that the only type of mental health
20 professional that you spoke with?
21    A.  Yes.
22    Q.  And did the embarrassment, distress,
23 humiliation and suffering translate into any physical
24 abnormalities?

CORBETT & WILCOX

Ann L. Breslin

Page 10

1    A.   Only sleeplessness, I believe.
2    Q.   And can you describe that, when it began?
3    A.   The last six or seven years, several times a
4  month, where I'm up worrying about this case and thinking
5  about all of the issues that I've had to go through with
6  it.
7    Q.   And is that your only physical symptom?
8    A.   Yes.
9    Q.   You've been able to go to work?
10   A.   Yes.
11   Q.   You have not missed any time off from work?
12   A.   No.
13   Q.   You did not feel your job performance was
14 impaired?
15   A.   In my new job, absolutely not.
16   Q.   Have you sought any medical treatment for your
17 sleeplessness?
18   A.   I have spoken to my doctor about it. But I
19 have not sought any specific medical treatment.
20   Q.   Because you did not need any?
21       MS. BREWINGTON: Objection.
22 BY MS. CSIZMADIA:
23   Q.   Because you did not feel that you needed any?
24   A.   Because I prefer to deal with my issues, as

Page 11

1  opposed to medicate them. I always felt that way.
2  Exercise. Yoga. Life-style changes.
3    Q.   Has that helped?
4    A.   I don't know.
5    Q.   Well, how much do you feel that what you just
6  described -- those are your symptoms relating to -- are
7  those all of your symptoms relating to your distress?
8    A.   Yes.
9    Q.   How much is that worth?
10   A.   Those are honestly numbers I'm not going to
11 pull out here. I need to really discuss that with the
12 attorneys. Definitely not prepared for that at this
13 time.
14       MS. CSIZMADIA: You already asked for
15 it, Lori. And I would think it is an absolutely fair
16 question for me to ask her today. I don't know what
17 other time I can ask it.
18       MS. BREWINGTON: I'm going to object.
19 Can we go off the record?
20       MS. CSIZMADIA: Yes.
21       (An off-the-record discussion took place
22 at this time.)
23       MS. CSIZMADIA: We are back on the
24 record.

Page 12

1       Ms. Brewington and I had a conversation
2  off the record about her objection to my question. And
3  we've agreed that at a later date, it would be acceptable
4  to the plaintiff to continue the deposition with respect
5  to the issue of pain and suffering only.
6       MS. BREWINGTON: Yes.
7  BY MS. CSIZMADIA:
8    Q.   Moving onto the issue of lost wages.
9       About $25,000 are the damages that you
10 claim were for lost wages.
11       Is that right?
12   A.   Yes.
13   Q.   Who were you alleging was paid more?
14   A.   Keith Robertson.
15   Q.   Just Keith Robertson?
16   A.   Keith Robertson is the person I'm comparing
17 myself to for the purposes of this complaint.
18   Q.   Can you tell me why you are comparing yourself
19 to Keith Robertson?
20   A.   Well, we did the same job. We both had
21 advanced degrees. We were hired within two weeks of each
22 other.
23   Q.   And you are suing for interest on that
24 $25,000.

Page 13

1       Is that right?
2    A.   Yes.
3    Q.   The letter references a retirement savings
4  difference. Ms. Brewington indicated $40,000 of your
5  claim is for retirement savings difference.
6       Is that right?
7    A.   Yes.
8    Q.   And I believe my understanding is that you say
9  you would have deposited more money than you did into the
10 deferred compensation program?
11   A.   Right.
12   Q.   And you would have begun doing so earlier?
13   A.   Yes.
14   Q.   And my understanding of the calculation is,
15 you have assumed you would have earned interest at a
16 interest of eight percent a year on that money. And
17 you've assumed you would have worked 25 years to
18 retirement.
19       MS. BREWINGTON: I'm going to object.
20 These are not questions. You are giving statements. You
21 have to ask her a question. You said my understanding is
22 this.
23       MS. CSIZMADIA: Okay.
24 BY MS. CSIZMADIA:

CORBETT & WILCOX

Ann L. Breslin

5 (Pages 14 to 17)

Page 14

1    Q. You began working for DNREC in 1994?
2    A. That's correct.
3    Q. And when did you start making contributions
4  into the deferred compensation plan?
5    A. I'm not exactly sure of the date. It was
6  close to the time where the Limited Maintenance Review
7  went through.
8    Q. Around January of 1997?
9    A. No. The Limited Maintenance Review, which
10  would have been 2000.
11    Q. And how much did you deposit into your
12  deferred compensation when you began?
13    A. I don't recall. It was below $50 a pay
14  period.
15    Q. How much are you claiming that you would have
16  deposited?
17    A. I've laid it all out there, but my estimate is
18  I would have put anywhere between $50 and $75 a pay
19  period in there. Reasonable rate of return. Eight
20  percent. When I look back at the rate of returns over
21  these years, it was actually 13 or 14 percent. But eight
22  percent is pretty much historically the rate of return.
23    Q. And that's what you think you would have done?
24    A. Yes.

