Ann L. Breslin

13 (Pages 46 to 49)

Page 46

1  comfortable in applying and interpreting complex
2  environmental laws relating to HSCA?
3      A.  That, and also Federal Superfund Laws.
4      Q.  Is it also true that you spent no time trying
5  to understand the personnel laws relating to your
6  position?
7      A.  That's not true. I told you, I definitely did
8  look up the Merit Rules. I did read them. I understood
9  some parts of it.
10     Q.  Fair enough.
11     A.  I carried between 12 and 15 sites at all
12 times. I worked weekends. Nights late. I understood
13 what I needed to understand for that point in time.
14     Q.  Was it a stressful job, then, if you were
15 working that many hours?
16     A.  Of course, yes.
17     Q.  Yes?
18     A.  Yes.
19     Q.  Is your current position stressful?
20     A.  Oh, yes.
21     Q.  Do you still work nights and weekends with
22 your current job?
23     A.  I do. Yes.
24     Q.  How is it that you are sure it is not your job

Page 47

1  stress that keeps you awake, as opposed to your concerns
2  about this grievance -- this lawsuit?
3      A.  Because when I'm laying in bed thinking about
4  this, it is pretty obvious what I'm thinking about.
5          My job as an OSC is the best job in the
6  agency. It is phenomenal. Couldn't be better.
7      Q.  Great.
8      A.  So...
9      Q.  That's a good attitude to have.
10     A.  I love it.
11     Q.  Look at the document that I put in front of
12 you.
13     A.  Sure.
14         MS. CSIZMADIA:  Can I have that marked
15 as Breslin 6.
16         (Document entitled Table of Current
17 Pages was marked as Breslin Exhibit No. 6 for
18 identification.)
19 BY MS. CSIZMADIA:
20     Q.  Tell me what it looks to be?
21     A.  This document contains rules and regulations
22 which govern personnel administration in Merit System
23 agencies.
24     Q.  Does that look to be the Merit Rules that you

Page 48

1  looked at in the past?
2      A.  I probably looked at them on line or a
3  third-hand copy. Who knows?
4      Q.  Do you know how the salary increases work for
5  State of Delaware employees, generally?  That's kind of
6  vague.
7      A.  It is a very vague question.  In other words,
8  how do you get a raise or not?  Or how are the systems
9  applied?  I know the basics.  I know some of the
10 information about selective market variation.  I may have
11 misinterpreted because it was spoken of in one form, and
12 it was actually maybe not in reinstitution of selective
13 market.  It may have been a Limited Maintenance Review,
14 if I went through my information again.
15         I had a woman that I considered a friend
16 at that point in time, again we don't socialize, two
17 people that I knew fairly well that were in the selective
18 market.
19     Q.  Who was that?
20     A.  Betsy Frey and Jane Biggs Singer.
21     Q.  Let me ask a more narrow question.
22         Was it the general practice for State
23 employees to get an increase in pay once a year?
24     A.  No.

Page 49

1      Q.  Was it the general practice that it happened
2  more or less frequently than that?
3      A.  Less frequently, definitely.  There were
4  several years I believe that there were no pay increases.
5  Due to budget constraints. Hiring freezes. Blah, blah,
6  blah. Oops. I did it again.
7      Q.  For the most part, did State employees get
8  raises more frequently than once a year?
9      A.  My understanding was it was in the summer.
10 June 30th, July 1st, was the yearly raise. Two or three
11 percent. Something like that.  I don't remember.
12     Q.  Is it fair to say, the hope was, we would get
13 one once a year, but sometimes we would not even get
14 that?
15     A.  That's correct.
16     Q.  Now, when State employees were given a raise,
17 in July or in the summer months, do you know what that
18 did to the pay range?
19     A.  Well, basically, the paygrade, the pay range
20 was bumped up, too. For example, why I left 23 cents a
21 year over entry level as an Environmental Scientist 3
22 with six years of experience was that I would get a
23 couple of percent and the paygrade would go up.
24 Basically, the feeling of it was bumping on your feet.

Ann L. Breslin

Page 50

1  You could never get away with it -- get away from it.
2          Once you were at entry level, you had no
3  hope, unless you had an advanced hire, or some sort of
4  magic wand was waved around. You would always be an
5  entry level.
6      Q. Did that apply to everyone?
7      A. I know it applied to SIRB and me.
8      Q. Now, you talked about an advanced hire?
9      A. Yes.
10     Q. What was an advanced hire?
11     A. My understanding of advanced hire was
12 something that your manager developed with quite a bit of
13 input from the person to prove that you were more than
14 just entry level.
15     Q. Drawing your attention to Merit Rule 5.0711
16 in your packet.
17     A. Okay.
18     Q. Can you read that?
19     A. 5.0711?
20     Q. Yes. 5.0711. Actually, I would like to draw
21 your attention to 5.0710.
22         Can you read that?
23     A. Yes, I can.
24     Q. Would you read it out loud for me, please?

Page 51

1      A. How about if you read it?
2      Q. I would appreciate it if you would read it for
3  me?
4      A. I feel like I'm back in school. Upon initial
5  appointment to any position in the classified service, on
6  or after July 1, 1986, an employee shall be paid a salary
7  equal to the minimum percentage of midpoint for the
8  assigned paygrade, except as hereinafter provided.
9      Q. Is that what you just described to me?
10         MS. BREWINGTON: I'm going to object.
11         THE WITNESS: No. That's not what we
12 just talked about. No. Actually, it is not. You asked
13 me about pay raises and pay scales and things like that.
14 BY MS. CSIZMADIA:
15     Q. Did you tell me that your pay range stayed the
16 same at the minimum percentage of midpoint for your
17 entire tenure at DNREC?
18     A. It often was 23 -- five cents, 12 cents more a
19 year, but relatively close. Yes.
20     Q. Were you in a position in the classified
21 service, to your knowledge?
22     A. I guess I was. I'm not sure.
23     Q. Have you read this section before in the past,
24 do you remember?

Page 52

1      A. Yes. A long time ago. But do I remember it?
2  No.
3      Q. Could you read 5.0711? Is that one of the
4  things that is an exception to that initial rule?
5      A. Mum-hum. Yes.
6      Q. Can you read 5.0712?
7      A. The appointing authority may request, and the
8  State Personnel --
9      Q. I'm sorry. Can you read 5.0711?
10     A. The Appointing Authority may approve a
11 starting rate higher than the minimum paygrade up to 80
12 percent of midpoint where the applicant's qualifications
13 are clearly over and above those required as minimum by
14 the class specification.
15         The Director may approve a starting rate
16 higher than the 80th percentile provided that such higher
17 rate is requested in writing by the appointing authority
18 and is clearly justified and contains applicable
19 documentation of the applicant's qualifications.
20     Q. Is that what you were referring to as an
21 advanced hire?
22     A. Mum-hum.
23         MS. BREWINGTON: Yes?
24         THE WITNESS: Yes.

Page 53

1  BY MS. CSIZMADIA:
2      Q. And the criteria there is that the
3  applicant's qualifications are clearly over those
4  required as a minimum by the class specification.
5          Is that correct?
6      A. That's correct.
7      Q. Is it fair to say that it also says that the
8  request must be in writing and that the request must
9  clearly justify and contain applicable documentation?
10     A. Yes. The question I would ask is what is
11 applicable documentation. It seems to be up to
12 interpretation, whether it be just a narration of
13 previous experiences.
14     Q. Who wrote the initial request for your
15 advanced hire?
16     A. Alex wrote the first draft. He sent it to
17 Karissa Hendershot and I. I made some changes and sent
18 it to -- I have the E-mail chain of it. Sent it back to
19 Alex. Alex made some changes. Sent it to Christina
20 Wirtz. Christina made changes. I sent it to Paul, also
21 noting I was going to print out a copy for him. He
22 always liked being able to write on the forms.
23 Initially, since he approved the final, it came from him.
24 It was signed by Alex for Christina and for Paul, since

Ann L. Breslin

15 (Pages 54 to 57)

Page 54

1   they were both out of the office.
2       Q.   Did you verify the information that was in it,
3   that it was correct?  Was the information in the memo
4   correct?
5       A.   My assumption is, I added some information.  I
6   added a lot of information that was given to me by Paul.
7   I'm assuming I verified that the information was correct.
8            MS. CSIZMADIA:  Mark this as the next
9   exhibit.
10           (Document dated November 13, 1996 was
11  marked as Breslin Exhibit No. 7 for identification.)
12  BY MS. CSIZMADIA:
13      Q.   I just showed you a document.
14           Can you identify it?
15      A.   Yes.  This is my advanced hire that Karl
16  developed, based upon the one Jamie put together for
17  Keith.
18      Q.   What percentage of midpoint were they asking
19  for you?
20      A.   91.8.
21      Q.   That's higher than 80 percent?
22      A.   Correct.  That's correct.  That is why I said,
23  as Keith's was.  And Keith's was approved.
24           MS. CSIZMADIA:  Next exhibit.

Page 55

1            (Document dated December 10, 1996 was
2   marked as Breslin Exhibit No. 8 for identification.)
3   BY MS. CSIZMADIA:
4       Q.   I will show you another document while we are
5   at it.
6            Can you identify it?
7       A.   It's the initial information that Karl sent
8   down to justify.  As with Keith's package, they requested
9   additional information from Jamie.  Jamie sent it down.
10  And, basically, Karl did the same thing.
11      Q.   And you verified that information, also?
12      A.   Yes.  Well, I mean, I got the letter for him.
13  And he added the performance review.
14      Q.   And did you sign the job accepting the
15  position, irregardless of the outcome of the advanced
16  hire request?
17      A.   Regardless of the outcome of the advanced hire
18  request.  I mean, that's not exactly what happened.  I
19  was already told at that point in time, the advanced hire
20  request was denied.  So, regardless of that, I did accept
21  the starting salary at that point in time.
22      Q.   What were you told about DNREC human
23  resources, their review of the advanced hire packages?
24      A.   You mean, how they reviewed it?

Page 56

1       Q.   Is it fair to say that you were told it was
2   turned down?
3       A.   Yes.  Oh, yes.  I was told that.
4       Q.   Who told you that?
5       A.   Karl.
6       Q.   And did Karl tell you what his understanding
7   of why it was turned down was?
8       A.   That they considered Keith's coastal
9   archeology work, and the fact that it took him to get his
10  Master's degree twice as long as it took me was
11  considered work experience.  Where my biology and botany
12  was not considered applicable work.
13      Q.   Are those the words that he used?
14      A.   Yes.
15      Q.   Or was that your charaterization?
16      A.   To my recollection, and this is almost
17  10-years-ago, yes.
18      Q.   Do you know who reviewed the request in
19  personnel?
20      A.   Evidently, Sharon Tazelaar did.
21      Q.   Did you know Sharon Tazelaar?
22      A.   I knew who she was at that point in time.  I
23  know now what has happened to her.  I know she is not
24  competent anymore.  I believe she was going to die at

Page 57

1   some point in time because of some physical problems.
2       Q.   Serious physical problems?
3       A.   Yes.  And they were surprised she even lived.
4       Q.   Now, how familiar were you with the human
5   resources office at that point?
6       A.   Not very much familiar.
7       Q.   Do you know who was the head of the human
8   resources offices?
9       A.   I think Merrilyn has always been the head of
10  the human resources office as long as I can remember.
11      Q.   Merrilyn Ramsey?
12      A.   Yes.
13      Q.   Obviously, she is a female.
14           Is that right?
15      A.   Yes.
16           MS. BREWINGTON:  Argumentative.
17           MS. CSIZMADIA:  I don't see how it is
18  argumentative.
19           MS. BREWINGTON:  You wouldn't.
20  BY MS. CSIZMADIA:
21      Q.   Can you tell me about the type of work you did
22  when you were an Environmental Scientist 3?
23      A.   Project management.  Remediation.
24  Coordinating with the EPA Superfund Sites.  Soup to nuts.

Ann L. Breslin

Page 58

1       Q.   And project management is one of the
2   requirements of the Environmental Scientist position.
3           Correct?
4       A.   That's correct.
5       Q.   In Paragraph 13 of your complaint, you,
6   essentially, state that Mr. Robertson resigned from his
7   position, returned a year later in November of 2003 and
8   was rehired at a higher salary than he was making when he
9   left?
10          MS. BREWINGTON:   What number are you on?
11          MS. CSIZMADIA:   Paragraph 13.
12          THE WITNESS:   Yes.  That's, essentially,
13  correct.  When he left, and by the time he came back, the
14  Limited Maintenance Review had gone through.  So, those
15  making above entry level were given an additional five
16  percent.  And those of us that would be now below entry
17  level were brought to minimum of paygrade.
18  BY MS. CSIZMADIA:
19      Q.   When you say in your complaint he was retired
20  at a higher salary, have you just explained why he was
21  rehired at the higher salary?
22      A.   Yes.
23      Q.   Are you aware there is a Merit Rule that
24  required him to be rehired at the same salary he would

Page 59

1   have been making?
2       A.   I understand that it was considered a leave of
3   absence.  It was not considered a separation of
4   employment or position.  I'm not sure how he put it.  He
5   and I spoke at length about that.  It was just considered
6   a leave of absence.  He came back into the position that
7   he was at before.
8       Q.   Let me draw your attention to Merit Rule
9   5.0720?
10      A.   One more time.
11      Q.   Well, you don't have to read that one out
12  loud.
13      A.   But tell me where I'm looking.
14      Q.   5.0720.
15      A.   Okay.
16      Q.   Does that appear to be a Merit Rule requiring
17  that he be rehired at the same rate?
18      A.   That's what it appears.  Yes.  No
19  disagreement.  No disagreement with what happened to
20  Keith.
21      Q.   You refer in Paragraph 14 of your complaint to
22  the results of Limited Maintenance Review, which were
23  announced around May 2000.
24          Is that right?

Page 60

1       A.   Mum-hum.  Yes.
2       Q.   Tell me what is a Maintenance Review?
3       A.   Well, my understanding of Maintenance Review
4   is because we were bleeding out scientist -- great --
5   that's going to be on there, too.  We were losing
6   scientist due to the fact that they could leave and be
7   hired by consulting firms for significantly higher
8   salaries.
9           We were falling far behind what normal
10  average persons would be paid and people were leaving.  I
11  understand that the Limited Maintenance Review came from
12  the fact that Environmental Scientist were being paid
13  much less than Environmental Engineers.  We were losing
14  people.  This came about by using selective market.
15      Q.   Would it be fair to say, State Personnel
16  reviewed the entire DNREC scientist theories, the ES1's
17  to ES4's?
18      A.   I have no knowledge of that.
19      Q.   Do you know whether the Merit Rules require
20  the director to continuously review the classification
21  plans?
22      A.   I don't know that either.
23      Q.   Drawing your attention to Merit Rule 3.0100.
24          Does it discuss the grouping of people

Page 61

1   into classes, based on their duties and responsibilities?
2       A.   It does.  Using the word substantially and
3   essentially.
4       Q.   Could you read it?
5       A.   The Director as required by law shall
6   establish and maintain a method of classifying all
7   positions in the classified service.  Positions
8   substantially alike in duties and responsibilities
9   requiring essentially the same knowledge, skills and
10  abilities, license or professional certification for
11  satisfactory performance, and using the same minimum
12  education and experience requirements, shall be grouped
13  into the same class and the same rates of pay under
14  similar working conditions shall be applicable thereto.
15  A list of approved classifications will be maintained and
16  kept current.
17      Q.   That's what the Environmental Scientist series
18  is.
19          Right?
20      A.   Okay.
21      Q.   A classification.  Is that correct?
22      A.   That appears to be the case.
23      Q.   When the Maintenance Review was done, did you
24  have to do a questionnaire related to your duties,

B-0082

Ann L. Breslin

17 (Pages 62 to 65)

Page 62

1  responsibilities, education and experience?
2      A. I don't recall.
3      Q. And do you recall who the Maintenance Review
4  applied to, the results of it?
5      A. I believe to the ES1 through 3.
6      Q. Was that just in the Division of Air and Waste
7  Management, do you know?
8      A. I don't know.
9      Q. Do you know whether it applied to ES employees
10  in the Division of Water Resources?
11      A. I'm not sure. I don't know.
12      Q. Did your classifications from ES3 change after
13  the Maintenance Review? You were still an ES?
14      A. I was still an Environmental Scientist 3 at a
15  different paygrade, though.
16      Q. At a lesser or higher paygrade?
17      A. Higher paygrade.
18      Q. Now, you say in Paragraph 16 of your complaint
19  that you sent an E-mail to Merrilyn Ramsey about the time
20  that the results of the Maintenance Review were
21  announced.
22          Is that right?
23      A. Yes.
24      Q. Do you have a copy of that E-mail?

Page 63

1      A. I do.
2      Q. I believe your characterization from your
3  complaint is that your concern was you were still going
4  to be paid at an entry-level salary.
5          Is that correct?
6      A. Yes.
7      Q. You find that somewhat insulting; don't you?
8      A. Well, I believe considering I was doing the
9  same work as Keith, it was unfair. I should be
10  compensated, as Keith was being compensated.
11      Q. Were there other people in ES3 positions in
12  the Division of Air and Waste Management being paid the
13  same salary as you?
14      A. There were several other people that were
15  hired post-'93. To my knowledge, none of them had
16  advanced degrees. I can only speak directly to the
17  specific job description. And you were calling them
18  selectives. But, basically, we don't write permits. We
19  don't count fish. We clean up hazardous sites. That's a
20  very specific thing that SIRB does.
21      Q. You run the SIRB program?
22      A. Yes. So, when you say Air and Waste
23  Management, there is a universe of Environmental
24  Scientist under Air and Waste management, pre and

Page 64

1  post-'93 hire. Different paygrades. Different
2  educational backgrounds, doing different things. I can
3  specifically say, I can talk about SIRB, specifically.
4      Q. Do you think it is fair to say in the
5  hazardous waste branch, the ES3's run the hazardous waste
6  program?
7      A. In RCRA. There are delegated RCRA. They do
8  inspections. They don't necessarily run the program.
9  There have been issues with EPA in their involvement with
10  RCRA.
11      Q. Is that a yes or no?
12      A. I don't think it is a yes or no. It is a much
13  more complicated question than you are putting to me.
14      Q. In Paragraph 17 of your complaint you say
15  are a member of ES workgroup.
16          What was that?
17      A. We were just talking pretty much formally and
18  informally about the fact that they were, as I said
19  before, bleeding out Environmental Scientist.
20      Q. Who is "we?" Who is in the ES workgroup?
21      A. Right now, the only person I can remember is
22  -- I can't remember -- I can't believe I forgot her name.
23      Q. Marjorie Crofts?
24      A. Yes. Marjorie Crofts.

Page 65

1      Q. Did she work for SIRB?
2      A. She was the assistant director, I think, is
3  her title for Air and Waste Management.
4      Q. That's a no then.
5          Right?
6      A. No.
7      Q. Were there other people that you can't
8  remember the names of?
9      A. Certainly. We were not the crew, the two of
10  us. I know there were quite a few people on it. There
11  were a couple of guys from RCRA on it. I can see their
12  faces, but I can't come up with their names.
13      Q. You say that you met formally and informally
14  because you were bleeding Environmental Scientist.
15          What was the purpose of the group?
16      A. Basically, to try to bring our salaries up
17  within shooting range of Environmental Scientist in the
18  real world. So, we would keep people in. We would
19  entice people to apply. We would keep them longer than
20  three to five years.
21      Q. Was there anybody there from "UTZ" (phonetic)
22  in your workgroup?
23      A. Maybe Jo Hall. I don't know. She was on a
24  lot of different committee.