Page 15

1    Q. How are you going to prove that?
2    A. Just by making the statement. The minute my
3  salary was increased and I was able to actually do it, as
4  opposed to being as hand them out as I was.
5    Q. Well, we all look back and wish we put more
6  money in our deferred comp; don't we?
7    MS. BREWINGTON: Objection.
8  Argumentative.
9  BY MS. CSIZMADIA:
10    Q. For lost pension, you are claiming $20,000 for
11  that?
12    A. Yes.
13    Q. Can you explain the basis of it?
14    A. Well, it was, basically, a rough figure. I
15  got on the pension calculator. I entered in what I'm
16  fairly sure was Keith's salary three years into the
17  calculator. I entered mine into the calculator. I added
18  up the difference for survivability. I used the
19  survivability table off of some web site that was a
20  government web site.
21    Q. And you were vested when you left the state?
22    A. I was.
23    Q. You are going to be drawing a state pension
24  later?

Page 16

1    A. Yes.
2    Q. So, it is the difference?
3    A. Yes.
4    Q. In Paragraph 44 of your complaint, you
5  specified you suffered loss of employment opportunities
6  and loss of employment benefits.
7    What employment benefits did you suffer
8  the loss of?
9    A. I don't understand exactly.
10    Q. Your complaint in Paragraph 44 says, As a
11  direct and proximate result of defendant's unlawful
12  gender discrimination, plaintiff has suffered and
13  continues to suffer loss of employment opportunities,
14  loss of income, loss of other employment benefits.
15    What other employment benefits were you
16  referring to?
17    A. My understanding is, a potential advancement.
18  Also, potential groups that I could have joined, which I
19  was not able to join, like the Brown Fields Redevelopment
20  Group.
21    Q. What is the criteria for the Brown Fields
22  Redevelopment Group?
23    A. Well, it appears to be the folks that were
24  qualified to do the job. And also that we're not in the

Page 17

1  position where they were questioning their pay.
2    Q. I don't understand. I'm sorry.
3    A. In other words, if you towed the line, and if
4  you didn't question, if you were that type of person,
5  those are the people that were allowed to be on the Brown
6  Fields Redevelopment Group.
7    Q. Who is in it?
8    A. Right now, I do not know.
9    Q. So, what period are you referring to?
10    A. Probably, the last year or two that I was at
11  DNREC.
12    Q. Who was in it then?
13    A. To my knowledge, at that point in time it was
14  Larry Jones and Rebecca Hawkins. She is no longer with
15  DNREC. Larry is still there.
16    Q. Anyone else?
17    A. Not to my knowledge.
18    Q. Those are the only two people in the group?
19    A. Those are the technical staff members.
20    Q. Now, prior to leaving DNREC, did you have a
21  scientific prominence or recognition with publication in
22  a scientific or trade journal?
23    A. No. That was my understanding of the
24  qualifications for becoming an ES4.

Ann L. Breslin

6 (Pages 18 to 21)

Page 18

1    Q.  So, you did not qualify for an ES4 when you
2    were at DNREC?
3    A.  At that point in time, I did not go into
4    qualifying for it.  I could have easily qualified for an
5    ES4, but that would have been my decision.  It is fairly
6    easy to publish, but at that point in time, no.
7    Q.  You are not claiming that one of the
8    employment opportunities that you lost was the ability to
9    continue in the career ladder?
10   A.  No.
11        MS. BREWINGTON:  Objection to form.
12        THE WITNESS:  The fact of the matter is,
13   I don't know.  I think that definitely that would have
14   been the next step that I would have made.  But we needed
15   to get clear of being entry-level salary as an
16   Environmental Scientist 3 after six years.  Once we dealt
17   with the issue of salary and parity, I was definitely
18   interested in becoming a 4.
19        My understanding is, personnel only
20   allowed one or two ES4's because of the salary.
21   BY MS. CSIZMADIA:
22   Q.  But you did not qualify at the time that you
23   were there?
24   A.  No.