Ann L. Breslin

Page 66

1    Q. Anybody there from Air?
2    A. I don't recall. We met a couple of times, and
3 I started the grievance process and I quit. I keep
4 everything. I'm sure I have notes and lists somewhere.
5    Q. When did you hear of the concept of leveling
6 up?
7    A. I know it was through DelDOT. DelDOT was
8 leveling up. And honestly, it became part of our
9 vocabulary in SIRB. That is the best that I can do to
10 remember.
11    Q. Explain to me what you mean by it became part
12 of your vocabulary?
13    A. We talked about leveling up. Alex kept
14 talking about leveling up.
15    Q. Did you have an idea of what he meant by that?
16    A. Yes. It was, basically, to bring those of us
17 that had been in the position for a lot of years up to a
18 more equitable salary.
19        The conversations with Alex,
20 specifically, were Environmental Scientist 2's that had
21 some issues and me, regarding me, specifically.
22    Q. Drawing your attention back to that Merit Rule
23 that I asked you to read and then asked you not to read.
24 Merit Rule 5.0712. I will ask you to read it again. I'm

Page 67

1 sorry. It makes more sense now.
2    A. Still says the same thing.
3    Q. Can you read it?
4    A. The appointing authority may request, and the
5 State Personnel Director may approve, a starting rate
6 higher than the minimum for the paygrade where a critical
7 shortage of applicants exists. The State Personnel, in
8 concurrence with the State Budget Director and the
9 Controller General, after specifying all equally
10 qualified incumbents of the same classification within
11 the same geographic area receiving a lower rate, may
12 provide that these employees shall have rates increased
13 to the rate established for entrance if their performance
14 is satisfactory.
15    Q. Is that the leveling up rule?
16    A. I don't know. I honestly don't. I am not
17 sure that is what they were referring to with leveling
18 up.
19    Q. You said that you were losing Environmental
20 Scientist.
21        Is that right?
22    A. Yes.
23    Q. To your knowledge, were you having problems
24 getting new ones?

Page 68

1    A. I believe that the cert that came in may or
2 may not have been filled. But I was one of the subject
3 matter experts. And the applicants that we were getting
4 -- you know -- just because someone has a Ph.D. in
5 something does not mean they are qualified to be cleaning
6 up hazardous sites.
7    Q. Is it fair to say that is because the degree
8 does not necessarily translate into their ability to do
9 something?
10    A. Well, if they have not had on-the-job
11 training, and they don't have an applicable Ph.D., or a
12 Master's degree in the field of geology, biology, or
13 environmental science, and you're applying for a SIRB
14 position and you have a Ph.D. in, let's see, radiation,
15 we don't do radiation very much. We would carry around
16 pancake probe years past. But specifically, if you have
17 a degree, Ph.D. in radiation, you may not be able to
18 clean up hazardous sites.
19    Q. Does that mean you are not capable of being
20 trained to?
21    A. If you spend lots of years in the position,
22 you can train probably 30 percent of the people. Some
23 people are untrainable.
24    Q. Is there a difference between the optimum

Page 69

1 candidate for a position and one who meets the minimum
2 causal qualifications?
3    A. I would assume so. But I am a scientist. I'm
4 not in personnel.
5    Q. In Paragraph 18 of your complaint, you state
6 that Paul Will, Alex Rittberg and Christina Wirtz agree
7 that the rehiring of Mr. Robertson to his original
8 position was the perfect opportunity to attempt to amend
9 the salary disparity.
10        Can you please explain the basis of that
11 statement?
12    A. Well, Paul is sitting in this chair. Alex is
13 standing to my right. Christina is standing to my left.
14 We were discussing Keith coming back, being very glad
15 that Keith was coming back, because no one wanted to deal
16 with Dover Air Force Base. And Alex brought up or said
17 that he was going to try to get a little bit more money
18 for Keith because there were some issues with another
19 gentleman being paid $20 more a month than him and it
20 bothered him. We had already been working through this
21 issue, the fact that I was entry level after all of those
22 years, it was a natural progression of the conversation.
23    Q. So, Keith, you are saying Keith was bothered
24 by the fact that someone else was making $20 a month more

Ann L. Breslin

19 (Pages 70 to 73)

Page 70

1  than him?
2      A.  It was kind of a joke.  Alex was trying to get
3  him a little bit more money when he came back.
4      Q.  Did it work?
5      A.  No.
6      Q.  Do you know why it did not work?
7      A.  Actually, I only know what Keith told me.
8      Q.  What did Keith tell you?
9      A.  It just did not work.
10     Q.  Who did he say made it not work?  Apparently,
11  his manager wanted it to work?
12     A.  Personnel.
13     Q.  Human resources?
14     A.  Yes.
15     Q.  In Paragraph 19 of your complaint you state
16  that on or about May 17th, plaintiff's immediate
17  supervisor at the time, Mr. Paul Will, drafted a
18  memorandum to the acting director of Air and Waste
19  Management?
20     A.  We spoke about that a while ago.  I explained
21  the chain with that.
22     Q.  Is that statement true?
23     A.  The statement is, essentially, true.  Yes.
24     Q.  Tell me what is not exactly true about it?

Page 71

1      A.  Well, it's true.  But by further explanation,
2  it was, as I explained before, I have to repeat, Alex had
3  the original templates that he used.  He made some
4  modifications to it.  He forwarded to me and also to
5  Christina Hendershot.  She was doing something to try to
6  become a 3.  I have E-mails for that.  I made some
7  changes.  Added some information from my original
8  advanced hire request back in '96.  I sent it onto Alex.
9  Alex made some revisions.  Sent it to Christina to make
10  revisions.  Forwarded to Paul, the E-mail.  Noted in the
11  E-mail that I was going to print it out for review,
12  approval and changes, the manager was making, or it was
13  coming from him.  As is common practice.  We generally --
14  any types of these things that talk about our own
15  experiences.
16      For example, the one from Keith, when he
17  was hired, again, was written primarily by Keith.  No
18  one knows better than your experiences and abilities than you
19  do.  It is common practice.  Proposed plans.  Final
20  plans.  Letters.  Anything else.  They may come from the
21  manager.  But the bulk of the information is included by
22  the staff member themselves.  The manager, as in this
23  case, reviewed, made some changes.  I wish I had his
24  copy.  He makes pen changes.  I kept everything.  For

Page 72

1  some reason, I did not keep that.  I still may have it.
2  I'll have to keep looking for it.  Sent it back to me.  I
3  made the changes that he made.
4      Evidently, him and Christina were out of
5  the office for some reason.  I had spoken to him about
6  it.  And, I think, Alex had talked to him about it.  Alex
7  Somebody talked to him about Alex signing them.  Alex
8  signed for both Christina and Paul.  And the thing went
9  out.
10     MS. BREWINGTON:  Off the record.
11     (An off-the-record discussion took place
12  at this time.)
13     MS. CSIZMADIA:  Back on the record.
14  BY MS. CSIZMADIA:
15     Q.  I'm slightly confused.  I thought that was --
16     A.  You're not confused at all.  Don't BS me.
17     Q.  I sort of am.  You said earlier the chain that
18  you were referring to, I was asking you about your
19  initial advanced hire request.
20     A.  No.  You said right here -- right here.
21     MS. BREWINGTON:  I think we're confused.
22     You're talking about earlier, the
23  earlier question?
24     MS. CSIZMADIA:  Previously.

Page 73

1      MS. BREWINGTON:  In the deposition.
2  Yes.
3      MS. CSIZMADIA:  And, I think, you were
4  referring to this.
5  BY MS. CSIZMADIA:
6      Q.  I asked you who wrote the advanced hire
7  request before, and you gave me a similar explanation?
8      A.  Oh.  You mean, the 1996 advanced hire request?
9      Q.  Yes.
10     A.  The 1996 advanced hire request was written
11  using Keith's template from Jamie and Karl and I wrote it
12  together.  Karl approved it, signed it and sent it down,
13  as he did with this.  The one.
14     MS. BREWINGTON:  We're clear.
15     MS. CSIZMADIA:  Okay.  Let's take a
16  break.
17     (Off the record at, approximately, 12:50
18  p.m.)
19     (Back on the record at, approximately,
20  1:00 p.m.)
21     MS. CSIZMADIA:  Back on the record.
22  Mark this as No. 9.
23     (Document dated May 17, 2001 was marked
24  as Breslin Exhibit No. 9 for identification.)

Page 74

BY MS. CSIZMADIA:
2    Q.  I just showed you a document.  Is that the one
3    that you talked about?  The collaboration of writing?
4        A.  From Paul Will to Bill Hill to Christina.
5    Yes.
6        Q.  Because Paul Will did not draft that.
7            Correct?
8        A.  He as all of the others managers and I drafted
9    it together.  It was, like I said, common practice for
10   everybody to work on the same document together.
11           I must say, I'm disappointed in his
12   response to that, but it is what it is.
13       Q.  So, if he said you presented to him and asked
14   him to sign it, that is not a fair characterization?
15       A.  No.  That is not correct.
16           MS. BREWINGTON:  Objection.  Calls for
17   speculation.
18   BY MS. CSIZMADIA:
19       Q.  Do you know if he read it before he signed it?
20       A.  Yes.  He read it.  Absolutely.  He also made
21   changes in pen to it.
22       Q.  In Paragraph 20 of your complaint you refer to
23   a response from Deputy Director Marjorie Crofts?
24       A.  Yes.

Page 75

1        Q.  Do you have a copy of that?
2        A.  I do.
3        Q.  Who was your manager in December of 2001?
4        A.  Paul was my manager.  I was working on sites
5    that both Paul and Alex were PM1's for, program manager
6    one's for, but I was primarily Paul's managee.
7        Q.  And Christina Wirtz, did she supervise both of
8    those managers?
9        A.  That's correct.
10       Q.  Was she on the ES1 Group?
11       A.  Christina?
12       Q.  Yes.
13       A.  I don't know.
14           MS. CSIZMADIA:  Mark this as Breslin 10.
15           (Document dated December 10, 2001 was
16   marked as Breslin Exhibit No. 10 for identification.)
17   BY MS. CSIZMADIA:
18       Q.  Did Christina ask for The Department to review
19   your salary situation in a memo dated December 10th?
20       A.  Yes.
21       Q.  Are you familiar with this document?
22       A.  Yes.
23       Q.  That's the document I just referred to; is it
24   not?

Page 76

1        A.  Yes.
2        Q.  How long have you and Christina been
3    discussing a mechanism for increasing your salary?
4        A.  I don't recall exactly how long.  Shortly
5    after she came to SIRB.  I don't know when that was.
6    2000.  1999.  I am not 100 percent sure when she came.
7        Q.  And this memo, is it dated December of 2001?
8        A.  December 10, 2001.
9        Q.  You both were pretty determined to find a way
10   to get your salary increased; weren't you?
11       A.  Well, I think Christina, as a good manager,
12   realized that Keith and I were not doing the same job,
13   and there was no reason why our salaries should be so
14   different.  And, I think, she as a good manager realized
15   that it was an issue that needed to be dealt with.
16       Q.  Is that a yes or no?
17       A.  Determined.  The way you say it sounds like,
18   at any risk of anything they would do that.  So, I would
19   say, I don't agree with your phrasing.  I do agree with
20   what I just stated.
21       Q.  Which one of you raised the idea of gender
22   discrimination in your conversations?
23       A.  I don't know.
24       Q.  Did the two of you decide that claiming gender

Page 77

1    discrimination might be a method to get your salary
2    raised?
3        A.  I don't think so.  No.  I think it was
4    something that she looked at everybodys salary and was
5    concerned about it as it was.
6        Q.  Who thought that you had been discriminated
7    against?
8        A.  I definitely thought I was being discriminated
9    against.  I believe Christina believed that I was being
10   discriminated against.
11       Q.  Who drafted this December 10, 2001 memo?
12       A.  Again, all you have to do is look at the
13   things are laid out to understand.  The bulk of the
14   experience and information, probably, maybe a little over
15   half of it, was from my direct experience and my
16   drafting.  And the rest she put in.
17       Q.  Do you remember who initially drafted it?  Are
18   you saying you drafted it and she added things?
19       A.  Well, if you look right in the back, it will
20   tell you how it is chroned.  It looks like it is a
21   merging of two documents.  Christina's chroned and my
22   chroned.  I'm assuming my chroned was this last bit, back
23   here explaining my positions.  And the front --
24           MS. BREWINGTON:  For the record, she is

B-0086

Ann L. Breslin

21 (Pages 78 to 81)

Page 78

1  pointing to the second page of the document.
2          THE WITNESS: Yes. A lot of times it
3  will depend on -- for example, someone may develop a
4  document and E-mail it another person. That person
5  may chron it under their own position. Here showing two
6  chron numbers. My assumption is she took my chroned
7  document and also used her.
8          MS. CSIZMADIA: Mark this as Exhibit 11.
9          (Document entitled Memorandum dated May
10  17, 2001 was marked as Breslin Exhibit No. 11 for
11  identification.)
12  BY MS. CSIZMADIA:
13      Q. I want to show you another document.
14          Are you familiar with this document?
15      A. Yes. This looks very much like Christina's
16  corrections to the document. Again, as I said before, I
17  said I moved stuff around and sent it around to the other
18  folks to review. So, that's probably where she got the
19  original document from. She keeps everything, as
20  Christina does. Everything that she has edited.
21      Q. Whose handwriting is all over it?
22      A. Well, some is mine. But it looks like
23  Christina's handwriting, from what I remember.
24      Q. The bullets in the upper right-hand corner,

Page 79

1  whose handwriting is that? Where it says, main thrust
2  should be sexual discrimination. His Master's counted,
3  yours did not. Or just less experience.
4      A. Christina.
5      Q. Can you look through it and find where it
6  talks about gender discrimination before these changes
7  were made to the document?
8      A. I know there would not be. In the original
9  one, it was a simple request for an advanced hire from
10  Paul.
11      Q. I don't understand. Can you explain that?
12      A. Well, since the original document, she is
13  listing this from, in other words, the information of my
14  experience in the back is from the document.
15      Q. From the advanced hire?
16      A. 2001 advanced hire document. That is the one
17  that Alex initially wrote. I edited. Alex edited again.
18  Christina edited. Paul edited. We sent it out with
19  Alex's signature.
20      Q. Let me draw your attention to Bullet No 4, or
21  Bullet No. 2. Years of experience performing this
22  Principal Accountability, seven years.
23          That could not have come from yours
24  earlier; could it?

Page 80

1          MS. BREWINGTON: Could you hold on one
2  second. Before you answer that question, point me to
3  where you are.
4          MS. CSIZMADIA: I am on the third page.
5  It says, May review complex permitting applications,
6  technical reports or other submissions.
7          MS. BREWINGTON: It's a bullet?
8          MS. CSIZMADIA: Heading.
9          MS. BREWINGTON: Number two.
10          MS. CSIZMADIA: Then there is a sentence
11  right underneath of it. Years of experience performing
12  this Principal Accountability, seven years. It is not
13  marked up.
14  BY MS. CSIZMADIA:
15      Q. This piece could not have come from yours
16  earlier; could it?
17          MS. BREWINGTON: It says here -- this is
18  exactly -- I am looking at Breslin 9.
19          THE WITNESS: This is from Paul's 2001
20  submission.
21          MS. BREWINGTON: And if we compare the
22  two --
23  BY MS. CSIZMADIA:
24      Q. This is a draft of the memo that Paul Will

Page 81

1  signed.
2          Correct?
3      A. This, no. This is not a draft of the memo
4  that Paul Will signed.
5          This is what Christina used as the basis
6  of the memo stamped confidential.
7          So, as of 2001, seven years of
8  experience is correct. Six, seven. Seven years.
9      Q. Reading Christina's point where she is saying
10  that the main thrust should be sexual discrimination, who
11  is she noting that for, do you know?
12      A. (Witness nodding.)
13      Q. Did you get this back from her marked up like
14  this?
15      A. No.
16          MS. BREWINGTON: The first answer to
17  your question, I think you asked something and she shook
18  her head. I wanted it on the record.
19          If the court reporter can read that
20  back.
21          (The court reporter was requested to
22  read back from the record.)
23  BY MS. CSIZMADIA:
24      Q. Did you talk to John Blevins, the Director of

CORBETT & WILCOX

Ann L. Breslin

22 (Pages 82 to 85)

Page 82

1   Air and Waste Management, concerning the request that
2   your salary be reviewed?
3       A.  Yes.
4       Q.  And how did that go?
5       A.  He was supportive, but not hopeful.
6       Q.  And did he express why he was not hopeful?
7       A.  I believe that it was probably because of the
8   fact that the state was going through a budget crunch.
9       Q.  You're saying that you believe it was
10  probably.  If you're just guessing, please tell me you
11  don't know?
12      A.  I don't know.  I guess I don't know
13  specifically.
14      Q.  So, the Director of Air and Waste Management,
15  John Blevins, sent a memo asking human resources to
16  review your salary.
17          Right?
18      A.  That's my understanding.  Yes.
19      Q.  And then in your complaint at Paragraph 26,
20  you say that Merrilyn Ramsey, the human resource manager,
21  sent a memorandum dated August 16, 2002 to Christina
22  Wirtz.
23          Is that correct?
24      A.  Yes.

Page 83

1       Q.  Is this the memo that you were referring to?
2       A.  Yes.
3           MS. CSIZMADIA:  Will you mark that as
4   the next exhibit, please.
5           (Document dated August 16, 2002 was
6   marked as Breslin Exhibit No. 12 for identification.)
7   BY MS. CSIZMADIA:
8       Q.  And what was the response?
9       A.  No.
10      Q.  And the reason given?
11      A.  My salary falls within the range of others
12  with her experience and credentials.
13      Q.  Does it say that Mr. Robertson had more
14  credible, applicable experience?
15      A.  It does say that.  Yes.
16      Q.  Are you familiar with this document?
17      A.  Yes.  I have a copy of it, of course.  It came
18  from me.
19      Q.  What is it?
20      A.  Basically, notifying those guys that I would
21  be jointly filing a grievance with the Department of
22  Labor.
23      Q.  And those guys are Paul, Christina and Alex?
24      A.  Yes.

Page 84

1       Q.  And are you thanking them for supporting you?
2       A.  That's what I say.  I want to thank the three
3   of you for supporting me over the past few years.
4       Q.  And in your memo you talk about Qazi and
5   Keith?
6       A.  Yes.
7       Q.  But today you're telling me you're concerning
8   yourself with Keith Robertson and not Qazi.
9           Correct?
10      A.  Well, Qazi has a Ph.D.  He's not a manager.
11  Whether a Ph.D. is worth $20 a month more is not
12  something I can discuss.  But Keith was hired with a
13  Master's degree two weeks after me.  He is doing the same
14  job.
15      Q.  The memo says that you are filing the
16  grievance and you are going to talk to the Department of
17  Labor.
18          Correct?
19      A.  Yes.
20      Q.  You actually abandon in your complain about
21  Qazi during the grievance process.
22          Isn't that correct?
23      A.  I didn't abandon it, per se.  My attorney
24  thought that the best thing to do is just to concentrate

Page 85

1   to the person that was equal to me.
2       Q.  And that's still your position?
3       A.  Yes.
4           MS. CSIZMADIA:  You can mark that as 13,
5   and you can mark this one as 14.
6           (E-mail dated September 11, 2002 was
7   marked as Breslin Exhibit No. 13 for identification.)
8           (Document dated September 11, 2002 was
9   marked as Breslin Exhibit No. 14 for identification.)
10  BY MS. CSIZMADIA:
11      Q.  I will show you another document.
12          Is this the grievance that your attorney
13  filed on your behalf?
14      A.  Yes.
15      Q.  And a grievance is an appropriate mechanism
16  for arguing that the Merit Rules have been violated.
17          Is that correct?
18      A.  I think it's one of the mechanisms.
19      Q.  Would it surprise you if the Merit Rules said
20  it is the only mechanism?
21      A.  Very little would surprise me these days.
22      Q.  The relief that you asked for in your
23  grievance is a leveling up.
24          Is that right?