Page 19

1    Q.  Have we covered any other benefits or
2    employment benefits or employment opportunities that you
3    lost?
4    A.  Those are the ones that I can recall at this
5    time.
6    Q.  And you are claiming $2,500 in attorney's fees
7    for the merit system grievance?
8    A.  Yes.
9    Q.  Is that the amount you paid Mr. Shiels?
10   A.  That is part of the amount I paid Mr. Shiels.
11   There is also travel.  There is also time I needed to
12   take off work.  That's an estimation.
13   Q.  Your travel?
14   A.  Mum-hum.
15   Q.  And your time off of work?
16   A.  Mum-hum.  Time I also put into the case that
17   was outside what was allowable.
18   Q.  How much was Mr. Shiels' fees?
19   A.  I don't recall that.  That's within $2,500.
20   That is within the $2,500.  I'm not 100 percent sure.  I
21   would have to pull out my records for that.
22   Q.  Do you have an idea what portion of it was
23   your time, as opposed to what you paid Mr. Shiels?
24   A.  Less than half.  A third, maybe.

Page 20

1    Q.  Did you instruct Mr. Shiels to withdraw the
2    grievance?
3    A.  Yes.
4    Q.  Are you familiar with this document?
5    A.  I have not seen a copy of this document.  I
6    was aware that he was going to send it.
7    Q.  Your attorney did not send you a copy of it?
8    A.  I don't think I got it.  He had been ill.  So,
9    I'm not sure.  But there is a letter similar to this
10   telling me that he was going to do this.
11   Q.  Is it consistent with your understanding of
12   what you instructed him to do?
13   A.  Mum-hum.
14        MS. CSIZMADIA:  Can we identify that as
15   Exhibit 1.
16        (One-page document dated August 23, 2004
17   was marked as Breslin Exhibit No. 1 for identification.)
18   BY MS. CSIZMADIA:
19   Q.  So, can you explain to me in the second
20   paragraph where is says, The available remedies are far
21   superior in the District Court than before the Merit
22   Employee Relations Board, what that means?
23   A.  To me, it means that I had decided to go
24   through the Department of Labor -- to the EEOC in

Page 21

1    Philadelphia.
2    Q.  And that was the reason for the decision that
3    you just decided to abandon this grievance?
4        MS. BREWINGTON:  I will object to form.
5    BY MS. CSIZMADIA:
6    Q.  What was the reason that you stopped this?
7    A.  That I stopped?
8    Q.  Yes.  The grievance.
9    A.  I had lost the first and second in-house
10   grievances, which I expected to lose, since you can't
11   have a hearing in front of your direct employer and
12   expect any kind of impartial or fair judgment.
13        The third step of the grievance, I
14   walked into, I think it was the Carvel Building or State
15   Building in Wilmington, into a very animated discussion
16   between hearing officer, Steve Karlsen and Merrilyn
17   Ramsey.  How are you doing?  How are the kids?  You've
18   been out much.  Blah, blah, blah.
19        I knew immediately that there would be
20   no fair and impartial judgment.  There was no separation
21   between the hearing officer and DNREC.  It was as if I
22   walked into old home week.
23        I did have one small victory.  They did
24   say I was not barred from filing a grievance because of

Ann L. Breslin

7 (Pages 22 to 25)

Page 22

1  time constraints, which was the big thing. I did not
2  expect to win that either due to the fact that there was
3  no impartiality shown. There was no separation between
4  Steve, Merrilyn and the hearing officer.
5          I also received new employment with the
6  federal government. And I started to go through this, to
7  be scheduled with the Merit Review Board. And I needed
8  to change the timing of it because I was in the middle of
9  training. This is the first year of the federal
10  position. A lot of things expected of me.
11          It was changed until August. At that
12  point in time, I was informed by my attorney that the
13  Deputy Attorney General that was going to be handling the
14  case was ill. And that most likely, there would be
15  significant delays due to her illness. Almost the same
16  day I received information from the Department of Labor
17  saying a positive cause finding would be coming my way,
18  and I would be able to receive the right to sue.
19          And considering what I feel to be a very
20  serious lack of impartiality through the whole process, I
21  made a decision that I was not going to take time and
22  jeopardize my new job by coming back to something that I
23  don't think could ever be impartial. That was my choice.
24      Q.  You said you did not expect the first two