Ann L. Breslin

23 (Pages 86 to 89)

Page 86

1    A. Leveling of pay with other Environmental
2 Scientist 3 incumbents who do precisely the same work as
3 the grievant.
4    Q. What is the rest of the sentence?
5    A. February 1, 2002.
6    Q. That is the point in time that you asked for
7 the leveling up to be applicable in your grievance?
8        MS. BREWINGTON: Objection.
9 BY MS. CSIZMADIA:
10    Q. So, is that the point that you asked for the
11 money?
12    A. This is what my attorney wrote in the letter.
13 Not for money wise, for back pay and things like that,
14 no. This is what my attorney wrote as of this date to bring my pay up.
15 attorney wrote as of this date to bring my pay up.
16    Q. And you filed that grievance on the same day
17 that you sent the E-mail. Your attorney filed the
18 grievance on the same day you sent the E-mail.
19        Is that right?
20    A. Yes.
21    Q. Now, in Paragraph 287 of your complaint, you
22 say with no other administrative remedy available to her?
23    A. 287?
24    Q. I'm sorry. Paragraph 28. I type too fast

Page 87

1 sometimes. Paragraph 28.
2        You say with no other administrative
3 remedy available to her, plaintiff filed a charge of
4 discrimination?
5    A. That's what my attorneys have written.
6    Q. And was that correct?
7    A. That's what my attorneys have written.
8    Q. At that time, was your appeal, your
9 administrative grievance ongoing?
10    A. I believe we were close to the first step.
11    Q. Is your attorney wrong, then?
12    A. This comes from my attorney. This is an
13 attorney question. There's lots in here that are forms.
14 There's lots in here that say codes. And if you asked me
15 about 40 CFR Part 300, I can tell you everything. But
16 the rest of it, that's why I have attorneys.
17    Q. Did you read it for factual accuracy before it
18 was filed on your behalf?
19    A. Of course, I did. But like I said, I have
20 attorneys.
21    Q. So, you don't know that a grievance is an
22 administrative remedy?
23    A. I have no opinion one way or another.
24    Q. In Paragraph 21 of your complaint you refer to

Page 88

1 three similarly situated males.
2        Who are you referring to there?
3    A. Keith and Qazi. And don't ask me how to spell
4 his last name. Salahuddin, or something to that effect.
5    Q. We already ascertained that you are talking
6 about Keith now.
7        Right?
8    A. Specifically about Keith, for purposes of the
9 quality.
10    Q. Now, going back to your E-mail dated September
11 11. It is Exhibit 13, I believe. Can you read out loud,
12 please, the last sentence of the first paragraph?
13    A. According to my attorney, the DOL will be
14 comparing my pay to those ES IIIs in SIRB, not ES IIIs in
15 DNREC, who complete the same duties, namely Qazi and
16 Keith, who are being paid substantially more per year.
17    Q. Why did you tell Paul, Christina and Alex
18 that?
19    A. Why did I tell them that?
20    Q. Yes.
21    A. Because of the facts.
22    Q. Why was it significant to point out?
23    A. So I could be accurate and have it for the
24 record.

Page 89

1    Q. Was it also because you knew there were other
2 ES3's in The Department that were females who were being
3 paid higher?
4    A. Not in SIRB. No.
5    Q. I'm not talking about just SIRB.
6    A. Well, I was talking about SIRB.
7    Q. Right. And I'm asking you why you felt the
8 need to clarify that you were just talking about SIRB?
9    A. Because these are people that were hired
10 post-'93 with the same pay scale as I am. You have to
11 compare apples to apples.
12        First you have to find out when were
13 they hired. They were hired pre-'93, pre-'94, pre-'93,
14 somewhere around there. Pre-'93 was a different pay
15 scale, as was Larry Jones, Kurt Olinger, Rob Allen.
16 Those guys were hired on a different pay scale. Larry
17 would be maybe $10,000 or $12,000 more per year. He was
18 hired on a different pay scale. Take those people out.
19 You have to talk apples and apples. Not apples and
20 lemons.
21        Then, after that, you have to talk about
22 the specific technical abilities of those folks in SIRB.
23    Q. And why --
24    A. What are people supposed to do --

Page 90

1        MS. BREWINGTON: Can she finish what her
2   thought was?
3        THE WITNESS: What do people in SIRB do.
4   Well, we investigate, remediate, secure hazardous sites.
5   We work with the EPA to do such. We have something
6   specific. Again, we don't count fish. We don't do RCRA
7   inspections. We do something very specific.
8        So, here is a guy that was hired two
9   weeks after me with a Master's degree doing the exact
10  same job as I was doing.
11       So, for accuracy sake, and to be
12  inclusive in what I was talking about, I wrote that down.
13       Now, I have from the beginning, I have
14  requested this several times -- if you're going to say
15  there are other women as ES3's that are being paid more
16  than me, I need to know their exact job description, when
17  they were hired, and their educational background, so we
18  could find out if we are dealing with apples and apples
19  or apples and lemons.
20       You just can't say, here is a woman.
21  She was hired in '88. Well, two percent, two percent,
22  two percent, two percent, plus a different pay scale.
23  Totally different issue.
24  BY MS. CSIZMADIA:

Page 91

1   Q.  That's your opinion.
2       Correct?
3   A.  That's the facts.
4   Q.  Well, you sound like you're an expert in
5   personnel now, which you tell me you're not?
6       MS. BREWINGTON: Objection.
7   Argumentative.
8       THE WITNESS: I know the facts that are
9   applicable of my case. If you have a different pay
10  scale, you have a different pay scale.
11  BY MS. CSIZMADIA:
12  Q.  When you talk about adding the two percent
13  every year, that is also added to the minimum of the pay
14  scale?
15  A.  That's correct.
16  Q.  So, that would not change it.
17      Correct?
18  A.  But if they start at a different pay scale.
19      Say, for example, I'm not 100 percent
20  sure, but I think ES3 went from like 13 -- 15 to 13 back
21  to 15 again. I'm in the GS system now. I don't remember
22  exactly what that is. If you have somebody whose base
23  salary is $50,000, and the next year you take selective
24  market away and the base salary for an ES3 is $30,000,

Page 92

1   you can't compare those people.
2   Q.  I didn't know I asked that question.
3       So, there are a couple of critical
4   points with respect to your salary.
5       Correct?
6   A.  Yes.
7   Q.  One of them was in 1994, when you were hired.
8   And you did not grieve the denial of the advanced hire
9   request.
10      Right?
11  A.  I don't think I had 1994 advanced hire. I may
12  have, but it was a long time ago.
13  Q.  When you were hired as an ES3, when was that?
14  A.  1996. 1997. Sorry. End of '96, beginning of
15  '97.
16  Q.  So, why didn't you grieve the denial of the
17  advanced hire request in '96?
18  A.  Well, there's two reasons. When I signed
19  accepting that salary, if the letter had said -- in fact,
20  I have the original letter here -- Dear, Ann Breslin, by
21  signing on the dotted line, you accept that forever and
22  above, six years down the road, you will continue to make
23  entry level and you will never be paid any more than
24  entry level, I would have never signed it.

Page 93

1        The assumption is, once you get into
2   your job, once you move through the ranks, your salary
3   goes up from entry level. First assumption.
4        And the second thing is, I did talk
5   about grieving it. Either Jamie or Steve, Steve Williams
6   or Jamie Rutherford said to me, Why don't you grieve it.
7   So, I went to Karl, and Karl said, not a good idea. You
8   can if you want, but you will be labeled as a
9   troublemaker if you do that.
10       So, separately, I went to N.V. Raman. I
11  explained the same thing to him. He said exactly the
12  same thing to me. Well, you can if you want. Realizing
13  I would have no management support, realizing that I was
14  two years into, or three years into a new job, I most
15  likely should have grieved it at that point. I was
16  afraid. I felt intimidated. Both of my managers had
17  told me, grieving it would label me as a troublemaker.
18       I continued to try to work through the
19  system, without having to go legal. It was a choice I
20  made.
21       Now, hindsight being 20/20, absolutely,
22  I should have done it.
23       I would say, too, at my step three
24  grievance, I was told that my grievance was not time

Ann L. Breslin

25 (Pages 94 to 97)

Page 94

1  barred, or whatever, just because of the fact that -- I
2  don't know what is the proper term to put it --
3  basically, the hearing officer said, the decision was for
4  and against. No, I don't think she has been
5  discriminated against. But the state was saying, DNREC
6  was saying, she is not being discriminated, and she
7  waited too long. The step three grievance said I did not
8  wait too long.
9        MS. BREWINGTON: Step three?
10       THE WITNESS: Step three of my grievance
11  process.
12            The fact of the matter is, I should have
13  done it right away, but I didn't. It is what is it.
14  BY MS. CSIZMADIA:
15       Q. Are you done?
16       A. Yes.
17       Q. I thought the step three grievance was the one
18  where you said it was completely bias against you, and it
19  felt like old home week?
20       A. Definitely did. Yes.
21       Q. But you won part of your grievance?
22       A. I did. I think it was pretty obvious from the
23  look on my face when I walked in there that I was pretty
24  disappointed by the chattiness of the situation.

Page 95

1            It's pretty clear, though, and my
2  attorney was pretty clear with it, too, once my final no
3  was said, that is when the clock started, and they agreed
4  with that.
5       Q. And this was the decision, the step three
6  grievance was the decision that immediately proceeded
7  your decision to not continue with the appeal? I'm just
8  trying to understand. Earlier you told me that
9  everything, basically, was stacked against you, and that
10  you were not getting a fair hearing.
11            Is that correct?
12       A. That's correct. I do believe that I made the
13  decision at that point in time not to go to the Merit
14  Review because when I walked in -- again, I will repeat
15  myself -- when I walked in, Steve and Merrilyn were
16  chatting away with the hearing officer like they were old
17  friends. And I knew immediately that me winning, and I
18  didn't, I lost the grievance. I did get a
19  positive reading by, no, it did not take her that long,
20  which gave me the ability to move to the next step, which
21  is my understanding, but I lost the grievance.
22            So, even though I had that little tidbit
23  of yeah, I did not wait too long, I still lost the
24  grievance. Completely consistent with what I said

Page 96

1  before.
2       Q. Second critical point is when you requested
3  leveling up of salary and it was denied.
4            Is that fair?
5       A. What?
6       Q. When your managers asked for your salary to be
7  leveled up to Keith's in and around 2000?
8       A. Yes.
9       Q. Was that another critical point in your pay
10  situation at DNREC?
11       A. I lost the first --
12       Q. The first one was when you --
13       A. I mean, what's the point? I lost the point.
14  What was the critical point of?
15       Q. I'm trying to understand when you were
16  discriminated against.
17            Can you tell me when you were
18  discriminated against?
19       A. I think at the beginning.
20       Q. At the very beginning?
21       A. And continuing on with the management.
22       Q. Which management?
23       A. With Karl.
24       Q. You believe Karl discriminated against you?

Page 97

1       A. Yes. Of course. He did not fight for me as
2  he should have fought for me.
3       Q. Anyone else?
4       A. I just talked about Karl. That's all.
5       Q. And you believe Karl did that because you were
6  a female?
7       A. Yes.
8       Q. And you're referring all the way back to when
9  he hired you as an ES3?
10       A. When I was competitively hired. Yes. '96/'97
11  time frame.
12       Q. It wasn't the human resources office that
13  discriminated against you?
14       A. That, I can't say. I never had any dealing
15  with them at that point in time.
16            And it's impossible to ask Sharon what
17  she was thinking. Sad for her is good for you guys.
18       Q. I absolutely disagree with that. I'm offended
19  that you say that. I would like to get a glass of water.
20       A. I heard through the grapevine that DNREC's
21  plan was to blame a woman that was incapacitated. I
22  heard it from two separate people. And that hurt me so
23  bad.
24       Q. Can you name those people?

Ann L. Breslin

Page 98

1    A.  No.  I will not name those people.  I could
2  not believe it.  I said, you got to be kidding me.  And
3  that, to me, is a woman that, for all intents and
4  purposes, has no way of defending herself.
5    Q.  Can you, please, name those people?
6         MS. BREWINGTON:  I will object on the
7  grounds of relevance.
8         And I would like to go off the record
9  and have a conference with my client.
10        MS. CSIZMADIA:  Yes.
11        (Off the record at, approximately, 1:50
12  p.m.)
13        (Back on the record at, approximately,
14  1:55 p.m.)
15        MS. CSIZMADIA:  Back on the record.
16  BY MS. CSIZMADIA:
17    Q.  Ms. Breslin, we just took a break so you can
18  talk to your attorney.
19        Did you discuss anything other than the
20  last piece, when we were talking about Sharon Tazelaar?
21    A.  No.
22    Q.  Ms. Breslin, your step one grievance was
23  before John Blevins.
24        Is that correct?

Page 99

1    A.  Yes.
2    Q.  He is the one that said he would look into the
3  matter for you and sent a memo saying he would do the
4  right thing for you.
5        Is that correct?
6    A.  Yes.
7    Q.  Were you represented at the hearing?
8    A.  I'm not sure.  Let me look at my file.  I
9  think I was.  I'm not sure.
10    Q.  Mr. Shiels had filed the appeal.
11        Is that right?
12    A.  Yes.
13    Q.  Was he at the hearing?
14    A.  I'm just trying to determine that right now.
15  Yes. It appears he was there.
16    Q.  Was there evidence at the hearing that in the
17  Division of Air and Waste Management female Environmental
18  Scientists were paid a slightly higher salary than males?
19    A.  Repeat the question.
20    Q.  Was there evidence at the hearing, the step
21  one grievance hearing, that in the Division of Air and
22  Waste Management that female Environmental Scientist 3's
23  had a slightly higher average salary than male
24  Environmental Scientist 3's?

Page 100

1    A.  There is a note here not specifically saying
2  in SIRB that that was the case.  But, yes, throughout Air
3  and Waste Management, that was the case.
4    Q.  Was there a written decision?  Well, pardon
5  me.
6         Was there also evidence at that hearing
7  that six male Environmental Scientist 3 in the Division
8  of Air and Waste Management were paid the same salary as
9  you?
10    A.  That was the statement here.  Yes.
11    Q.  Have you seen the written decision -- the
12  result of John Blevins written decision?
13    A.  I have a faxed copy of it.  I don't have an
14  original like this.
15        MS. CSIZMADIA:  Mark this as 15.
16        (Document dated October 29, 2002 was
17  marked as Breslin Exhibit No. 15 for identification.)
18  BY MS. CSIZMADIA:
19    Q.  Does the written decision that you have
20  identified that's Exhibit 15 say that?
21    A.  Say what?
22    Q.  That female Environmental Scientist have a
23  slightly higher average of $46,221 than males at $45,418
24  in the Division of Air and Waste Management?

Page 101

1    A.  Within the Division of Air and Waste
2  Management.  Not within SIRB, specifically.
3    Q.  Did Mr. Blevins find any sexual
4  discrimination?
5    A.  John says The Department has not engaged in
6  sexual discrimination.
7    Q.  You filed an appeal of that decision; did you
8  not?
9    A.  I did.
10    Q.  You had a hearing before Deputy Secretary
11  David Small?
12    A.  Yes.
13    Q.  Were you represented by an attorney at that
14  hearing?
15    A.  I was.
16        MS. CSIZMADIA:  Mark this as 16.
17        (Document dated November 22, 2002 was
18  marked as Breslin Exhibit No. 16 for identification.)
19  BY MS. CSIZMADIA:
20    Q.  Was there evidence at the hearing that Keith
21  Robertson and Larry Jones qualifications were
22  distinguishably different than yours?
23    A.  The statement was made.  The first page looks
24  like my hiring, Keith's hiring and Qazi's hiring.  The

# Ann L. Breslin

27 (Pages 102 to 105)

## Page 102

1  second page appears to be Larry's hiring in '87, Qazi's
2  in 2000 and Keith's in 1994. A statement is made,
3  superior qualifications.
4      Q.  And are you familiar with the document that I
5  just placed in front of you?
6      A.  I have a copy of that.
7      Q.  Is that the November 22, 2002 decision?
8      A.  Yes.
9      Q.  Does the Deputy Secretary find that you were
10  discriminated against?
11      A.  David wrote, The Department's analysis
12  provided herein shows that there are distinguishable and
13  supporting differences in the qualifications of her
14  colleagues which justify their current salaries.
15          There was a mistake. You said Larry,
16  and Larry is not listed in this one at all.
17      Q.  I'm sorry.
18          You filed an appeal of that decision?
19      A.  My attorney did. Yes.
20      Q.  On your behalf?
21      A.  Yes.
22      Q.  Did you have a hearing before the State
23  Personnel Hearing Officer?
24      A.  I did.

## Page 103

1          MS. CSIZMADIA: Mark this as 17.
2          (Document entitled Step Three Grievance
3  Decision was marked as Breslin Exhibit No. 17 for
4  identification.)
5  BY MS. CSIZMADIA:
6      Q.  Can you identify this document?
7      A.  Yes.
8      Q.  Read the statement on Page 3 of that decision,
9  please?
10      A.  The paragraph there, top or bottom?
11      Q.  Top.
12      A.  Based on all the evidence and testimony
13  introduced at the hearing, I am persuaded that The
14  Department has not discriminated against the Grievant as
15  result of her gender when it denied her request to have
16  her salary leveled up.
17          That was a statement from the hearing
18  officer, actually.
19      Q.  On the page before that, the paragraph before,
20  can you read that paragraph, too, please?
21      A.  The last paragraph or first?
22      Q.  The last.
23      A.  The hearing officer actually writes, Merit
24  Rule 5.0712 also gives The Department discretion to seek

## Page 104

1  a starting rate higher than the minimum and to level up
2  the salaries of incumbents under certain circumstances,
3  i.e., if there is a critical shortage of applicants. It
4  was not determined that there was a critical shortage of
5  Environmental Scientist applicants, and The Department
6  was not obligated to seek a starting rate higher than the
7  minimum. Accordingly, there has been no violation of the
8  Merit Rules.
9      Q.  Where is the decision of the MERB Board that
10  that one could to appeal to?
11      A.  Pardon?
12      Q.  Where is the decision of the MERB Board that
13  would have heard the appeal of that decision?
14      A.  Where is the decision of the MERB Board? I'm
15  not clear.
16      Q.  The State Merit Employees Review Board. That
17  is the people who would have reviewed that decision?
18      A.  I realize that. What do you mean, what
19  statement?
20      Q.  I said, this decision. Where is the decision
21  of the MERB Board?
22      A.  We covered the fact that at that point in
23  time, since I had been employed by the State of Delaware
24  or by the Federal Government, and that knowing The

## Page 105

1  Department of Labor positive cause finding was coming, I
2  made a decision not to go onto the Merit Review Board.
3          Also, it should be noted, Steve Karlsen
4  tried to get me disqualified from that, as well. Who
5  knows whether that would have worked or not.
6      Q.  Moving onto the merits of the denial of your
7  request for advanced hire.
8      A.  Where are we?
9      Q.  Do you remember reading Rule 5.0711 that
10  provides the appointing authority may provide a higher --
11  starting rates higher than the minimum for the paygrade
12  up to 80 percent at this point where the applicants'
13  qualifications are clearly over and above the initial
14  required minimum by the class specification.
15          MS. BREWINGTON: Before you answer that
16  question, where are you again?
17          MS. CSIZMADIA: 5.0711.
18          MS. BREWINGTON: Thank you. You were
19  just making a statement.
20  BY MS. CSIZMADIA:
21      Q.  May approve a starting rate higher than the
22  80th percentile provided that such higher rate is
23  requested in writing by the appointing authority and is
24  clearly justified and contains applicable documentation

B-0093

Ann L. Breslin

28 (Pages 106 to 109)

Page 106

1  of the applicant's qualifications.
2          Do you remember reading that?
3      A. I do. I think I read that one. Who knows
4  what I've read and haven't read so far.
5      Q. That's the advanced hire provision.
6          Correct?
7          MS. BREWINGTON: Asked and answered.
8  Objection.
9  BY MS. CSIZMADIA:
10     Q. What work is it that you believe met the
11  criteria of clearly over and above those required by the
12  minimum of the class specification?
13     A. Meaning my job?
14     Q. Yes.
15     A. Everything I was doing. I have a list in 2001
16  of my 12 projects that I was working on. I was not entry
17  level. I was barely entry level when I was entry level.
18  I wasn't on the learning curve. I was a person that was
19  fully functional in my position. I was on the technical
20  assistance group. I was on the consultant review group.
21  I was handling projects, both with the EPA and State.
22  Voluntary Clean Up Program, Hazardous Substance Clean Up
23  Act dealing with project officers and consulting firms.
24  Definitely was not entry level.