Page 23

1  steps to be impartial because they were in-house?
2      A.  Yes.
3      Q.  You were concerned about the third steps
4  because of the conversation?
5      A.  Yes.
6      Q.  What was the fourth step?
7      A.  Excuse me?
8      Q.  Where was the next appeal to?
9      A.  To the Merit Review Board.
10      Q.  Who are the members of the Merit Review Board?
11      A.  I don't know who the members are.
12      Q.  You did not take the time to find out?
13      A.  No. I would have, had I gone ahead to that
14  next step, had I remained a State of Delaware employee, I
15  most certainly would have gone through.
16      Q.  And you withdrew your grievance, or your
17  attorney withdrew your grievance on August 23rd?
18      A.  It appears to be the case.
19      Q.  And the hearing was scheduled for August 25th?
20      A.  I don't recall.
21      Q.  That's what the letter says, though?
22      A.  Yes. That's correct.
23      Q.  So, you decided, for the reasons you have
24  already stated, to withdraw the grievance at that point?

Page 24

1      A.  Well --
2      Q.  And you were concerned about impartiality?
3          MS. BREWINGTON: Wait. Wait. I'm going
4  to object.
5          THE WITNESS: I'm not sure what you
6  mean.
7  BY MS. CSIZMADIA:
8      Q.  Why are you asking for your attorney's fees to
9  be paid if you decided not to continue to pursue it?
10      A.  I think there was a lack of impartiality
11  through the entire process. There was no existence.
12  This is all part of the grievance and the complaint that
13  I considered one entity.
14      Q.  Now, the last sentence in that paragraph says,
15  Nor do the Merit Rule System Limitations have the same
16  significance.
17          What does that mean?
18          MS. BREWINGTON: I will object. She did
19  not write the letter.
20          MS. CSIZMADIA: She said those were the
21  reasons that her and her attorney -- that she instructed.
22          MS. BREWINGTON: That's a
23  mischaracterization.
24  BY MS. CSIZMADIA:

Page 25

1      Q.  Do you know what that means?
2      A.  Nope. I do not know. Legal documents of this
3  sort that are not environmental related, that's why I
4  have attorneys. That's why I hire attorneys.
5      Q.  Can you identify any other current or former
6  DNREC employees with whom you remember discussing your
7  pay issues?
8      A.  I have a list.
9          (Merrilyn Ramsey has entered the
10  deposition room.)
11          MS. CSIZMADIA: I just asked Ann what
12  employees she can remember discussing her pay issues
13  with.
14  BY MS. CSIZMADIA:
15      Q.  You can continue.
16      A.  I would first start by saying it was just
17  general knowledge within SIRB. And also it was within
18  some of the other branches in the division.
19          Obviously, Keith Robertson. Merrilyn
20  Ramsey, of course. Alex Rittberg. Paul Will. Christina
21  Wirtz. John Blevins. I believe I discussed it with Nick
22  DiPasquale. He and I became friends. N.V. Raman. Jamie
23  Rutherford. Larry Jones. Kurt Olinger, O-L-I-N-G-E-R.
24  Rob Allen. Jane Biggs Singer. Chris Hendershot.

B-0073

Ann L. Breslin

8 (Pages 26 to 29)

Page 26

1    Q. Karissa?
2    A. Yes. Karissa.
3    Q. I thought you said Chris. Sorry.
4    A. That's the universe that I can recall right
5  now. Those are the folks that I worked closely with.
6  They knew of my case. They knew of the grievance.
7    Q. You talked to all of them about it?
8    A. In some form or the other. Whether it was
9  just generally, or it was specifically, depending upon my
10 level of friendship.
11   Q. In general, were they supportive of you?
12   A. Yes. In general. There were a few that
13 definitely were afraid of any sort of trouble that might
14 cause with their career.
15   Q. Is that what they said, or what you assumed?
16   A. No. That's what they said.
17   Q. Do you remember who said that?
18   A. No.
19   Q. Do you remember a person saying it?
20   A. I remember several people saying it.
21   Q. Don't remember which ones?
22   A. No. Not specifically.
23   Q. Who was not supportive?
24   A. What is your definition of not supportive?