Page 107

1      Q. Were you referring to your experience with
2  Houghton College and at the Chesapeake Bay Foundation?
3      A. I was referring to my experience from the time
4  I started until the time I went to ES3.
5      Q. I believe you told me earlier that the policy
6  was that you needed to work for six months to even
7  qualify?
8      A. That's correct.
9      Q. And it's experience as project management, is
10  it not, that is the difference between an ES2 and ES3.
11          Is that correct?
12     A. My understanding from I think what you had me
13  read earlier, in one of the earlier exhibits somewhere.
14     Q. So, both you and Keith had worked for SIRB as
15  a two for, at least, six months before you applied for an
16  ES3 position?
17     A. Correct.
18     Q. For the promotion.
19          Correct?
20     A. Yes.
21     Q. You both had the same amount of experience
22  there?
23     A. Yes. We both had the same amount of
24  experience. Doing hazardous site clean up. Remediation

Page 108

1  investigation.
2      Q. You both had Bachelor degrees.
3          Right?
4      A. And we both had Master degrees.
5      Q. And Master degrees.
6          Right?
7      A. Yes.
8      Q. So, what prior experience in project
9  management did you have, in addition to your work at
10  DNREC, that would qualify you to exceed the
11  qualifications, the minimum?
12     A. But I was already working for DNREC when I
13  went from my two and then to my three.
14     Q. I'm looking for what's different between you
15  and Keith.
16          You both worked for, at least, six
17  months with The Department. You both had Bachelor
18  degrees?
19     A. Yes. And Master degrees.
20     Q. And Master degrees?
21     A. Correct.
22     Q. And you both had some prior experience.
23          Correct?
24     A. Yes.

Page 109

1      Q. So, what would differentiate between the two
2  of you would be your prior experience.
3          Correct?
4      A. I don't think there is a differentiation. I
5  think the whole point of this is, we are similar, very
6  similar. In fact, not even substantially the same job.
7  Pretty much the same job.
8      Q. If there is a difference, it would be in your
9  prior work experience, then.
10          Correct?
11     A. I don't think there is a difference.
12     Q. Could you, please, answer my question?
13     A. I have answered it.
14     Q. Do you believe your prior work experience was
15  absolutely equivalent to Keith's prior work experience?
16     A. I believe we had the same type of background
17  experience to start off, entry level for those positions
18  that we were hired into in DNREC.
19     Q. Let's look at your advanced hire request
20  again. What exhibit was that? Exhibit 4. No. 7. Have
21  we marked that? Yes. Exhibit 7.
22     A. Okay.
23     Q. And we need the supplement exhibit, which is
24  Exhibit 8.

Ann L. Breslin

29 (Pages 110 to 113)

Page 110

1        MS. BREWINGTON: Which ones are we going
2   to look at?
3        MS. CSIZMADIA: Seven and eight.
4        MS. BREWINGTON: Not 4.
5        MS. CSIZMADIA: I read that wrong. I
6   apologize.
7        MS. BREWINGTON: Seven and eight. Do
8   you have them?
9        THE WITNESS: I have the ones she is
10  referring to. I actually started writing on them.
11  BY MS. CSIZMADIA:
12     Q.   You told me that you and Karl wrote these
13  together.
14          Is that correct?
15     A.   Mum-hum. That is correct.
16     Q.   Did you have anything to put in them that you
17  did not put in them?
18     A.   Well, we were requested to add more
19  information, which was my epic. Part of the epic, you
20  had to exceed expectations that showed you were working
21  at a higher level. And we added the letter from the
22  Chesapeake Bay Foundation, which I worked for a while.
23     Q.   Did you know it was really important to making
24  a determination as to what was in the memos?

Page 111

1     A.   What?
2     Q.   Was it important to human resources' ability
3   to make a determination about your credentials was the
4   information in the memos? Did they base it on anything
5   else?
6     A.   I don't know.
7     Q.   So, the information in the memos would be
8   pretty important.
9          Correct?
10    A.   Generally is, yes.
11    Q.   Was there anything in there that you asked
12  Karl to put in there that he did not put in there?
13    A.   I don't believe so. But I'm not 100 percent
14  sure, considering it was eons ago.
15    Q.   If you look at the first memo, which is
16  Exhibit 7, and I'll number these myself. At the bottom,
17  the last paragraph refers to your work experience at the
18  Chesapeake Bay Foundation?
19    A.   Yes.
20    Q.   Can you read that, please, out loud?
21    A.   Ann Breslin's work experience at Chesapeake
22  Bay Foundation as a wetland scientist is directly
23  applicable to work performed in SIRB -- at SIRB. Ann
24  performed wetlands delineation research projects, which

Page 112

1   includes bill research over the wetlands permitting
2   process in Pennsylvania. Emphasis is directed toward
3   discovering if the net loss of wetlands is comparable to
4   net gain during wetlands mitigation/reconstruction.
5     Q.   Can you read the next paragraph, too, please?
6     A.   And also worked for 1.66 years as a laboratory
7   assistant. Her duties included teaching skills and
8   laboratory sessions, tutoring, catalogued and preparing
9   herbarium of present and historical flora for college
10  archives and assisting in research project.
11    Q.   Do you consider that the level of work that
12  you did at SIRB highly technical work that you did at
13  SIRB?
14    A.   Please rephrase. I don't understand the
15  question.
16    Q.   Did you consider your work experience at the
17  Chesapeake Bay Foundation and as a laboratory assistant
18  to be comparable to the level of work that you were doing
19  as an Environmental Scientist?
20    A.   In SIRB?
21    Q.   Yes.
22    A.   Were they the same? The principles of project
23  management, data gathering, decision making, writing
24  reports, briefing superiors. Yes.

Page 113

1          Did I have experience with cleaning up
2   hazardous sites at that point in time? No.
3     Q.   So, this experience was applicable to the job.
4          Right?
5          This experience would have been
6   applicable to a job in wetlands as an Environmental
7   Scientist 3, also.
8          Correct?
9     A.   I don't know. I don't know if there's
10  selectives markets -- selectives, I think they're called.
11    Q.   With no selectives, was the minimums you read?
12    A.   I would have to see it before I could make any
13  kind of decision.
14    Q.   You don't think wetlands work is more
15  applicable to wetlands. I think that's what you're
16  telling me. And I'm clarifying what you're telling me.
17    A.   No. I have to be very careful because there's
18  an agenda. And what I'm trying to do is explain, without
19  falling into a hole, of my own making. So, I would have
20  to see a job description for the wetlands project before
21  I could make any kind of decision. Project management is
22  project management.
23          I'm a scientist, highly technical. I
24  did teaching for a lot of years. I did mentoring when I

CORBETT & WILCOX

B-0095

Ann L. Breslin

30 (Pages 114 to 117)

Page 114

1  was with SIRB.
2      Q.  Tell me where else your advanced hire request,
3  this November 13th document, points to any prior work
4  experience?
5      A.  In November?
6      Q.  Mum-hum.  Yes.
7      A.  I worked for Houghton College.
8      Q.  We talked about that.
9          Right?
10     A.  Yes.  I worked for Chesapeake Bay Foundation.
11  I worked for Shippensburg University.
12     Q.  And where is that?
13     A.  It's not here.  I was in community relations.
14     Q.  So, it is not applicable?
15     A.  I think it's very applicable.  But it is what
16  it is.
17     Q.  Why didn't you put it in?
18     A.  I'm a time machine.  Maybe I can tell you.
19     Q.  Let's go to the supplement advanced hire.
20     A.  Mum-hum.
21     Q.  Exhibit No. 8.  This memo attaches a copy of
22  your performance plan.
23          Is that correct?
24     A.  Yes.  For January '95 to December 1995.

Page 115

1      Q.  And I believe you told me the purpose was to
2  show the level that you were working at that you had
3  been --
4      A.  That is what Carl told me.
5      Q.  And then -- go ahead.
6      A.  And if you exceed expectations, it would be
7  enough to show that you were working at that higher level
8  for at least six months.
9      Q.  And that was the criteria, just to get the
10  career ladder advancement?
11     A.  At that point in time was my understanding.
12  Yes.
13     Q.  Now, attached to that is a very nice letter
14  from the Chesapeake Bay Foundation.
15          Correct?
16     A.  Yes.
17     Q.  Can you read the bullets for me, please?
18  Well, actually, you don't want to read the whole letter;
19  do you?
20     A.  No.  Not really.
21     Q.  I would like the letter to be read.  So, would
22  you rather read it, or have me read it?
23     A.  I'll read it.  Dear Ann.  Thank you for your
24  request to revisit your internship here at CBF.  Even

Page 116

1  though it was several years ago, you still rank on top as
2  the best intern with which I have worked.  Here is a list
3  as a follow up of some your responsibilities.
4          Constructing and maintaining database
5  listing information on all wetlands permits that were
6  proposed in 1991.
7          Working with our Maryland wetlands
8  scientist in developing a database to use all of the
9  permit reviews done here and in other states.
10          Composing the data review request sent
11  to the P.A. Department of Environmental Resources and
12  scheduling file review times with the DER staff because
13  the majority of the time, DER will only hold a limited
14  number of files for each review.  And we looked at all of
15  the wetland encroachment files for the calendar year
16  1991.
17          Through the data and files, gleaning
18  from the files, the answers to the questions under the
19  CBF review sheet.  Entering data in the database.  Filing
20  process with request for files that were not found the
21  first time they were requested.
22          Traveling to the Army Corp of Engineers
23  Office in Baltimore to review wetlands permits submitted
24  to the Corp of Engineers.

Page 117

1          Task that were assigned to you required
2  high attention and maintain a high level of interest and
3  devotion to the job.
4          After reviewing your work closely at the
5  beginning, I was very comfortable in allowing you the
6  independence to make judgment calls in answering the
7  questions on the CBF review sheet.
8          It was the answer to these questions
9  that became the basis of redoing the wetland permitting
10  program.
11          I hope this is what you needed.  Please
12  give me a call if you need more information.
13     Q.  Thank you.
14          Now, just to clarify, moving back to the
15  laboratory assistant at Houghton College.  You were a
16  laboratory/teacher assistant during the regular school
17  year of September '88 through May of '89 and September of
18  '89 through May of '90.
19          Is that correct?
20     A.  That's what I wrote.  That's correct.
21  Graduated in '90.  So, it is probably actually in my --
22     Q.  I will actually hand you a document.  That is
23  the application for the Environmental Scientist 1 job.
24          Is that right?

Ann L. Breslin

31 (Pages 118 to 121)

Page 118

1    A.  Yes.
2         (State of Delaware Employment
3  Application for Environmental Scientist 1 job was marked
4  as Breslin Exhibit No. 18 for identification.)
5  BY MS. CSIZMADIA:
6    Q.  I will show you another document.
7         Was that your application for the
8  Environmental Scientist 2 job?
9    A.  Yes.
10   Q.  And then the third would be the application
11 for the Environmental Scientist 3 job.
12        Right?
13   A.  Yes.
14        (State of Delaware Employment
15 Application for Environmental Scientist 2 job was marked
16 as Breslin Exhibit No. 19 for identification.)
17        (State of Delaware Employment
18 Application for Environmental Scientist 3 job was marked
19 as Breslin Exhibit No. 20 for identification.)
20 BY MS. CSIZMADIA:
21   Q.  On you resume attached to your ES2
22 application, which is No. 19, are those the time frames
23 that you submitted?
24   A.  Yes.

Page 119

1    Q.  Are those accurate?
2    A.  Yes.
3    Q.  How is it that you describe your work there in
4  that resume?
5    A.  Teacher's assistant for all botany labs.
6  Catalogued.  Existing herbarium.  Catalogued and prepared
7  herbarium of historical flora for college archives.
8  Assisted botany professor during research projects.
9    Q.  Oh, look.  That talks about your Shippensburg
10 community relations too, same resume.
11        Could you read that, please?
12   A.  Facilitated student-community communications
13 planned, and coordinated student and community
14 activities, such as the College Career Day and Annual
15 Children's Fair.  Prepared maps on the AutoCad Version
16 11 Computer Mapping Programs.
17   Q.  Do you think you put that on your advanced
18 hire application package?
19   A.  No idea.
20   Q.  In your ES3 application, which is Exhibit No.
21 20, there is a minimum qualifications section where you
22 address each of these minimum qualifications separately.
23        Do you see the section that refers to
24 program management number three?

Page 120

1    A.  Yes.
2         MS. BREWINGTON:  What page are you on?
3  Is it like a page or anything?
4         MS. CSIZMADIA:  Second or third page.
5  Number three.
6  BY MS. CSIZMADIA:
7    Q.  What do you use to show that you have
8  experience in environmental/natural resources program or
9  project management?  What work experience?
10   A.  Sampling.  Laboratory results.  Compiling.
11 Designing.  Peer reports.  SO reports.  Brownfield
12 Preliminary Assessment reports.  Consultant oversight, as
13 a project manager during inspections and investigations.
14 Activities under PCB.
15   Q.  It is your SIRB work.
16        Correct?
17   A.  Yes.
18   Q.  Is there anything else?
19   A.  No.
20        MS. CSIZMADIA:  Mark this as 21.
21        (Memorandum dated September 17, 1996 was
22 marked as Breslin Exhibit No. 21 for identification.)
23 BY MS. CSIZMADIA:
24   Q.  I will show you another document.

Page 121

1         Have you seen this before?
2    A.  I have a copy of that.
3    Q.  That's Mr. Robertson's advanced hire report;
4  is it not?
5    A.  Yes.
6         MS. CSIZMADIA:  Mark this as 22.
7         (Memorandum dated September 13, 1996 was
8  marked as Breslin Exhibit No. 22 for identification.)
9  BY MS. CSIZMADIA:
10   Q.  Here is another document, Exhibit 22.
11        You said that was Keith's supplemental
12 response to his advanced hire request?
13   A.  Yes.  Kind of interesting his was initially
14 denied, too.
15   Q.  Yes, it is.
16        Mr. Robertson cites his experience with
17 SIRB in his advanced hire request.
18        Right?
19   A.  No.
20   Q.  What about under justification on the first
21 page?
22   A.  Bottom of the first page he refers to work
23 level as ES3 responsibility.
24   Q.  Under justification, does it say Keith

B-0097

Page 122

1   Robertson worked under Site Investigation and Restoration
2   Branch, SIRB, since February 1, 1994?
3       A.  Yes.
4       Q.  In addition to his 2.5 years of Environmental
5   Scientist experience within SIRB Keith Robertson has 4.75
6   years of related experience.
7           Is that right?
8       A.  Yes.
9       Q.  That's really the only mention of his SIRB
10  work in this document.
11          Correct?
12      A.  Yes.
13      Q.  There's a whole other page-and-a-half
14  discussing his other work.
15          Right?
16      A.  Yes.  Coastal Archaeology.
17      Q.  Now, looking at his supplemental request, it
18  is another page-and-a-half, please?
19      A.  Archaeology.  Yes.  Some Coastal Zone
20  Management Act Evaluations.
21      Q.  Now, we have already clarified you both had
22  comparable degrees?
23      A.  We do.
24      Q.  And as you pointed out, the human resources

Page 123

1   office asked for follow-up information from both of these
2   request.
3           Right?
4       A.  Yes.
5       Q.  And the response that you and Mr. Kalbacher
6   drafted for the additional information, it forwards a
7   copy of your performance evaluation.
8           Correct?
9       A.  That's correct.
10      Q.  And a nice letter from you from the Chesapeake
11  Bay Foundation.
12          Correct?
13      A.  Yes.
14      Q.  And the letter from the Chesapeake Bay
15  Foundation says that you ranked as the best intern
16  Ms. Cuso ever worked with.
17          Correct?
18      A.  That's correct.
19      Q.  It says that the bulk of your time was spent
20  composing data review request to send to the Pennsylvania
21  Department of Environmental Resources and scheduling file
22  review times with DER staff.
23          Right?
24      A.  It was project management, as well.  Wetlands

Page 124

1   investigations.  Permitting.  That's correct.
2       Q.  Is that what the letter says, what I read?
3       A.  What the letter says, and you have also to
4   look at my advanced hire justification says to explain it
5   a little bit better.  I asked Barb to just detail what
6   specific fit of work it was.
7       Q.  I'm just asking you, does the letter from Barb
8   say most of your time was spent doing that?
9       A.  But it is not inclusive to my job description
10  there.  No.  But it is exactly what the letter says.
11      Q.  And what she said you spent the bulk of your
12  job doing is not project management experience; is it?
13      A.  I believe it is.  Yes.  Project management.
14      Q.  In response to a follow-up request concerning
15  Keith Robertson, they provided another memo also.
16          Right?
17      A.  That's correct.
18      Q.  I'm going to read some of it to you.  I would
19  like to ask you if it's a fair characterization of some
20  of the information in it.  Okay.  I'm looking at the
21  supplement.  I'm starting my summary on the third
22  paragraph.
23          MS. BREWINGTON:  On the first page?
24          MS. CSIZMADIA:  Yes.

Page 125

1   BY MS. CSIZMADIA:
2       Q.  While working as a geoarchaeologist for the
3   Rhode Island Center for Public Archaeology, he was the
4   only geologist at the center.
5           Is that correct?  Is that what it says?
6           MS. BREWINGTON:  Can she read it first?
7   BY MS. CSIZMADIA:
8       Q.  Let me give you a minute to read it?
9       A.  Okay.  (Pause.)
10      Q.  Did you have a chance to read it now?
11      A.  Yes.  Sure.
12      Q.  The letter says that he was working as the
13  only geologist at the center, while working as a
14  geoarchaeologist for the Rhode Island Center for Public
15  Archaeology?
16      A.  Yes.
17      Q.  It says that his expertise and
18  responsibilities embodied more of a consulting nature,
19  assisting in the development of experimental design and
20  establishment of project goals, as well as ensuring
21  implementation and measuring progress of the
22  investigation from a geologic perspective through
23  oversight of site excavation and artifact collection,
24  while simultaneously developing statistical analyses on

# Ann L. Breslin

33 (Pages 126 to 129)

## Page 126

1 the data collected, areal and temporal artifact
2 distribution.
3        Do you see that in the memo?
4    A.  Yes, I do.
5    Q.  It talks about his personal technical
6 responsibilities, including soil classification and
7 profiling, topographic mapping, et cetera?
8    A.  Yes.
9    Q.  I'm going to read a little bit more and ask
10 you if you see it and we'll get to the end.
11        Keith ultimately compiled all of this
12 information into a comprehensive palaeoenvironmental
13 reconstruction. And that information resulted in the
14 re-routing of a proposed highway, which otherwise would
15 have destroyed a valuable piece of New England Native
16 American history.
17        Do you see that?
18    A.  Yes.
19    Q.  Describes his duties at the University of
20 North Carolina as a project manager for a 14-month field
21 study of shoreline dynamics along Topsail Island, North
22 Carolina. And says he was fully responsible for design,
23 development, implementation and conclusion of the
24 project.