Page 27

1  Saying no, you don't deserve it. Or no, I don't think I
2  want to get involved. I need a little bit more
3  explanation.
4    Q. Fair enough. Maybe I'll just skip that.
5  Well, whatever your characterization of supportive is.
6          What do you consider supportive?
7    A. Probably, anybody that did not specifically
8  say, no, I will not help you, or no, I cannot help you.
9  Or no, I disagree, or I think you have a case that won't
10 work.
11   Q. So, using that definition of supportive, who
12 was not supportive?
13   A. Merrilyn.
14   Q. Anybody else?
15   A. Of the list that I have given you?
16   Q. Yes.
17   A. No. Not specifically in that fashion. No.
18   Q. What about John Blevins? You are including
19 him in the list of people who were supportive under your
20 definition?
21   A. To my face, and every conversation that we
22 had, he was supportive.
23   Q. Now, you worked for DNREC for nine years, and
24 you obviously required some friendship with some of these

Page 28

1  people?
2    A. Yes.
3    Q. Which of these individuals or which
4  individuals currently or formerly working for DNREC do
5  you consider your friends?
6    A. What is your definition of friends?
7    Q. Do you still maintain contact with any of
8  these people?
9    A. I do.
10   Q. Who?
11   A. Larry Jones. Karissa Hendershot. And Keith
12 Robertson.
13   Q. Anybody else?
14   A. Most of those folks I still would have lunch
15 with. But as far as associating with them outside of
16 work situation, no.
17   Q. What about Christina?
18   A. Christina, I consider her a friend, but we
19 don't socialize. The same with Nick. I have seen Nick
20 in other capacities when he worked for the State. I
21 would consider him a friend, but we don't socialize.
22   Q. Fair enough. When is the last time you talked
23 to Christina?
24   A. I'm not sure. It's probably been six months,

Page 29

1  at least. I'm not sure. I was working a site in
2  Delaware City. I stopped by to have lunch with Larry and
3  with...
4    Q. With Larry and Christina or just Larry?
5    A. With Larry. And I talked with Alex and
6  Christina and half of the people I worked with there.
7    Q. What did you talk to Christina about?
8    A. How she was liking her new job.
9    Q. Did you talk about this case?
10   A. We briefly mentioned this case. Briefly. I
11 asked her how she was doing. And did she like the new
12 job. I explained to her, she would be an interested
13 party in this.
14   Q. Of the people in human resources, are you
15 friends with any of them?
16   A. No.
17   Q. Do you like any of them?
18   A. I don't know how to answer that question. I
19 don't know them.
20   Q. Have you heard other people in SIRB complain
21 about human resources?
22   A. Yes.
23   Q. Can you tell me who you've heard complain
24 about human resources?

B-0074

Ann L. Breslin

9 (Pages 30 to 33)

Page 30

1    A.  It's years worth of general complaints about
2  specific things. (Indicating.)
3         MS. BREWINGTON:  Was your answer no?
4  You went like this? (Indicating.)
5         THE WITNESS:  Yes, I've heard them
6  complain about human resources.
7  BY MS. CSIZMADIA:
8    Q.  Is it just people in SIRB you heard complain
9  about human resources?
10   A.  No.
11   Q.  Is it fair to say you heard a lot of
12  complaints?
13   A.  Yes.
14   Q.  Have you made complaints of your own?
15   A.  Official or verbal?
16   Q.  Just unofficial.
17   A.  Yes.
18   Q.  Were any of the people that complained male?
19   A.  Yes.  Several were.
20   Q.  You don't recall any names, though?
21   A.  No.  I left DNREC over three-years-ago.  I
22  keep current with this case and with several of my
23  friends.
24   Q.  You filed a complaint with the Delaware

Page 31

1  Department of Labor?
2    A.  Yes.
3    Q.  How did you go about doing that?
4    A.  I went to their offices and filled out
5  paperwork.
6    Q.  Did you talk to somebody personally while you
7  were there?
8    A.  I did.
9    Q.  How many times did you go?
10   A.  I believe I was there two or three times.
11   Q.  Were they professional?
12   A.  Absolutely.
13   Q.  Did you find it distressing to be there?
14   A.  The mere fact that I had to go to the
15  Department of Labor was extremely distressing.  My
16  interactions with them were not.
17   Q.  I believe you said you are employed by the
18  Federal Government now?
19   A.  Yes.
20   Q.  Is your federal position a merit position?
21   A.  It is a career position.
22   Q.  Career position.
23        What does that mean?
24   A.  Where I work, you have three levels where you

Page 32

1  are on probation for a year.  Then you are considered
2  career conditional for a year.  And after your third
3  year, you are considered a career employee.
4    Q.  Now, what is your job title?
5    A.  I'm an on-scene coordinator.
6    Q.  And you are working for EPA.
7         Is that correct?
8    A.  That's correct.
9    Q.  How many different medias does EPA work with?
10  Water?  Air?  Hazardous waste?
11   A.  Yes.
12   Q.  Lots?
13   A.  Everything.
14   Q.  Is on-scene coordinator, is it limited to just
15  the area where you work?
16   A.  It is limited in some fashion.  It is very
17  complicated.  I am an on-scene coordinator for EPA Region
18  III.  Maryland, Delaware, Virginia, West Virginia,
19  District of Columbia, Pennsylvania.  That is considered
20  EPA Region III.  However, I am a fully warranted on-scene
21  coordinator throughout the United States, including
22  Puerto Rico where we respond to natural disasters,
23  terrorist attacks, whatever, that may affect the
24  environment, chemicals across the United States.