## Page 127

1        Do you see that?
2    A.  Yes.
3    Q.  Following the project's completion, Keith's
4 research was utilized by the North Carolina Division of
5 Coastal Management in planning future development of the
6 Onslow Bay section of the North Carolina coastline.
7        The information and design approach have
8 been incorporated into course material for a summer
9 graduate course and two publications were generated from
10 the report.
11        Do you see that?
12    A.  I do. Good for Keith.
13    Q.  Is that environmental scientist type work?
14    A.  Project management.
15    Q.  Project management is one of the requirements
16 for Environmental Scientist.
17        Right?
18    A.  Mum-hum.
19    Q.  So, the additional work experience that we
20 talked about with Keith Robertson, besides his SIRB work
21 and beside his degrees that we have just discussed, and
22 the additional work experience on your advanced hire
23 package that we talked about beside SIRB, besides your
24 advanced degree when you were working as a laboratory or

## Page 128

1 teaching assistant when you were spending the bulk of
2 your time composing data review request and schedule file
3 reviews.
4        Correct?
5    A.  Mum-hum.
6    Q.  Do you still think the reason you were turned
7 down is because you were discriminated against?
8    A.  We're missing the whole point here. Keith and
9 I were doing the same job.
10        Why in the world would you not pay me
11 the same, or they would not pay me the same amount for
12 the same job? That is the essence. Merit Reviews.
13 Whatever. That is the question. We were doing the same
14 work. We were on the Technical Assistance Group. We
15 were on the Consultant Review Group. Dealing with EPA.
16 We were dealing with project management. We carried a
17 very heavy load.
18        Keith and I together carried the same
19 heavy load, and we carried a load heavier than most of
20 the other people that we worked with together, doing the
21 same job. Doing the same job. I was not entry-level,
22 and I should not have been entry level.
23        Regardless of a lot of fancy words, and
24 it's a lot of fancy words, what Keith was doing was

## Page 129

1 pretty basic. Good for Keith. That's Keith's thing.
2 Keith's thing is a geology when he was in graduate
3 school. My was botany and biology.
4        The essential question is this. I was
5 not entry-level. Why were we being paid so differently?
6 Why was I being paid entry-level? Why?
7        And I know, and Merrilyn can say this
8 did not happen, but I leaned across the table and said to
9 you and Steve, tell me that I do not deserve to be paid
10 the same amount as Keith. Tell that to my face. Look me
11 in the eye.
12        And Steve said, Well, that's not what we
13 are saying here. We don't have any mechanism. It is
14 just ridiculous. It's absolutely, completely ridiculous.
15 We were doing the same job. I was not entry-level. Six
16 years as an Environmental Scientist 3, and I was being
17 paid 23 cents a year. I had a Master's degree. I was
18 doing a highly technical specialized job. It is
19 ridiculous. And I was the only one.
20        So, all this covers up is the essential
21 issue. The essential issue was, it wasn't that we were
22 doing substantially the same job or similar jobs, we were
23 doing the same job.
24    Q.  And you don't think that the difference in

Ann L. Breslin

Page 130

1  your experience when you got there made a difference?
2      A.  When I got there.  When I got there.  That is
3  not the issue here.
4          The issue is, what happened when you are
5  down the road.  What happened to you a year down the
6  road.  What happened three years down the road.
7          I saw in your answer to my complaint the
8  word hazardous site was taken out of the first sentence.
9  Pretty clever.  But, basically, neither of us had any
10  experience with hazardous sites, clean up, remediation,
11  investigation when we started there.  None of us had
12  hazardous experience.  It was on-the-job training.
13          Do I think he should have been paid more
14  than me because he worked on coastal archaeology projects
15  when we were both working in SIRB, absolutely not.
16  Absolutely not.  I was there nine years.  He was there
17  maybe 10, altogether.  Just ridiculous.  It is so
18  ridiculous.  Doesn't even passed the lab test.
19      Q.  You don't really care what the Merit Rules
20  say; do you?
21          MS. BREWINGTON:  Objection.
22          MS. CSIZMADIA:  Actually, it is a
23  question.
24          THE WITNESS:  I think there is something

Page 131

1  that is truth and honesty and what is fair.  And I think
2  that is the absolute issue here.
3  BY MS. CSIZMADIA:
4      Q.  Do you think The Department followed the Merit
5  Rules?
6      A.  I have not read the Merit Rules from soup to
7  nuts.  If I read the Merit Rules from soup to nuts, I may
8  be able to make sort of an educated decision on that.
9          I think very well they could have taken
10  the Merit Rules that you gave to me and showed me and
11  easily remedied the problem.  The decision was made not
12  to.
13      Q.  And you are telling me the reason it was not
14  was because you're a woman?
15      A.  I believe that was the reason.
16      Q.  And Karl Kalbacher was the one that made the
17  decision to pay you that way and to not --
18      A.  I believe he initially --
19          MS. BREWINGTON:  Hold on.  I need you to
20  finish the question.
21          MS. CSIZMADIA:  Okay.
22  BY MS. CSIZMADIA:
23      Q.  Karl Kalbacher was the reason that you were
24  paid that way?

Page 132

1          MS. BREWINGTON:  I will object on the
2  grounds it's a compound question.  You can answer to the
3  extent you know how.
4          THE WITNESS:  I said initially when the
5  decision was made, when I came on, back in '96/'97, that
6  position, to not fight for me to go further, I believe
7  that was one issue with Karl was discrimination.
8          I also agree and also think that later
9  on when it was very clear that I was the only person
10  being paid entry-level by far, and the only woman there,
11  I do believe that I was discriminated against.
12  BY MS. CSIZMADIA:
13      Q.  By whom?
14      A.  By DNREC.
15      Q.  Which person?
16      A.  By DNREC itself.
17      Q.  You can't point to a specific person?
18      A.  I'm saying by DNREC.
19      Q.  I'm asking you if you can point to a specific
20  person?
21          MS. BREWINGTON:  Objection.  Asked and
22  answered.
23          MS. CSIZMADIA:  I don't think she
24  answered it.

Page 133

1          THE WITNESS:  I answered it.
2          MS. BREWINGTON:  Answer to the extent
3  you know.
4          THE WITNESS:  I think DNREC.  That was
5  the policy of it.  Don't rock the boat.
6  BY MS. CSIZMADIA:
7      Q.  There is one thing I wanted to clarify.
8          You told me you chose not to file a
9  grievance at that point.
10          Should Mr. Karl Kalbacher have done
11  something when you chose not to pursue it?
12          MS. BREWINGTON:  I'm going to object.
13  At what point, just for clarification.
14          MS. CSIZMADIA:  At the denial of your
15  advanced hire request.  You choice not to grieve it.
16          MS. BREWINGTON:  Thank you.
17  BY MS. CSIZMADIA:
18      Q.  Were you expecting Mr. Kalbacher -- should
19  Karl Kalbacher have done something when you chose not to
20  pursue your remedy?
21      A.  I have no idea.
22      Q.  You think it is discrimination that he did
23  not?
24      A.  I believe he did not fight for me like he

Ann L. Breslin

35 (Pages 134 to 137)

Page 134

1  should have.
2      Q.  What did you have, at that point, I'm not
3  talking about later, but at that point what did you have
4  that you could have fought with?
5      A.  That was quite an insult. It was pretty good.
6  Right to the ribs.
7      Q.  I did not mean it as an insult.
8      A.  It really was. You are saying my experience
9  is like shit, and it's not.
10     Q.  No. I'm not saying that.
11     A.  But the fact of the matter is this, Jamie,
12 again, even had to talk to personnel, even when the
13 supplemental went down, she again had to sit there and
14 argue with him on the phone. She argued for a long time
15 until finally it was okay. I have this one piece of
16 paper that I have, I've gotten from her and from Sharon,
17 which has all kind of scribble going around whether or
18 not we could do it. Whether or not it was applicable or
19 whether the money was there. Whatever. She fought. She
20 fought long and hard. Good for me.
21     Q.  You're saying Jamie fought for Keith?
22     A.  Long and hard. Karl did not fight for me.
23     Q.  How many months was your internship at
24 Chesapeake Bay Foundation?

Page 135

1      A.  I believe it was seven months. That's what it
2  says. You have to understand, this was 16-years-ago, at
3  least.
4      Q.  Your first application, your ES1 application,
5  which is No. 18, your transcript attached to it has two
6  internships in the summer semester.
7          Is that the internship at the Chesapeake
8  Bay Foundation?
9      A.  Where are you?
10     Q.  On the transcript attached to ES1 application.
11 Last page.
12     A.  I can't find it right now.
13     Q.  I'll show you mine.
14     A.  Yes. I would have to look it up. I did
15 internship with the GIS people. I also did it with
16 community relations. Graduate internships. I worked for
17 a couple of the geologist there.
18          So, honestly, I would have to
19 cross-reference it to my course work.
20     Q.  Prior to you leaving DNREC, was there a point
21 when Karl used to be your supervisor?
22     A.  Yes.
23     Q.  Who became your supervisor after that?
24     A.  Paul Will. There were some interim managers

Page 136

1  there.
2      Q.  Before Mr. Karl Kalbacher left, did he ever
3  have occasion to speak to you or voice to you any
4  concerns about your performance in writing?
5      A.  I believe I had a run-in with our secretary
6  over some issue. I have that somewhere here, which I
7  wrote a full explanation for.
8      Q.  Would he have kept copies of that document?
9      A.  Pardon?
10     Q.  Would he have kept a copy of those documents?
11     A.  Who, Karl?
12     Q.  Yes.
13     A.  I have no idea.
14     Q.  Did he maintain a personal file in his office
15 related to you?
16     A.  That, I don't know. I don't dig around Karl's
17 personal stuff. Here is the letter.
18     Q.  Excuse me. Can you finish that? You don't
19 dig around in Karl's personal what?
20     A.  His files or drawers. I never had occasion to
21 dig around his drawers, unless he said, go in my drawer
22 and get something out.
23     Q.  So, you did not go into his office and take
24 that file when he left?

Page 137

1      A.  I don't think so.
2          MS. BREWINGTON: Do you know what file?
3          MS. CSIZMADIA: The file with those
4  write-ups in it.
5          MS. CSIZMADIA: May I see them, so I can
6  clarify.
7          THE WITNESS: Yes.
8  BY MS. CSIZMADIA:
9      Q.  That's not what I'm referring to.
10     A.  In fact, when I left, right before I left, I
11 went down to personnel and requested a full copy of my
12 file and most of it was missing.
13     Q.  So, you don't know anything about Karl having
14 a file in his office that may have contained some
15 write-up about you?
16     A.  Not to my knowledge. But I'm sure most
17 managers keep files on the people that they have.
18     Q.  And you don't think it would be appropriate
19 for you to go in his office and take out the file?
20         MS. BREWINGTON: I'm going to object on
21 the grounds of relevance.
22         THE WITNESS: I have no idea what this
23 has to do with anything.
24 BY MS. CSIZMADIA:

CORBETT & WILCOX

Ann L. Breslin

36 (Pages 138 to 141)

Page 138

1    Q.  Did you tell somebody that you went into
2  Karl's office and took out a file on you after he left?
3    A.  Not to my memory.
4    Q.  Did you go into his office and take out a
5  file?
6    A.  No.
7    Q.  If somebody said that you told them that you
8  did --
9        MS. BREWINGTON:  I will object on the
10 grounds of speculation.
11       THE WITNESS:  No idea.
12 BY MS. CSIZMADIA:
13   Q.  So, you're saying, you did not go into his
14 office and take out a file?
15       MS. BREWINGTON:  I'll object.  Asked and
16 answered.  Relevance.
17       MS. CSIZMADIA:  Relevance is to
18 credibility.  A lot of this deals with credibility.
19 BY MS. CSIZMADIA:
20   Q.  Do you know what I'm talking about?
21   A.  No.  I have no idea what you're talking about.
22 I would like to see what you're talking about.
23   Q.  What I am talking about is whether you went
24 into Karl's office and took a file out concerning you?

Page 139

1    A.  I have no memory of doing that.  Of course,
2  Karl left 10-years-ago.  Eight-years-ago.
3    Q.  That would not be significant enough to
4  remember?
5    A.  No.
6        MS. CSIZMADIA:  I have no further
7  questions.
8        MS. BREWINGTON:  We would like to read
9  and sign.
10       (The deposition was concluded at,
11 approximately, 2:30 p.m.)
12       I HAVE READ THE FOREGOING DEPOSITION,
13 AND IT IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.
14
       _____
       ANN L. BRESLIN
15
16
17
18
19
20
21
22
23
24

Page 140

INDEX

DEPOSITION OF: ANN L. BRESLIN

EXAMINATION                       PAGE

Examination by Ms. Csizmadia        3

EXHIBITS

1. One-page document dated August 23,    20
   2004 was marked as Breslin Exhibit
   No. 1.
2. Document entitled Class Title:        38
   Environmental Scientist 1 was marked
   as Breslin Exhibit No. 2.
3. Document entitled Class Title:        39
   Environmental Scientist 2 was marked
   as Breslin Exhibit No. 3.
4. Document entitled Class Title:        39
   Environmental Scientist 3 was marked
   as Breslin Exhibit No. 4.

Page 141

INDEX CONTINUED:

5. Document entitled Class Title:        39
   Environment Scientist 4 was marked
   as Breslin Exhibit No. 5.
6. Document entitled Table of Current    47
   Pages was marked as Breslin Exhibit
   No. 6.
7. Document dated November 13, 1996 was  54
   marked as Breslin Exhibit No. 7.
8. Document dated December 10, 1996      55
   was marked as Breslin Exhibit No. 8.
9. Document dated May 17, 2001 was       73
   marked as Breslin Exhibit No. 9.
10. Document dated December 10, 2001     75
    was marked as Breslin Exhibit
    No. 10.
11. Document entitled Memorandum         78
    dated May 17, 2001 was marked
    as Breslin Exhibit No. 11.
12. Document dated August 16, 2002       83
    was marked as Breslin Exhibit
    No. 12.

Ann L. Breslin

37 (Pages 142 to 144)

Page 142

1   INDEX CONTINUED:
2
3   13. E-mail dated September 11, 2002       85
4       was marked as Breslin Exhibit
5       No. 13.
6   14. Document dated September 11, 2002     85
7       was marked as Breslin Exhibit
8       No. 14.
9   15. Document dated October 29, 2002       100
10      was marked as Breslin Exhibit
11      No. 15.
12  16. Document dated November 22, 2002      101
13      was marked as Breslin Exhibit
14      No. 16.
15  17. Document entitled Step Three          103
16      Grievance Decision was marked
17      as Breslin Exhibit No. 17.
18  18. State of Delaware Employment          118
19      Application for Environmental
20      Scientist 1 job was marked as
21      Breslin Exhibit No. 18.
22
23
24

Page 143

1   INDEX CONTINUED:
2
3   19. State of Delaware Employment          118
4       Application for Environmental
5       Scientist 2 job was marked
6       as Breslin Exhibit No. 19.
7   20. State of Delaware Employment          118
8       Application for Environmental
9       Scientist 3 job was marked as
10      Breslin Exhibit No. 20.
11  21. Memorandum dated September 17,        120
12      1996 was marked as Breslin
13      Exhibit No. 21.
14  22. Memorandum dated September 13,        121
15      1996 was marked as Breslin
16      Exhibit No. 22.
17
18
19
20
21
22
23
24

Page 144

1               C E R T I F I C A T E
2   STATE OF DELAWARE:
                    :
3   NEW CASTLE COUNTY:
4           I, Gloria M. D'Amore, a Registered
5   Professional Reporter, within and for the County and
6   State aforesaid, do hereby certify that the foregoing
7   deposition of ANN L. BRESLIN, was taken before me,
8   pursuant to notice, at the time and place indicated; that
9   said deponent was by me duly sworn to tell the truth, the
10  whole truth, and nothing but the truth; that the
11  testimony of said deponent was correctly recorded in
12  machine shorthand by me and thereafter transcribed under
13  my supervision with computer-aided transcription; that
14  the deposition is a true record of the testimony given by
15  the witness; and that I am neither of counsel nor kin to
16  any party in said action, nor interested in the outcome
17  thereof.
18          WITNESS my hand and official seal this
19  26st day of April A.D. 2006.
20
21
22  _____
    GLORIA M. D'AMORE
    REGISTERED PROFESSIONAL REPORTER
23  CERTIFICATION NO. 119-PS
24

CORBETT & WILCOX

Breslin
Keith J. Robertson                    v.     State of Delaware, Department of Natural Resources & Environmental Control
                              C.A. # 05-290                              June 26, 2006

                                                                              Page 1

```
            IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF DELAWARE
ANN L. BRESLIN,                )
                               )
      Plaintiff,               )
                               )
      v.                       ) C.A. No. 05-290
                               )
STATE OF DELAWARE,             )
DEPARTMENT OF NATURAL          )
RESOURCES & ENVIRONMENTAL      )
CONTROL,                       )
                               )
      Defendant.               )
```

            Telephonic deposition of KEITH J. ROBERTSON
taken pursuant to notice at the law offices of Margolis
Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware,
beginning at 1:05 p.m., on Monday, June 26, 2006, before
Kimberly A. Hurley, Registered Merit Reporter and Notary
Public.
APPEARANCES:

            LORI BREWINGTON, ESQUIRE
            MARGOLIS EDELSTEIN
              1509 Gilpin Avenue
              Wilmington, Delaware 19806
              for the Plaintiff

            VALERIE S. CSIZMADIA, DEPUTY ATTORNEY GENERAL
            (via telephone)
            DEPARTMENT OF JUSTICE
              Carvel State Office Building
              820 North French Street
              Wilmington, Delaware 19801
              for the Defendant

      ALSO PRESENT:

            ANN L. BRESLIN

                  WILCOX & FETZER
      1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477
                    www.wilfet.com

Page 2

1        KEITH J. ROBERTSON,
2    the witness herein, having first been
3    duly sworn on oath, was examined and
4    testified as follows:
5  BY MS. BREWINGTON:
6    Q.    Good afternoon, Mr. Robertson. I'll be taking
7  your deposition today in connection with Ann Breslin's
8  gender discrimination action against DNREC.
9         Have you ever testified in a deposition
10  before?
11    A.    No.
12    Q.    I'm going to ask you a few questions. I'll
13  make every effort to ask them one at a time and you will
14  go ahead and give me your response to the question. If
15  for some reason you don't understand the question, just
16  let me know and I'll go ahead and try and rephrase it or
17  ask it in a different way. But if you do answer the
18  question, we will both assume you understood it.
19    A.    Okay.
20    Q.    I have a court reporter here, and I know we're
21  taking your deposition by phone today. The court
22  reporter is in the room with me and she will be recording
23  your statements. Please make sure that you speak loud
24  enough for her to hear you and that your answers are

Page 3

1  either yes or no and not the uh-huhs or uh-uhs because
2  they don't show up too clear on the record.
3         Do you understand?
4    A.    I'm not quite sure how to spell them. Yes.
5    Q.    Exactly. At some point I may need to stop you.
6  I'm going to look at the court reporter's face and if
7  she's frowning when she's not getting it, I'm going to
8  slow down things.
9         Please state your full name.
10    A.    Keith John Robertson.
11    Q.    What is your current address?
12    A.    P.O. Box 6542, 11-B Street, Bridgeton,
13  North Carolina, 28519.
14    Q.    Are you originally from North Carolina?
15    A.    No.
16    Q.    Where do you currently work?
17    A.    State of North Carolina, Division of Water
18  Resources.
19    Q.    What is your job title there?
20    A.    Hydrogeologist.
21    Q.    What do you do as a hydrogeologist?
22    A.    I am responsible for approximately 20 percent
23  of the North Carolina monitoring well network which
24  consists of approximately 175 monitoring well sites

Page 4

1  across the state that keep track of water levels within
2  the various aquifers, as well as chloride data to measure
3  chloride information to measure saltwater intrusion.
4    Q.    How long have you worked there?
5    A.    Almost two years. It will be two years on
6  July 28.
7    Q.    That's coming up.
8         I'd like to talk with you about your
9  employment history. Where did you work prior to working
10  for the State of North Carolina?
11    A.    Tell you what, we will start with after I
12  graduated graduate school.
13    Q.    Okay. And then we will do your education.
14  Let's start with your work and then we will go back to
15  education.
16    A.    I got out of graduate school and worked for
17  five or six months as a geoarchaeologist with the
18  University of Rhode Island. That was in the fall and
19  winter of 1993-1994.
20         February 1994 I was hired by the State of
21  Delaware Superfund program as it was then known. I
22  worked with them for a little over five years until, I
23  think it was, September of '99 that I left.
24         And between then and November 2000 I worked

Page 5

1  for Environmental Strategies Corporation, which was an
2  environmental consulting firm, as a geologist based out
3  of Reston, Virginia.
4         I didn't particularly care for that line of
5  work or the company and I was asked to return and I took
6  advantage of that. So I returned to DNREC in November of
7  2000 and stayed there until July of -- two years ago.
8    Q.    Who asked you to return? Did they contact you?
9  Did someone from DNREC contact you?
10    A.    Positions were open and I had toyed around with
11  the idea of returning, and Alex Rittberg, my -- who would
12  then become my supervisor who previous was actually just
13  a coworker, he worked in Dover while I worked in
14  New Castle, gave me a ring and asked if I would be
15  interested in returning. And, well, as it turns out yes,
16  I would be interested in returning. So I filed all of
17  the application paperwork and underwent the interview and
18  all that and then did return.
19    Q.    When you began working at DNREC originally in
20  1994, were you hired as an Environmental Scientist II?
21    A.    Yes.
22    Q.    And then sometime after that you were promoted?
23    A.    Yes.
24    Q.    And you were promoted to Environmental

2 (Pages 2 to 5)

Breslin
Keith J. Robertson

v.