Page 33

1    Q.  How many regions are there of EPA?
2    A.  Ten.
3    Q.  Is it fair to say there are on-scene
4  coordinators in all ten regions?
5    A.  Yes.
6    Q.  And do they do similar type of job functions?
7    A.  Similar.  Yes.  Exactly the same, sometimes
8  not.  It really depends.  Some areas are divided
9  geographically.  Some are divided by function.  Some are
10  enforcement OSC.  Some are removal OSC's.  Some act more
11  like remedial program managers.  Some do emergency
12  responses.
13   Q.  Now, is the federal job structured similar to
14  the state job, where if you applied for a position as an
15  on-scene coordinator, you would automatically in a
16  different agency or different area, you would
17  automatically be qualified because of your position now?
18  Like a lateral transfer in the state system.
19        MS. BREWINGTON:  I will object.
20        THE WITNESS:  I'm very confused.
21        MS. BREWINGTON:  Form.
22  BY MS. CSIZMADIA:
23   Q.  When you worked for DNREC, are you familiar
24  with the term lateral transfer?

B-0075

Ann L. Breslin

Page 34

1    A.  Absolutely.  Yes.
2    Q.  What is that?
3    A.  Basically, an Environmental Scientist could
4  move from Environmental Scientist to another
5  Environmental Scientist position based upon hopefully the
6  set of skills that you would develop in that specific
7  position that you worked in in the specific branch.  They
8  would move over and take their pay with them as they
9  want.
10    Q.  If you were an Environmental Scientist 3 in
11  SIRB, you could apply for and be qualified for an
12  Environmental Scientist 3 position in Water Resources?
13    A.  You could apply for it, but be qualified for
14  it.  It's a completely different set of specific job
15  duties.
16    Q.  So, are you saying you don't know the answer
17  to that?
18    A.  For an OSC to be an OSC in another region, it
19  would really depend.  It just depends.  There is no easy
20  answer to that question.
21    Q.  Getting back to the DNREC question.
22        When you worked for SIRB, could you have
23  applied for an Environmental Scientist 3 position in
24  water and be automatically qualified, by virtue of your

Page 35

1  current employment?
2    A.  I don't know the answer to that question.  I
3  would think that it is a specific set of skills and
4  abilities that you would need to know for specific ones.
5    Q.  That would be assuming there were no
6  selectives.  Those are additional qualifications.
7        Correct?
8        MS. BREWINGTON:  I will object.  These
9  are not questions.  You are giving her statements.
10        MS. CSIZMADIA:  I am asking her if she
11  agrees with them.  That is the question.
12        MS. BREWINGTON:  But you are not saying
13  do you agree.  You are not saying is that correct.  You
14  are just saying a statement.
15        MS. CSIZMADIA:  I will work on that.
16  BY MS. CSIZMADIA:
17    Q.  Is it correct you have a Bachelor of Arts with
18  a Major in Biology and a Minor in English Literature from
19  Houghton College of New York?
20    A.  Houghton College of New York.
21    Q.  Is it correct you have a Master of Science in
22  Geoenvironmental Studies from Shippensburg University in
23  Pennsylvania?
24    A.  That's correct.

Page 36

1    Q.  Do you know when you began working for DNREC?
2    A.  You mean the date?
3    Q.  Yes.
4    A.  January 19, 1994.
5    Q.  And were you a Merit System Employee at that
6  time or seasonal?
7    A.  Seasonal hire.
8    Q.  Can you explain what a seasonal hire is?
9    A.  Seasonal hire, basically, I believe, the
10  difference is, you come in without insurance benefits or
11  any sort of career mode.  I believe that when you are
12  hired full time, that time does count toward your total
13  time in.  That's my understanding.
14    Q.  And what level of ES were you when you were
15  seasonal?
16    A.  ES1.
17    Q.  And we referred to ES1 and ES3, and ES4.
18        Are those different levels of
19  Environmental Scientist job?
20    A.  Yes.  You missed two.  But.  Yes.
21    Q.  I think I missed it because we had not
22  referred to it yet.
23        You were a seasonal for a while.  And
24  then DNREC posted an Environmental Scientist 2 merit