State of Delaware, Department of Natural Resources & Environmental Control
C.A. # 05-290

June 26, 2006

Page 6

1    Scientist III?
2    A.   Correct.
3    Q.   In what year were you promoted?  Was that the
4    same year, 1994?
5    A.   No.  I believe it was 1995 that I was promoted.
6    Q.   Was this a career ladder promotion?
7    A.   Yes.
8    Q.   Do you know what a career ladder promotion is?
9    A.   Are you asking me?
10   Q.   Yes.  Do you know what it is?
11   A.   Within your position, as I understand it.
12   Q.   So what do you mean by it's within your
13   position?
14   A.   Essentially the position that you have applied
15   for that you hold has an amount of growth associated with
16   it up to a certain level, and in this case the position
17   was assigned at a level IV, but I was brought in as a
18   Scientist II.  Therefore, there was some growth within
19   that same position to go to a III and then to a IV
20   without having to go through any program and do any
21   applications or anything along those lines.
22   Q.   Did you receive an increase in your salary as a
23   result of the career ladder promotion?
24   A.   Yes.

Page 7

1    Q.   Do you know how much of an increase you
2    received?
3    A.   I started out at DNREC February '94, $22,998.
4    In that year and a half prior to my promotion I did get
5    some increases.  Honestly I don't remember the exact
6    numbers, but they didn't put me much beyond 25,
7    26 thousand.  I'll be honest.
8         When I got the promotion to Environmental
9    Scientist III, my boss and I put together an advanced
10   hire package and I ended up, I believe, don't quote me on
11   the exact numbers, but it was something like 34, 37,
12   somewhere in that range.
13   Q.   Okay.  Who was your manager at that time?
14   A.   Jamie Rutherford.
15   Q.   So both you and Jamie Rutherford put together
16   your advanced hire package?
17   A.   Correct.
18   Q.   When you say you both put it together, what
19   part did you do versus what part she did?
20   A.   She really gave me the guidance.  I put the
21   package together.  I wrote goals, all the things that
22   sort of -- supporting documents I needed to put together,
23   why I believed I was worthy of the position, examples of
24   my work, my educational and work history.  And Jamie

Page 8

1    reviewed it, gave me some guidance and some
2    recommendations on what to do.  Of course, she did
3    include some language recommending me for the advanced
4    hire.
5    Q.   We talked a moment ago about your education.  I
6    kind of want to go back to that.  Tell me about your
7    education since, I guess, high school.
8    A.   I graduated high school, went to Long Island
9    University, South Hampton College, which is out on the
10   east end of Long Island, and got a Bachelor's degree in
11   geology in four years.  Graduated August of 1998.
12        Worked for actually a year after that as a
13   geoarchaeologist with the University of Delaware and then
14   entered University of North Carolina Chapel Hill's
15   geology program and I got my Master's of geology -- I
16   actually received the degree in the winter of '94, but
17   for the last two years or so, year and a half after that,
18   all that I was doing was writing my thesis.  So I enrolled
19   in the campus, living on campus, doing research from '89
20   to November of '92.
21   Q.   I know that you worked as an Environmental
22   Scientist III at DNREC.  Could you tell me, if you can
23   remember, what some of your job duties were?
24   A.   Yes.  Really there were two major categories of

Page 9

1    duties.  First was the regulatory end of it.  I was a
2    project manager, and my job was to assess, reinforce the
3    state Superfund laws regarding the investigation and
4    cleanup of hazardous waste disposal, hazardous substance
5    disposal sites in the state.  And that's really the
6    oversight aspect of the job where consultants,
7    responsible parties would be performing the work and I
8    would be overseeing the technical aspects of their work
9    and making sure that they adhered to all the regulations
10   that were appropriate.
11        The second half of my job was the more
12   hands-on.  There were a limited number of investigations
13   that our branch did ourself.  We went out with the drill
14   rig and the shovels and collected the samples and
15   essentially performed the investigations ourselves.  And
16   that was the second half of my job.
17        I should say maybe as part of both, because
18   of my background in geology and groundwater, I also
19   provided technical assistance, hydrogeology assistance to
20   those members of the staff that were not hydrogeologists;
21   for instance, those that were biologists, chemists, what
22   have you.  And in like turn I'm not a biologist or a
23   chemist, so when I needed their experience, they would
24   provide that to me in exchange.

3 (Pages 6 to 9)

Breslin
Keith J. Robertson

State of Delaware, Department of Natural Resources & Environmental Control

v.

C.A. # 05-290                                                          June 26, 2006

Page 10

1    Q.    Ann Breslin also served as an Environmental
2    Scientist III; is that correct?
3    A.    Correct. II, then III.
4    Q.    Similar to you?
5    A.    Yes.
6    Q.    Do you know whether you were hired after
7    Ann Breslin?
8    A.    If I remember correctly, we were hired at the
9    same time, although Ann may have -- and, of course, she
10   knows this better than I do. If I remember correctly,
11   Ann served some time as a seasonal or a temp. for a
12   couple weeks beforehand. I could be wrong on that, but
13   that's what I vaguely recall. But we were actually given
14   sort of the same month, hire date.
15   Q.    Would you consider or would you have considered
16   both yourself and Ann two of the most senior
17   Environmental Scientist IIIs in DNREC?
18   A.    When? When are you asking this? When we were
19   hired?
20   Q.    No, not when you were hired. '01. Around
21   2001.
22   A.    Let's see. 2001. In DNREC I'm not sure. In
23   truth --
24   Q.    In what?

Page 11

1    A.    In truth, our New Castle office did not have
2    all that much interaction with some of the others. For
3    instance, the water programs, the various water programs
4    and long-life programs down in Dover. So I really cannot
5    speak -- I really don't know much about the personnel and
6    what they did even in some cases.
7         But the program that we did work with --
8    Q.    Which is SIRB, right?
9    A.    We were in SIRB, Investigation and Restoration
10   Branch. The tanks program, hazardous waste program, the
11   water supply section, we were getting there in seniority.
12   Were we the most senior? No much, but we were certainly
13   in the top quarter.
14   Q.    And that's both you and Ann Breslin?
15   A.    Correct, because we were both there the same
16   amount of time.
17   Q.    Would you agree that Ann Breslin's job
18   description was similar to yours?
19   A.    Yes, with the following caveat: The state
20   Superfund -- or rather the state Superfund branch which
21   became the SIRB branch really was divided into three
22   programmatic sections. One handled the federal Superfund
23   sites. Those would be the military bases and such. He
24   second were the state Superfund and voluntary cleanup

Page 12

1    programs. Those were state-assigned cleanups. And then
2    there was the preremedial program which was delegated
3    from the EPA in which the site -- the state, rather,
4    received funds to pursue the investigation of possible
5    sites. They would look into the history of an area and
6    assess whether they were -- this was the potential for
7    some of the sites -- some Superfund sites in that area.
8         Ann worked for that program, as well as had
9    the voluntary cleanup program came along, did some of
10   that work. I did not work in the preremedial program at
11   all. Although periodically I may have gone out and
12   helped them in the field, I did not work in that program.
13   I worked in the state and federal program. There was a
14   difference in that regard in what we did. The
15   techniques, the knowledge base really were very much the
16   same except for maybe the regulatory difference, but
17   there we are.
18        MS. CSIZMADIA: Can I ask a question right
19   here?
20        MS. BREWINGTON: Are you asking him a
21   question or me?
22        MS. CSIZMADIA: I'm asking you, or do you
23   want me to save them for the end?
24        MS. BREWINGTON: Is it something you need

Page 13

1    to interrupt the questioning for? Is it an objection?
2         MS. CSIZMADIA: No. Go ahead. I'm sorry.
3    BY MS. BREWINGTON:
4    Q.    Did you and Ann both serve on the hole basin
5    management team?
6    A.    Yes.
7    Q.    What is that?
8    A.    At some point -- I don't remember when it was
9    initiated -- the powers that be decided that it would be
10   best to start looking -- be beneficial to start looking
11   into the state's environment, particularly its water
12   resources, in a more holistic fashion. DNREC had a dozen
13   or more programs and branches and they didn't always
14   communicate well with each other. You have your little
15   territory that you work well within, but how many times
16   do you honestly communicate with Water Resources or with
17   Parks or with Wildlife? This is a way by which the
18   various programs could learn about what each other does
19   and then see if there was information that they could
20   share and would be useful for one another.
21        And the way they initiated this program was
22   based on the state's primary water basin. You could
23   divide the state of Delaware into five primary drainage
24   basins. And so they did that and they assigned a basin

4 (Pages 10 to 13)

Breslin
Keith J. Robertson

v.

State of Delaware, Department of Natural Resources & Environmental Control

C.A. # 05-290

June 26, 2006

Page 14

1  investigation team composed of members from all of the
2  branches of DNREC, as well as outside individuals,
3  University of Delaware, etcetera, to investigate these
4  various five basins.
5      Ann belonged to at least one or more. I
6  don't know how many. And I belonged to two, three.
7  Q.  Are you finished?
8  A.  Yes.
9  Q.  I wasn't sure if you were finished that answer.
10     Did both you and Ann serve on the technical
11 assistance team?
12 A.  Yes.
13 Q.  What is the technical assistance team?
14 A.  When I had mentioned previously about providing
15 technical support to other project managers who did not
16 happen to have -- who were hydrogeologists or in my case
17 asking assistance from other people who were biologists
18 and chemists, which I was not, that was the technical
19 assistance.
20     At one point in time it was very formal.
21 You belonged to the tag group and this was a biologist,
22 chemist, and hydrogeologist, and everyone went to these
23 people, and these three people, that's what they did.
24 They acted -- and everyone used them as a resource. That

Page 15

1  was more in the beginning when it was -- the program with
2  the DNREC Superfund program under Ann B. Ramon.
3      As time went on, new management came in,
4  got a lot more sites, a lot of that -- and some of these
5  tag members left, but the responsibilities of technical
6  support, technical review were really just sort of
7  disseminated amongst the remainder of the staff.
8      So I know that Ann, myself, Bob Asreen,
9  who's presently still there, all provided technical
10 overview for those people who did not have our particular
11 expertise.
12 Q.  What was Ann's particular expertise, do you
13 know?
14 A.  Biology, ecology, wetlands.
15 Q.  Am I correct that Ann had special training in
16 wetlands?
17 A.  Yes. In fact, I believe that was her Master's
18 degree, in wetlands delineation, wetlands identification.
19 I can tell you if a land's wet, but that's about as far
20 as I can help you. When instances such as that arose,
21 those would be the types of questions that I would ask of
22 Ann.
23     Now, towards, I guess, the latter year,
24 year and a half, two years of my tenure at DNREC, I

Page 16

1  remember handing a lot of my sites that had ecological
2  issues over to Ann for her review since I was not a
3  biologist or an ecologist.
4  Q.  How about this natural resources damage
5  assessment, is that something that Ann was trained in?
6  Would that be considered a special duty?
7  A.  Yes. I'll be honest with you, I did not have
8  any personal involvement in NRD, natural resource damage.
9  My knowledge there is really scanty. The basic concept
10 being the view that groundwater, ecology, wildlife, biota
11 are resources of the state and if you somehow impact
12 them, you, therefore, owe the state based on the laws of
13 that resource.
14     I did not have any workings immediately
15 with that group, so I'm really not best man for those
16 sorts of questions.
17 Q.  Did both of you serve on the Consultant Review
18 Committee?
19 A.  Yes.
20 Q.  What is that?
21 A.  In order to perform environmental consulting
22 work at a SIRB or Superfund site in the state of
23 Delaware, we didn't want anyone with a shovel performing
24 the work because it can be hazardous work. We early on

Page 17

1  in the program as part of the initiation of the
2  multicleanup program I believe put together a consultant
3  qualifications program which essentially stated these are
4  the minimum requirements that you need to have, minimum
5  personnel you need to have, minimum experience you need
6  to have in order to perform investigation or cleanup work
7  under the state Superfund, which then became SIRB,
8  program.
9      So consultants wishing to do work and
10 managing cleanup or investigate any of our sites
11 submitted a qualifications package to this group who
12 reviewed these qualification packages and made a decision
13 on whether or not they were qualified. We tried to
14 include all technical aspects. I know engineering,
15 biology, chemistry, geology, management, wells, technical
16 staff.
17 Q.  Would you agree that both Ann and yourself had
18 essentially similar responsibilities as full-performance
19 project managers?
20 A.  Actually, if I might step back a minute. You
21 just triggered a memory. For a long time, I don't recall
22 exactly how long, Ann really managed that consultant
23 qualifications program. Towards my last two years there
24 I believe Alex Rittberg took it over. But for a very

5 (Pages 14 to 17)

Breslin
Keith J. Robertson

v.    State of Delaware, Department of Natural Resources & Environmental Control

C.A. # 05-290    June 26, 2006

Page 18

1  long time, as a matter of fact, Ann was a real
2  coordinator in essentially noting which packages came in,
3  disseminating them to the various people that are on the
4  review committee, coordinating the responses, getting
5  responses to the consultants, identifying any hole data
6  gaps that might be necessary, that sort of thing.
7      I'm sorry. Go ahead. I didn't mean to
8  interrupt.
9      Q.   I wanted to know if you would consider both you
10  and Ann similar with respect to your responsibilities as
11  full-performance project managers.
12     A.   Certainly. Certainly. In the beginning when I
13  think DNREC-SIRB had a lot more experienced staff, we
14  were the new bees. We did a lot of the hands-on, a lot
15  of the field work. Actually that worked out well because
16  it gave us a lot of hands-on training.
17     After a while, with a lot of the senior
18  staff leaving, Ann and I were became the senior staff and
19  we got junior staff below us. There really were only
20  four -- three, four, maybe five, people in SIRB by the
21  time of my second stint at DNREC that was ongoing that
22  really carried a full load of sites, and that means more
23  than a dozen sites, but you yourself managed, as well as
24  providing tag review and technical review for the other

Page 19

1  people and doing regulatory development work such as
2  consultant qualifications or something like that. But
3  Ann was most definitely one of the people carrying her
4  full load.
5      Q.   Tell me about the training that you had to do
6  to become an Environmental Scientist III.
7      A.   Besides my formal education?
8      Q.   Yes. Would it be training on-site there?
9      A.   Well, DNREC, particularly in my first couple
10  years there, we underwent an awful lot of training. Some
11  of it was held on-site at the office, some of it up at
12  Philadelphia EPA Region 3, some of it across the country
13  offered by various either governmental or private
14  organizations, both in project management, regulatory
15  issues such as here as the EPA Superfund, learn about
16  EPA Superfund, risk assessment, technical issues, state
17  transport of contaminants, etcetera. And they were
18  offered all the time.
19     We had, thankfully, a very healthy training
20  budget. And Ann I know was one of us three or four of us
21  that took advantage of these as much as possible. Went
22  at least twice a year, if not more, to these various
23  training exercises. Courses I should say.
24     Q.   There was also a 40-hour OSHA training?

Page 20

1      A.   You have to have that to even work in our
2  program.
3      Q.   That was required?
4      A.   Yes.
5      Q.   So both you and Ann took part in that?
6      A.   Everyone who went out in the field in our
7  program had to have that.
8      Q.   At some point in your career with DNREC you
9  left; is that correct?
10     A.   Correct. Twice, actually. The first time I
11  left was September 1999.
12     Q.   September of 1999. Tell me why you left.
13     A.   Two reasons. One, I wanted to see what else
14  was out there. I had done a stint of five plus odd years
15  with the State and I just sort of had this inkling if I
16  spent too much time working for the State, then -- not
17  too much time. That's not quite the phrase I'm looking
18  for. After a certain amount of time working in
19  regulatory government, private consulting firms won't
20  hire you. At least that's the conventional wisdom. They
21  figure that you're whatever. That's the conventional
22  wisdom. That was sort of playing at the back of my head.
23  If I ever wanted to try consulting, probably now is about
24  the time.

Page 21

1      Second, it was actually -- rough little
2  patch, six or seven months, where I had some very trying
3  sites that I was managing, very political, always on the
4  phone putting out some political fire, police stations
5  calling me, property owners calling their lawyers,
6  calling here. That's not what I got into the business
7  for. I'm a scientist. They just sort of drove me nuts.
8  Combination of factors which caused me to depart in 1999.
9      Q.   You eventually returned to DNREC approximately
10  a year later?
11     A.   Fourteen months, yes.
12     Q.   You said before that you returned because, I
13  guess, someone contacted you from DNREC?
14     A.   The reason that I returned, I worked for this
15  consulting firm for 14 months and didn't realize it, I
16  guess, or chose not to realize it, pick your poison
17  there, when I chose to work for that consulting firm,
18  that I was doing a lot of travel. It got to the point
19  where I was living out of a suitcase and traveling twice
20  a week. On Monday morning I never knew where I would be
21  by Thursday. That really got a little tiresome.
22     Combine that with an awful lot of hours,
23  many of which were not paid. And I started to feel like
24  I was being abused. All the hours and time that I was

6 (Pages 18 to 21)

Breslin
Keith J. Robertson

v.