Page 37

1  position.
2        Is that correct?
3    A.  Yes.
4    Q.  Did they hire you into that position?
5    A.  Yes.
6    Q.  That was a Merit System position; was it not?
7    A.  Yes.
8    Q.  Can you tell me what that means to be in the
9  Merit System?
10    A.  Basically, means you get insurance and all of
11  the benefits of being a full-time employee.
12    Q.  Does it also mean you have certain rights and
13  obligations according to state law?
14    A.  I would assume so.
15    Q.  Do you know whether The Department is
16  constrained to follow the Merit Rules?
17    A.  I don't know.  Like I said, you asked me
18  specifically those questions.  That's why I have
19  attorneys.  I don't know whether they can stray at them
20  or not.  I have no idea.
21    Q.  Have you ever looked up the law on the Merit
22  System?
23    A.  I did a long time ago.  It has probably been
24  about five or six years.  Again, I am a biologist and

B-0076

Ann L. Breslin

11 (Pages 38 to 41)

Page 38

1  scientist. I am not an attorney.
2      Q.  Your Environmental Scientist 2 position, was
3  it in a career ladder?
4      A.  I believe ES positions are all career ladder.
5      Q.  Can you tell me what it means to be in a
6  career ladder?
7      A.  Basically, one through four. I don't know if
8  there is a five or not, that you could potentially go
9  through a career ladder advancement or competitive.
10     Q.  So, in the career ladder, once you qualify,
11 can you then apply to meet the next level?
12     A.  At that point in time, you needed to work for
13 six months at that upper level before you are allowed to
14 apply to it. Whether there was a written or unwritten
15 rule, I am not 100 percent sure. But everybody
16 understood that that was the case.
17     Q.  Have you ever seen the job specifications and
18 descriptions for the Environmental Scientist position?
19     A.  Yes.
20     Q.  I will give you four documents and ask you if
21 you are familiar with them.
22         MS. CSIZMADIA: Mark these as Breslin 2
23 through 5.
24         (Document entitled Class Title:

Page 39

1  Environmental Scientist 1 was marked as Breslin Exhibit
2  No. 2 for identification.)
3          (Document entitled Class Title:
4  Environmental Scientist 2 was marked as Breslin Exhibit
5  No. 3 for identification.)
6          (Document entitled Class Title:
7  Environmental Scientist 3 was marked as Breslin Exhibit
8  No. 4 for identification.)
9          (Document entitled Class Title:
10 Environment Scientist 4 was marked as Breslin Exhibit No.
11 5 for identification.)
12 BY MS. CSIZMADIA:
13     Q.  Are you familiar with those documents?
14     A.  Yes.
15     Q.  Exhibit 2 which is Environmental Scientist 1
16 job description, is that the ES1 job description?
17     A.  That's what its says.
18     Q.  And what is Exhibit No. 3?
19     A.  I don't know. You tell me.
20     Q.  Is that the Environmental Scientist 2
21 description?
22     A.  That's exactly what it is. That's what it is.
23 Yes. I believe so.
24     Q.  Exhibit 4?

Page 40

1      A.  Environmental Scientist 3. And Exhibit 5 is
2  the Environmental Scientist 4.
3      Q.  Exhibit 5 is Class ES 4?
4      A.  Yes.
5      Q.  Just looking at the ES2, which is Exhibit 3,
6  can you run through and describe the exhibit, what the
7  job description consist of?
8      A.  I'm not sure what the purpose of that is.
9  Everybody can read this.
10     Q.  Can you turn to the minimum qualifications
11 section, please?
12     A.  Yes.
13     Q.  Can you also turn to the minimum
14 qualifications in the ES2, which is Exhibit 3. Let's
15 look at 2 and 3?
16     A.  Yes.
17     Q.  Tell me what the difference is between the
18 minimum qualifications for 2 and 3?
19     A.  Well, part two and part three vary.
20     Q.  Can you tell me how they vary, please?
21     A.  Well, two is experience applying techniques --
22 I can read this. This is a worthless exercise.
23         Two says, Experience applying the
24 methods and techniques used in assembling, analyzing and

Page 41

1  interpreting scientific or technical data, and the
2  preparation of reports.
3          Number 2 says, on 3, experience
4  analyzing data. And the first one is the same. Second
5  one is a little bit different. Third one is knowledge of
6  environmental law. Third is, experience in
7  environmental/natural resources program or project
8  management.
9      Q.  Is that the main difference experience in project
10 management and experience in applying the methods and
11 techniques of analyzing data?
12     A.  Yes.
13     Q.  And do you know what the minimum
14 qualifications mean?
15     A.  Yes. Specifically that. They are the minimum
16 qualifications for the position. If you don't meet the
17 minimums, supposedly, automatically you're not. I was a
18 subject matter expert before. That does not necessarily
19 always count.
20         Supposedly, if you don't meet the
21 minimum qualifications, you can't apply for it.
22     Q.  That's the rule. Is that the rule?
23     A.  I don't know if that's the rule. But that's
24 the understanding.