State of Delaware, Department of Natural Resources & Environmental Control

C.A. # 05-290

June 26, 2006

Page 22

1  putting in, someone else making money off me. So I had
2  had enough and thought about well, okay, I have tried my
3  stint at consulting, don't like it, maybe I can go back
4  and do regulatory work again. It was about the time that
5  I was mulling that over that I got a phone call from
6  Alex Rittberg, saying well, we have got some openings,
7  would you be interested in returning. Well, yes, I would
8  be. So I did return.
9      Q.   When you returned to DNREC, were you making the
10  same amount that you had been making when you left?
11     A.   No. It increased a little bit, but that was
12  because the baseline salary had increased during that
13  time. I don't know a percentage point. One and a
14  half percent, something like that. They increased.
15     Q.   Did you receive any other increases while you
16  worked at DNREC?
17     A.   Yes.
18     Q.   Tell me about --
19     A.   They were just the cost of living increases
20  that they gave to everybody.
21     Q.   When you talked about the increase of, I think
22  you said, one or two percent, would that have been the
23  limited merit review, limited maintenance review?
24     A.   No. No. When it came to environmental

Page 23

1  scientists, whenever they performed maintenance, we never
2  got raises. We got cuts. No. Same thing with when they
3  took us off of selective market, our baseline salary went
4  down. Except for cost of living increases, scientists'
5  salaries rarely went up.
6      Q.   Was there a difference in the salary that you
7  received versus what Ann Breslin received?
8      A.   In the beginning I presume that we were both
9  making the same. When I got my advanced hire and
10  promotion to a III, Ann was also promoted to a III at
11  some point. I don't know when. I really don't.
12     Q.   That's okay.
13     A.   So there was a time when, yes, I was making
14  more than her and when she got her promotion to a III, I
15  know that there was some disagreement between her and her
16  supervisor at the time, Karl Kalbacher, and she did not
17  either get as much of the advanced hire or didn't get
18  advanced hire, one or the other. But at the end of it
19  she was a III, I was a III, and I was making a lot more
20  than her.
21     Q.   Do you know whether Ann was making entry-level
22  as an ES III?
23     A.   Honestly I didn't keep that much track on
24  anybody.

Page 24

1      Q.   That's fair. Do you know whether Ann was the
2  only regular full-time female Environmental Scientist III
3  in SIRB?
4      A.   Hold on. Let me go back. What date are we
5  talking here?
6      Q.   I want to talk about through your employment
7  there. So '94 to --
8      A.   Sanger may have. I honestly don't remember
9  what title she held.
10     Q.   Who she that?
11     A.   Sanger may or may not have been an
12  environmental scientist. But she also had been there a
13  lot longer.
14         Karissa Hendershot may have been a III. I
15  honestly don't recall.
16         Kristin Thornton may have gotten promoted
17  to a III by the time I left second time around which is
18  what, two years ago?
19         Same thing with Rebecca Hawkins, but she
20  since left DNREC. Both of them, if they were IIIs, they
21  were only III right before I left.
22     Q.   But you're not sure whether they were III?
23     A.   I'm not sure whether they were or weren't. The
24  only one I can think of that may have been a scientist

Page 25

1  III -- in fact, she was a scientist -- was
2  Jane Biggs-Sanger and she had been there a long time by
3  the time Ann and I started.
4      Q.   But do you know whether she was a seasonal
5  employee?
6      A.   She was full-time for a long time and then she
7  had some family issues and she left and then came back.
8  The details of when she came back I can't tell you. I
9  Whether it was seasonal, whether it was full-time. I
10  know there was an awful lot of issues associated with her
11  return. I really can't tell you.
12     Q.   Why did you leave DNREC the second time?
13     A.   I was disgusted with upper-level management.
14     Q.   You were?
15     A.   Yes.
16     Q.   Why is that?
17     A.   I felt that -- I want to choose my words
18  carefully here. I felt that upper-level management --
19  I'm not talking about my supervisor. I'm not even
20  talking about my branch manager. I'm talking about above
21  their heads -- were doing the citizens of the state of
22  Delaware a disservice by focusing more, paying more
23  attention to the politics of the program than the
24  technical merits of the program. I got the distinct

7 (Pages 22 to 25)

B-0110

Breslin
Keith J. Robertson

v.

State of Delaware, Department of Natural Resources & Environmental Control

C.A. # 05-290

June 26, 2006

Page 26

1  feeling -- no, not feeling. I know for a fact that many
2  decisions were made and swept -- our opinions swept aside
3  and after a while I just came to the conclusion, well, if
4  you're not going to listen to me, then why am I here? It
5  wasn't just me.
6      Q.   There were others that felt the same way?
7      A.   Most. Most.
8      Q.   Just one more question for you. There has been
9  some discussion about the location of each person's
10  personal records in the New Castle office. Would you be
11  able to tell us what you know, if anything, about access
12  to those records by employees?
13     A.   Unfettered access by anyone who wants it, as
14  far as I knew.
15     Q.   That includes like employees through
16  upper-level management?
17     A.   Someone off the street. I don't know in what
18  order these occurred, but the personnel files are located
19  in -- there was like an island in the middle of the
20  secretarial area that the top -- the tabletop and used
21  for papers and various things, and then underneath were
22  filing. Personnel records were at some point kept in
23  there.
24          I also know that they were also at some

Page 27

1  point kept in the filing room which consisted of a half
2  dozen mobile filing shelves that could be moved back and
3  forth. Particularly the filing room, the mobile filing
4  shelf, there was absolutely no restriction on access to
5  those files.
6      Q.   So anyone could access anyone's personnel file,
7  like even one that's not their own?
8      A.   Yes.
9          MS. BREWINGTON: I don't have anything
10  further.
11          Valerie, do you have anything?
12          MS. CSIZMADIA: I do.
13  BY MS. CSIZMADIA:
14     Q.   Keith, I think that I have it correctly. You
15  said in the there are three programmatic sections. One
16  was federal sites, another was state and volunteer
17  cleanup sites, and there were preremedial sites?
18     A.   Correct.
19     Q.   You said that the techniques and knowledge
20  bases were the same, but there were some programmatic
21  differences between the programs you did and the programs
22  that Ann did; is that right?
23     A.   Well, the technical knowledge base was the
24  same, correct. The legality, the programmatic

Page 28

1  differences, for instance, how the federal program
2  operated versus the state program versus the preremedial
3  program, those changed. But the technical knowledge base
4  was the same for all three programs.
5      Q.   You're in Water Resources now?
6      A.   Yes.
7      Q.   Would it be similar to the environmental
8  scientist positions at DNREC that were environmental
9  scientists, the same knowledge bases or the same
10  techniques I think you said were the same as the ones in
11  SIRB but a different program?
12          MS. BREWINGTON: I'm going to object to
13  form. Mr. Robertson, you can go ahead and answer if you
14  understood the question.
15     A.   I'm not quite sure -- correct me if I'm wrong,
16  make sure that I have this right. Are you asking if the
17  skills and knowledge base of what I do now versus what I
18  did before? Actually, I'm not sure.
19     Q.   There were environmental scientists I believe
20  you said in like Water here in Delaware?
21     A.   Yes. Water Resources.
22     Q.   Right. And would they have similar techniques,
23  the ES IIIs in Water, as was used in the SIRB branch?
24     A.   Some. It really depended on what they did.

Page 29

1  For instance, an environmental scientist with a
2  hydrogeology background, which is what I was at SIRB, and
3  what those people are in Water Resources presently at
4  DNREC, while there is a knowledge base of hydrogeology,
5  the basics of the science, there are differences. Water
6  Supply, for instance, performs and does work drastically
7  different than a groundwater scientist would do in SIRB
8  who was concerned less with water supply, in fact almost
9  not at all, more than contamination of the groundwater.
10          So that there was a significant overlap, of
11  course, but there were some differences.
12     Q.   Okay.
13     A.   Does that answer the question?
14     Q.   I think so.
15          Can you tell me about the work you did for
16  the State related to the arsenic background
17  concentration, the arsenic --
18     A.   Actually, if I may take a step back and there's
19  a little bit more background to it.
20          When I started with DNREC -- actually, when
21  the voluntary cleanup program was put together in 1995, I
22  think, one of the subjects that was bantered about was
23  the idea of cleanup standards. And one of the approaches
24  to cleanup standards was a background standard, cleaning

8 (Pages 26 to 29)

Breslin
Keith J. Robertson

v.

State of Delaware, Department of Natural Resources & Environmental Control
C.A. # 05-290

June 26, 2006

Page 30

1   up a site and all of its contaminants to background.
2          Well, of course, the organic background
3   would be zero. Without man, these man-made chemicals
4   wouldn't be there. Particular sites are complicated with
5   metals and inorganic compounds because they are, to some
6   extent, naturally occurring; therefore, you have to make
7   a determination on whether the observed concentrations of
8   metals or inorganics at your site are above what would be
9   naturally occurring or not.
10         And there was an old publication that one
11  of the former SIRB members had put together years before
12  that essentially compiled a lot of background site sample
13  data into a table and said, okay, here's a bunch of
14  supposedly background data of metals. What I did was
15  took that table and then added or supplemented to it
16  another 75 samples or so, performed some statistical
17  analyses on it, and that became adopted as the background
18  cleanup standards for metal.
19         That's the background. When the tanneries
20  initiative, when the tanneries became a more noticeable
21  factor in the SIRB program, which I'll say is '99, 2000,
22  somewhere along that line, arsenic came to the forefront
23  because arsenic is one of the primary contaminants in
24  tannery waste. And because arsenic was such a big issue

Page 31

1   and the background concentrations were sufficiently small
2   and very close to EPA's toxic threshold for arsenic,
3   there was some confusion over background being higher
4   than the toxic threshold, etcetera, etcetera.
5          So when Alex Rittberg initiated and -- he
6   came up with the idea and I sort of -- he passed the buck
7   to me and I ran with it. It was the arsenic study in
8   which background flow samples were collected from I
9   forget how many, but some number of areas that were
10  presumably not impacted by industrial activity, the
11  parklands, wilderness areas, those sorts of things, where
12  presumably any arsenic present would be naturally
13  occurring.
14         Took samples from these areas, analyzed
15  them for the full fleet of metals but particularly
16  interested in arsenic. Took some values, performed
17  statistical analysis on them, and the end publication I
18  put together compared the data set from that arsenic
19  study, the background study that we just did, to the
20  statistical samples that were done from all that previous
21  background data that I had mentioned a few minutes ago,
22  and essentially presented a bunch of statistical measures
23  and values and from that offered that to management and
24  said here's the range of data, here's where the numbers

Page 32

1   fall. Allowing them -- making recommendations about what
2   the cleanup standards should be, but knocking it back
3   into their court to make the final decision.
4   Q.    That's basically original research?
5   A.    Yes. I won't claim it's completely original
6   because my supervisor came up with the idea.
7   Q.    But you implemented it and did the work?
8   A.    Yes.
9   Q.    Can you tell me a little bit about the CO
10  archeology work you did for the Rhode Island Center for
11  Public Archeology and specifically any project management
12  that you did there?
13  A.    Actually, as a geoarchaeologist, I was not a
14  project manager at all. I was technical staff.
15  Q.    That was where?
16  A.    At the University of Rhode Island Center for
17  Public Archeology.
18  Q.    What about as the coastal geologist for the
19  Institute of Marine Science?
20  A.    Coastal geologist, Center for Marine Science,
21  was an extension of my Master's thesis work. I did
22  research on my Master's thesis in coastal geology at the
23  University of North Carolina and my adviser had various
24  other projects ongoing in the Outer Banks and coastal

Page 33

1   North Carolina. And I worked with him with his various
2   projects and also performed as an outside editor to a
3   coastal research journal.
4   Q.    I'm looking at your advanced hire document and
5   I'll represent to you that it says, "While employed by
6   the University of North Carolina, Keith was a project
7   manager for a 14-month field study of shoreline dynamics
8   along Topsail Island, North Carolina, and was fully
9   responsible for the design, development, implementation,
10  and conclusion of the project."
11  A.    That was my Master's thesis. Yes.
12  Q.    Is that statement correct?
13  A.    Yes.
14  Q.    And then did I ask you about the University of
15  Delaware Center for Archaeological Research?
16  A.    No. The work I did at the University of
17  Delaware and the work I did at University of Rhode Island
18  are essentially the same thing. I worked in programs
19  that required a level of physical science knowledge, but
20  in both cases there were no physical scientists on staff.
21  So I did physical science work for them. Geology, soils,
22  identification of flura and fauna, identification of
23  artifacts, those sorts of things. In both cases I was
24  staff, technical staff.

9 (Pages 30 to 33)

Breslin                                                    State of Delaware, Department of Natural Resources & Environmental Control
Keith J. Robertson                              v.    C.A. # 05-290                                    June 26, 2006

Page 34

1   Q.   When I was just reading from the advanced hire
2   request, I believe you said earlier that Jamie Rutherford
3   and you worked on those together?
4   A.   Correct.
5   Q.   And Jamie is a male or female?
6   A.   Female.
7   Q.   And did you say that you did the original
8   write-up and then she made some changes to it?
9   A.   She edited. Reviewed it and edited it and made
10  suggestions.
11  Q.   I assume that she asked you to do that, to
12  draft it?
13  A.   Yes.
14  Q.   Did she tell you why she asked you to draft it?
15  A.   If I want the promotion, then I got to work for
16  it.
17  Q.   Were you the best person to draft it?
18  A.   Honestly I'm not trying to be smart, but who
19  else would know my background better than me? If it's a
20  promotion that I want, I'm going to be the one that gives
21  the best recommendation on why I deserve it.
22  Q.   Right. Did you ever put in for an ES IV?
23  A.   No.
24  Q.   Was that your decision?

Page 35

1   A.   Yes. Honestly, if I had been there a little
2   longer, I was going to apply for it, but it came to my
3   realization about a year before I left that given a
4   particular division director and some of the upper-level
5   management, that I had bumped heads enough that there
6   wasn't a snowball's chance in hell, if I may use a
7   vernacular, of my ever getting promoted to IV based on
8   politics. I didn't even bother.
9   Q.   When you were rehired by DNREC, does the term
10  "reconstructed salary" mean anything to you?
11  A.   I don't know what it means.
12  Q.   Going back to the advanced hire request that
13  you put together, so everything in that would be true?
14  A.   Yeah.
15  Q.   Are you and Ann friends?
16  A.   Yes. Not close, close friends, but yeah, we're
17  friends.
18  Q.   When we were talking about the personnel files
19  earlier or you and Lori were, you were talking about the
20  main personnel files, I believe, where the official
21  records are kept. Is that right?
22  A.   You know, I never pawed my way through it. I
23  don't know if there were multiple subsets or some were
24  primary or secondary. I just know that there were a lot

Page 36

1   of files in there with people's names on them.
2   Q.   Do you know if the managers had individual
3   files perhaps in their own offices?
4   A.   I'm sure they did, but I don't know that for
5   sure one way or the other.
6   Q.   Did Ann ever tell you or did anybody ever tell
7   you that Ann went into Karl's office after he left and
8   took out some files?
9   A.   No. Never heard of that.
10        MS. CSIZMADIA:  Give me just a second,
11  please.
12        Those are all the questions that I have.
13        MS. BREWINGTON:  I don't have anything
14  further. Mr. Robertson, would you like to read and sign
15  the deposition transcript? You have the right to do
16  that, but you can certainly waive that if you don't want
17  to.
18        THE WITNESS:  I'll tell you what, unless I
19  absolutely have to, because it would probably be an
20  awfully long fax. If you want me to, I will do it, but,
21  again, I'm happy to mail it or fax it to me to do it. It
22  makes no matter.
23        MS. BREWINGTON:  We will go ahead and
24  waive. If you'd like to waive, I don't have a problem

Page 37

1   with that.
2        THE WITNESS:  Okay. Thank you.
3        MS. CSIZMADIA:  Just because he says that,
4   he's never done one before, Keith, the purpose of reading
5   and signing the deposition is to have an opportunity to
6   look at it and make sure that the court reporter got
7   everything right.
8        THE WITNESS:  Oh, okay.
9        MS. CSIZMADIA:  So it would be your
10  opportunity to look at it and say, you know, that's not
11  what I said, I distinctly remember what I said in a
12  particular instance. So if you waive that opportunity,
13  you don't have another opportunity to do it. If you
14  wanted to do that, we could certainly overnight it to
15  you. It is a short time frame that you have to do it,
16  but it is your one time.
17        THE WITNESS:  How long would it be?
18        MS. CSIZMADIA:  Thirty-five pages, and the
19  pages don't have a lot of lines on them.
20        THE WITNESS:  I didn't realize I talked
21  that much.
22        MS. CSIZMADIA:  They're double-spaced.
23        THE WITNESS:  I'll tell you what. For
24  formality sake, why don't I.

10 (Pages 34 to 37)

Breslin
Keith J. Robertson

v.

State of Delaware, Department of Natural Resources & Environmental Control

C.A. # 05-290

June 26, 2006

Page 38

1    MS. BREWINGTON:  That's fine with me.
2    Off the record.
3    (Deposition concluded at 2:00 p.m.)
4    - - - - -
5
6    T E S T I M O N Y
7
8    DEPONENT:  KEITH J. ROBERTSON          PAGE
9
10   BY MS. BREWINGTON............................ 2
11   BY MS. CSIZMADIA............................ 27
12
13   (No exhibits were marked at this time.)
14
15   ERRATA SHEET/DEPONENT'S SIGNATURE    PAGE 39
16
17   CERTIFICATE OF REPORTER          PAGE 40
18
19
20
21
22
23
24

Page 40

CERTIFICATE OF REPORTER

STATE OF DELAWARE)
                 )
NEW CASTLE COUNTY)

I, Kimberly A. Hurley, Registered
Professional Reporter and Notary Public, do hereby
certify that there came before me on the 26th day of
June, 2006, the deponent herein, KEITH J. ROBERTSON, who
was duly sworn by me and thereafter examined by counsel
for the respective parties; that the questions asked of
said deponent and the answers given were taken down by me
in Stenotype notes and thereafter transcribed by use of
computer-aided transcription and computer printer under
my direction.
       I further certify that the foregoing is a
true and correct transcript of the testimony given at
said examination of said witness.
       I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.

       Kimberly A. Hurley
       Certification No. 126-RPR
       (Expires January 31, 2008)

DATED:

Page 39

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT

11 (Pages 38 to 40)

B-0114

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ANN L. BRESLIN,                    )
                                   )
        Plaintiff,                 )
                                   )
        v.                         )  C.A. No. 05-290
                                   )
STATE OF DELAWARE,                 )
DEPARTMENT OF NATURAL              )
RESOURCES & ENVIRONMENTAL          )
CONTROL,                           )
                                   )
        Defendant.                 )

        Deposition of PAUL W. WILL taken pursuant
to notice at the offices of DNREC, 391 Lukens Drive, New
Castle, Delaware, beginning at 10:00 a.m., on Friday,
June 23, 2006, before Kimberly A. Hurley, Registered
Merit Reporter and Notary Public.

APPEARANCES:

        LORI BREWINGTON, ESQUIRE
        MARGOLIS EDELSTEIN
          1509 Gilpin Avenue
          Wilmington, Delaware 19806
          for the Plaintiff

        VALERIE S. CSIZMADIA, DEPUTY ATTORNEY GENERAL
        DEPARTMENT OF JUSTICE
          Carvel State Office Building
          820 North French Street
          Wilmington, Delaware 19801
          for the Defendant
ALSO PRESENT:
        ANN L. BRESLIN

        WILCOX & FETZER
1330 King Street - Wilmington, Delaware 19801
        (302) 655-0477
        www.wilfet.com

Breslin
Paul W. Will

v.

C.A. # 05-290

State of Delaware, Department of Natural Resources & Environmental Control
June 23, 2006

Page 2

1           PAUL W. WILL,
2       the witness herein, having first been
3       duly sworn on oath, was examined and
4       testified as follows:
5   BY MS. BREWINGTON:
6       Q.   Good morning.
7       A.   **Good morning.**
8       Q.   I have the privilege of taking your deposition
9   here today. Have you ever participated in a deposition
10  before?
11      A.   **Yes.**
12      Q.   So you know how this works?
13      A.   **Uh-huh.**
14      Q.   I'm going to ask you a series of questions, and
15  I will make every effort to ask them one at a time.
16      A.   **Okay.**
17      Q.   If you don't understand something, just let me
18  know and I will repeat it. If you do answer the
19  question, we will go ahead and assume that you did
20  understand the question that was asked. In order for
21  this to work, we have a court reporter here, and please
22  be sure that your answers are yes and no as opposed to
23  uh-uhs or the uh-huhs because they don't show up too
24  great on the record.