B-0077

Ann L. Breslin

12 (Pages 42 to 45)

Page 42

1    Q. Now, who is the supervisor who initially hired
2  you at DNREC?
3    A. Karl Kalbacher.
4    Q. Did Karl Kalbacher lie to you or mislead you
5  when he hired you into the ES2 position?
6    A. I'm not sure what the question is supposed to
7  be referring to.
8    Q. Did he lie to you when he hired you? Did he
9  lie in order to get you to take the Environmental
10 Scientist 2 position?
11   A. I don't think he lied to me. I am sure this
12 is a leading question. That's why I am trying to figure
13 out where you are going with this.
14   Q. Just answer it.
15      Do you know that he lied to you?
16   A. I do not know that he lied to me. I know a
17 lot of things about Karl. Specifically about being hired
18 as an ES2, he hired me as an ES2. I interviewed for it.
19 I signed the acceptance.
20   Q. When you were promoted to ES 3 position, was
21 that also by Karl?
22   A. Yes.
23   Q. Did he lie to you in the course of that
24 promotion, that you know of?

Page 43

1      MS. BREWINGTON: I will object. These
2  questions are very vague.
3      THE WITNESS: I have no knowledge of him
4  lying to me or not lying to me. Ten years ago. I have
5  lots of information that happened 10-years-ago. But
6  whether I was feel that Karl was lying to me or not is --
7  it depends -- I don't understand the question.
8      Why are you asking me that question?
9  BY MS. CSIZMADIA:
10   Q. Were you told something in order to induce you
11 to take the position that was not true, to your
12 knowledge?
13   A. I know she is going somewhere with this. I
14 have no idea what you mean by that. Did he say, I am
15 going to slide $500 bucks under the table if you take the
16 position, and then he didn't.
17   Q. Anything like that? Did he tell you that it
18 was a given that you would get an advanced hire?
19   A. Did Karl tell me it was a given?
20   Q. Yes.
21   A. No. He said there was a very good chance I
22 would get an advance hire.
23   Q. But he did not tell you it was certainty?
24   A. No.

Page 44

1    Q. Do you know of anything else that he did to
2  induce you to take the position that turned out not to be
3  true?
4    A. Not to my knowledge.
5    Q. Are you familiar with the Merit Rules?
6    A. I know they exist.
7    Q. Have you ever looked at them?
8    A. As I said before, I looked at them quite a few
9  years ago. But then again, that's why I have attorneys
10 to tell me what they say and interpret them for me.
11   Q. Can you go back to the ES3 job description
12 before we get to the Merit Rules. That would be Exhibit
13 4?
14   A. Sure.
15   Q. Look at the minimum qualifications?
16   A. Okay.
17   Q. Can you tell me what it says about experience
18 applying the law or knowledge of the law?
19   A. Experience interpreting and applying
20 environmental laws, rules and regulations.
21   Q. Did you have experience in 1994, or was it
22 '96?
23   A. Yes. '96.
24   Q. Did you have experience in applying and

Page 45

1  interpreting environmental laws in 1996?
2    A. With HSCA. Yes, I did. The voluntary clean
3  up program had not gotten off its feet at that point in
4  time.
5    Q. Did you have a Master's degree at that time?
6    A. Yes. Mum-hum. What kind of question is that?
7  Of course, I have a Master's degree.
8    Q. Is the environmental field a technically
9  complicated field?
10   A. It's a very broad question, which there's no
11 simple answer.
12   Q. Is the environmental field a technically
13 simple field?
14   A. There is no answer to that either. It just
15 depends on what part of the environmental field you are
16 talking about. That's a generic question.
17   Q. Are the HSCA laws technically simple?
18   A. Portions are fairly simple and portions are
19 fairly complicated. There's a lot there that's up to
20 someone's interpretation.
21   Q. How many years did you have the Environmental
22 Scientist 3 job?
23   A. Six years.
24   Q. So, is it fair to say that you were very

CORBETT & WILCOX

B-0078