Page 3

1           The other rule is that we have to take
2   turns talking. I don't think we will have a problem with
3   that. I think I'll ask questions and you will be able to
4   answer, and I'll make every effort not to interrupt you.
5       A.   **Okay.**
6       Q.   At times DNREC's attorney may object to some of
7   the questions that are being asked. The only thing that
8   I ask is that you go ahead and answer the question unless
9   she specifically advises you not to answer the question.
10  Do you understand?
11      A.   **Yes.**
12      Q.   Please state your name for the record.
13      A.   **Paul W. Will.**
14      Q.   What did you do in preparation for your
15  deposition testimony today?
16      A.   **Not much. I have been through it before, so
17  I'm familiar with what goes on.**
18      Q.   Did you review any documents?
19      A.   **I reviewed some old documents that I had
20  prepared when Ann was employed with DNREC.**
21      Q.   Do you remember which documents you reviewed?
22      A.   **A couple of documents that I prepared regarding
23  some procedures that I didn't think were exactly
24  followed.**

Page 4

1       Q.   These were procedures that weren't followed by
2   Ann?
3       A.   **Yes.**
4       Q.   Was it like performance review documents or
5   something like that?
6       A.   **No. These were regarding some projects that
7   she was involved with.**
8       Q.   And then what you wrote about the actual
9   projects and gave her a copy of it?
10      A.   **I wrote about the incident that was regarding
11  the project and I believe I gave her a copy of it or she
12  was -- there was a copy that was accessible for her.
13  Usually you make a copy of it and one was for the file,
14  one was for the employee, and one was for my manager who
15  I prepared it for.**
16      Q.   Was there more than one document that you
17  reviewed like that?
18      A.   **I think there were two.**
19      Q.   Other than those two documents, do you recall
20  reviewing anything else?
21      A.   **No.**
22      Q.   I'd like to start off by talking about your
23  work experience specifically with DNREC and then we will
24  go to your work experience prior to DNREC. If we could

Page 5

1   start with chronologically when you became employed, in
2   what capacity, how long you served in that capacity. If
3   you need to have me ask a question to prompt you to
4   continue, we will go from there.
5       A.   **I have had two positions since I have been
6   employed with DNREC. I started with DNREC April 1st,
7   1993, and was hired as an Environmental Scientist III,
8   and I served in that capacity until about January 2000,
9   upon which time I took over as a Program Manager I. I
10  have been employed in that capacity since January 2000.**
11      Q.   As an ES III were you in SIRB or in a different
12  branch?
13      A.   **I think I was with the Superfund branch which
14  is the SIRB branch. We changed names, I guess, from the
15  late '90s. We went from the Superfund to the Site
16  Investigation & Restoration Branch. So for all of my
17  13 years has been with this branch that I'm currently
18  with. We just changed names.**
19      Q.   As program manager -- and you became that in
20  2000?
21      A.   **January 2000, yes.**
22      Q.   -- did you have direct reports, like did people
23  directly report to you? Were you their supervisor?
24      A.   **Once I became a manager, yes. I had a staff of**

2 (Pages 2 to 5)

B-0116

Breslin
Paul W. Will                                    v.        State of Delaware, Department of Natural Resources & Environmental Control
                                        C.A. # 05-290                                June 23, 2006

Page 6

1   about I think at that time six people that reported to
2   me. Ann being one of them.
3       Q.   Let me just represent to you something. Ann
4   became employed in 1994 with DNREC. When did you become
5   her manager, do you remember?
6       A.   January of 2000.
7       Q.   That was when she was directly under you in
8   January of 2000?
9       A.   I believe so, yes.
10      Q.   Who else reported to you at that time, do you
11  remember?
12      A.   Larry Jones, Karissa Hendershot, I think
13  Kurt Olinger.
14      Q.   That was a while ago.
15      A.   Yes. Dave Langseder, I believe, and I think
16  Rebecca Hawkins, although I'm not quite sure of her hire
17  date. I don't know if she came to me from another
18  manager when she switched staff. That's about all I can
19  recall.
20      Q.   This was in 2000 and Ann was an ES III; is that
21  correct?
22      A.   I'm not sure what her -- I don't know if she
23  was a II or a III.
24      Q.   How about the others, were they either

Page 7

1   Environmental Scientist II or III?
2       A.   Yes. I think Karissa Hendershot may have been
3   a I. She was either a I or a II. I think Kurt Olinger
4   was a III. David Langseder was an Engineer II or III.
5   And Rebecca Hawkins I believe was either an ES I or II.
6   I think there was also one other person.
7   Kristin Thornton was under my group. She was an ES II
8   when I started managing.
9       Q.   Is it fair to say that Ann may have been the
10  only ES III in SIRB in 2000 that was a female?
11      A.   I don't know if that was the case or not. I
12  know we had other female ES's. I'm not sure what their
13  levels were.
14      Q.   We have talked about your work experience at
15  DNREC. Let's talk about your work experience prior to
16  DNREC.
17      A.   Okay. Graduated from UNC, North Carolina,
18  Chapel Hill, in '89. I was employed with Guardian
19  Environmental out of Bear, Delaware, from May 1990 until,
20  I think, February '91. From February '91 until March '93
21  I was with WIK Associates, an environmental consultant
22  here in New Castle, and then came to DNREC in April '93.
23      Q.   You indicated that you were a Program
24  Manager I?

Page 8

1       A.   Correct.
2       Q.   What were some of your primary job
3   responsibilities?
4       A.   As a PM I.
5       Q.   You're a PM I now?
6       A.   Yes.
7       Q.   Tell me what are some of your jobs.
8       A.   I manage a staff of about -- I think at this
9   point I have four, maybe five, people that report to me,
10  and they're assigned to environmentally related projects
11  and I oversee their work on those projects. I also
12  conduct their performance plans, reviews, and report to
13  Kathy Stiller Banning, who is our current PM II.
14      Q.   Who is that, again?
15      A.   Kathy Stiller Banning. She's our current
16  Program Manager II. She's our branch supervisor.
17      Q.   Christina Wirtz?
18      A.   She's a program manager. She was the Program
19  Manager II prior to Kathy Stiller Banning.
20      Q.   When was that change?
21      A.   I think I want to say a year this -- not this
22  past October, not October 2005, but maybe October 2004.
23  In that time frame. I think the fall of 2004 is when the
24  switch occurred.

Page 9

1       Q.   What position is Christina currently?
2       A.   I think she is the community ombudsperson for
3   the division.
4       Q.   Is this a position she applied for, do you
5   know?
6       A.   I don't know.
7       Q.   What was your major in college?
8       A.   Geography, with an environmental science minor.
9       Q.   That's your Bachelor's, correct?
10      A.   Correct.
11      Q.   Do you have a Master's degree?
12      A.   No, I do not.
13      Q.   Did Ann report to you throughout her life of
14  employment?
15      A.   She reported to me from the time I became a
16  PM I, which was January 2000, I think up until about
17  maybe nine months before she departed. The last nine
18  months I think of her time with DNREC she reported to
19  Alex Rittberg.
20      Q.   Who is Alex Rittberg?
21      A.   He is currently the Program Manager II of the
22  Tanks Management Branch.
23      Q.   When Ann reported to him, was he also a Program
24  Manager I?

3 (Pages 6 to 9)

Breslin
Paul W. Will

v.

State of Delaware, Department of Natural Resources & Environmental Control
C.A. # 05-290

June 23, 2006

Page 10

1    A.    Yes.
2    Q.    Did Keith Robertson report to Alex Rittberg?
3    A.    Yes.
4    Q.    How familiar are you with Ms. Breslin's lawsuit
5    against DNREC?
6    A.    Vague familiar. I just know that there is one
7    pending. It's been going on, I think, for quite
8    sometime.
9    Q.    What is your understanding of the nature of
10   this lawsuit?
11   A.    My understanding of it is it has to do with a
12   pay disparity or something.
13   Q.    Do you have an understanding of with whom this
14   pay disparity is with?
15   A.    As far as like a former DNREC employee?
16   Q.    I'm just asking. I don't know.
17   A.    I think my understanding of it is it revolves
18   around the hiring of Keith Robertson as opposed to the
19   hiring in relation to the hiring of Ann.
20   Q.    Tell me a little bit about DNREC in terms of
21   its purpose and its function.
22   A.    I can tell you about the purpose of the branch
23   that I work with.
24   Q.    Is that because you're not familiar with the

Page 11

1    general purpose of DNREC, or is it because the branches
2    are different?
3    A.    The branches are different. If you were
4    looking for the overall purpose of DNREC, it's to provide
5    protection to public health and the environment in the
6    state of Delaware. And the purpose of SIRB itself is to
7    provide -- is to investigate, remediate the releases of
8    hazardous substances which occur in the state.
9    Q.    There are several different sections or
10   branches in DNREC?
11   A.    There's several different divisions and then
12   branches within those divisions. I'm not sure of the
13   exact numbers of -- there may be five or six different
14   divisions and then branches within those divisions.
15   Q.    Let me show you a document. We're going to
16   have that marked as Will 1. Could you take some time now
17   and review the document for me? I just want to ask you a
18   couple questions about it.
19   A.    Sure. (Complied.)
20          (Will Deposition Exhibit No. 1 was marked
21   for identification.)
22   BY MS. BREWINGTON:
23   Q.    Are you finished?
24   A.    Uh-huh.

Page 12

1    Q.    Okay. What I have put in front of you is a
2    document off the State of Delaware, the official Web
3    site. At the top there it says, "DNREC: Division of Air
4    & Waste Management." As I understand it, there are
5    several different divisions in DNREC and this is just one
6    of the divisions. Is that correct?
7    A.    Right.
8    Q.    Then there are also sections and branches
9    within the Division of Air & Waste Management?
10   A.    Yes.
11   Q.    Are those the things that I had listed here
12   where it says, "Air Quality Management Section,"
13   "Emergency Prevention and Response Branch"?
14   A.    Those are the different branches.
15   Q.    What's the difference between a section and a
16   branch?
17   A.    In my opinion, very little.
18   Q.    On the second-to-last page it's labeled: "Site
19   Investigation & Restoration Branch." That's the SIRB?
20   A.    Correct.
21   Q.    It indicates that it's responsible for the
22   identification, evaluation, and remediation of hazardous
23   waste sites from Brownfields to federal Superfund sites
24   in the state. Is that an accurate statement?

Page 13

1    A.    Yes.
2    Q.    There are several other different sections
3    here. Is it fair to say that each section has a
4    different function?
5    A.    I would say each branch has a different
6    specialty. The function is still the same in my eyes
7    which is to provide protection to public health, welfare,
8    and the environment.
9    Q.    Tell me how each section has a different
10   specialty.
11   A.    Well, within SIRB we deal primarily with soil,
12   groundwater, sediment, surface water. Whereas, in the
13   Air Branch, they deal primarily with air issues. Those
14   are the differences that I see.
15   Q.    In each section do you still have Environmental
16   Scientists I, II, and III and Engineer I, II, and III, if
17   you have those?
18   A.    I do believe that each branch does have similar
19   categories of workers as far as scientists, engineers.
20   Obviously, in the Water & Soil Division, you have
21   geologists that deal with soil issues. You wouldn't
22   necessarily have that in the Air Branch. But I do
23   believe like the Air Branch, they do have scientists. We
24   have scientists. Water Resources has scientists.

4 (Pages 10 to 13)

Breslin
Paul W. Will

v.

State of Delaware, Department of Natural Resources & Environmental Control

C.A. # 05-290

June 23, 2006

Page 14

1  Engineers also in those branches, as well.  The answer I
2  guess is yes, they do -- we have them here, they have
3  them there.
4     Q.   Would the Air Quality Management Section
5  scientists do the same job as the SIRB scientists?
6     A.   I'm not really familiar with what their
7  scientists do over in the Air Branch.
8     Q.   Would it be a fair statement that, since they
9  have different specialties, they are doing different
10  jobs?
11     A.   Again, I don't really know what their job is
12  over there, so I wouldn't be able to comment on what
13  their specialty is.
14     Q.   But you can't say one way or the other whether
15  the environmental scientist job is the same across the
16  board?
17        MS. CSIZMADIA:  He already answered that.
18  I object that it's asked and answered.
19        MS. BREWINGTON:  You can go ahead and
20  answer the question.
21     A.   Can you restate the question?
22     Q.   I guess what I'm trying to say is:  You're not
23  familiar with the Air Quality Management Section.
24     A.   Not as familiar as I am with SIRB.

Page 15

1     Q.   And you indicated that the Air Quality
2  Management Section is a different specialty.
3     A.   Because they deal with air and we don't.
4     Q.   If the environmental scientists in Air Quality
5  Management deal with air and SIRB environmental
6  scientists don't, is it fair to say that the
7  environmental scientists in Air would have a different
8  job?
9     A.   Yes.
10     Q.   Did Keith Robertson report to you at all?
11     A.   I don't believe so.  I think he was always with
12  either Jamie Rutherford, who was the PM I before Alex and
13  when Alex assumed his PM I responsibilities, he inherited
14  Jamie's staff which included Keith.
15     Q.   I'd like to focus on the ES IIIs.
16     A.   Okay.
17     Q.   What are some of the job responsibilities of an
18  ES III in SIRB?
19     A.   I see them as managing all aspects of any
20  environmentally related project that they're assigned at
21  the ES III level.  We look for the ES IIIs to manage with
22  a lesser degree of supervision from the PM I's just based
23  upon their experience and knowledge of the environmental
24  field.

Page 16

1        We also use the ES III level more for our
2  technical assistance guidance teams.  Again, based upon
3  their experience and knowledge of the projects and how
4  they relate to our mission here at SIRB.
5     Q.   You can go ahead and review that document.
6        MS. CSIZMADIA:  Can I ask you if this is
7  current?
8        MS. BREWINGTON:  I just printed it off the
9  Web site.  Would it be current?
10        MS. CSIZMADIA:  It would be current, but I
11  don't know if that's the same as --
12        MS. BREWINGTON:  I'll ask him about it,
13  then.
14        (Will Deposition Exhibit No. 2 was marked
15  for identification.)
16  BY MS. BREWINGTON:
17     Q.   I have just put in front of you a document
18  entitled, "State of Delaware Class Series Description
19  Environmental Science Series."  I have asked you to
20  review it and specifically the Environmental
21  Scientist III on the second page.
22     A.   Okay.
23     Q.   Are the job duties listed in this document for
24  an ES III consistent with your understanding of the job

Page 17

1  duties of both Keith Robertson and Ann Breslin?
2     A.   Yes.
3     Q.   Then I'd like to take you to I think it's the
4  second-to-last page.  It's entitled, "Minimum
5  Qualifications for Environmental Scientist III."  Do you
6  see where it says that?
7     A.   Yes.
8     Q.   Is a Bachelor's degree in one of the life,
9  natural, or physical sciences a minimum qualification for
10  Environmental Scientist IIIs?
11     A.   Yes.
12     Q.   Is it your understanding that Ann Breslin had
13  both her Bachelor's and Master's degrees?
14     A.   Yes.
15     Q.   Do you have an understanding of whether
16  Keith Robertson had both his Bachelor's and Master's
17  degrees?
18     A.   As far as I knew, he did.  Again, he wasn't
19  under me, so...
20     Q.   That's fair.
21        What are some of the other minimum
22  qualifications for an ES III?
23     A.   Well, the biggest one, of course, is the
24  degree.

5 (Pages 14 to 17)

Breslin
Paul W. Will

v.

State of Delaware, Department of Natural Resources & Environmental Control
C.A. # 05-290                                                    June 23, 2006

Page 18

1    Q.   Is that pretty much the biggest one?
2    A.   That's the biggest one.  Other qualifications
3    for that, to get to the III level, I think there is a
4    limited-experience requirement.  You have to have so many
5    years' experience.
6    Q.   Do you know how many years?
7    A.   No, I don't.
8    Q.   Would you agree that Ann Breslin exceeded the
9    minimum qualifications of an ES III?
10        MS. CSIZMADIA:  If I could clarify at what
11   point in time are you referring to, when he supervised
12   her?
13        MS. BREWINGTON:  I guess my question is a
14   general question, and I just wanted to know if you would
15   agree that she exceeded them.  And if you did, then you
16   can tell me what time frame.
17   A.   I would say she met the qualifications.
18   Q.   At no time did she exceed the minimum
19   qualifications?
20   A.   I think if she would have, I would have
21   recommended that she go to the IV level if she exceeded.
22   Q.   I hear what you're saying, but can you still
23   exceed the minimum qualifications and still be an ES III?
24   A.   I don't see why you couldn't.

Page 19

1    Q.   So if Ann exceeded the minimum qualifications,
2    you wouldn't necessarily have to promote her to a IV?
3    A.   No, you wouldn't have to.
4    Q.   But you're saying you would have?
5    A.   Could have, yes.
6    Q.   In terms of the minimum qualifications for the
7    Environmental Scientist IV, one of the minimum
8    qualifications is, quote, possession of either a Master's
9    degree in an environmentally related scientific
10   discipline."  Is that correct?
11   A.   That's correct.
12   Q.   Would it be fair to say that Ann Breslin met at
13   least one of the minimum qualifications?
14   A.   By having the Master's degree in an
15   environmentally related scientific discipline, yes.
16   Q.   You can put that aside.
17        Were you responsible for conducting
18   performance reviews of Ms. Breslin?
19   A.   Yes.
20   Q.   How often?
21   A.   Performance reviews and plans were usually done
22   once a year.
23   Q.   What criteria did you base your reviews on?
24   A.   Work completed in an acceptable time frame,

Page 20

1    number of projects handled, ability to work with others.
2    I think, for the most part, that's it.
3    Q.   Did Ms. Breslin exceed expectations in terms of
4    her performance while she reported to you?
5    A.   I know she at least met them.  There could have
6    been performance I'm not familiar with.  I managed her
7    for almost four years, I think.  I'm not sure if during
8    those years she exceeded, but good chance she probably
9    did.
10   Q.   Why do you say that?
11   A.   Because I don't have the reviews memorized as
12   far as what year, what rating she received.
13   Q.   No, but you said it's a good chance she
14   probably did exceed it.  I just want to know why you said
15   that.
16   A.   I don't recall any real major deficiencies with
17   her work that would have resulted in her not getting at
18   least a meet/exceeds, but there could have been years
19   where performance was better than meets.  I don't
20   remember what years those could have been.
21   Q.   In terms of meets expectations, is that
22   something that you start all your employees out with?
23   A.   No.
24   Q.   So some employees will start off with exceeds

Page 21

1    expectations for the first year of you evaluating them?
2    A.   No, not necessarily.  The rating I give is
3    based upon that year's work.
4    Q.   I guess I'm trying to clarify.  You don't start
5    anyone off at a meets.
6    A.   My personal management style?  No.
7    Q.   Were you generally happy with her performance?
8    A.   Yes.
9    Q.   Could you tell me a little bit about Ann's work
10   ethic?
11   A.   I think she had a very good work ethic.  I
12   think she believed in our mission.  I think she enjoyed
13   the work she did.
14   Q.   Do you recall any of the projects that she was
15   on?
16   A.   I think when Ann worked with me, when we worked
17   together, her primary responsibility was to work with me,
18   assist me in what we call the preremedial program.
19   That's the performance of preliminary assessments and
20   site inspections.  And in that capacity she did an
21   adequate job.
22   Q.   Just adequate?
23   A.   I'll say she did a good job.
24   Q.   Do you recall what type of preremedial programs

6 (Pages 18 to 21)