Breslin
Paul W. Will
                                                v.        State of Delaware, Department of Natural Resources & Environmental Control
                    C.A. # 05-290                        June 23, 2006

Page 22

1  that you had Ann involved in?
2      A.  Well, there were two main projects that revolve
3  around that program. It's commonly referred to as the
4  PASI. The PA is preliminary assessment portion of the
5  program which is similar to what a phase 1 environmental
6  audit would be. And the SI portion is the site
7  inspection portion or the sampling portion of the
8  preremedial program commonly referred to as the phase 2
9  portion, phase 2 audit.
10         (Will Deposition Exhibit No. 3 was marked
11  for identification.)
12  BY MS. BREWINGTON:
13     Q.  I just put in front of you a document. It's
14  titled, "Breslin v. State of DE/Department of Natural
15  Resources." It provides a case number, and it says
16  regarding April 2nd, 2004, request for additional
17  information, and the date is April 26, 2004.
18         Based on the top of this document here in
19  the square box, it indicates that Ann Breslin was hired
20  in November of 1994 as an Environmental Scientist II and
21  that she became full-time in -- no, I'm sorry. And then
22  January 18, '94, she was seasonal. Is that correct, or
23  do you not know?
24     A.  I don't know.

Page 23

1      Q.  It also indicates that the starting salary for
2  both Ann Breslin and Keith Robertson was $22,998. Do you
3  see where it says that?
4      A.  Yes, I do.
5      Q.  And then as of January 2002, Ann Breslin's
6  salary was $38,390 and Keith Robertson's salary was
7  $43,100.25.
8      A.  I see that.
9      Q.  Do you have any idea why there was such a
10  discrepancy between Ann Breslin's salary and
11  Keith Robertson's?
12     A.  No, I do not.
13     Q.  Then we will go to the December 2002 salary.
14  Do you see where it indicates that Ann Breslin made
15  $39,158 and Keith Robertson was making $43,962?
16     A.  Uh-huh. I see that.
17     Q.  Just below that it indicates Ann Breslin's
18  specific job duties from performance plan.
19     A.  Uh-huh.
20     Q.  If you could review those for me.
21     A.  (Complied.)
22         Okay.
23     Q.  The job duties listed underneath there where it
24  says, "Ann Breslin's Specific Job Duties From Performance

Page 24

1  Plan," were these the job duties that she was responsible
2  for when she reported to you?
3      A.  Yes.
4      Q.  Now I'd like to take you to -- I believe a page
5  of this is missing. I just looked at it. So I probably
6  can't ask you too much about it, but I'd like you to turn
7  to Keith Robertson's --
8         MS. CSIZMADIA: It may be flip-flopped.
9         MS. BREWINGTON: Is that what it is?
10         MS. CSIZMADIA: I think 4 is last. I don't
11  know what this is, but...
12         MS. BREWINGTON: It's actually stapled
13  wrong.
14     A.  You meant page 4?
15     Q.  Page 4 to 5 I want you to look at. I'd like
16  you to look at Keith Robertson's specific job duties from
17  performance plan.
18     A.  (Complied.)
19         MS. CSIZMADIA: Can we clarify what this
20  is, what this document is?
21         MS. BREWINGTON: I can certainly ask him,
22  but I'm not sure he knows what the document is.
23         Off the record.
24         (Discussion off the record.)

Page 25

1  BY MS. BREWINGTON:
2      Q.  What I have presented to you is a document that
3  was submitted by DNREC to the EEOC during Ann Breslin's
4  investigation.
5      A.  Okay.
6      Q.  Have you had an opportunity to review
7  Keith Robertson's specific job duties?
8      A.  Yes.
9      Q.  Would you agree with me that the job duties for
10  Keith Robertson are similar to that of Ann Breslin?
11     A.  They are similar with some differences.
12     Q.  Do you want to tell me about the differences?
13     A.  The difference that I see is primarily in the
14  geologic technical support field because I believe that
15  at least my recollection with Keith's education was that
16  he had a geology degree. So apparently he was being
17  utilized for his geology knowledge and experience on some
18  projects.
19     Q.  What was Ann's degree in, do you know?
20     A.  I don't know.
21     Q.  Could it be that Keith Robertson was utilized
22  specifically for his degree and Ann was utilized
23  specifically for hers?
24         MS. CSIZMADIA: I would object to that as

7 (Pages 22 to 25)

B-0121

Page 26

1  speculative.
2      MS. BREWINGTON: You can answer.
3  **A.   I would say that Keith was because he had the**
4  **geology.**
5  Q.   But you're not sure about Ann?
6  **A.   I'm not sure about Ann.**
7  Q.   And Ann reported directly to you?
8  **A.   Yeah. I mean, you asked for the difference.**
9  **That's the difference I see.**
10  Q.   Were you aware of the discrepancies in pay
11  between Ann Breslin and Keith Robertson?
12  **A.   Again, like I stated earlier, vaguely. I**
13  **understood that there was some differences which this**
14  **whole thing revolves around. That's about as much as I**
15  **know about it.**
16  Q.   You became Ann's manager in 2000?
17  **A.   Correct.**
18  Q.   Around what time did you first become aware of
19  the discrepancies between Ann Breslin's pay and
20  Keith Robertson's pay?
21  **A.   After she left.**
22  Q.   During the time that she worked at DNREC, were
23  you not aware that she had an issue with her pay?
24  **A.   I was not aware.**

Page 27

1  Q.   You mentioned that the first time you learned
2  of Ann's concern about pay was after she left DNREC.
3  **A.   I believe so. I think I received a copy of a**
4  **letter that had a law firm's heading on the top of it and**
5  **I became aware that there was a court action underway**
6  **about pay.**
7  Q.   That was probably around the time that she
8  left, 2003?
9  **A.   After she left. I would say I think probably**
10  **sometime within 2004.**
11  Q.   Did Ann ever send you e-mails about her pay and
12  requesting for assistance in trying to get an increase
13  comparable to Keith Robertson?
14  **A.   She may have. I'm not aware. I can't**
15  **remember.**
16  Q.   I guess I'm kind of concerned or confused
17  because initially you indicated that you weren't aware
18  that she had issues with her pay.
19  **A.   Not until she left. So --**
20  Q.   But you may have received an e-mail?
21  **A.   May have. I don't know.**
22  Q.   But you have no recollection of receiving it?
23  **A.   I do not have any recollection of receiving**
24  **one. I'm not saying she didn't send me one. I just**

Page 28

1  **don't remember if she did.**
2  Q.   But you have work e-mail here?
3  **A.   Uh-huh.**
4  Q.   How often do you check it?
5  **A.   Every day.**
6  Q.   And you receive e-mails from employees?
7  **A.   Every day.**
8  Q.   You send out e-mails from that same --
9  **A.   If it warrants a response, yes, I respond, yes.**
10  Q.   Is there any reason why you wouldn't have
11  responded to an e-mail from Ann regarding her pay?
12  **A.   If it didn't involve me personally? I probably**
13  **wouldn't have responded.**
14  Q.   Wouldn't it have involved you if you're her
15  manager?
16  **A.   Not necessarily. If it was an issue that she**
17  **had with another employee, I would see that between her**
18  **and the employee.**
19  Q.   Who assists employees with advanced hire
20  requests and things like that?
21  **A.   Normally it's probably HR and the direct**
22  **supervisor.**
23  Q.   Did you have a sense of whether Ann Breslin
24  should be making substantially less than Keith Robertson?

Page 29

1  **A.   Say that again.**
2  Q.   Did you have an understanding of whether Ann
3  should be making less than Keith Robertson?
4  **A.   No.**
5  Q.   Did you have an understanding of whether they
6  should be making the same amount?
7  **A.   No, I didn't. Did I understand why they**
8  **weren't? No.**
9  Q.   You didn't understand that?
10  **A.   Uh-uh.**
11  Q.   Is that because they were doing the same job?
12  **A.   Probably. They were good ES IIIs.**
13  Q.   Did you feel it was fair that Keith Robertson
14  was making more money than Ann Breslin when they were
15  doing the same job?
16  **A.   Did I feel it was fair? Actually, the pay -- I**
17  **look at employees' pay between them -- their pay is their**
18  **business just like my pay is my business. I really don't**
19  **get involved in how much the employees are getting paid.**
20  **I personally see that as a decision that's made by other**
21  **people, primarily Human Resources. So it really wasn't**
22  **that much of a concern to me, to be honest.**
23  Q.   But I'm asking you now. Retrospectively, do
24  you think that was fair?

8 (Pages 26 to 29)

B-0122

Breslin
Paul W. Will                    C.A. # 05-290    State of Delaware, Department of Natural Resources & Environmental Control
                                                June 23, 2006

Page 30

1   A. If she was being mistreated, then no, it wasn't
2   fair.
3   Q. What is an advanced salary request?
4   A. I don't know that much about it, again. That's
5   more for HR to determine, and I always leave it for them.
6       An employee, once hired, if it's a new
7   employee, I believe if a new employee is hired, they can
8   request an advanced salary, and, again, that becomes more
9   of an issue between them and Human Resources. I as the
10  manager can prepare an advanced hire or advanced salary
11  hire request and I send that to Human Resources, but they
12  have the ultimate say on whether or not it's granted or
13  not.
14  Q. Have you done that?
15  A. I have done it, I think, twice in the whole
16  time that I have been a manager.
17  Q. For whom?
18  A. I did one for Robert Asreen when he was first
19  hired. Robert is a hydrologist with our branch. And I
20  did one for an ES IV that I hired and stayed a whole
21  week. Those, I believe, are the only two that I have
22  ever done. I'm sorry. I did a third. I did one for
23  Betsy Rogers who was another hydrologist. I think those
24  are the only three that I have ever done.

Page 31

1   Q. Do you know whether Robert Asreen -- I'm not
2   sure if I'm saying that right, but do you know whether
3   his was granted, his request?
4   A. I think his was.
5   Q. How about the ES IV that left?
6   A. His was not.
7   Q. Is it because he left after four days?
8   A. I think his request was above what Human
9   Resources and personnel were willing to pay.
10  Q. How about Betsy Rogers?
11  A. I'm not sure whether -- I can't remember if
12  hers was granted or not.
13  Q. Did you do an advanced salary request for Ann?
14  A. I don't think I did. I think because I didn't
15  hire Ann.
16  Q. Did you submit any documentation to HR
17  regarding her salary?
18  A. No, not that I'm aware of.
19      (Will Deposition Exhibit No. 4 was marked
20  for identification.)
21      THE WITNESS: I guess I did.
22  BY MS. BREWINGTON:
23  Q. We're going to mark this as Will 4. Does this
24  refresh your recollection as to whether you submitted an

Page 32

1   advanced hire request for Ann Breslin?
2   A. Well, it definitely establishes that I did. As
3   far as refreshing it, no, it doesn't refresh it.
4   Q. What is this document that I placed in front of
5   you?
6   A. It's an advanced hire request for
7   Ann L. Breslin.
8   Q. Who's it from?
9   A. It's from me.
10  Q. Who is it to?
11  A. It's to the Human Resources Office.
12  Q. I'd like to go over the handwriting that we
13  have on the document. Would it be fair to say that this
14  is perhaps a draft of the document?
15  A. Unless it's marked "draft." I don't see it
16  being marked "draft." Wait a minute. Yes, this is the
17  one that has my name on it, but it was not drafted by me.
18  Q. Were you aware of it?
19  A. Yes.
20  Q. We will get to who drafted it and everything.
21      Do you recognize the handwriting?
22  A. No, I do not. I know it's not mine.
23  Q. I would hope you recognize your handwriting.
24  A. That I am sure of.

Page 33

1   Q. What I'd like to do is go through the
2   handwriting and if we could try to figure out, the two of
3   us, what perhaps is indicated on this document and
4   hopefully throughout these depositions we will figure out
5   whose handwriting it is.
6   A. Okay.
7   Q. Let me ask you a question first. Have you ever
8   seen this document before?
9   A. Yes.
10  Q. When I say "this document," I mean this
11  document with the writing.
12  A. No, I have not seen this document. I saw the
13  one without the writing.
14  Q. Perhaps that was the final version of the
15  document.
16  A. I don't know.
17  Q. But you saw some form of this document?
18  A. I saw this document without the handwriting on
19  it. I saw this document with the type on it.
20  Q. At the top left it says, "An advanced hire
21  salary of 91.8% of midpoint was requested for
22  Ms. Breslin." Is that accurate?
23  A. That's what it says.
24  Q. Then over to the right, it's a bullet. It

9 (Pages 30 to 33)

Page 34

1  says, "Main thrust should be sexual discrimination." Is
2  that accurate?
3      A.  That's what it says.
4      Q.  Then underneath that it says, "His Master's
5  counted, yours did not?"
6      A.  That's what it says.
7      Q.  Do you think that we could deduce from the
8  statement here, "His Master's counted, yours did not?"
9  that Ann Breslin did not write this?
10         MS. CSIZMADIA:  You're asking him to
11  speculate, so I'm going to object.  But go ahead.
12     A.  Say that again.  I'm sorry.
13     Q.  I guess what I'm asking is:  The handwriting on
14  this document --
15     A.  I would say just by reading that, I doubt Ann
16  would have wrote that.
17         MS. CSIZMADIA:  If you could get him to
18  read the rest of it, too.
19         MS. BREWINGTON:  Yes, I am.
20     Q.  Underneath that it says, "His Master's counted,
21  yours did not," question mark, "or just lab experience."
22  Is that an accurate statement?
23     A.  I see this is saying "or just lab" and it looks
24  like it could be -- I see x-p-r-n.

Page 35

1      Q.  That's fair.  Let's go down to the bottom right
2  above "Justification."  It indicates:  "Mr. Robertson now
3  makes $3,591.67 per month while Ms. Breslin makes
4  $3,199.25 per month."  Is that accurate?
5      A.  Yes.
6      Q.  Underneath that statement that we just read, it
7  indicates:  "Please elaborate further on Keith regarding
8  laboratory and scientist experience," question mark.
9      A.  That's what it says.
10     Q.  Then we have over to the right side, bottom
11  corner, it says, "This appears to be a significant
12  discrepancy between these two actions which may be
13  considered as," and then it says something there, but I
14  think it's cut off, "discrimination."
15         Is that accurate?
16     A.  Uh-huh.
17     Q.  Yes?
18     A.  Yes.  Actually it doesn't say "this."  It's
19  "these."
20     Q.  "These two actions"?
21     A.  "These significant" --
22     Q.  I think that --
23     A.  There appears to be, yes.  It says, "There
24  appears to be a significant discrepancy."

Page 36

1      Q.  I said, "This appears to be."  "There appears
2  to be a significant discrepancy between these two actions
3  which may be considered as discrimination."  Is that
4  accurate?
5      A.  Uh-huh.
6      Q.  Who took part in drafting this document?
7      A.  I believe it was Ann.
8      Q.  Did anyone else have any other involvement in
9  drafting this?
10     A.  I don't know.
11     Q.  We discussed earlier that over to the right
12  here where it says, "His Master's counted, yours did
13  not?" that perhaps Ann did not write that.  Is that
14  accurate?
15     A.  Perhaps.
16     Q.  Well, I just want to understand what you said
17  before.  Is that fair to say?  Did you say that it's not
18  likely that she wrote that?
19     A.  Just the way it's worded, it's not likely that
20  she would have written that.
21     Q.  Can you think of any other person that may have
22  been involved in this document?
23     A.  From my office?  Christina Wirtz.
24     Q.  Who's Christina Wirtz?

Page 37

1      A.  She at that time was my supervisor, RPM II.
2      Q.  She may have assisted in this document?
3      A.  No.  I don't think she assisted in writing the
4  document.  I think she saw the document after it was
5  written.  Just like I did.
6      Q.  Anyone else?
7      A.  Not from my office.  Where it went after it
8  left this office, I don't know -- I would say it went to
9  Human Resources.  So there's people down there that would
10  have looked at it.
11     Q.  This document is from you, correct?
12     A.  Yes.  It says from Paul Will.  Yes.
13     Q.  Did you support Ms. Breslin's request for an
14  increase in her salary?
15     A.  Yes, I did.
16     Q.  Why is that?
17     A.  I support anybody that wants more money.
18     Q.  Anybody?  Even if they don't deserve it?
19     A.  If they can justify it that they think they
20  deserve it, I'll support them.
21     Q.  Did you feel that she could justify that she
22  deserved an increase?
23     A.  After I read this, yeah.  That's why I signed
24  it.

10 (Pages 34 to 37)

Breslin
Paul W. Will

v.    State of Delaware, Department of Natural Resources & Environmental Control

C.A. # 05-290                                      June 23, 2006

Page 38

1          MS. BREWINGTON:  We will have this marked
2    as Will 5.
3          (Will Deposition Exhibit No. 5 was marked
4    for identification.)
5    BY MS. BREWINGTON:
6    Q.   Are you confused?
7    A.   No.
8    Q.   What is this document that I put in front of
9    you?
10   A.   It looks like the same one.
11   Q.   What's the difference between them, though?
12   A.   Signatures are different.
13   Q.   What signatures?
14   A.   Well, this document has handwriting all over
15   it. This one doesn't.
16         MS. BREWINGTON:  For the record, he's
17   pointing to 4 having the handwriting all over it and
18   5 not having the handwriting all over it.
19         THE WITNESS:  Actually, this is a different
20   document.
21   Q.   It is?
22   A.   Yes. Second paragraph starts with "According"
23   on Exhibit 4. This exhibit starts with "Pursuant."
24   "Justification" is bolded in this one. It's not in this

Page 39

1    one. You want me to keep going?
2    Q.   No. I guess I want to know from you, you saw a
3    version of this document; is that correct?
4    A.   Uh-huh.
5    Q.   Do you know what you saw? Did you see the
6    final copy?
7    A.   I saw the copy that was given to me.
8    Q.   Do you know whether it was this copy, based on
9    your review?
10   A.   I can't remember. No.
11   Q.   Were you aware that this document was going to
12   be sent to Human Resources?
13   A.   Yes. At least the one I reviewed.
14   Q.   So this was under your authorization; is that
15   fair to say?
16   A.   Sure, yes.
17   Q.   Where it says "Justification," underneath
18   that --
19   A.   Which document?
20   Q.   Exhibit 5. It indicates, quote, Ann Breslin's
21   experience and knowledge clearly exceed the minimum
22   requirements for an ES III." Do you see where it says
23   that?
24   A.   Uh-huh.

Page 40

1    Q.   Would you agree with that statement?
2    A.   Yes.
3    Q.   It also indicates, I believe it's the last
4    sentence on that first page, that Ms. Breslin has 7.5
5    years of scientist experience with SIRB.
6    A.   7.4?
7    Q.   7.4. What did I say?
8    A.   5.
9    Q.   "In addition to her 7.4 years of environmental
10   scientist experience with the SIRB, Ann Breslin has
11   2.243 years of related experience."
12         Would you agree with that statement?
13   A.   Yes.
14   Q.   Now, this memo is dated May 17th, 2001. We
15   have already addressed the fact that Ms. Breslin's
16   employment began in '94. It ended in or around 2003. In
17   2001 she had worked for DNREC for approximately five
18   years; is that fair to say?
19   A.   As a merit employee. We're not counting
20   seasonal. She started in '94. 2001 would be seven
21   years.
22   Q.   Yes, you're right. Seven years. Okay.
23         After seven years of working at DNREC, did
24   you consider her an entry-level employee?

Page 41

1    A.   No.
2    Q.   Did you feel that she should be paid as an
3    entry-level employee?
4    A.   No.
5    Q.   Did you support her request to increase her
6    salary so that it was comparable with Keith Robertson?
7    A.   At the time I didn't really know that this was
8    for Keith or involved Keith. I supported her request for
9    advanced salary, yes.
10         MS. CSIZMADIA:  Do you want to take a
11   break?
12         (A recess was taken.)
13         (Will Deposition Exhibit No. 6 was marked
14   for identification.)
15   BY MS. BREWINGTON:
16   Q.   Take a look at this document. It's will 6.
17   A.   (Complied.)
18         Okay.
19   Q.   I think what's going to be easiest for us to
20   do, I'd like to review this document. It's a two-page
21   document. It looks like both pages are the same except
22   for the top of the pages. But we will go through both
23   documents.
24         Take a look at the first page of Will 6.

11 (Pages 38 to 41)

Page 42

1  At the bottom, would you agree that that's an e-mail from
2  Ann Breslin?
3  **A.   At the bottom?**
4  Q.   At the bottom.
5  **A.   Very bottom?**
6  Q.   I think it says, "For what it is worth." I
7  think that is probably "For what it is worth."
8  **A.   Yes, I would agree.**
9  Q.   Do you know who she sent that to? Can you
10  tell, based on reviewing this document?
11  **A.   It doesn't have a "to" that I can see.**
12  Q.   I just want to make sure I wasn't missing
13  anything.
14        The next message here --
15  **A.   The one above it?**
16  Q.   Yes. Could you read that aloud for me?
17  **A.   "I modified the intro and justification section**
18  **to be consistent with my last email regarding requesting**
19  **an advanced hire based on the promotion (increase in**
20  **paygrade) you received as part of last year's maintenance**
21  **review. I will forward you that last email again where I**
22  **referenced all the applicable merit rules. You did a**
23  **very good job describing your experience."**
24  Q.   Who is that e-mail from?

Page 43

1  **A.   It looks like it's from Alex Rittberg.**
2  Q.   Does that indicate who it was sent to?
3  **A.   Not that I can see.**
4  Q.   Based on the content of that e-mail, is it fair
5  to say that it was sent to Ann Breslin?
6  **A.   I can't tell. It doesn't say "to."**
7  Q.   Let's go to the next one.
8  **A.   The one above it?**
9  Q.   Yes. Go ahead and read that one out loud for
10  me.
11  **A.   Where it starts with "Paul"?**
12  Q.   Yes.
13  **A.   "Paul - I will print out a copy for your**
14  **review - since it will be coming from you.**
15        **"Alex and I have had LONG discussions about**
16  **this over the past year and he wanted to make an attempt**
17  **to work on this for me since he has managed to get every**
18  **advanced hire approved to a point. I fear weird doing**
19  **this but it may be worth a try since I am the only ES III**
20  **in sirb STILL making entry level...please forward the**
21  **paper to Christina for review after you are done with it**
22  **so we can get this moving...for what it is worth...AB."**
23  Q.   Who wrote that e-mail?
24  **A.   Ann Breslin.**

Page 44

1  Q.   Who did she send it to?
2  **A.   It was sent to me.**
3  Q.   Was it sent to anyone else or cc'd to anyone
4  else?
5  **A.   Doesn't look like it.**
6  Q.   Is there an attachment to the e-mail?
7  **A.   Not that I can see. Well, yeah. Advanced hire**
8  **for Ann Breslin including Alex's**
9  **corrections.doc.beyond.RTF.**
10  Q.   It indicates in here that someone did a good
11  job describing your experience. It says, "You did a very
12  good job describing your experience." And that was a
13  message from Alex, correct?
14  **A.   Uh-huh.**
15  Q.   Alex indicates that he modified the intro and
16  justification section to be consistent with his last
17  e-mail. Is that also correct?
18  **A.   That's what it says.**
19  Q.   Then the e-mail was sent from Ann to you
20  enclosing the attachment; is that also correct?
21  **A.   Looks to be, yes.**
22  Q.   Do you know whether you reviewed this document?
23  **A.   I don't know.**
24  Q.   Do you know whether you forwarded anything to

Page 45

1  Christina Wirtz?
2  **A.   I can't remember if I did or not.**
3  Q.   The date of this e-mail at the top is Thursday,
4  May 17th, 2001. Do you see that?
5  **A.   Yes, I do.**
6  Q.   If we go back to Will 5, that's also right in
7  front of you right there, that's the same exact date,
8  May 17, 2001.
9  **A.   Correct.**
10  Q.   Is it fair to say that the e-mail is
11  referencing the advanced hire request dated May 17, 2001?
12  **A.   Yes.**
13  Q.   Turning to the next page, if you will, I'd like
14  to just go over the top because if you agree with me, the
15  bottom portions are actually on the first page.
16  **A.   Yeah. They kind of go in reverse where the**
17  **most current one, I guess, is on the top of page 1 and**
18  **the first one that was actually done is your second.**
19  Q.   Kind of confusing.
20        At the top of the page is an e-mail. Do
21  you see that?
22  **A.   Is this the one from Christina Wirtz?**
23  Q.   That's what it looks like to me, but I'm going
24  to ask you about it. It's an e-mail from

12 (Pages 42 to 45)

Page 46

1    Christina Wirtz, correct?
2    **A.    Yes.**
3    Q.    It's to?
4    **A.    Alex and Ann, cc'd to me.**
5    Q.    And the subject is?
6    **A.    "Here you go."**
7    Q.    And the date?
8    **A.    Thursday, May 17, 2001.**
9    Q.    And the attachment?
10   **A.    Advhire.hire.doc.beyond.RTF.**
11   Q.    If you could read it for me.
12   **A.    "This looks great! Ann, you are so**
13   **accomplished, and should definitely be compensated**
14   **accordingly. I made minor edits, a few periods here and**
15   **there, and saved it in your alb file as on footer. Also**
16   **noticed that the number of years are missing from 4**
17   **through 8, with no description for 8."**
18   Q.    Now, would you agree with me that both Ann and
19   Christina Wirtz assisted in drafting the May 17th, 2001,
20   hire request?
21   **A.    Yes.**
22   Q.    Would you also agree that you saw some form of
23   this advanced hire request before it was sent to Human
24   Resources?

Page 47

1    **A.    Yes.**
2    Q.    When memos are sent out in your office from
3    your area, is it uncommon for someone else to draft them
4    and then for it to come from you?
5    **A.    That is uncommon, yes.**
6    Q.    Is there a reason why you did not draft the
7    advanced hire request?
8    **A.    No. I mean, again, this is something that Ann**
9    **was pursuing, not necessarily myself.**
10   Q.    But you supported it.
11   **A.    Yes, I supported it.**
12   Q.    Did you receive a response to the advanced hire
13   request?
14   **A.    I don't recall if I did or not.**
15   Q.    Do you know whether or not she received it?
16   **A.    I don't, no.**
17          **(Will Deposition Exhibit No. 7 was marked**
18   **for identification.)**
19   **BY MS. BREWINGTON:**
20   Q.    Have you had an opportunity to review this?
21   **A.    Not yet. Hold on. Okay.**
22   Q.    Does this help refresh your recollection as to
23   whether her advanced hire request was approved or denied?
24   **A.    Yes, it does.**

Page 48

1    Q.    Tell me about that.
2    **A.    That obviously it was not approved.**
3    Q.    Did you receive anything other than a memo
4    regarding the advanced hire request?
5    **A.    I don't recall if I did or not.**
6    Q.    Who is Marjorie Crofts? It's from Marjorie?
7    **A.    Yes.**
8    Q.    Can we back up? We have to basically identify
9    this document because I don't know what I'm looking at
10   when I'm reading the transcript. It's a memorandum,
11   correct? And it's to you from Marjorie Crofts, the
12   director's office, and it's dated May 31st, 2001,
13   subject: Advanced hire request for Ann Breslin. Is that
14   correct?
15   **A.    Correct.**
16   Q.    Do you recall informing Ann about the denial of
17   the advanced hire request?
18   **A.    I cannot remember if I did or not.**
19   Q.    Did you have any discussions with Ann?
20   **A.    Can't remember if I did or not.**
21   Q.    Did you have any discussions with anyone?
22   **A.    Can't remember if I did or not.**
23   Q.    So once you received this denial, you didn't
24   pursue it any further?

Page 49

1    **A.    I don't believe I did.**
2          **(Will Deposition Exhibit No. 8 was marked**
3    **for identification.)**
4    **BY MS. BREWINGTON:**
5    Q.    I have just placed in front of you what we will
6    mark as Will 8. The title of this document is "Delaware
7    Department of Natural Resources & Environmental Control
8    Administrative Policies and Procedures." The subject is
9    "D-0918 - Advanced Salary." The section is "D-0900,
10   Personnel Management." It was issued October 23rd, 2001;
11   revised November 13th, 2001.
12          Is that all accurate?
13   **A.    Yes.**
14   Q.    Do you know whether this form was created by
15   Human Resources?
16   **A.    I don't know.**
17   Q.    Have you ever seen this form before?
18   **A.    I have seen a lot of policies and procedures.**
19   **I don't know if I have actually read this one.**
20   Q.    Is it fair to say that it's a policy regarding
21   advanced salaries?
22   **A.    Yes.**
23   Q.    Do you see where it says, "Subject to available
24   funding, advanced salaries should be primarily used

13 (Pages 46 to 49)

Page 50

1  for:"?
2      A.  Yes, I see that.
3      Q.  It says, "A. Retention"?
4      A.  Uh-huh.
5      Q.  And then a ways down it says, "B. New Hire
6  Recruiting."  Do you see that?
7      A.  Yes.
8      Q.  If you turn to the next page, it indicates:
9  "C. Internal Equity."
10     A.  Yes.
11     Q.  Do you have an understanding of what that
12  means, internal equity?
13     A.  No, I don't.
14     Q.  If you could read for me underneath "C.
15  Internal Equity."
16     A.  **"To maintain internal equity to the degree**
17  **possible, the following criteria and or actions are**
18  **implemented:**
19          **"No advanced salary will be permitted for**
20  **those incumbents whose critical reclassification request**
21  **results in a promotion greater than three pay grades.**
22          **"Technical positions are a priority.**
23          **"The department will selectively use a Peer**
24  **Review process to scrutinize education, experience and**

Page 51

1  **training to support a request."**
2      Q.  Was Ann Breslin's position as an Environmental
3  Scientist III a technical position?
4      A.  Yes, it was.
5      Q.  Is it fair to say that based on this advanced
6  salary policy, that technical positions are given a
7  priority?
8      A.  Yes.  It says, "technical positions are a
9  priority."
10     Q.  How about that next bullet or diamond?  It
11  says, "the department will selectively use a Peer Review
12  process to scrutinize education, experience and training
13  to support a request."  And that's located under the
14  "Internal Equity" section.  Do you know whether the
15  Department used some sort of peer review for Ann Breslin?
16     A.  I don't know if they did or not.
17     Q.  Do you know anything about the peer review
18  process?
19     A.  No, I don't.
20     Q.  Now, HR makes the determination as to whether
21  someone receives an advanced --
22     A.  That's my understanding, yes.
23     Q.  When a manager submits the advanced salary
24  request, do you have an understanding of the emphasis

Page 52

1  that is placed on the manager's recommendation?
2      A.  Yes, I do.  But it's ultimately up to HR
3  whether or not they support that.
4      Q.  But you said you do.  Is there an emphasis on
5  the manager's request for an advanced hire?
6      A.  I don't know.
7      Q.  But the decision is solely made by Human
8  Resources?
9      A.  My understanding is.  Even if I fully support
10  it 100 percent, they still have the ultimate call.  And I
11  understand that.
12     Q.  Let's go back to an exhibit.  We're going to
13  look at 5.  HR makes the final determination; is that
14  correct?
15     A.  As I understand it, yes.
16     Q.  Is it your understanding that HR bases its
17  determination on what's indicated in the --
18     A.  Advanced hire request.
19     Q.  And the information submitted from the advanced
20  hire request comes from the supervisor?
21     A.  Supposed to, yes.
22     Q.  How familiar is Human Resources with each --
23  let's be specific.  How familiar is Human Resources
24  familiar with the environmental scientist job?

Page 53

1          MS. CSIZMADIA:  Speculating.  I object.  Go
2  ahead.
3      A.  To the point that they're familiar with the
4  principal accountabilities that they have and the
5  policies that they administer, the knowledge and
6  experience required, the principal accountabilities I
7  would say to that point.
8      Q.  You can put that aside.
9          Do you know whether Ann Breslin ever
10  received a salary comparable to Keith Robertson at any
11  time before she ended her employment?
12     A.  Did she receive a salary -- I wasn't aware of
13  exactly what their salaries were, so I don't know.
14     Q.  But do you know whether or not she ever
15  received an advanced hire request or anything like that?
16     A.  I know from this one that was done that she
17  wasn't. I know from Marge Crofts saying she didn't.
18     Q.  But you don't know of anything else going on
19  after that with her salary?
20     A.  Not that I'm aware of.
21          **(Will Deposition Exhibit No. 9 was marked**
22  **for identification.)**
23
24  BY MS. BREWINGTON:

14 (Pages 50 to 53)

B-0128

Page 54

1    Q.    I just put in front of you a document that
2  we're going to mark as Will 9.  Would you agree with me
3  that that is an e-mail?
4    A.    Yes, it is.
5    Q.    It's from Ann Breslin, correct?
6    A.    Correct.
7    Q.    And it was sent Wednesday, September 11th,
8  2002?
9    A.    Correct.
10    Q.    It's to you, Christina Wirtz, who's above you,
11  correct?
12    A.    Correct.
13    Q.    Or who was at the time.
14    A.    That's right.
15    Q.    And Alex Rittberg.
16    A.    Correct.
17    Q.    Now, Alex was also a Program Manager I; is that
18  correct?
19    A.    That's correct.
20    Q.    He did not have a direct reporting relationship
21  with Ann?
22    A.    Yes, he did.
23    Q.    Did he have it at this time?
24    A.    I'm not quite sure.

Page 55

1    Q.    He did have it after you, though?
2    A.    After me.  I cannot remember when I stopped and
3  he started.  Could have been around this time.  I'm not
4  sure.
5    Q.    The subject is "Personnel Issues -
6  CONFIDENTIAL."
7    A.    Correct.
8    Q.    "Importance," Sensitivity," "High
9  Confidential."
10        Go ahead and read this document for me.
11    A.    "Paul, Christina, Alex - I need to update all
12  of you on the steps that I have taken and will be taking
13  in order to attempt to settle the pay inequity issues.
14  Yesterday I retained an attorney to represent me in this
15  matter.  He will be filing a Grievance with the State for
16  me either today or tomorrow.  Later today I will be
17  taking a few hours off to file a claim with the
18  Department of Labor under the Equal Pay Act of 1963.
19  According to my attorney, the DOL will be comparing my
20  pay to those ES IIIs in SIRB (not ES IIIs in DNREC) who
21  complete the same duties (namely Qazi and Keith) who are
22  being paid substantially more per year.
23        "I want to thank the three of you for
24  supporting me over the past few years, either by drafting

Page 56

1  memos on my behalf or by verbally supporting me in my
2  efforts.  I had not wanted to take this step but I have
3  been unable to avoid this action due to DNREC Personnel's
4  attitude in this matter.
5        "Thanks - Ann."
6    Q.    Earlier in your deposition you indicated that
7  you weren't aware of any pay issues until after she left.
8  This document was sent to you.  Does this help to refresh
9  your recollection on whether there were pay issues with
10  Ann while she was employed with DNREC?
11    A.    Yes, it does.
12    Q.    The second paragraph indicates:  "I want to
13  thank the three of you for supporting me over the past
14  few years, either by drafting memos on my behalf or by
15  verbally supporting me in my efforts."
16        Would you agree that you supported Ann in
17  her requests for an increase in her salary?
18    A.    Yes.
19    Q.    I think my last question was did you support a
20  request, and you agreed that you did.  Can you tell me
21  why you supported her request?
22    A.    Because over the years I thought she did a good
23  job with the Department, and I believe if someone has an
24  issue and they feel that they're right, I took a look at

Page 57

1  the facts and understood them.  So I supported her.
2        MS. BREWINGTON:  I don't have anything
3  further.
4  BY MS. CSIZMADIA:
5    Q.    Just a couple questions.
6        Drawing your attention to Will 2, do you
7  know whether these environmental science series
8  information, whether it's the current information or
9  whether it's the information that was applicable when Ann
10  was here?
11    A.    Well, Lori, is that right?  If you got this off
12  the Web you said, then it's got a 6/22 print date on it.
13  It should be the most current.
14    Q.    Drawing your attention to the last page, does
15  this indicate that information may have changed over the
16  years?
17    A.    Yes.  In some cases, yes.  It looks like it has
18  changed on every one but maybe V.
19    Q.    Drawing your attention to Will No. 5, whose
20  initials are after your name and after Christina's name?
21    A.    It looks like -- from what I can recollect,
22  that looks like an AR.  So it looks like it could be
23  Alex's.
24    Q.    Are they your initials?

15 (Pages 54 to 57)

B-0129

Page 58

1   **A.   They're not my initials, no.**
2   Q.   Who did you say wrote that document?
3   **A.   This was drafted by Ann.**
4   Q.   Did you do any independent research to
5   substantiate the information in it?
6   **A.   No. I simply reviewed it.**
7   Q.   You told Lori that the information submitted in
8   the advanced hire request usually is supposed to come
9   from the supervisor. What did you mean by that?
10  **A.   Well, just that the advanced hire requests are**
11  **normally prepared -- I know in my experience as manager,**
12  **once a person is hired, if they request an advanced hire**
13  **request, that's usually prepared by the manager after**
14  **consulting with the person requesting the advanced hire**
15  **request. That's how they obtain some additional**
16  **information.**
17  Q.   Just one more question, I believe. Lori asked
18  you whether you felt it was personally fair the situation
19  with Ann's pay. Has it been your experience that in your
20  personal interpretation of fairness, has the application
21  of the merit rules always resulted in fair results to
22  you?
23  **A.   Personally? Have they always resulted in**
24  **fairness? No.**

Page 59

1   Q.   Why do you say that?
2   **A.   Just personal preference. My belief of a**
3   **person whose work abilities could be sometimes higher**
4   **than that that Human Resources might think for whatever**
5   **reason.**
6         MS. CSIZMADIA:  Thank you. I don't have
7   any other questions.
8         MS. BREWINGTON:  I'd like to take a short
9   break to discuss and then I have a few more.
10        (A recess was taken.)
11        MS. BREWINGTON:  I don't have anything
12  further.
13        (Deposition concluded at 11:45 a.m.)
14         - - - - -
15
16
17
18
19
20
21
22
23
24

Page 60

1              T E S T I M O N Y
2
3   DEPONENT:  PAUL W. WILL              PAGE
4   BY MS. BREWINGTON............................ 2
5   BY MS. CSIZMADIA............................. 57
6
7              E X H I B I T S
8
9   WILL DEPOSITION EXHIBIT NO.          MARKED
10  1 - A two-page document entitled, "Sections
    and Branches"................................. 11
11
    2 - A multi-page document entitled,
12  "State of Delaware Class Series
    Description Environmental Science Series"...... 16
13
    3 - A five-page document entitled,
14  "Breslin v. State of DE/Department of
    Natural Resources, Case No.:
15  0210667/17CA300024"............................ 22
16  4 - A multi-page typewritten document
    with handwritten notes......................... 31
17
    5 - A multi-page document entitled,
18  "Memorandum," dated May 17, 2001.............. 38
19  6 - Two pages of e-mails...................... 41
20  7 - A memorandum dated May 31, 2001........... 47
21  8 - Administrative Policies and Procedures
    of DNREC....................................... 49
22
    9 - An e-mail  dated September 11, 2002........ 53
23  ERRATA SHEET/DEPONENT'S SIGNATURE       PAGE 61
24  CERTIFICATE OF REPORTER              PAGE 62

Page 61

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT

16 (Pages 58 to 61)

Breslin
Paul W. Will
C.A. # 05-290

State of Delaware, Department of Natural Resources & Environmental Control
June 23, 2006

Page 62

CERTIFICATE OF REPORTER

STATE OF DELAWARE)
          )
NEW CASTLE COUNTY)

      I, Kimberly A. Hurley, Registered
Professional Reporter and Notary Public, do hereby
certify that there came before me on the 23rd day of
June, 2006, the deponent herein, PAUL W. WILL, who was
duly sworn by me and thereafter examined by counsel for
the respective parties; that the questions asked of said
deponent and the answers given were taken down by me in
Stenotype notes and thereafter transcribed by use of
computer-aided transcription and computer printer under
my direction.
      I further certify that the foregoing is a
true and correct transcript of the testimony given at
said examination of said witness.
      I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.


          Kimberly A. Hurley
          Certification No. 126-RPR
          (Expires January 31, 2008)


DATED:

17 (Page 62)

B-0131

                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF DELAWARE

ANN L. BRESLIN,                )
                               )
        Plaintiff,             )
                               )
        v.                     ) C.A. No. 05-290
                               )
STATE OF DELAWARE,             )
DEPARTMENT OF NATURAL          )
RESOURCES & ENVIRONMENTAL      )
CONTROL,                       )
                               )
        Defendant.             )

              Deposition of E. ALEXANDER RITTBERG taken
pursuant to notice at the offices of DNREC, 391 Lukens
Drive, New Castle, Delaware, beginning at 1:00 p.m., on
Friday, June 23, 2006, before Kimberly A. Hurley,
Registered Merit Reporter and Notary Public.

APPEARANCES:

             LORI BREWINGTON, ESQUIRE
             MARGOLIS EDELSTEIN
               1509 Gilpin Avenue
               Wilmington, Delaware 19806
               for the Plaintiff

             VALERIE S. CSIZMADIA, DEPUTY ATTORNEY GENERAL
             DEPARTMENT OF JUSTICE
               Carvel State Office Building
               820 North French Street
               Wilmington, Delaware 19801
               for the Defendant
ALSO PRESENT:
             ANN L. BRESLIN

                    WILCOX & FETZER
      1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477
                    www.wilfet.com

Breslin
E. Alexander Rittberg

v.    State of Delaware, Department of Natural Resources & Environmental Control
C.A. # 05-290
June 23, 2006

Page 2

1          E. ALEXANDER RITTBERG,
2      the witness herein, having first been
3      duly sworn on oath, was examined and
4      testified as follows:
5  BY MS. BREWINGTON:
6      Q.   Good afternoon, Alex.
7      **A.   Hi.**
8      Q.   I have the privilege of taking your deposition
9  today with respect to Ann Breslin's discrimination charge
10 against DNREC. Have you ever testified in a deposition
11 before?
12     **A.   No.**
13     Q.   This is how it works: I'm going to ask you a
14 series of questions. I'll make every effort to ask them
15 one at a time. If for some reason you don't understand
16 the question, just let me know and I'll repeat it or
17 rephrase it. If you answer the question, I'll assume
18 that you and I both understood both the question and
19 answer. Okay?
20     **A.   Okay.**
21     Q.   If at any time you need to take a break, just
22 let me know. The court reporter is here and she will be
23 taking down your responses to my questions. It's very
24 important when answering my questions that your answers

Page 3

1  are yes and no as opposed to uh-huhs and uh-uhs because
2  it's very difficult for that to appear on the record. We
3  want the record to be as clear as possible.
4          Do you understand?
5      **A.   Yes.**
6      Q.   Okay, great. At times DNREC's attorney will
7  object to some of the questions I ask. That is entirely
8  proper. The only thing that I ask is that you answer the
9  question unless she specifically advises you not to
10 answer. Okay?
11     **A.   Okay.**
12     Q.   Please state your full name for the record.
13     **A.   Alex Rittberg.**
14     Q.   Do you have a middle name?
15     **A.   Alexander is my middle name.**
16     Q.   What's your first name?
17     **A.   Earl.**
18     Q.   You don't like it?
19     **A.   You have to talk to my mom about that.**
20     Q.   What did you do in preparation for your
21 deposition testimony today?
22     **A.   I met with Val.**
23     Q.   Did you do anything else?
24     **A.   I reviewed some old e-mail.**

Page 4

1      Q.   Tell me about those old e-mails. What do you
2  remember about the e-mails?
3      **A.   What do I remember about them.**
4      Q.   How many did you review, like a couple, one,
5  two?
6      **A.   About five, I believe.**
7      Q.   Were they in your e-mail account?
8      **A.   Yes.**
9      Q.   Were they regarding Ann Breslin?
10     **A.   Yes.**
11     Q.   Tell me what about Ann Breslin.
12     **A.   They were about -- at the time there was a**
13 **decision made in our department where environmental**
14 **scientists received a bump-up due to a maintenance**
15 **review, and the e-mails were about trying to get existing**
16 **staff a leveling-up in salary or a higher salary if they**
17 **were here for a certain number of years for that bump-up**
18 **decision.**
19     Q.   Is that something you sent out to Human
20 Resources?
21     **A.   Yes.**
22     Q.   Did you get a response?
23     **A.   Yes, I did.**
24     Q.   What was that, if you can remember?

Page 5

1      **A.   The response was that they did not -- they**
2  **issued a policy that year that said you could not get --**
3  **put in for, get an advanced hire as part of a maintenance**
4  **review promotion.**
5      Q.   Did you review any other documents?
6      **A.   I can't remember.**
7      Q.   I'd like you to take me through your work
8  experience, and we will start with here specifically at
9  DNREC and then we will go to your previous work
10 experience. Is that okay?
11     **A.   Sure.**
12     Q.   When did you begin working with DNREC?
13     **A.   In December of '91.**
14     Q.   What was your job title?
15     **A.   I started as an environmental engineer in the**
16 **Solid and Hazardous Waste Branch.**
17     Q.   That branch is different than SIRB?
18     **A.   Yes. That's down in the Dover office.**
19     Q.   Were you promoted?
20     **A.   Yes. I was promoted to an environmental**
21 **program manager in, I believe, 1992. And I was a program**
22 **manager in the Solid and Hazardous Waste Branch through**
23 **1998. And then in September of 1998 I joined the Site**
24 **Investigation and Restoration Branch.**

2 (Pages 2 to 5)

Breslin
E. Alexander Rittberg

v.    State of Delaware, Department of Natural Resources & Environmental Control

C.A. # 05-290

June 23, 2006

Page 6

1  Q.  And that's SIRB?
2  A.  And that's SIRB.
3  Q.  As a program manager?
4  A.  As a Program Manager I.
5  Q.  And that's your current position?
6  A.  No. In 2005, January 2005, I was promoted to
7  an Environmental Program Manager II of the Tank
8  Management Branch.
9  Q.  And that's a different branch?
10  A.  That's a different branch but still in this
11  building.
12  Q.  You have experience in the solid hazardous --
13  A.  Solid and Hazardous Waste Management Branch.
14  Q.  And SIRB?
15  A.  Right.
16  Q.  And now Tank Management?
17  A.  Yes.
18  Q.  You're a program manager?
19  A.  Yes.
20  Q.  You have been a program manager since January
21  of 2005?
22  A.  Program Manager II. That's the branch manager
23  level.
24  Q.  What did you do prior to working for DNREC?

Page 7

1  A.  I was in the Army from September of '87 through
2  '91.
3  Q.  Prior to that?
4  A.  Prior to that I was in college at the
5  University of Delaware.
6  Q.  Did you receive your Bachelor's degree?
7  A.  Yes. In chemical engineering.
8  Q.  Do you have a Master's degree?
9  A.  No, I do not.
10  Q.  How familiar are you with the details of
11  Ms. Breslin's lawsuit?
12  A.  I read the complaint when I met with Val.
13  Q.  Was that the first time that you learned of the
14  details of the lawsuit?
15  A.  Yes.
16  Q.  Tell me a little bit about DNREC in terms of
17  its purposes or function.
18  A.  DNREC's function is to protect human health and
19  the environment, to promote conservation of natural
20  resources, to ensure recreational activities are provided
21  from our park system. We have quite a variety of
22  activities that we're involved with.
23  Q.  You mentioned three of the different branches,
24  correct?

Page 8

1  A.  Three of the different -- branches that I
2  worked in?
3  Q.  Yes. Three of the different branches of DNREC.
4  That's what you mentioned so far.
5  A.  As far as describing DNREC's activities or --
6  Q.  Let me start all over.
7  A.  Sure.
8  Q.  I'm going to ask you about the different
9  branches in DNREC, and I wanted to ask you whether you
10  previously discussed at least three of those branches.
11  Is that fair to say?
12  A.  Which three?
13  Q.  Solid and Hazardous Waste?
14  A.  Yes, that is correct.
15  Q.  SIRB and Tank Management?
16  A.  Right.
17  Q.  And there are other branches?
18  A.  Yes.
19  Q.  What are some of the other branches?
20  A.  Some of the other branches -- why don't we
21  start in our division. We have a whole Air Quality
22  section, Air Resources section, and within that there's
23  Permitting branches, Air Monitoring or Surveillance, and
24  Planning. Then we have an Emergency Response Branch

Page 9

1  which is now called the Emergency Prevention and -- EPRB.
2  They changed their name. Emergency Prevention Response
3  Branch. And they do emergency response to spills, things
4  of that type of nature.
5  Q.  Okay.
6  A.  We have a few other divisions within DNREC. I
7  don't know how far you want me to go.
8  Q.  Tell me.
9  A.  We have a Water Resources Division, and that
10  contains our Groundwater Protection Branch, our Surface
11  Water Discharge Branch, our Wetlands Section, our
12  Environmental Laboratory. Then there's probably a few
13  others within that branch and I can't remember.
14  Q.  That's enough for that one.
15  A.  We have a Division of Soil and Water and that's
16  where the Erosion and Sediment Control Program is, as
17  well as something called A-319 Program for nonpoint
18  source pollution. The Dredging Section is also within
19  Soil and Water.
20  Q.  Any other branches you can think of?
21  A.  And Parks. I'm not sure how our Parks
22  Department is -- Division is split up. I'd rather not
23  get into that.
24  Q.  That's fine. So far you have mentioned Solid

3 (Pages 6 to 9)

Page 10

1  and Hazardous Waste, SIRB, Tank Management, Air Quality,
2  Emergency Response, Water Resource Division.
3  **A.   Okay.**
4  Q.   And Soil and Water.
5  **A.   Okay.**
6  Q.   Is that correct?
7  **A.   That's correct.  I forgot our enforcement.**
8  Q.   And Enforcement.
9       Now, within those branches what are some of
10  the job titles?  Do they vary?
11  **A.   They do, but there's some that are consistent.**
12  Q.   Tell me about the ones that are consistent.
13  **A.   There's environmental engineers, environmental**
14  **scientists, hydrologists, program managers,**
15  **administrative specialists, paralegals, planners. That's**
16  **a good start.**
17  Q.   That is a great start.  Let me ask you about
18  the environmental scientists.
19  **A.   Okay.**
20  Q.   Would it be fair to say that the job duties of
21  an environmental scientist in Water Resource may be
22  different than the job duties of an environmental
23  scientist in SIRB?
24  **A.   Would it be fair to say that the different --**

Page 11

1  **that there would be a difference in job duties.**
2  Q.   Yes.
3  **A.   There would be some differences, yes, but you**
4  **could also draw similarities.**
5  Q.   Tell me about the differences between an
6  environmental scientist in SIRB as opposed to an
7  environmental scientist in another division.
8  **A.   Division or branch?**
9  Q.   Branch.
10  **A.   Environmental scientist in SIRB -- well, there**
11  **could be differences even within the program, but**
12  **basically you could be assigned as a project manager for**
13  **a site, contaminated site investigation, or a cleanup**
14  **project.  That could be similar to an environmental**
15  **scientist in the Solid and Hazardous Waste Branch.  It**
16  **may be similar to an environmental scientist -- sometimes**
17  **the tank staff gets involved in that type of activity, as**
18  **well, but on a smaller scale, dealing with releases from**
19  **underground storage tanks.**
20  Q.   Would it be similar to the environmental
21  scientist in Parks?
22  **A.   In Parks, I don't know how many environmental**
23  **scientists they actually have because I haven't worked**
24  **there.  I know they have some naturalist positions, but**

Page 12

1  **those are probably different.**
2  Q.   How about environmental scientists in the Air
3  Quality Section?
4  **A.   Environmental scientists in Air Quality could**
5  **do some activities that involve collecting ambient air**
6  **data or they could be specifically doing risk assessment**
7  **type of work or they could be writing regulations.**
8  Q.   Writing regulations?
9  **A.   Yes.**
10  Q.   Is collecting -- I believe you said ambient?
11  **A.   Uh-huh.  Ambient air data.**
12  Q.   Is that something that a SIRB environmental
13  scientist would do as part of their job duties?
14  **A.   It could come into play as a duty at a site if**
15  **they are worried about like dust emissions and the**
16  **ambient air quality within a building, if there's some**
17  **type of confined entry type of work going on.**
18  Q.   Is there anything that you can think of that
19  the environmental scientists in SIRB -- that is unique to
20  just the environmental scientists in SIRB?
21  **A.   Is unique to the environmental scientists in**
22  **SIRB.  The process, the administration process, that the**
23  **environmental investigation and cleanup activities happen**
24  **under, meaning the laws and regulations, are specific to**

Page 13

1  **the SIRB program.  Sometimes our programs use those same**
2  **regulations as appropriate and relevant regulations that**
3  **may apply to the work that they do, but primarily it's**
4  **the administrative framework that those regulations fall**
5  **under that make it unique to SIRB, meaning that work in**
6  **SIRB is supported by a specific set of regulations and**
7  **laws, and SIRB staff probably have the most experience**
8  **working under those unique laws.**
9  Q.   So the same laws environmental scientists work
10  under are different than the other --
11  **A.   Yes.**
12  Q.   -- regulations?
13  **A.   Yes.**
14  Q.   In the other departments.
15  **A.   Uh-huh.**
16  Q.   Did Ann Breslin ever directly report to you?
17  **A.   Yes.**
18  Q.   When was that?
19  **A.   That was for several months before she left our**
20  **department.  I can't recall the exact dates.**
21  Q.   I'll represent to you that she left DNREC in
22  2003.
23  **A.   Okay.**
24  Q.   In February of 2003.  Would it have been

4 (Pages 10 to 13)

Page 14

1  several months prior to that, so probably in 2002 at
2  sometime that she reported to you?
3  **A.   That sounds like the general time frame.**
4  Q.   Would you say you were familiar with her work
5  performance?
6  **A.   Yes.**
7  Q.   Tell me about her work performance.  What do I
8  want to know about it?  Is that what --
9  **A.   Yes, what would you like to know about it?**
10  Q.   How would you characterize her work?  I guess
11  I'm coming from not only you as her supervisor but what
12  you saw while working at DNREC.
13  **A.   Ann was a very hard-working person.  She**
14  **readily accepted new tasks.  She could effectively manage**
15  **a project and you could tell she really cared about the**
16  **work she did.**
17  Q.   How about Keith Robertson, did he ever report
18  directly to you?
19  **A.   Yes, he did.**
20  Q.   Do you remember when that was?
21  **A.   Keith was in my group when I came to SIRB and**
22  **then he left for a period of time and then came back, and**
23  **I cannot recall those dates.**
24  Q.   When did you start in SIRB, September of '98?

Page 15

1  **A.   '98.**
2  Q.   Is it fair to say that when you first started
3  there in SIRB, that he reported to you?
4  **A.   Yes.**
5  Q.   Around September of 1998.  And then he left for
6  sometime and then he came back and he reported directly
7  to you?
8  **A.   Yes.**
9  Q.   At some point both Ann Breslin and Keith were
10  ES IIIs; is that correct?
11  **A.   Yes.**
12  Q.   What are ES IIIs?
13  **A.   Your question, I'm sorry?**
14  Q.   What are ES IIIs?
15  **A.   ES IIIs are a type of level within a job**
16  **classification an environmental scientist.**
17  Q.   What are some of the job responsibilities of an
18  ES III in SIRB?
19  **A.   An ES III in SIRB is expected to manage a site**
20  **investigation or remediation project.  They're expected**
21  **to work independently with little or minimal supervision.**
22  Q.   Anything else?
23  **A.   They could work on a variety of different types**
24  **of projects, either state lead project, an EPA-funded**

Page 16

1  **project, a Department of Defense project.**
2  Q.   Take a look at the second document there.  I
3  think it's labeled Will 2.  I have put in front of you
4  what has previously been marked as Will 2.  Do you see
5  that?
6  **A.   Yes.**
7  Q.   It's entitled, "State of Delaware Class Series
8  Description Environmental Science Series."  I'd like you
9  to review the job duties for Environmental Scientist III.
10  **A.   Okay.  (Complied.)**
11  **Okay.**
12  Q.   Now that you have had an opportunity to review
13  these job duties, my question is:  Are the job duties
14  listed here consistent with your understanding of the job
15  duties for both Keith and Ann Breslin?
16  **A.   Yes.**
17  Q.   And then I want you to turn to the minimum
18  qualifications for Environmental Scientist III.  It's
19  actually on page 5 of 6.
20  **A.   Keith actually was doing some higher-level**
21  **work, as well, in addition to these duties.**
22  Q.   You want to talk about that?  What was he
23  doing?
24  **A.   He was doing things like statewide**

Page 17

1  **investigation of public drinking water supplies, as well**
2  **as determining statewide background level for arsenic.**
3  Q.   You know this because he reported directly to
4  you?
5  **A.   Yes.**
6  Q.   Is there anything else that he did?
7  **A.   That's all that I recollect.**
8  Q.   The minimum qualifications, is a Bachelor's
9  degree one of the minimum qualifications for
10  Environmental Scientist III?
11  **A.   A Bachelor's degree in one of the life,**
12  **natural, or physical sciences, yes.**
13  Q.   If you turn to the next page, you will see a
14  list at the bottom where it says, "Environmental
15  Scientist I," "Environmental Scientist II," and
16  "Environmental Scientist III."  Minimum qualifications,
17  9/91, do you see where it says that?
18  **A.   Yes.**
19  Q.   Is it fair to say that these minimum
20  qualifications were instituted in September of 1991?
21  **A.   I would assume that.  I'm not sure that's what**
22  **that date means there, but it's likely.**
23  Q.   Ann Breslin had both her Bachelor's and
24  Master's degrees; is that correct?

5 (Pages 14 to 17)

B-0136

Page 18

1  A.  I believe so, yes.
2  Q.  What are some of the other minimum
3  qualifications of an ES III?
4  A.  Some other minimum qualifications?
5  Q.  Besides the Bachelor's degree.
6  A.  No. 2 is " experience analyzing data." No. 3
7  is "Experience in environmental/natural resource program
8  or project management." No. 4 is "Experience
9  interpreting and applying environmental laws, rules and
10 regulations." No. 5 is "Experience with computers and
11 computer information systems."
12 Q.  Ann reported to you sometime in 2002 through
13 the end of her employment in 2003. I'm going to
14 represent that to you because I know you said you weren't
15 sure of the dates.
16 A.  Yes.
17 Q.  But during that time period, my question is:
18 Would you agree that Ann exceeded these minimum
19 qualifications of ES III?
20 A.  2 through 5 or including the possession of the
21 Bachelor's degree or all of them?
22 Q.  All of them.
23 A.  I believe Ann has a Master's degree, so I think
24 she exceeded No. 1. "Experience analyzing data," Ann had

Page 19

1  several years of experience with the min quals 2 through
2  5 based on her experience working in the program at the
3  time.
4  Q.  So is your answer yes, she met that minimum
5  qualification or exceeded that minimum qualification?
6  A.  She at least met that. As far as exceeding,
7  she had the experience.
8  Q.  How many years of experience has she had at
9  that point?
10 A.  She had at least -- depends on how long she
11 worked for the Department. I forget that.
12 Q.  I'll represent to you that she began her
13 employment in '94.
14 A.  Okay.
15 Q.  Based on the fact that she had been employed
16 since '94 and we're talking about the time period of
17 2002, because that's when she reported to you, would you
18 agree that she exceeded the minimum requirement for
19 experiencing and analyzing data at that point?
20 A.  I would say that she had seven, eight years of
21 experience, yes.
22 Q.  How about the next one?
23 A.  At that point in -- when are we talking again?
24 Q.  2002.

Page 20

1  A.  Yes, she had experience at least meeting.
2  Q.  But you wouldn't go so far as to say exceeding
3  with No. 3?
4  A.  It depends.
5  Q.  What does it depend on?
6  A.  It depends how you're defining exceeding and
7  having experience. She had at least seven to eight
8  years' experience in at least 1 through 4, including
9  No. 5, experience with computers.
10 Q.  Would you consider that meeting the minimum
11 qualifications?
12 A.  No. I would consider it exceeding. It depends
13 how we're defining these things.
14 Q.  That's fair. In terms of the minimum
15 qualifications for the Environmental Scientist IV, one of
16 the minimum qualifications is, quote, Possession of
17 either a Master's Degree in an environmentally related
18 scientific discipline." Is that correct?
19 A.  That's correct.
20 Q.  Would you agree that Ann met at least one of
21 the minimum qualifications for ES IV?
22 A.  With possession of the Master's degree? Yes.
23 Q.  Now I'd like you to take a look at what has
24 been previously marked as Will 3.

Page 21

1      Off the record.
2      (Discussion off the record.)
3  BY MS. BREWINGTON:
4  Q.  I'll represent to you that this is a document
5  that was submitted by DNREC to the EEOC, the Equal
6  Employment Opportunity Commission, with respect to
7  Ann Breslin's charge of discrimination.
8      I want to ask you to review
9  Ann Breslin's -- actually, first, let's look at Keith's
10 because Keith reported directly to you. Is that correct?
11 A.  Yes.
12 Q.  Let's look at Keith's first. And the pages may
13 be messed up.
14 A.  I think Keith's is at the end.
15 Q.  Take a look at the bottom numbers, 4 to 5.
16 A.  Am I on the right page?
17 Q.  It's like 4 is the last page and it should be
18 the second-to-last page.
19 A.  Okay.
20 Q.  Have you reviewed them?
21 A.  Give me a minute.
22 Q.  Sure. Take your time.
23 A.  Okay.
24 Q.  My first question is: Is this an accurate list

6 (Pages 18 to 21)

B-0137

Breslin
E. Alexander Rittberg

v.    State of Delaware, Department of Natural Resources & Environmental Control

C.A. # 05-290    June 23, 2006

Page 22

1  of Keith's primary job duties?
2  **A.  It looks like it includes most.  It's accurate,**
3  **yes.**
4  Q.  Now I'll ask you to turn to the front and take
5  a look at Ann Breslin's specific job duties.
6  **A.  Okay.**
7  Q.  Is it fair to say that the job duties for
8  Keith Robertson are similar to that of Ann Breslin?
9  **A.  As they're represented here, there are**
10 **similarities, yes.**
11 Q.  Let me ask you one more question about that.
12 I'm sorry.
13      Turning to page 5 at the bottom, you see
14 where it says, "Mr. Robertson began his employment with
15 SIRB on" February 1st, 1994, and then it says, "From"
16 February 1st, 1994, to February 22nd, 2003,
17 "Mr. Robertson had nine years of experience with SIRB"?
18 Do you see where it says that?
19 **A.  Yes.**
20 Q.  Was there a time in between February 1st, 1994,
21 through February 22nd of 2003 when he left DNREC?
22 **A.  I don't remember.**
23 Q.  I believe you just testified to that.  I'm not
24 asking --

Page 23

1  **A.  Was there a time?  Yes.**
2  Q.  Yes, there was.
3  **A.  Yes.**
4  Q.  Is it fair to say --
5  **A.  Well, remember I testified I don't remember the**
6  **dates.  I believe it's before '03 that he left.**
7  Q.  But between his hire date and his end date, he
8  left somewhere between there?
9  **A.  Yes.**
10 Q.  Is it fair to say that that is not indicated on
11 this page?
12 **A.  It says nine years here.  It does not mention**
13 **him leaving.**
14 Q.  Do you know how long he was gone from DNREC?
15 **A.  I can't remember.**
16 Q.  Was it longer than six months?
17 **A.  I really can't remember.**
18 Q.  That's fine.
19      At any time were you aware of a discrepancy
20 in pay between Ann Breslin and Keith Robertson?
21 **A.  Between Ann and Keith.**
22 Q.  In their salaries.
23 **A.  Yes.**
24 Q.  Do you recall, and I know this is difficult,

Page 24

1  the first time you became aware that there was some sort
2  of discrepancy in pay between the two of them?
3  **A.  As a manager I would have to prepare budgets**
4  **and grants and so I was aware of everyone's salary and**
5  **the differences between them.**
6  Q.  You became a manager of SIRB in 2000; is that
7  right?  '98?  I don't remember.
8  **A.  '98.**
9  Q.  Is it fair to say that you were aware of this
10 discrepancy as early as '98?
11 **A.  Probably '99, once I got into the grants.**
12 Q.  Did you understand why there was a discrepancy
13 between the pay?
14 **A.  There's a lot of reasons for discrepancies**
15 **between pay, so I really didn't question it or try to**
16 **understand the why.**
17 Q.  In your opinion, should Ann have been making
18 less money than Keith?
19 **A.  I didn't have the information to make that**
20 **determination.  I really can't say.**
21 Q.  What information would you need?
22 **A.  You would need to know how their starting**
23 **salaries were derived and how long they had been with the**
24 **Department, what places they were working for the State**

Page 25

1  **when the raises came into place, you would have to know**
2  **when they were promoted or hired into their positions,**
3  **whether either one received an advanced salary.**
4  Q.  Let's go back to Will 3.  Take a look at the
5  hire dates for me.  Would you agree that Ann was hired
6  November 1st, '94?  I'm sorry.  January 18th, '94.
7  **A.  It's hard to tell on here as you just pointed**
8  **out.  It has seasonal.  Has both dates on it here.**
9  Q.  Let me ask you this:  Could you tell based on
10 this form where it says "Hire Date" when Keith Robertson
11 was hired?
12 **A.  That it was only one date.  I'd say yes,**
13 **February '94.**
14 Q.  Is it fair to say that Keith Robertson's hire
15 date is after Ann Breslin's?
16 **A.  After Ann Breslin's?**
17 Q.  Yes.
18 **A.  If you go by the November date under Ann's,**
19 **then he's before her.  You see what I mean?  If you go by**
20 **the seasonal date, he's after.  If that's what those**
21 **dates represent.**
22 Q.  That's fair.  How about the starting salary,
23 did both Ann and Keith start at the same salary?
24 **A.  Based on this information, yes.**

7 (Pages 22 to 25)

Page 26

1    Q.   What was that salary?
2    A.   $22,998.
3    Q.   As of January 2002, what was Ann Breslin's
4    salary?
5    A.   $38,390.
6    Q.   And Keith Robertson's?
7    A.   $43,100, and I don't know -- 25 cents.
8    Q.   That's what I would say.
9         How about as of December 2002, what was
10   Ann's salary?
11   A.   December 2002, $39,158 and change.
12   Q.   And Keith Robertson's?
13   A.   $43,962 and change.
14   Q.   Based on your review of this document, is it
15   fair to say that both were hired in '94?
16   A.   Yes.
17   Q.   Is it fair to say that both of them had the
18   same starting salary?
19   A.   Yes. On this sheet.
20   Q.   Now that you have that information, my question
21   earlier that I asked was: Do you have a sense of whether
22   Ann should have been making substantially less money than
23   Keith Robertson.
24   A.   Something else must have come into play here --

Page 27

1    Q.   Like what?
2    A.   -- that creates the discrepancy.
3    Q.   Like what?
4    A.   I'm speculating.
5         MS. CSIZMADIA: I would object on the
6    grounds that you're asking him to speculate. But go
7    ahead if you feel like you can.
8         THE WITNESS: It depends how the offers and
9    agreements, the hire agreements, were done. Sometimes
10   you start with the minimum salary with the opportunity to
11   ask for an advanced hire salary. I don't know if that
12   becomes retroactive, if that came into play here or not,
13   but it looks like both received the same starting salary.
14   Q.   Is it fair to say that based on your review of
15   the top part of that document, that Keith Robertson may
16   have received some form of advanced hire?
17   A.   That could account for the difference, yes.
18   Q.   Is there anything else that may account for
19   that difference?
20   A.   I would say no, not that I can think of.
21   Q.   What is an advanced salary request?
22   A.   An advanced salary request is a request that a
23   manager can put forward to HRO when somebody, a
24   candidate, who's applied for a job exceeds the minimum

Page 28

1    for that position. It means they get more than the
2    minimum salary for that position.
3    Q.   In your opinion, have you done advanced salary
4    requests?
5    A.   Yes.
6    Q.   Whose advanced salary requests have you
7    completed?
8    A.   There's been several.
9    Q.   Several. Okay. Approximately how many?
10   A.   Approximately eight to ten, eleven over the
11   years.
12   Q.   Did you complete an advanced hire request for
13   Keith Robertson?
14   A.   No. When Keith came back, he was reinstated,
15   so I did not have to put in for an advanced hire --
16   advanced salary request.
17   Q.   So he didn't receive an increase when he came
18   back?
19   A.   I don't know if he got a bump-up, because at
20   the time they bumped up environmental scientists to
21   different new pay grades, higher pay grades. And I don't
22   know how that related to the date when he came back or
23   what he got.
24   Q.   Who makes the determination whether an advanced

Page 29

1    salary request will be granted?
2    A.   It depends on the percentage. There's a
3    certain percentage that the -- that stays within our
4    department. It goes through HRO, they make a
5    recommendation, put it forth to our cabinet secretary who
6    decides. If it's higher than a certain percentage, which
7    I believe is 85 percent, it goes to the State Personnel
8    Office to review and they make the decision.
9    Q.   So as I understand it, it starts with the
10   manager?
11   A.   Yes.
12   Q.   And then it goes to Human Resources?
13   A.   It goes through our division director.
14   Q.   Division director, okay. And then it goes
15   through the Human Resources Office?
16   A.   Yes.
17   Q.   And at that point, then it's sent to the
18   cabinet secretary?
19   A.   Yes -- actually the cabinet secretary has to
20   support both. If it's below 85 percent, the cabinet
21   secretary can approve it. If it's higher than
22   85 percent, then the cabinet secretary has to support the
23   decision going forward to HRO or the State Personnel
24   Office to make the decision.

8 (Pages 26 to 29)

B-0139

Breslin
E. Alexander Rittberg

v.

C.A. # 05-290

State of Delaware, Department of Natural Resources & Environmental Control
June 23, 2006

Page 30

1   Q.   How is this decision made?
2   A.   A manager puts forth a review of the
3   candidate's training and experience. They relate to the
4   minimum qualifications. And you try and sum it up with
5   the number of years that the person has either
6   demonstrating or exceeding the minimums. Then by the
7   time it gets to HRO, they do an assessment of how that
8   person's years of experience relates to existing work in
9   the Department and that's called a salary comparison and
10  they look at the adjusted service date of the DNREC
11  employee versus the years of experience that the
12  applicant has and they see where it fits in in comparison
13  to existing employees and try and make the best decision
14  they can.
15          (Rittberg Deposition Exhibit No. 1 was
16  marked for identification.)
17  BY MS. BREWINGTON:
18  Q.   I have just put in front of you what's
19  previously been marked Rittberg 1. What is this
20  document?
21  A.   This is an advanced hire request for
22  Keith Robertson.
23  Q.   It's from whom?
24  A.   It's from me.

Page 31

1   Q.   It's to?
2   A.   To our Human Resources Office.
3   Q.   It's dated?
4   A.   November 16, 2000.
5   Q.   So the statement you made previously that you
6   didn't do an advanced hire request for Keith, that's not
7   accurate, correct?
8   A.   Well, I put in for one. Actually, I'm not sure
9   if this went forward to HRO. If it was in
10  Keith Robertson's file, it must have. But it came back
11  with the decision that it wasn't needed because it was
12  reinstatement.
13  Q.   So you submitted your request, but you're
14  saying it wasn't granted.
15  A.   I would rather phrase it that it wasn't needed.
16  Q.   The second paragraph, it's the last sentence,
17  "Mr. Robertson then worked for DNREC-SIRB for an
18  additional 3.5 years and then left in September of 1999,
19  to spend over a year doing environmental consulting."
20          Does that refresh your recollection in
21  terms of when he left and how long he was gone?
22  A.   Which paragraph were you looking at?
23  Q.   The second paragraph, the last sentence.
24  A.   You want me to read the whole thing? Okay.

Page 32

1   Q.   I think I had a question pending.
2          MS. CSIZMADIA: You asked if that refreshed
3   his recollection to when he left and came back.
4          MS. BREWINGTON: Thanks.
5   A.   Right. He left in September '99.
6   Q.   He was gone for over a year; is that correct?
7   A.   Yes.
8   Q.   Who was involved in drafting this advanced hire
9   request?
10  A.   Myself and I usually involve the staff person.
11  So I'd say Keith Robertson.
12  Q.   What role did Keith play in this advanced hire
13  request? Do you understand what I mean?
14  A.   Can you clarify it?
15  Q.   Okay. You said you usually involve the
16  employee.
17  A.   Right.
18  Q.   I guess my question is: How do you involve the
19  employee?
20  A.   By having them outline their experience in past
21  jobs and things of that nature.
22  Q.   Is that something that they verbally do with
23  you? Do you meet with them or do you have them write
24  something down?

Page 33

1   A.   Usually it's written and we go back and forth
2   with the document.
3   Q.   Is it fair to say that it's a joint group
4   effort in trying to --
5   A.   I would describe it as a joint effort.
6   Q.   What is the benefit do you think of involving
7   the employee in the drafting of the advanced hire
8   request?
9   A.   To make sure that the hiring manager
10  understands the type of work that the employee did while
11  working elsewhere and making sure that it's an accurate
12  depiction of that person's experience.
13  Q.   Would you agree that the best person to do that
14  would be the employee themselves?
15  A.   Yes.
16          MS. CSIZMADIA: Let's take a break.
17          (A recess was taken.)
18  BY MS. BREWINGTON:
19  Q.   I have just put in front of you Will 5.
20  A.   Yes.
21  Q.   Take a look at that document for me. After you
22  have had an opportunity to review it, if you could just
23  tell me what it is.
24  A.   It's an advanced hire request for Ann Breslin.

9 (Pages 30 to 33)

Page 34

1    Q.   Who is it to and from?

2    A.   **It is to Human Resources Office from Paul Will.**

3    Q.   And the date of the advanced hire request is

4    what?

5    A.   **The date of the request is May 17, 2001, but if**

6    **you can see, my initials are on there, too, as far as I**

7    **signed for Paul.**

8    Q.   So you signed on behalf of Paul?

9    A.   **Uh-huh.**

10   Q.   And the date is May 25th, 2001?

11   A.   **That's the date I initialed, yes. I signed for**

12   **Christie, too, it looks like.**

13   Q.   Do you know why you signed for them?

14   A.   **Both must have been out of the office. I can't**

15   **tell you why.**

16   Q.   Do you know whether Paul Will was in support of

17   her request for an advanced hire?

18   A.   **I can't remember.**

19   Q.   Did you get in trouble for signing off on --

20   A.   **No.**

21   Q.   How about Christina Wirtz, do you know whether

22   she was in support?

23   A.   **I really can't remember. I would generally say**

24   **both of them were if I signed off.**

Page 35

1    Q.   So is it fair to say that you, Paul, and

2    Christina were involved in this request for an advanced

3    hire for Ann Breslin?

4    A.   **I don't remember how much involvement Paul had**

5    **in it, but -- I would say we were all involved, yes.**

6    Q.   But you just don't know to what extent?

7    A.   **Yes.**

8    Q.   So it's fair to say that Paul was aware of this

9    document?

10   A.   **Yes.**

11   Q.   Seeing as though you signed off on this for

12   Christina and Paul, would it be fair to say that you were

13   in support of her advanced hire request?

14   A.   **Based on the situation described here, yes,**

15   **with the leveling-up or the bump-up of the existing**

16   **employees and to a new minimum and how it did not give**

17   **any additional compensation for employees that had quite**

18   **a few years of experience, yes, I was in support of this**

19   **effort.**

20   Q.   When you say "the leveling-up," what are you

21   referring to?

22   A.   **That's a Human Resources term. That's what**

23   **they call it when there's a hire that comes in at a**

24   **certain salary, a new hire, and existing employees get a**

Page 36

1    **leveling-up.**

2        **In this case maybe I did use the term**

3    **correctly just a few minutes ago. In this situation**

4    **there was a maintenance review that occurred that**

5    **resulted in the existing employees getting the promotion**

6    **to a higher pay grade. It left all of the people, no**

7    **matter how many years of experience they had with the**

8    **Department, at that new minimum pay grade and did not**

9    **take into account or give additional compensation for**

10   **years of experience that existing employees may have had.**

11   Q.   You mentioned that all of the employees were at

12   the minimum pay grade.

13   A.   **All the employees that were not grandfathered**

14   **into higher-level pay grades, I believe that they have**

15   **them in between 1991 and 1993. There was a maintenance**

16   **review done in those years that resulted in the**

17   **environmental scientists being downgraded.**

18   Q.   How about Keith Robertson, was he grandfathered

19   in?

20   A.   **No, because he came after the downgrades. So**

21   **he was not grandfathered in.**

22   Q.   Was he at the minimum pay grade at this time?

23   A.   **At this time any environmental scientist on**

24   **staff would have been bumped up that was not**

Page 37

1    **grandfathered, would have been bumped up to the new pay**

2    **grade.**

3    Q.   I guess what my question is: Him being bumped

4    up to the new pay grade, would that put him at the

5    minimum pay grade, that's where he would be at the

6    minimum pay grade?

7    A.   **Yes, I believe so.**

8        MS. CSIZMADIA: Could we read that back? I

9    got lost. I'm sorry.

10       (The reporter read back as instructed.)

11       MS. CSIZMADIA: Were we talking about Keith

12   being at the minimum?

13       MS. BREWINGTON: Yes.

14       THE WITNESS: After the bump-up?

15       MS. BREWINGTON: Yes.

16       THE WITNESS: It depends. Let me rephrase

17   that. A number of employees were placed at the new

18   minimum. I don't remember if there were additional

19   compensation for folks that may have been already at that

20   new minimum.

21   BY MS. BREWINGTON:

22   Q.   Are you saying that Keith may have been already

23   at the minimum and received an increase?

24   A.   **What I'm saying is I don't know where Keith was**

10 (Pages 34 to 37)

B-0141

Page 38

1  in relation -- where his salary was in relation to the
2  new salary.
3       Q.  Your statement previously that all
4  environmental scientists would have been moved up to the
5  minimum pay grade is not necessarily accurate?
6       A.  No, I wouldn't say that was accurate.  It would
7  depend on where they were with respect to the new minimum
8  pay grade.
9       Q.  So some employees may have received an
10  additional 5 percent?
11      A.  The ones that were grandfathered, I know they
12  did.  Other employees, I don't know.  They may have.
13      Q.  This maintenance review, is that the
14  leveling-up that you talked about previously, or no?
15      A.  No.  Leveling up was something we were looking
16  at, I believe, when we brought Keith back to see if we
17  could assist other environmental scientists such as Ann
18  in getting a higher salary, and that would basically
19  bring up your existing staff to that level of salary that
20  you are recommending for the new person.
21      Q.  Is this a term that you created?
22      A.  No.  It's within the context of the merit
23  rules.
24      Q.  Is it your understanding that the merit rules

Page 39

1  have some form of leveling-up?
2       A.  They did at that period of time.  I don't know
3  if they have changed since.
4       Q.  That period of time would have been around when
5  Keith was rehired?
6       A.  Around when Keith was rehired, yes.  That was
7  one option we were looking at to try to increase
8  salaries.  We thought staff was deserving, as well as the
9  advanced hire package that we submitted which was based
10  on the time I believe -- I thought there was a promotion
11  that occurred through the maintenance review and that
12  this would be an allowable type of thing that could occur
13  at that period of time.
14      Q.  Is it accurate that Ann was the only female
15  working as an ES III in SIRB?
16      A.  No.
17      Q.  Who else?
18      A.  Karissa Hendershot.
19      Q.  And Karissa was an ES III?
20      A.  She was an ES II, I believe, at that merit.
21      Q.  We are talking about an ES III.  Did I not
22  specify that?
23      A.  I may have missed it.
24          Jane Biggs-Sanger was an Environmental

Page 40

1  Scientist III at the time.
2       Q.  And she worked in SIRB?
3       A.  Yes.
4       Q.  How do you spell her last name?
5       A.  B-i-g-g-s.  And then she hyphenates it
6  S-a-n-g-e-r.
7       Q.  Did Jane Biggs-Sanger have a Master's degree?
8       A.  I don't recall.
9       Q.  Do you know when she was hired?
10      A.  No, I do not.  It was -- she's been with the
11  program for quite sometime.  I would say late '80s, early
12  '90s.
13      Q.  Does Jane Biggs-Sanger currently work here now?
14      A.  Yes.
15      Q.  Is she still in SIRB?
16      A.  Yes.
17      Q.  Do you recall a time when Jane Biggs-Sanger
18  worked as a seasonal employee?
19      A.  Yes.
20      Q.  Is that perhaps the same time that Ann Breslin
21  worked in SIRB?
22      A.  Ann was working in SIRB when Jane was a
23  seasonal.
24      Q.  We were talking about this leveling-up.  Do you

Page 41

1  know of other agencies that have leveled up their
2  employees?
3       A.  No, I do not.  I may have in the past and
4  forgotten.
5       Q.  As of today, you can't recall.
6       A.  As of today, I can't recall.
7       Q.  How about DelDOT, does that refresh your
8  recollection as to whether they leveled up salaries?
9       A.  I just can't recall.  It sounds familiar.
10      Q.  Is there anything that you can recall about
11  DelDOT and leveling up salaries?
12      A.  Nothing specific.
13      Q.  Anything generally?
14      A.  No.  As I said, it's familiar, but I can't
15  recall.
16      Q.  I'm not sure if I asked you this before, but
17  I'm going to ask it again.  Did you support Ann Breslin's
18  request for an increase in salary comparable to
19  Keith Robertson?
20      A.  Comparable to Keith Robertson?  Yes.
21      Q.  Why is that?
22      A.  Well, I thought all of the environmental
23  scientists that did not get a bump-up or that did not get
24  additional compensation for their years of experience

11 (Pages 38 to 41)

Page 42

1  when the bump-up occurred should have gotten some
2  additional compensation for their years of experience
3  within the Department, meaning that somebody that got
4  hired as a new hire that month, if they were coming in
5  without exceeding the minimum shouldn't be compensated
6  the same as somebody who was already working for the
7  Department and had years of experience on that job.
8      Q.   In Ann Breslin's case, was she essentially
9  being paid at an entry-level rate?
10     A.   If somebody would have started as an ES III,
11  not only Ann but all the other ES IIIs that were placed
12  at that minimum salary were basically working at an
13  entry-level rate.
14     Q.   Can you say that again?
15     A.   I said all the ES IIIs that got moved up to
16  that new minimum salary were basically working at the new
17  entry-level rate. Entry level for that Environmental
18  Scientist III level, the person would still have to meet
19  the minimums.
20     Q.   Do you remember who the other ES IIIs were?
21     A.   Other ES IIIs. Within the branch at what
22  period of time?
23     Q.   We're talking about I want to say -- I think
24  all of our conversation and dialog has been with respect

Page 43

1  to this leveling-up and we discussed that it was around
2  the time that Keith Robertson came back.
3      A.   I would phrase that we have also discussed the
4  maintenance review bump-up, as well.
5      Q.   Okay. I think the last -- I think I went back
6  to the leveling-up when I asked you if there were any
7  others that did the leveling-up.
8      A.   Okay.
9      Q.   I want to talk about that. The time frame
10  would be around 2000.
11         MS. CSIZMADIA:  Could you clarify because
12  there was -- are you saying there was a leveling-up?
13         MS. BREWINGTON:  No, I'm not saying there
14  was a leveling-up. I think, and correct me if I'm wrong,
15  there were efforts to level up employees.
16     A.   There was at least discussion of it.
17     Q.   And the time frame, as I understood it, was
18  around 2000 when Keith came back.
19     A.   I can't remember the time frame. It was I
20  would say somewhere between 1998 and 2002.
21     Q.   That's fair. My question was: Who were the
22  Environmental Scientist IIIs in SIRB at that time?
23     A.   We had Larry Jones, Qazi Salahuddin. Jane I
24  already mentioned.

Page 44

1      Q.   She was seasonal, correct?
2      A.   I don't know the dates that she was seasonal
3  and then got hired back.
4      Q.   But we discussed earlier she was seasonal when
5  Ann Breslin worked there?
6      A.   When Ann Breslin worked for SIRB for over seven
7  years and Jane was seasonal for about two years of that,
8  I believe.
9      Q.   All right. Who else?
10     A.   At the III level?
11     Q.   Yes.
12     A.   There were some others. I'm not sure if they
13  made it to the III level by then.
14     Q.   Keith was one of them, right?
15     A.   Keith was one, yes.
16     Q.   Can you recall anybody else?
17     A.   Environmental Scientist III level in SIRB. Not
18  that I can remember. Paul Will.
19     Q.   He was an ES III during this time?
20     A.   He was an ES III between '98 and 2002. At some
21  point in there. I don't know the exact date he was
22  promoted.
23     Q.   Going back to this limited maintenance review,
24  that was in May of 2000.

Page 45

1      A.   Okay.
2      Q.   That's based on this document here, Will 5,
3  May 22nd, 2000, the result of the limited maintenance
4  review. Do you see where it says that?
5      A.   Yes.
6      Q.   Now, let me ask you this:  There are certain
7  people in SIRB, ES IIIs, that went up to the minimum pay
8  grade; is that correct?
9      A.   Yes.
10     Q.   And then there are other people in SIRB that
11  are ES IIIs that received a 5 percent increase; is that
12  also correct?
13     A.   Yes.
14     Q.   That's all based on the limited maintenance
15  review?
16     A.   Yes.
17     Q.   Do you know, sitting right here, which
18  employees received 5 percent and which employees were
19  bumped up to the minimum pay grade?
20     A.   I can say for sure that Larry Jones and
21  Jane Biggs received the 5 percent. And Keith, Ann, and
22  I'm not sure who else was here at the time, Qazi, would
23  have been brought up to the new minimum. Like I said, I
24  think there was some other criteria. It depended on what

12 (Pages 42 to 45)

B-0143

Page 46

1  they were making at the time.
2  Q.  So for Larry Jones and Jane Biggs, they were
3  given 5 percent increases, correct?
4  A.  Yes.  There was another gentleman, too,
5  Rob Allen, that may have worked in the branch, too, for
6  that period of time.
7  Q.  He was an ES III?
8  A.  Yes, Rob was an ES III.
9  Q.  Do you know whether he received a 5 percent
10  increase or if he was brought up to the minimum?
11  A.  I don't want to guess.
12  Q.  I don't want you to guess.  I just want you to
13  tell me who you're sure of.
14     Is it Larry and Jane that you're sure that
15  they received a 5 percent --
16  A.  Yes.
17  Q.  You also mentioned Qazi?
18  A.  Qazi Salahuddin.
19  Q.  Close enough.
20     Keith Robertson, Paul Will, Ann Breslin,
21  and Rob Allen, all ES IIIs between 1998 and 2002; is that
22  correct?
23  A.  I'm not sure when Rob left.
24  Q.  That's fine.

Page 47

1  A.  I don't want to guess.  I'll just say I don't
2  know if he got 5 percent.
3  Q.  We will go one by one.  Qazi, do you know
4  whether he received the 5 percent or was bumped up to the
5  minimum?
6  A.  With Qazi, he got an advanced hire when he came
7  in.  So I'm not sure if that had an effect.
8  Q.  If that had an effect, would that mean that he
9  would have been --
10  A.  Already above that minimum?  Yes.
11  Q.  And then would have received a 5 percent --
12  A.  I don't know if the rules allow that to happen.
13  I can't remember that.  I know the people that were
14  pre-'93 definitely got 5 percent.  I don't know if people
15  that came in after and were above that minimum received
16  the 5 percent, as well.
17  Q.  How about Keith Robertson, you don't know
18  either way?
19  A.  No, I don't.
20  Q.  How about Paul Will, you don't know either way?
21  A.  No.
22  Q.  Ann Breslin?
23  A.  Yes.
24  Q.  What do you know?

Page 48

1  A.  Ann got to the new minimum.
2  Q.  The new minimum.
3  A.  Yes.
4  Q.  And Rob Allen?
5  A.  Rob I'm not sure.  Don't know.
6  Q.  Fair enough.
7     I'd like you to take a look at Will 6.
8  A.  (Complied.)
9  Q.  Have you had an opportunity to review it?  I'd
10  like you to read for me the parts of this e-mail that you
11  wrote.
12  A.  Okay.  "I modified the intro and justification
13  section to be consistent with my last email regarding
14  requesting an advanced hire based on the promotion
15  (increase in pay grade) you received as part of last
16  year's maintenance review.  I will forward you that last
17  email again where I referenced all the applicable merit
18  rules.  You did a very good job describing your
19  experience."
20  Q.  Did you send this message in reference to the
21  advanced hire request that we just talked about?
22  A.  Yes.
23  Q.  Who did you send it to?
24  A.  It's a little hard to track here.

Page 49

1  Q.  It is a little hard to track.  I don't believe
2  it specifically indicates who you sent it to.  I just
3  thought you might know.
4  A.  I'm trying to figure out who forwarded it.
5  Q.  Can I ask you a question?
6  A.  Sure.
7  Q.  If you look at the last sentence of your letter
8  or e-mail, it says, "You did a very good job describing
9  your experience."
10  A.  Yes.
11  Q.  Is it fair to say that you at least sent it to
12  Ann?
13  A.  Yes.
14  Q.  There may have been others, but we know based
15  on this last sentence that you probably sent it to her.
16  A.  Yes.
17  Q.  How about the e-mail above that?
18  A.  It's kind of written twice.  There's two here.
19  The first page or the second page?
20  Q.  I'm still on the first page.  I want to ask you
21  about that first full paragraph, the one beginning with
22  "Alex."  Go ahead and read it for me.  You don't have to
23  read it out loud if you don't want to.
24  A.  (Complied.)

13 (Pages 46 to 49)

Case 1:05-cv-00290-GMS    Document 51-4    Filed 09/29/2006    Page 25 of 46

Breslin                                                      State of Delaware, Department of Natural Resources & Environmental Control
E. Alexander Rittberg              v.    C.A. # 05-290                          June 23, 2006

Page 50

1      **Okay.**
2    Q.   Did you have conversations with Ann regarding
3  her salary?
4    **A.   Yes.**
5    Q.   Is it a fair statement that you had these
6  conversations over the past year?
7    **A.   Yes.**
8    Q.   Did you want to make an attempt to work on this
9  for her?
10   **A.   Yes.**
11   Q.   Did you manage to get every advanced hire
12 approved to a point?
13   **A.   Most of the advanced hires, if not all.  I**
14 **don't remember every one, but I had gotten a lot of them**
15 **approved that I submitted.**
16   Q.   Why do you think that is?
17   **A.   When you write an advanced hire justification,**
18 **you really have to describe the person's experience and**
19 **you also have to relate it to the minimum criteria that's**
20 **listed in the job specifications.  Some people can write**
21 **that up better than others.**
22   Q.   How about that next sentence, "I feel weird
23 doing this but it may be worth a try since I am the only
24 ES III in sirb STILL making entry-level"?

Page 51

1    **A.   Okay.**
2    Q.   We talked about several different people
3  between 1998 and 2002.
4    **A.   Uh-huh.**
5    Q.   Based on your recollection and after reviewing
6  this e-mail, is it possible that Ann was the only
7  environmental scientist in SIRB still making entry-level?
8    **A.   It's possible, yes.  As I stated before, but**
9  **if some of the other folks were making higher than that**
10 **new minimum salary, they could have gotten a bump-up, and**
11 **I don't remember what the rule is for that.**
12   Q.   How did this all come about, this May 17th
13 memo?  Walk me through, if you can remember, how it
14 happened.  Do you know what I'm asking?
15   **A.   I know what you're asking.  And I think it came**
16 **about out of a willingness for the managers in SIRB to**
17 **work with our employees to try and get them additional**
18 **compensation following the maintenance review.**
19   Q.   So it was a joint effort between you and
20 Ann Breslin and Christina Wirtz and Paul Will?
21   **A.   Yes.  At the time we had lost quite a bit of**
22 **staff from the SIRB branch to not just outside jobs but**
23 **other government jobs in different agencies, which is the**
24 **EPA, Army Corps of Engineers, and others, and we really**

Page 52

1  **didn't want to lose any more of our experienced people.**
2    Q.   Would you say there was like a retention issue?
3    **A.   Yes, there was a retention issue.**
4    Q.   Do you know whether the merit rules provide any
5  policy with respect to retention and salaries?
6    **A.   Yes.  It takes two years to document.  That**
7  **policy is called a Selective Market Policy where**
8  **additional-hire salaries or market-based salaries are put**
9  **in place for specific job classifications.  It takes two**
10 **years, at least two years, of data, from what I have been**
11 **told, to establish a selective-market salary and you have**
12 **to demonstrate your turn-over rate, as well as the**
13 **difficulty in hiring new people to fill the positions.**
14   Q.   How does that selective-market salary research
15 thing go along with this limited maintenance review?  Do
16 you use the results of this -- why are you smiling?
17   **A.   I wish I knew.  I don't know.**
18   Q.   Okay.
19   **A.   It's all done by our State Personnel Office.**
20 **And how the two relate -- they're both there within our**
21 **compensation system, but I don't know how they really**
22 **relate to each other.**
23   Q.   Back to the May 17th, 2001, memo.  It was in an
24 effort to assist Ann with her salary; is that correct?

Page 53

1    **A.   Not just Ann, but there were other ESs both --**
2    **not just at the ES III levels but ES II levels, and not**
3    **just in SIRB but within other programs that were in the**
4    **same situation that were now at the new minimum salary**
5    **which some took it as any raise is a good raise.  And**
6    **some were added.  This other issue of if somebody new**
7    **comes in, they were basically at an entry-level salary.**
8    Q.   But Ann may have been the only person in SIRB
9  as an ES III affected by that?
10   **A.   She may have, yes.**
11   Q.   I'm going to ask you questions about the next
12 document.  If you don't know much, that's okay, just say
13 I don't know.
14        It's been previously marked as Will 8.
15 Have you ever seen this document before?
16   **A.   Yes, I have seen it.**
17   Q.   What is it?
18   **A.   It's a Department policy.**
19   Q.   What is the subject?
20   **A.   The subject is "Advanced Salary."**
21   Q.   By "Department" you mean DNREC?
22   **A.   Yes.**
23   Q.   It was issued on October 23rd, 2001, and then
24 revised on November 13, 2001; is that correct?

14 (Pages 50 to 53)

Page 54

1    A.    Yes.
2    Q.    I want to ask you about this first section
3  here. You have seen it before, right?
4    A.    I have seen it, yes.
5    Q.    When have you seen it?
6    A.    In reviewing Department policies in the course
7  of writing advanced hires.
8    Q.    This policy was issued October 23rd, 2001.
9    A.    Uh-huh.
10   Q.    Do you know whether or not there was a policy
11  similar to this prior to this date?
12   A.    No, I don't know that.
13   Q.    The first section there, it's in bold, it
14  begins with "I. Subject to available funding, advanced
15  salaries should be primarily used for," and then it says,
16  "A. Retention."
17   A.    Uh-huh.
18   Q.    Then it says, "NOTE:  Excluded would be career
19  ladder promotions, and promotions as a result of a
20  maintenance review."
21         Tell me what, if you know, it means by
22  "Excluded would be career ladder promotions."
23   A.    That would be an internal promotion, and the
24  candidate that would receive that internal promotion

Page 55

1  would not be allowed to put in for an advanced salary.
2    Q.    How about the section labeled "C. Internal
3  Equity"?  Have you had an opportunity to review that
4  already?
5    A.    Give me a minute.
6    Q.    Okay.
7    A.    Okay.
8    Q.    What is your understanding of internal equity?
9    A.    Internal equity, to make comparable
10  compensation for people that work for our department that
11  have a similar experience level.
12   Q.    Is the Environmental Scientist III position a
13  technical position?
14   A.    Yes.
15   Q.    Do you see the last bullet there?  It says,
16  "the department will selectively use a Peer Review
17  process to scrutinize education, experience and training
18  to support a request."
19   A.    Yes.
20   Q.    Do you know whether that was ever done in
21  Ann Breslin's case?
22   A.    I don't know.
23   Q.    Do you have any idea who would be a part of a
24  peer review committee?

Page 56

1    A.    For advanced hires?  I don't know.
2    Q.    Did you have discussions with Ann regarding her
3  salary?
4    A.    Yes.
5    Q.    Can you recall what was said during those
6  conversations, generally?
7    A.    Generally?
8    Q.    Generally.
9    A.    Very generally.
10   Q.    Okay. Generally. Very generally.
11   A.    From what I remember, Ann had concerns that she
12  was not being fairly compensated and -- could I use what
13  was in the e-mail?  That she felt that she was the only
14  Environmental Scientist III making the new, quote,
15  entry-level salary and was asking if we could do anything
16  as managers to assist her in getting additional
17  compensation.
18   Q.    Do you know whether she ever received an
19  increase in salary comparable to Keith Robertson?
20   A.    I don't know.  I don't think she did.
21   Q.    I have just put in front of you what has
22  previously been marked as Will 9.  Go ahead and take a
23  look at it and let me know when you're finished.
24   A.    (Complied.)

Page 57

1          Okay.
2    Q.    I'm going to switch things up and show you a
3  different one.  We will go back to that.
4          (Rittberg Deposition Exhibit No. 2 was
5  marked for identification.)
6  BY MS. BREWINGTON:
7    Q.    Take a look at what has been marked as
8  Rittberg 2, but keep that one aside.
9    A.    (Complied.)
10   Q.    Have you read it?
11   A.    Yes.
12   Q.    I'd like to focus on the top portion of this
13  document. It's an e-mail from Ann Breslin to Paul Will,
14  cc'g yourself.
15   A.    Okay.
16   Q.    It's regarding maintenance review policy.  The
17  date of it is June 1st, 2001, 8:56 a.m.  Go ahead and
18  read for me the first -- actually read this first e-mail
19  message.
20   A.    "Hello All - Well I was informed that I was
21         officially shot down for more than entry level.
22         Before I go the route of grieving the whole
23         thing I would like to look at another way of
24         dealing with it.  The background for Alex and

15 (Pages 54 to 57)

Page 58

1    Christina is the following (comparing Keith and
2    I since we are very similar): I was hired on
3    January 15, 2001 - Keith was hired 2 weeks
4    later. We both have MS Degrees - and both went
5    for promotion to ES IIIs at the same time.
6    Jamie did hers for keith through career ladder.
7    Karl did not want to be bothered so he posted a
8    position - reviewed applicants and hired me into
9    it. Keith and I both have several years of work
10   experience - his with South Carolina Coastal
11   Geology - mine was with Botany and Wetlands.
12   When both of the advanced hires were filed,
13   according to Karl, Personnel did not feel like
14   my experience was applicable to my job - but
15   Keith's was considered applicable. I thought
16   that was weird since both sets of experience
17   were out of state - and we were both ESs - not
18   hydros or wetlands scientists - yet we could use
19   both in our work experience as project managers.
20   We have been treated differently from the start
21   for some reason - Jamie told me once that one of
22   the big reasons I was shot down was that Karl
23   made Personnel mad by some comments he made when
24   they questioned my advanced hire - but that is

Page 59

1    totally hearsay. I would like Personnel to
2    explain their reasoning in late 1996 to me - if
3    they just bring me up to the level of Keith -
4    which I think is fair - I would be happy with
5    that."
6    Q.   Do you remember getting this e-mail?
7    A.   Before today I do not remember getting it. I
8    probably did. It's addressed to me. But I probably read
9    it in 2001.
10   Q.   And it's what, 2006?
11        Did you support Ann Breslin's request for
12   equal pay?
13   A.   I supported Ann getting additional
14   compensation, as well as the other environmental
15   scientists that were now working at the new minimum
16   salary. And yes, I supported Ann getting additional pay.
17   Q.   Now if we could go back to the one I had you
18   read earlier, Will 9.
19   A.   Okay.
20   Q.   What is this document?
21   A.   An e-mail.
22   Q.   Can you tell me anything else about it?
23   A.   An e-mail from Ann.
24   Q.   I'll help you out. It's an e-mail from Ann to

Page 60

1    Paul Will, Christina Wirtz, and yourself. It's dated
2    Wednesday, September 11th, 2002. Is that correct?
3    A.   Yes.
4    Q.   The subject is "Personal Issues -
5    Confidential." The importance, high; sensitivity,
6    confidential. The second paragraph indicates: "I want
7    to thank the three of you for supporting me over the past
8    few years, either by drafting memos on my behalf or by
9    verbally supporting me in my efforts."
10        Would you agree with that?
11   A.   Yes.
12   Q.   As of September 11th, 2002, is it fair to say
13   that, based on this e-mail, Ann had decided to seek
14   counsel to deal with the pay inequities?
15   A.   Yes.
16   Q.   Do you know whether she, in fact, filed a
17   grievance regarding this?
18   A.   Yes. She did.
19   Q.   Do you know that she filed a Charge of
20   Discrimination with the Department of Labor?
21   A.   Yes. I read the complaint.
22        MS. CSIZMADIA:  Objection, just because I
23   think his answer was not the same as yours, but I don't
24   think he recognizes the difference.

Page 61

1    Q.   My question was were you aware that she filed a
2    complaint with the Department of Labor. I wasn't asking
3    about the complaint that you reviewed. I was asking you
4    if you knew that she filed a claim with the Department of
5    Labor.
6    A.   I don't know the difference. I don't know.
7        MS. BREWINGTON:  Rittberg 3.
8        (Rittberg Deposition Exhibit No. 3 was
9    marked for identification.)
10   BY MS. BREWINGTON:
11   Q.   Is this Ann Breslin's resignation letter?
12   A.   Yes.
13   Q.   It's dated February 11, 2003?
14   A.   Yes.
15   Q.   It's addressed to yourself?
16   A.   Yes.
17   Q.   Go ahead and read it for me.
18   A.   "Dear Alex, please consider this as
19        notification of my resignation from my position
20        as an Environmental Scientist III, effective
21        February 24, 2003.
22        "Although I have enjoyed working with you, I
23        have decided to pursue employment with the
24        United States Environmental Protection Agency

16 (Pages 58 to 61)

B-0147

Page 62

1 Region III in Philadelphia. As you are well
2 aware, the compensation provided by DNREC has
3 not managed in any way to keep pace with my
4 growing responsibilities within DNREC. It is a
5 fact that after 6 years of full performance as
6 an Environmental Scientist III, I continue to be
7 compensated in the same manner as a new
8 employee. In addition, my salary remains far
9 lower than my counterparts within SIRB. This
10 fact has become completely unacceptable to me
11 and I must move into an employment situation in
12 which I will be fairly and equitably
13 compensated.
14 "Thank you for all of your help in this and
15 other matters and for your many personal
16 kindnesses."
17 Q. "Sincerely, Ann Breslin"?
18 A. "Sincerely, Ann Breslin."
19 Q. After six years of full performance as an
20 ES III, was Ann Breslin compensated at the same manner as
21 a new employee?
22 A. Yes. Due to that maintenance review.
23 Q. Is it also true that her salary remained lower
24 than her counterparts within SIRB? Counterparts meaning

Page 63

1 other ES IIIs.
2 A. I don't remember the other ES III salary, but
3 based on her e-mail, it sounded like it did.
4 Q. How did you feel about her resignation?
5 A. Another experienced person, highly skilled
6 person leaving our branch. I was sorry to see her leave.
7 Q. Does that go back to that retention problem?
8 A. It does, yes. Ann could manage a project and
9 she managed projects very well.
10 MS. BREWINGTON: I don't think I have
11 anything further.
12 MS. CSIZMADIA: I have got a couple
13 questions.
14 BY MS. CSIZMADIA:
15 Q. Drawing your attention to Will 8, it's the
16 advanced salary policy. The second page, section C, in
17 that first bullet it talks about critical
18 reclassification request, does it not?
19 A. Yes.
20 Q. Does the third bullet also refer to requests?
21 A. "The department will selectively use a Peer
22 Review process to scrutinize education, experience and
23 training to support a request." Yes.
24 Q. Does it appear to be referring to a critical

Page 64

1 classification request?
2 A. I don't know.
3 Q. Do you know if there's a difference between a
4 critical reclassification request and a maintenance
5 review?
6 A. Do I know there's a difference between the two.
7 I believe there is a difference in the fact that a
8 critical reclass request comes from the Department and a
9 maintenance review is initiated by SPO or HR.
10 Q. When you talk about the rules, what are you
11 talking about, what rules?
12 A. The rules? Merit rules or state policies. Is
13 that what you're referring to?
14 Q. The merit rules. Is it your understanding the
15 Department has to follow the merit rules?
16 A. Yes.
17 Q. Drawing your attention to Will No. 2, Ms. --
18 let's go to page 5 of 6. Ms. Brewington asked you --
19 A. Will No. 2. I was on Rittberg 2.
20 Q. That's the ES series. Page 5. Ms. Brewington
21 asked you whether Ms. Breslin met one of the
22 qualifications for an ES IV relating to the Master's
23 degree, correct?
24 A. Yes.

Page 65

1 Q. How many of the minimum qualifications do you
2 have to meet before you're qualified for a position?
3 A. All of them.
4 Q. The job duties that are set out in this
5 environmental science series, when you were talking about
6 the environmental scientists in Air and in UST and in
7 Water, do you fulfill the same job duties that are set
8 out in this series description?
9 A. The job duties are written generally enough
10 that they should apply to the type of work that the
11 people do in all of the branches.
12 Q. And the limited maintenance review, is that a
13 maintenance review of all the persons employed in the
14 environmental science series in DNREC?
15 A. Yes.
16 Q. When you said that you lost lots of talented
17 people, experienced people like Ann, because of the
18 maintenance review, were some of those people females?
19 A. Due specifically to the maintenance review or
20 just because of the state compensation system?
21 Q. Due to the state compensation system, did you
22 lose people that were just females or just males or both?
23 A. We lost both.
24 Q. When you said you supported people's efforts to

17 (Pages 62 to 65)

Breslin                                    v.        State of Delaware, Department of Natural Resources & Environmental Control
E. Alexander Rittberg              C.A. # 05-290                        June 23, 2006

Page 66

1   get a salary higher than the entry level, did you support
2   the efforts of males to get in the environmental
3   scientist series III who had been here longer to get more
4   than the entry level?
5      A.  I supported all of the environmental scientists
6   regardless of gender, race.  All environmental
7   scientists, they get additional compensation.
8      Q.   And the environmental scientists also that were
9   in SIRB?
10     A.   Yes.
11     Q.   Did you think that Ann's pay was lower because
12  she was a female?
13     A.   No.
14          MS. CSIZMADIA:  I don't have any more
15  questions right now.
16          MS. BREWINGTON:  Can we take a break?
17          MS. CSIZMADIA:  Sure.
18          (A recess was taken.)
19          MS. BREWINGTON:  I don't have anything
20  further.
21          (Deposition concluded at 3:10 p.m.)
22              - - - - -
23
24

Page 68

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT

Page 67

1        T E S T I M O N Y
2
3   DEPONENT: E. ALEXANDER RITTBERG        PAGE
4
5   BY MS. BREWINGTON............................ 2
6   BY MS. CSIZMADIA............................ 63
7
8        E X H I B I T S
9
10  RITTBERG DEPOSITION EXHIBIT NO.        MARKED
11
12  1 - A memorandum dated November 16, 2000...... 30
13  2 - Two pages of e-mails...................... 57
14  3 - A letter dated February 11, 2003,
        to E. Alex Rittberg from Ann L. Breslin....... 61
15
16  ERRATA SHEET/DEPONENT'S SIGNATURE        PAGE 68
17
18  CERTIFICATE OF REPORTER        PAGE 69
19
20
21
22
23
24

Page 69

CERTIFICATE OF REPORTER

STATE OF DELAWARE)
                 )
NEW CASTLE COUNTY)

        I, Kimberly A. Hurley, Registered
Professional Reporter and Notary Public, do hereby
certify that there came before me on the 23rd day of
June, 2006, the deponent herein, E. ALEXANDER RITTBERG,
who was duly sworn by me and thereafter examined by
counsel for the respective parties; that the questions
asked of said deponent and the answers given were taken
down by me in Stenotype notes and thereafter transcribed
by use of computer-aided transcription and computer
printer under my direction.
        I further certify that the foregoing is a
true and correct transcript of the testimony given at
said examination of said witness.
        I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.

            Kimberly A. Hurley
            Certification No. 126-RPR
            (Expires January 31, 2008)


DATED:

18 (Pages 66 to 69)

Page 1

                IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF DELAWARE

ANN L. BRESLIN,                    )
                                   )
      Plaintiff,                   )
                                   )
         v.                        ) C.A. No. 05-290
                                   )
STATE OF DELAWARE,                 )
DEPARTMENT OF NATURAL              )
RESOURCES & ENVIRONMENTAL )
CONTROL,                           )
                                   )
      Defendant.                   )

                Deposition of KARL F. KALBACHER taken
pursuant to notice at the law offices of Margolis
Edelstein, 1509 Gilpin Avenue, Wilmington, Delaware,
beginning at 1:00 p.m., on Wednesday, June 28, 2006,
before Kimberly A. Hurley, Registered Merit Reporter and
Notary Public.
APPEARANCES:
            LORI BREWINGTON, ESQUIRE
            MARGOLIS EDELSTEIN
              1509 Gilpin Avenue
              Wilmington, Delaware 19806
              for the Plaintiff
            VALERIE S. CSIZMADIA, DEPUTY ATTORNEY GENERAL
            DEPARTMENT OF JUSTICE
              Carvel State Office Building
              820 North French Street
              Wilmington, Delaware 19801
              for the Defendant


ALSO PRESENT:

            ANN L. BRESLIN


                    WILCOX & FETZER
        1330 King Street - Wilmington, Delaware 19801
                     (302) 655-0477
                     www.wilfet.com

B-0150

Page 2

1           KARL F. KALBACHER,
2     the witness herein, having first been
3     duly sworn on oath, was examined and
4     testified as follows:
5  BY MS. BREWINGTON:
6     Q.   Good afternoon.
7     A.   Good afternoon.
8     Q.   My name is Lori Brewington, and I represent
9  Ann Breslin in her gender discrimination action against
10 DNREC.
11          Have you ever testified in a deposition
12 before?
13    A.   Yes.
14    Q.   So I'm sure you know that I'm going to ask you
15 a series of questions, and I'll make every effort to ask
16 them one at a time.  If at any time you do not understand
17 the question that I ask, if you could just let me know
18 and I'll go ahead and rephrase or repeat the question.
19          If at any time you need to take a break,
20 just let me know.  There is water.  I don't imagine we're
21 going to be too long today, but you never know.
22          At times DNREC's attorney may object to
23 some of the questions that I ask, and that's entirely
24 proper.  The only thing that I ask is that you go ahead

Page 3

1  and answer the question unless she specifically advises
2  you not to answer the questions.
3          Do you understand the instructions?
4     A.   Yes.
5     Q.   What did you do in preparation for your
6  deposition testimony today?
7     A.   I met with the DNREC attorney for about half an
8  hour just to understand the lawsuit and I was provided
9  with some materials, I guess the complaint in the United
10 States District Court which I reviewed a little bit, a
11 request for advanced hire and advanced promotion for
12 competitive hire, and then a supplemental information
13 request on behalf of Ann Breslin for advanced hire, and
14 then an employee performance plan appraisal from a period
15 of January 1, 1995, to December 31, 1995, and then a
16 response to the complaint by the State.
17    Q.   Is that the answer?  Is that what the second
18 page says?
19    A.   Yes, I believe it's the answer.  Defendant's
20 answer.  That's basically it.
21    Q.   So those are the documents that you reviewed in
22 connection with the deposition testimony today?
23    A.   Yes.
24    Q.   I'd like to start off by talking about you and

Page 4

1  your work experience.  Where do you currently work?
2     A.   I work for New Castle County, Delaware,
3  Government.
4     Q.   What is your job title?
5     A.   I'm the Director of Redevelopment.
6     Q.   How long have you been Director of
7  Redevelopment?
8     A.   I have been director since September of 2005.
9     Q.   What did you do prior to being Director of
10 Redevelopment?
11    A.   I worked for KCI Technologies, which is an
12 environmental consulting firm, for about a year.
13    Q.   Prior to that?
14    A.   I was the Environmental Program Administrator
15 for the Maryland Department of the Environment,
16 Environmental Restoration and Redevelopment Program.
17    Q.   How long were you with that?
18    A.   Approximately five years.
19    Q.   Prior to that?
20    A.   I was an Environmental Program Manager I with
21 DNREC Site Investigation & Restoration Branch.
22    Q.   When did you begin your employment with DNREC?
23    A.   January 1, 1989.
24    Q.   In January of 1989 were you a Program

Page 5

1  Manager I?
2     A.   No, I was not.
3     Q.   Take me through your employment at DNREC.
4     A.   I started as a Hydrologist I on January 1,
5  1989.  I was promoted, I believe, to -- competitively
6  hired to a Hydrologist II approximately nine months later
7  as a well head protection hydrogeologist.  I then was
8  competitively hired as a Hydrologist level III -- I
9  believe that was another six or seven months later -- as
10 a Superfund project manager/hydrogeologist.  And I think
11 about nine months after that I was hired competitively as
12 an Environmental Program Manager I in Superfund --
13 formerly Superfund, now Site Investigation & Restoration
14 Branch.
15    Q.   Ann Breslin worked at DNREC between 1994 and
16 2003.  My question is:  During that time did you serve as
17 a program manager?
18    A.   During a portion of that time I served as an
19 Environmental Program Manager I.
20    Q.   Not during that whole time because you weren't
21 there.
22    A.   Correct.
23    Q.   When did you leave DNREC?
24    A.   I believe I left DNREC in August 1999.  August

2 (Pages 2 to 5)

Breslin
Karl F. Kalbacher
v.
C.A. # 05-290
State of Delaware, Department of Natural Resources & Environmental Control
June 28, 2006

Page 6

1 or September. I have to check my records.
2   Q.   Did Ann Breslin report to you from 1994 to
3 1999?
4   A.   Yes. I believe that's correct.
5   Q.   Tell me what some of your roles and
6 responsibilities were as Program Manager I.
7   A.   My responsibilities were to direct, manage
8 technical and administrative staff assigned to my
9 section; to review and approve work products, reports,
10 letters; to perform performance evaluations of employees,
11 and promotional requests; to serve as part of the
12 management team for the direction of the Superfund
13 branch; to do grants management and program development.
14 I think that generally captures -- of course, public
15 contact with a variety of different groups, whether they
16 be interested third parties or persons who we were
17 conducting environmental studies of their property.
18   Q.   How many employees reported directly to you?
19   A.   That would vary over time, but on average I
20 would suggest about seven or so.
21   Q.   Would they all be ES IIIs or is it any role in
22 terms of any job title?
23   A.   The jobs were varied. There were different
24 levels of environmental scientists, as well as

Page 7

1 hydrogeologists. And, of course, there were
2 administrative assistants, secretaries. There might have
3 been a planner at one point or another.
4   Q.   When did you graduate from high school?
5   A.   1979.
6   Q.   Did you go to college?
7   A.   Yes.
8   Q.   Where did you attend college?
9   A.   Tulane University.
10   Q.   What did you receive?
11   A.   Bachelor of Science, 1983.
12   Q.   Do you have any other education?
13   A.   Master's of Science 1986, Stephen F. Austin
14 State University, and I also took, I think, over 30 hours
15 of education, secondary education classes, at various
16 colleges.
17   Q.   Did you enjoy your job at DNREC?
18   A.   Yes.
19   Q.   Why did you leave?
20   A.   Because of the promotional opportunity.
21   Q.   When Ann Breslin was hired at DNREC, did she
22 report to you at that time? And that would be in 1994.
23   A.   I believe that I hired Ann Breslin from the
24 period of 1994 to 1999, depending upon which position she

Page 8

1 was seeking.
2   Q.   So you may have hired her in 1994 and then also
3 hired her again in '96 when she became an ES III?
4   A.   I believe there were three hires. One was for
5 a Seasonal Environmental Scientist, second was for an
6 Environmental Scientist II, and thirdly was for an
7 Environmental Scientist III. Hiring in the context of
8 the position was posted for competitively and she was
9 retained, chosen.
10   Q.   Is it fair to say that since you hired her for
11 all those three positions, that you felt that she was the
12 most qualified?
13   A.   Yes.
14   Q.   Let's talk about the decision to post the
15 ES III position. That was in '96; is that correct?
16   A.   I presume you to be correct.
17   Q.   Did you make the decision to post the position?
18   A.   I don't think it would be fair to characterize
19 that as being done in isolation. I worked for a Program
20 Manager II and for a director, and, certainly, if they
21 had any -- they should have had or could have had direct
22 interest. Moreover, they could have had direct say over
23 whether that position was posted as a I, II, III, IV.
24   Q.   Are you saying that you don't know whether they

Page 9

1 had a say?
2   A.   I really don't know if they had a say. My
3 general approach to management has never been to work in
4 isolation, and I don't think my boss would want me to do
5 that.
6   Q.   Do you think as you sit here today you don't
7 really recall the details?
8   A.   I'm certain that I would not have acted in
9 isolation in that decision.
10   Q.   You may or may not know the answer to this
11 question, but my question is: Why did you and/or DNREC
12 decide to, I guess, post the position competitively as
13 opposed to doing, I guess, a career ladder promotion or
14 something like that?
15   A.   I don't recall the answer to that, so I
16 wouldn't want to speculate. There are options available
17 to managers to provide for the most expedited mechanisms
18 for hire, and so I think it was my responsibility, my
19 duty to fill the positions as I saw fit in consultation,
20 with approval of the Program Manager II and the division
21 director.
22   Q.   It's fair to say that that decision to do a
23 competitive hire was fitting for the time?
24   A.   I don't think it was in conflict with any

3 (Pages 6 to 9)

Breslin
Karl F. Kalbacher

v.    State of Delaware, Department of Natural Resources & Environmental Control
C.A. # 05-290                        June 28, 2006

Page 10

1  process or policy of the State.
2      Q.   Ms. Breslin, she ultimately received a position
3  as an ES III through the competitive interview process,
4  correct?
5      A.   That's my understanding. That's my
6  recollection.
7      Q.   Did others interview for the position?
8      A.   I would hope so. I don't recall.
9      Q.   You don't know how many or anything like that.
10     A.   I don't.
11     Q.   Do you know why you chose Ann for this
12 position?
13     A.   I can't recall specifically, but I think that
14 she would have had the qualities necessary to fulfill the
15 requirements of the position based upon my knowledge of
16 her academic, as well as work, history. Specifically in
17 the Site Investigation & Restoration Branch.
18     Q.   Did you submit a request for an advanced hire?
19     A.   I did.
20     Q.   Why did you do that?
21     A.   I did it because, again, in consultation with
22 my immediate supervisor and if he so chose to seek
23 consultation with a division director, he would do so, we
24 collectively decided that that was an appropriate action

Page 11

1  to take. And I also believe that Ann may have requested
2  such, as well, which is, in my view, perfectly
3  acceptable.
4      Q.   Two questions. Who was your immediate
5  supervisor at the time?
6      A.   I don't know how to pronounce or spell it, his
7  first name or his middle name. We just called him
8  N.V. Raman.
9      Q.   How do you spell Raman?
10     A.   R-a-m-a-n.
11     Q.   Why did you feel that it was an appropriate
12 action, this advanced hire?
13     A.   I have viewed most of the hires that I had as
14 qualified people, and I also had as a regular -- as part
15 of this promotional package had received in advance the
16 salaries and service dates of other persons in similar
17 ES III positions within Air and Waste Management and I --
18 in looking it over now, it seemed to be a reasonable
19 approach to take.
20     Q.   The advanced hire request.
21     A.   Yes.
22     Q.   As I understand it, without an advanced hire
23 request, someone coming in to an ES III position would
24 receive 80 percent of the midpoint. Is that correct?

Page 12

1      A.   I believe that was correct at the time. I
2  can't speak to what it is now.
3      Q.   If a person is receiving 80 percent of the
4  midpoint, does that mean they're not credited for any
5  prior work experience or education?
6      A.   You know, that type of assessment is best done
7  by the Personnel Department of DNREC. I may be
8  incorrect, but I believe that the decision to request the
9  advanced hire is management and the decision to accept
10 that recommendation is the Personnel Department
11 management. The management at Superfund felt that it was
12 acceptable and appropriate to request an advanced hire,
13 so that's what we did.
14         Beyond that, it had been my knowledge and
15 understanding and history, practice that that decision
16 for accepting the recommendation was really DNREC
17 personnel management.
18     Q.   Do you know who in DNREC personnel management
19 is responsible for accepting advanced hire?
20     A.   I would suggest that Marilyn Morris was or is
21 the ultimate authority at DNREC, recognizing that there
22 probably are appeal processes within the State's system
23 beyond that.
24     Q.   You said Marilyn Morris; is that correct?

Page 13

1      A.   Marilyn Morris or Marilyn Ramsey. I think she
2  was remarried.
3      Q.   How about Sharon Tazelaar, did she play a role?
4      A.   I believe Sharon did play a role. She reported
5  to Marilyn.
6      Q.   Based on my review of the advanced hire
7  request, it seems as though managers support their
8  request by providing details about the employee's
9  previous experience in terms of their Bachelor's,
10 Master's degree, I guess their technical field of
11 expertise.
12         My question is: What is your understanding
13 of how DNREC personnel becomes familiar with that
14 technical expertise in order to make a decision?
15     A.   Well, I think that your statement is correct
16 that they look at the number of years of experience and
17 that will help -- my understanding of what they do is
18 that the number of years of experience weighs heavily on
19 their decision to accept or reject a recommendation for
20 advanced higher. And that they want to place some type
21 of weight on the quality of the work experience, how
22 relevant it is to the duties of the position and the
23 value to the department.
24         Again, I would suggest to you that we were

4 (Pages 10 to 13)

B-0153

Page 14

1  the producers and the transmitter of information. We
2  were not the decision-makers.
3      Q.   That's fair. I'm just trying to figure out
4  how -- based on your understanding, if you have one, how
5  personnel would determine the weight and quality of the
6  experience if they don't work in that field.
7      A.   All I can suggest to you is that we at the
8  time, if we could pull back to 1996, there would have
9  been rules and guidance as to how we go about this
10  process, and my job would be to follow those rules, and
11  in the context of advocating for the advanced hire, I
12  would want to do all that I could to present a compelling
13  case for the advanced hire.
14      Q.   Do you know whether anyone from personnel
15  consults anyone from the actual department regarding the
16  advanced hire request?
17      A.   You know, I seem to recollect that there might
18  have been third parties that they would seek out subject
19  matter experts. Certainly I think that's done for review
20  of applications to see if people are qualified. That may
21  have been the case also for reviewing advanced hire
22  requests. I don't know.
23      Q.   Do you know where these third-party subject
24  matter experts come from? Are they part of DNREC?

Page 15

1      A.   My understanding is yes. At the time.
2      Q.   And the time that we're talking about is during
3  your employment?
4      A.   Yes. With DNREC.
5      Q.   Yes. Take a look at the advanced hire request.
6  It's dated November 13th, 1996.
7      A.   Yes.
8      Q.   It's from you as program manager to
9  Sharon Tazelaar. You can look at either one.
10          MS. CSIZMADIA:   Can we go off the record
11  for a second?
12          MS. BREWINGTON:   Yes.
13          (Discussion off the record.)
14  BY MS. BREWINGTON:
15      Q.   Have you had an opportunity to review this?
16      A.   I did review this.
17          MS. BREWINGTON:   Off the record.
18          (Discussion off the record.)
19  BY MS. BREWINGTON:
20      Q.   We're going to have this marked, actually, but
21  he's going to look on a different copy of it.
22          (Kalbacher Deposition Exhibit No. 1 was
23  marked for identification.)
24  BY MR. BREWINGTON:

Page 16

1      Q.   You indicated that you had an opportunity to
2  review this, correct?
3      A.   Yes.
4      Q.   Tell me what this document is.
5      A.   The title of it is "Request for Advance
6  Promotion for Competitive Hire of Ann L. Breslin," and it
7  indicates that "Ann has been selected via competitive
8  interview process for an Environmental Scientist III,"
9  and that I am requesting via the approval of three other
10  persons that her hire salary be at 91.8 percent of
11  midpoint. And it provides a justification based upon her
12  academic background and work experience.
13      Q.   The three other approvals, is that
14  Nicholas Di Pasquale?
15      A.   Uh-huh.
16      Q.   And Leilani M. Wall?
17      A.   Yes.
18      Q.   And N.V. Raman?
19      A.   Yes. If I may clarify, if they don't initial
20  on this document, then it doesn't go anywhere.
21      Q.   I don't see initials on this document.
22      A.   Well, at some point there were initials on the
23  document.
24      Q.   It did go somewhere and they initialed it?

Page 17

1      A.   Initialing means agreement unless they say
2  initial with concerns and send it back. It's not acting
3  in isolation.
4      Q.   Your request was a salary of 91.8 percent of
5  the midpoint?
6      A.   Yes.
7      Q.   Is there a reason why you chose 91.8 percent?
8      A.   I don't recall specifically, but I would
9  suggest that it was based upon the salary comparison of
10  other ES IIIs in the Division of Air and Waste Management
11  which are identified on the second page.
12      Q.   I'm looking at that now. Is it fair to say
13  that the range of ES III positions in the Division of Air
14  and Waste Management is -- and I don't know the answer to
15  this yet because I'm looking. Is it from like $33,000 to
16  $41,000, approximately?
17      A.   I believe it is similar, but it goes up to at
18  least $43,374.
19      Q.   I see that one. So the lowest is around
20  $33,000. I see a 38. I see a 40. So between 33 and 40
21  thousand?
22      A.   $43,000.
23      Q.   $43,000?
24      A.   Yes.

5 (Pages 14 to 17)

B-0154

Case 1:05-cv-00290-GMS   Document 51-4   Filed 09/29/2006   Page 35 of 46

Breslin                                                    State of Delaware, Department of Natural Resources & Environmental Control
Karl F. Kalbacher                                v.                                    June 28, 2006
                                         C.A. # 05-290

Page 18

1  Q.   Based on that, you chose to request
2  91.8 percent of the midpoint?
3     A.   Well, again, I think if you look at the date
4  1996 and the fact that I think we were indicating that
5  she has approximately on the high end 5.159 years, if you
6  were to use that as a first cut as comparison to a
7  service date, then you would find that the vast majority
8  of the Environmental Scientist IIIs would have a service
9  tenure much longer than the candidate in this case.
10  There were some exceptions. But I see, in fact, maybe
11  two or three exceptions to that rule.
12     Q.   Is the 5.159 years of experience, is that
13  considered on the high end?  Is that what you said?
14     A.   I think it is just a reflection of her total
15  work experience as a laboratory assistant at a college up
16  through her years of experience with SIRB. What I'm not
17  able to -- let me back it up a little bit, because if you
18  look at the service date and then you look at Ann's
19  service date, she would have basically three years.
20     Q.   How do you figure that out?
21     A.   The service date is service to DNREC. So her
22  service date time would be 2.916 years with SIRB. That's
23  all she ever worked for. So then you go to 3, you go '96
24  to '93 and there might be one person or maybe one or two

Page 19

1  people -- maybe three. Again, maybe three that would fit
2  that category that you might look at in the context of
3  service date versus salary.
4     Q.   It's fair to assume that you felt that Ann
5  deserved an advanced hire request; is that correct?
6     A.   Absolutely. I wouldn't have -- I believe the
7  decision was mine to initiate, but the decision to agree
8  with that was also N.V. Raman's, Leilani Wall, and
9  Nicholas Di Pasquale. So I was an advocate for the
10  advanced hire.
11     Q.   Can you tell me why you felt that she deserved
12  an advanced hire request?
13     A.   I can't specifically recall exactly what I was
14  thinking, but I happen to know that Ann did a good job
15  for the Superfund program as reflected in her performance
16  reviews, that she agreed with those performance reviews,
17  and based upon her history of work and her past work
18  experience, I judged that that was an appropriate thing
19  to do.
20     Q.   What work experience did you use to justify
21  your request on advanced promotion?
22     A.   Again, I can't specifically recall other than
23  what is here.
24     Q.   You can actually refer to the document. I

Page 20

1  don't have a problem with that.
2     A.   I think the document speaks for itself. I
3  reflected upon her years of experience with Superfund and
4  her other related experience, I reflected that she had
5  handled an intensive workload that was at the full
6  Environmental Scientist III level, that she demonstrated
7  excellent project management and organizational skills,
8  and that she had past work experience that should be
9  considered, and that she had excellent effective oral and
10  writing skills.
11     Q.   You mentioned in the advanced hire request that
12  wetlands scientist experience that she had with the
13  Chesapeake Bay Foundation was directly applicable to the
14  work performed at SIRB.
15     A.   Yes.
16     Q.   My question is:  If you can recall, how was
17  this work experience directly related to the work
18  performed at SIRB?
19     A.   The Site Investigation Restoration Branch
20  investigates land and so if there is a wetland, then that
21  would be something that we would investigate.
22     Q.   That makes sense. That's something that maybe
23  I wouldn't necessarily -- I mean, I didn't know. That's
24  great.

Page 21

1      How about the laboratory assistance, is
2  that directly applicable?
3     A.   I think I reflected that in the document that
4  it was directly applicable because we do take laboratory
5  samples and so knowledge of laboratory process and
6  outcomes would be relevant to the position.
7     Q.   How about her Master's degree in
8  geoenvironmental studies and Bachelor of Arts degree in
9  biology and environmental science, is that directly
10  related to her work at SIRB?
11     A.   Well, there are certain requirements for
12  fulfilling the position to begin with, so the answer to
13  that is yes.
14     Q.   Are you aware that a Master's degree is not a
15  requirement of an ES III?
16     A.   I'm aware that that's the case.
17     Q.   So is it fair to say that the fact that she had
18  a Master's degree added to your thought that she should
19  deserve --
20     A.   I put it in the advanced hire request because I
21  thought it had relevance.
22     Q.   You also indicate on the second page:
23  "Accordingly, her professional and technical skill should
24  be considered fully adequate and relevant, far beyond the

6 (Pages 18 to 21)

B-0155

Page 22

1 entry level, to the requirements of the ES III for which
2 she has been recommended."
3        In your opinion, was her skill far beyond
4 entry level?
5     A.   I put it in writing. I stand by everything I
6 put in writing.
7     Q.   Take a look at -- I don't know what page it is,
8 but it's the memo. It's actually attached.
9     A.   Yes.
10    Q.   This is a memo from you to Sharon Tazelaar and
11 it's regarding Ann Breslin's advanced hire request
12 supplemental information. It's dated December 10th,
13 1996.
14        Did Sharon request additional information
15 from you?
16    A.   I don't recall specifically the process that
17 was involved; however, at a minimum, we must have
18 received a response back to our initial request for
19 advanced hire that it would not be accepted, and, as a
20 matter of experience, when such things occurred, we would
21 try to supplement -- we would try to query as to what
22 were the -- what information was lacking, what could we
23 try to provide in addition to what we had previously
24 provided to support the recommendation.

Page 23

1     Q.   I know you can't specifically recall, but would
2 it have been a common practice for you to receive
3 something from Sharon in writing, or is that something
4 verbally she would discuss with you?
5     A.   Well, I can't recall. Obviously the best way
6 is always to put it in writing. I don't see it in the
7 record, so I have to presume that it was some form of
8 oral conversation, discussion.
9     Q.   Take a look at the next page for me. It's the
10 State of Delaware Employee Performance Planning and
11 Appraisal. The evaluation period of January 1, 1995,
12 through December 31, 1995. It's for Ann Breslin, and her
13 classification is an Environmental Scientist II. Is that
14 your signature where it says "Rater"?
15    A.   Yes.
16    Q.   Whose signature is it where it says "Reviewer"?
17    A.   N.V. Raman.
18    Q.   And the final score is 5.64; is that correct?
19    A.   Yes.
20    Q.   Tell me, I guess, what exactly a 5.64
21 calculates into.
22    A.   A 5.64 is a score that exceeds the performance
23 meets expectations, employee performance is fully
24 competent and reliable. That is the 5.0 standard. So it

Page 24

1 is higher than that standard but lower than performance
2 consistently exceeds expectations, employee's
3 acknowledged for exceptional effort which is a 7.0.
4     Q.   Would it be fair to say that during that year
5 she exceeded expectations?
6     A.   It would be fair to say that during that year
7 her performance exceeded the meet expectations standard.
8     Q.   You can put that document aside.
9        This request for an advanced hire of
10 91.8 percent of midpoint was denied; is that correct?
11    A.   That's my understanding and my recollection.
12        MS. BREWINGTON: I'd like to have that
13 marked as Kalbacher 2.
14        (Kalbacher Deposition Exhibit No. 2 was
15 marked for identification.)
16 BY MS. BREWINGTON:
17    Q.   Have you had an opportunity to review that
18 document? Tell me what I placed before you.
19    A.   This is a letter that was drafted and signed by
20 myself to Ann Breslin which is a formal offer of the
21 position of Environmental Scientist III effective
22 November 16, 1996, for a salary of $29,496. This
23 references the fact that there is a pending request for
24 advanced salary.

Page 25

1     Q.   At this point it had been denied; is that
2 correct? The next sentence says, "The salary advance
3 request was pursued during November through January 8,
4 1997. However, it was denied by DNREC."
5     A.   I read that, correct, yes.
6     Q.   So the $29,496 salary that she received, that
7 did not include an advanced hire request.
8     A.   It did not have an advanced hire request.
9     Q.   Does that mean that this salary, the $29,496
10 represents 80 percent of the midpoint?
11    A.   I would presume that's the case. I don't have
12 the table to know that for a fact.
13    Q.   I know that you were requesting, is it,
14 91.8 percent?
15    A.   Yes.
16    Q.   Do you know why she didn't receive anything in
17 terms of any credit for any experience?
18    A.   I can't recall.
19    Q.   Did that make sense to you?
20    A.   Certainly, if I had requested 91.8 percent,
21 that anything less than that would have been something.
22    Q.   How was it communicated to you that this
23 request was denied?
24    A.   Again, I don't recollect, but I don't see

7 (Pages 22 to 25)

Breslin
Karl F. Kalbacher
v.
State of Delaware, Department of Natural Resources & Environmental Control
C.A. # 05-290
June 28, 2006

Page 26

1 any -- I don't have any information provided in writing
2 to me, so I have to presume that it was conveyed orally.
3    Q.  But you don't have any recollection of a
4 conversation with anyone from personnel?
5    A.  There had to have been a conversation. Somehow
6 the information was conveyed to me.
7    Q.  I'm asking you as you stand here today, do you
8 have any recollection?
9    A.  I believe that there was a recollection because
10 knowing Ann, she would have wanted to know specifically
11 what was going on and encouraging me to make contact, and
12 I'm sure I did.
13    Q.  But as you stand here today, you do not have
14 any recollection of the conversation?
15    A.  I don't.
16    Q.  You do not have an understanding of why the
17 request was denied?
18    A.  I don't have a specific recollection. I'm sure
19 at the time I did. And I can only suggest to you that
20 the additional information that was provided to the
21 Personnel Department was done to bolster her
22 qualifications and to bolster her work experience, number
23 of years of relevant work experience. I suspect that
24 personnel may have viewed the work experience in a

Page 27

1 different way than I did, the relevancy of it.
2    Q.  Meaning that they may not have felt it was
3 relevant?
4    A.  They may have viewed the work experience
5 differently than I did. I can't really --
6    Q.  Because you really don't know what they were
7 thinking?
8    A.  I wasn't in their head.
9    Q.  You didn't receive any documentation that you
10 can recall?
11    A.  I don't recall. It may be there, but I don't
12 recall.
13    Q.  Do you recall any conversations with Ann about
14 the advanced hire request?
15    A.  I recall that I certainly talked to her about
16 pursuing the advanced hire. I know that I would have
17 talked to her about the initial rejection of the advanced
18 hire request. I would have coordinated with her on the
19 seeking of additional information from the Chesapeake Bay
20 Foundation. Only Ann could provide that information.
21 That would be sent from me. So I had to have talked to
22 her about that.
23    Q.  Do you know whether you discouraged Ann from
24 pursuing the fact that she received a denial?

Page 28

1    A.  You know, it's not my decision to discourage or
2 encourage people. It's my decision to advocate and
3 pursue in writing. So that decision is Ann's.
4    Q.  Did you have any discussions with her as to
5 whether she should grieve this denial?
6    A.  If we did have a discussion, it was in the
7 context of what the personnel rules allow for, but it
8 would be inappropriate for me to offer advice in that
9 regard. That's a personal decision by the employee. I
10 was serving in management and trying to advocate for the
11 employee, and I don't think it would be appropriate to
12 have offered advice in a grievance, potential grievance,
13 case.
14         MS. BREWINGTON: I don't have anything
15 further.
16 BY MS. CSIZMADIA:
17    Q.  Just a couple questions. Going to Kalbacher 2,
18 which was the letter to Ann, the acceptance letter.
19    A.  Yes.
20    Q.  Actually, that's the wrong one. Let me ask you
21 a question first.
22         Did you lie to Ann in any way to get her to
23 take this Environmental Scientist III job?
24    A.  Lie to her?

Page 29

1    Q.  Yes.
2    A.  No. I had no reason to lie to her.
3    Q.  Did you mislead her in any way to get her to
4 accept the job?
5    A.  No. I think it's a good thing she got hired.
6    Q.  Looking at Kalbacher 1, the last sentence under
7 the heading "Salary Request," could you read that for us?
8    A.  "Her salary is funded from the Federal
9 Pre-Remedial Support Agency Cooperative Agreements."
10    Q.  What does that mean that she's supposed to work
11 on?
12    A.  That means that her responsibilities should be
13 working on federal Superfund preremedial sites.
14    Q.  Is that one of the sections in the SIRB branch?
15    A.  Yes. That was the section that I managed along
16 with other programs.
17    Q.  What other programs were there in the SIRB
18 branch?
19    A.  Well, there was the state Superfund, the
20 federal Superfund remedial, the voluntary cleanup
21 program.
22    Q.  Are the duties of the scientists in those
23 different areas exactly the same as the ones in -- as
24 each other?

8 (Pages 26 to 29)

Breslin
Karl F. Kalbacher

v.    State of Delaware, Department of Natural Resources & Environmental Control
C.A. # 05-290

June 28, 2006

Page 30

1   A.   No.  They're different.
2   Q.   Who wrote this document that I was just asking
3   you about, Kalbacher 1?
4   A.   I did.
5   Q.   Did you have any assistance from anyone?
6   A.   I would presume that I received assistance from
7   the Personnel Department or the personnel liaison to
8   gather information on the salary comparison, and it would
9   seem to me that I would have received information from
10  Ann with regard to her years of experience with SIRB, her
11  other years of relevant experience, her academic
12  background, so that I could correctly convey her work
13  experience.
14  Q.   You indicated earlier that you must have asked
15  her to get more information concerning the Chesapeake Bay
16  Foundation?
17  A.   I had to have.
18  Q.   Drawing your attention to the EPPA.  I meant to
19  ask you this question earlier and I never did.  I do not
20  understand the dates on this.  I'm not sure how relevant
21  it is, but can you explain to me how it is that the
22  performance plan was signed in October of '95 but the
23  performance appraisal dates are January of '95?
24  A.   Right.  I suspect that that is an error on both

Page 31

1   our parts.  It probably is '96 since the time period is
2   January '95 to December '95.  We would have concluded the
3   performance review probably in January after the year had
4   concluded.
5   Q.   Continuing in that EPPA document --
6   A.   You know sometimes when you have the beginning
7   of the year, you go '95, '96, you just forget to do it.
8   I think that's what it is.  I did that a lot.
9   Q.   It's a January thing.
10  A.   Yes.
11  Q.   Can you read me the comments under
12  "Assessment"?
13  A.   Under "Assessment," under "Employee Comments"?
14  Q.   Yes.
15  A.   "I will improve in this area as in all others
16  with time."
17  Q.   And the comments under "Job Dimension" -- or
18  "Investigative/Research," I'm sorry.
19  A.   "Rater Comments:  Ann has done a good job
20  writing PA/SI reports.  The PA's require that
21  considerable research be conducted."
22  Q.   That is your comment?
23  A.   Yes.
24  Q.   Going down to interpersonal interactions, can

Page 32

1   you read me the comment there?
2   A.   "Rater Comments," which are mine, "Ann works
3   effectively with Branch staff to coordinate workload
4   activities.  Ann is a good listener."
5   Q.   And Ann's comment?
6   A.   "Karl has helped to bolster my confidence by
7   giving constant positive and corrective feed back."
8   Q.   Next page, comments under "Planning"?
9   A.   Planning, this is Ann's comments.  "With only a
10  few investigations completed, I am pleased with my
11  progress."
12  Q.   Comments under "Workload Completion"?
13  A.   My comments:  "Ann is very aware of meeting
14  project deadlines.  She routinely meets these deadlines."
15  Q.   Flipping all the way down to "Development of
16  Others," same comment.
17  A.   My comment:  "Ann did a super job working with
18  new staff on PA/SI Projects."
19  Q.   "Agency/Unit/Program Representation," can you
20  read that?
21  A.   My comment:  "Ann communicates effectively with
22  the public on sites assigned.  Ann is very courteous when
23  dealing with the public."
24  Q.   "Verbal Communications"?

Page 33

1   A.   My comment:  "Ann conveys her views orally in a
2   concise and meaningful manner.  Ann did a good job
3   meeting with the public regarding the Pusey and Jones
4   Shipyard."
5   Q.   This is a good review?
6   A.   Yes.
7   Q.   Looking at the range of salaries, which is the
8   second page of that same exhibit, do you recall if there
9   was a maintenance review that had an impact on the
10  salaries of the environmental scientists?
11  A.   I believe that there was a maintenance review
12  at some point.  I just don't recall when.
13  Q.   Do you remember if it raised salaries or
14  lowered salaries?
15  A.   I believe at that time it lowered salaries.
16  Q.   So some of the higher salaries here on this
17  list that you're reading, the $43,000s, the 40,s, are
18  they from relatively earlier service dates, longer --
19  A.   Those employees were Environmental Scientist
20  IIIs prior to the reassessment of the environmental
21  scientist series.
22  Q.   Did you treat Ann any differently because she
23  was a female than any of your other employees?
24  A.   No.

9 (Pages 30 to 33)

Breslin
Karl F. Kalbacher

v.    C.A. # 05-290

State of Delaware, Department of Natural Resources & Environmental Control
June 28, 2006

Page 34

1    Q.    Do you have reason to believe that anyone else
2    did?
3    A.    No.
4            MS. CSIZMADIA:  I have no further
5    questions.
6            MS. BREWINGTON:  I don't have anything.
7            (Deposition concluded at 1:50 p.m.)
8            - - - - -
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 36

REPLACE THIS PAGE

WITH THE ERRATA SHEET

AFTER IT HAS BEEN

COMPLETED AND SIGNED

BY THE DEPONENT

Page 35

1            T E S T I M O N Y
2
3    DEPONENT:  KARL F. KALBACHER            PAGE
4
5    BY MS. BREWINGTON............................ 2
6    BY MS. CSIZMADIA............................ 28
7
8            E X H I B I T S
9
10   KALBACHER DEPOSITION EXHIBIT NO.            MARKED
11
12   1 - A memorandum dated November 13,
      1996, with attachments........................ 15
13
      2 - A letter dated January 9, 1997,
14   to Ann L. Breslin from Karl F. Kalbacher....... 24
15
16   ERRATA SHEET/DEPONENT'S SIGNATURE        PAGE 36
17
18   CERTIFICATE OF REPORTER            PAGE 37
19
20
21
22
23
24

Page 37

CERTIFICATE OF REPORTER

STATE OF DELAWARE)
                 )
NEW CASTLE COUNTY)

        I, Kimberly A. Hurley, Registered
Professional Reporter and Notary Public, do hereby
certify that there came before me on the 28th day of
June, 2006, the deponent herein, KARL F. KALBACHER, who
was duly sworn by me and thereafter examined by counsel
for the respective parties; that the questions asked of
said deponent and the answers given were taken down by me
in Stenotype notes and thereafter transcribed by use of
computer-aided transcription and computer printer under
my direction.
        I further certify that the foregoing is a
true and correct transcript of the testimony given at
said examination of said witness.
        I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.


        Kimberly A. Hurley
        Certification No. 126-RPR
        (Expires January 31, 2008)


DATED:

Wilcox & Fetzer, Ltd.            Professional Court Reporters

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

ANN L. BRESLIN,                     )
                                    )
            Plaintiff,              )
                                    )
v.                                  )    Civil Action No.
                                    )      05-290
STATE OF DELAWARE, DEPARTMENT,)
OF NATURAL RESOURCES AND            )
ENVIRONMENTAL CONTROL,              )
                                    )
            Defendant.              )

            Deposition of CHRISTINA WIRTZ taken pursuant to
notice at the offices of Margolis Edelstein, 1509 Gilpin
Avenue, Wilmington, Delaware, beginning at 10:00 a.m. on
Tuesday, June 27, 2006, before Anne L. Adams, Registered
Professional Reporter and Notary Public.

APPEARANCES:

            LORI A. BREWINGTON, ESQ.
            MARGOLIS EDELSTEIN
              1509 Gilpin Avenue
              Wilmington, Delaware  19806
              for the Plaintiff,
            VALERIE S. CSIZMADIA, ESQ.
            DEPARTMENT OF JUSTICE
              102 W. Water Street, Third Floor
              Dover, Delaware  19904
              for the Defendant.

-------------------------------------------------------
                    WILCOX & FETZER
     1330 King Street - Wilmington, Delaware 19801
                    (302) 655-0477

Page 2

1    CHRISTINA WIRTZ,
2    the witness herein, having first been
3    duly sworn on oath, was examined and
4    testified as follows:
5            EXAMINATION
6  BY MS. BREWINGTON:
7    Q.  Good morning, Miss Wirtz. My name is Lori
8  Brewington. I have the privilege of taking your
9  deposition today. Have you ever testified in a
10  deposition?
11    **A.  Not a deposition per se. I have given testimony**
12  **as a professional geologist before in the State of New**
13  **Jersey.**
14    Q.  I'm going to ask you a series of questions. I
15  will make every effort to ask them one at a time. If at
16  any time you don't understand the question or would like
17  me to rephrase the question, let me know and I will do
18  that. If at any time you need to take a break, just let
19  me know.
20    **A.  All right.**
21    Q.  When asking these questions, I want to make sure
22  that you understand it. So, like I said, I will
23  certainly rephrase or re-ask. But if you do answer the
24  question, we will go ahead and assume that you understood

Page 3

1  the actual question.
2    **A.  Okay.**
3    Q.  We have a court reporter here. She will be
4  taking down your responses to questions. Please make
5  every effort to answer yes or no as opposed to the uh-huh
6  or uh-uh's because for some reason they don't show too
7  clear on the record. You won't know whether that's a yes
8  or no or a maybe.
9        At times your attorney may object to some of
10  the questions I ask. That's entirely proper. The only
11  thing I ask you to do, you go ahead and answer the
12  question unless she specifically advises you not to
13  answer the question.
14    **A.  Okay.**
15    Q.  Please, state your name for the record.
16    **A.  Christina Wirtz.**
17    Q.  And what I would like to do is actually talk
18  about your work experience first at DNREC and then
19  anything previous to that. Because I understand you are
20  still working at DNREC; is that correct?
21    **A.  Absolutely.**
22    Q.  How long have you been employed at DNREC?
23    **A.  Approximately six years.**
24    Q.  And I would like you to walk me through your

Page 4

1  employment at DNREC. You can either start from now
2  previously or from the beginning to now.
3    **A.  Okay. I started in November, 2000, as a manager**
4  **of the Site Investigation and Restoration Branch for the**
5  **Division of Air and Waste Management. This position is**
6  **called a program manager II position. And I held that**
7  **position for approximately four years, maybe a little**
8  **more, and then made a change. I think it was in October**
9  **of 2003. And I assumed a new position as a community**
10  **outreach ombudsman for the Division of Air and Waste**
11  **Management. For both positions, I reported to the head**
12  **of the division, the director of Air and Waste**
13  **Management.**
14    Q.  And was that at one time John Blevins?
15    **A.  Yes, it was.**
16    Q.  And is he no longer with --
17    **A.  No. He's with the EPA now.**
18    Q.  And why did you change positions from a program
19  manager to an ombudsman?
20    **A.  At that time, I had a few personal situations**
21  **that were occurring. Actually, it was like the perfect**
22  **storm. My son was doing poorly in school. He had**
23  **flunked a few subjects. My aunt was dying. And I had to**
24  **take care of her at home and then later in a retirement**

Page 5

1  **home. And I had some health issues.**
2        **And at the same time, the division was**
3  **reorganizing and this other position became available. I**
4  **took a leave of absence for approximately three or four**
5  **months to take care of my aunt. And then once she passed**
6  **away, I returned to work. And shortly thereafter, I**
7  **switched positions. It was a great opportunity for me to**
8  **use some different skills. Not only am I professional**
9  **geologist certified in the States of New Jersey,**
10  **Pennsylvania, Delaware, Tennessee, I also have an art**
11  **degree that I have never been able to use. Yes. So it's**
12  **a nice change of pace for me at a very good time.**
13    Q.  Okay. Now, I'll represent to you that Ann
14  Breslin was employed as an environmental scientist
15  between 1994 and February of 2003. Would it be fair to
16  say your job title, at that time, was program manager II?
17    **A.  Correct.**
18    Q.  I'm not sure if you answered the question because
19  I think we went off the record. Would you have been a
20  program manager II during the time of Ann Breslin's
21  employment?
22    **A.  Some of Ann Breslin's employment. I think Ann**
23  **had been at the state for a number of years before I**
24  **assumed my responsibilities as a program manager.**

Page 6

1    Q.   I see.  Okay.  Did you have employees that
2    reported directly to you as a program manager II?
3        A.   Absolutely.  I had approximately 30 employees
4    that reported directly to me.
5        Q.   You had approximately 30.  Would one of them have
6    been Paul Will?
7        A.   Yes.
8        Q.   How about Alex Rittberg?
9        A.   Yes.
10       Q.   So they both reported to you?
11       A.   Yes.
12       Q.   And they were program manager ones?
13       A.   Correct.
14       Q.   What did you do prior to working at DNREC?
15       A.   For approximately 12 years I worked as an
16   environmental geologist with a, well, it was several
17   consulting firms in the area, in the tri-state area.
18   Previous to that, I was a petroleum geologist, an
19   exploration geologist in Texas for an oil company, In
20   Search Exploration.
21       Q.   Did you attend college?
22       A.   I did.
23       Q.   And from where?
24       A.   Rice University.

Page 7

1        Q.   You received a Bachelor's Degree?
2        A.   Yes.
3        Q.   In what field?
4        A.   Let's see.  It was geology.  It was a double
5    major.  Geology and fine art.
6        Q.   Do you have any other education?
7        A.   Yes.  Masters course work at Southern Methodist
8    University.  I also attended Drexel University to take a
9    hydro class, hydrology.  Also the University of
10   Pennsylvania, once I came here, to kind of help me shift
11   to environmental geology from the petroleum geology
12   field.
13       Q.   As program manager, what were some of your jobs
14   responsibilities?
15       A.   Supervise approximately 30 employees.  Also
16   oversee the laboratory that we have on site at the Lukens
17   Building, which is our field office.  Oversee equipment
18   that's used in the field, geologists, environmental
19   scientists, engineers that do field work, do project
20   management for this particular branch.
21            This branch is responsible for all the super
22   fund sites in the State of Delaware.  There are three
23   programs that are managed with this branch, Voluntary
24   Clean-Up Program, Brown Fields Program, and the Hazardous

Page 8

1    Substance Clean-Up Act sites, which we refer to HSCA
2    sites.
3        Q.   And as a program manager II, did you have much
4    interactions with Ann Breslin?
5        A.   Yes.  I had interaction every day with Ann.
6        Q.   And as ES III, what were some of Ann's job
7    duties?
8        A.   At the program, there are so many sites that need
9    to be addressed that each project manager would have to
10   carry a full load, including what we consider to be very
11   difficult sites, also some of the backlog sites that
12   hardly anybody could ever get to.  Extremely heavy loads
13   consisting of field work, report writing, statistical
14   analysis, computer work.  And Ann particularly carried a
15   very high load.  She was one of our star managers.
16            She was able to do a number of EPA removals
17   for us.  These are very complex fast paced hazardous
18   situations.  And Ann had the experience and the high
19   level of responsibility.  She could handle those sites
20   with ease.
21       Q.   When you talk about Ann's experience and her high
22   level of expertise, are you comparing her to other
23   environmental scientist III's?
24       A.   I'm comparing her to the people that worked at

Page 9

1    the branch.  We had engineers who did almost identical
2    work to the environmental scientists.  So it was a
3    combination of environmental scientists and engineers.
4        Q.   Would it be fair to say that Ann was at the top
5    of --
6        A.   Absolutely.  In fact, Ann, we used Ann to train
7    some of our new people.  The majority of our new people
8    would be mentored by Ann.  She was great at field work.
9    It's very detailed work.  You have to follow EPA and
10   state protocols.  It has to be done just right.  And we
11   could trust that Ann would do this for us.  And she
12   trained some great people who are still at the state
13   today.
14       Q.   Now, are you familiar with a Keith Robertson?
15       A.   Yes.  Keith also worked for me.
16       Q.   Would you agree that Keith Robertson's duties and
17   Ann Breslin's duties were similar?
18       A.   Almost identical.  I would agree.
19       Q.   My next question was going to be:  How would you
20   characterize Ann's work performance?
21       A.   Excellent, reliable, dependable.  Her deadlines,
22   she met all her deadlines.  Report writing skills,
23   excellent.  She was great at public speaking.  We had a
24   number of sites that were high profile sites.  We were in

Breslin
Christina Wirtz

v.    State of Delaware, Department of Natural Resources & Environmental Control
C.A. # 05-290                                 June 27, 2006

Page 10

1  the City of Wilmington. Helen Chambers Park comes to
2  mind. She could be relied on to do an excellent job at
3  all times.
4      Q.  Do you know whether Ann Breslin was the only
5  female ES III in SIRB?
6      A.  No, she was not the only that I recall.
7      Q.  And who else also worked in SIRB that was a
8  female?
9      A.  We have Kristen Thornton, Rebecca Hawkins,
10 Karissa Hendershot. Now, at the time that Ann was there,
11 I believe they were ES II's. They have since been
12 promoted to ES III's.
13     Q.  Let me ask you the question again. While Ann was
14 employed with DNREC, was she the only ES III in SIRB?
15     A.  Yes.
16         MS. CSIZMADIA:  Could you read that back,
17 please?
18         (Thereupon, the reporter read back the
19 pending question.)
20         MS. CSIZMADIA:  You didn't say female. You
21 said only --
22         THE WITNESS:  Oh, female. Yes. Thank you.
23 BY MS. BREWINGTON:
24     Q.  Was she the only female ES III in SIRB at the

Page 11

1  time while she was employed?
2      A.  Yes.
3         MS. BREWINGTON:  Okay. Thank you for the
4  clarification.
5         MS. CSIZMADIA:  You are welcome.
6         (Wirtz Deposition Exhibit No. 1, April 2,
7  2004, Request for Additional Information, was marked for
8  identification.)
9  BY MS. BREWINGTON:
10     Q.  Take a look at that document that I just placed
11 in front of you. We are going to have that marked as
12 Wirtz 1. What I just put in front of you is a document
13 that was produced by DNREC to the EEOC during Ann
14 Breslin's investigation of gender discrimination.
15         Were you aware that both Ann Breslin and
16 Keith Robertson both began their employment making the
17 exact same amount of money? That's $22,998?
18     A.  I was not aware of those amounts.
19     Q.  Would it be fair to say that since Keith
20 Robertson started out at the very same salary as Ann that
21 he was not credited with any prior work experience when
22 he began his employment?
23     A.  Can you rephrase?
24     Q.  Yes. If you look at the starting salaries of

Page 12

1  both Ann Breslin and Keith Robertson, you can see that
2  they are the same. My question is:  Would it be fair to
3  say that since they are the same exact salary that Keith
4  was not credited with any previous work experience?
5      A.  I think you can say that.
6      Q.  If you take a look at the specific job duties
7  from the performance plan for Ann Breslin on Page 1
8  through 2 and also take a look at Keith Robertson's
9  specific duties from the performance plan Page 4 through
10 5, would it be fair to say that they had similar job
11 duties?
12     A.  They should have been almost identical. But let
13 me review this. Only the site names should be different.
14 But the type of work should have been exactly the same.
15 If you can save me the exercise, did you go through this
16 line by line and compare them?
17     Q.  I did. And there are some differences I did
18 note. And I wanted to ask you --
19     A.  The differences appear at the end to me. But I
20 do believe Ann did very similar work to what I'm seeing
21 here.
22     Q.  On Keith's?
23     A.  On Keith's.
24     Q.  Would it be fair to say that Ann's may not be a

Page 13

1  complete listing?
2      A.  I think that would be fair to say. I'm not
3  seeing any of the consultant qualification work that she
4  did. She supervised the program for us. I'm not seeing
5  the utilized advanced and innovative scientific methods
6  in the application of technical disciplines. They both
7  did that.
8      Q.  That's something that you see on Keith's that's
9  not on Ann's?
10     A.  Correct.
11     Q.  But it's your statement today that that's one of
12 her specific job duties as well?
13     A.  Absolutely.
14     Q.  Okay.
15     A.  I would say the last four bullets really.
16     Q.  Keith's?
17     A.  On Keith's you could apply to Ann's as well.
18     Q.  Okay.
19     A.  Ann also did -- there is like the unshaded
20 bullets at the top. She assisted in establishing ground
21 water management zones as required. That's part of
22 project management. She did work on the EQuIS
23 Implementation Team as well.
24         So really, you know, that last super bullet

4 (Pages 10 to 13)

B-0163

Page 14

1  with all those little ones, I think you could put those
2  directly under Ann's qualifications as well.
3      Q.  Do you have any idea why they wouldn't be
4  included in her specific job duties?
5      A.  No, I don't know why they weren't included.
6  There is one thing that I don't believe that Ann did.
7  And that was the participation in the ITRC and ASTSWMO
8  work groups.  But I'm not absolutely sure.  I think Ann
9  may have done ASTSWMO.  That I'm not sure of.  The others
10  I am positive of.
11      Q.  Great.  You can put that document aside.  And
12  I'll ask you to take a look at the document I just put
13  before you that we are going to have marked as Wirtz 2.
14  It's to Paul Will from Ann Breslin.  It's CC'g, is it
15  Lawrence Jones and Robert Asreen?
16      A.  Asreen, A-S-R-E-E-N.
17          (Wirtz Deposition Exhibit No. 2, E-Mail to
18  Paul Will from Ann Breslin Dated October 23, 2001, was
19  marked for identification.)
20  BY MS. BREWINGTON:
21      Q.  And the subject is site summaries and the date is
22  October 23rd, 2001.
23      A.  Uh-huh.
24      Q.  I first just want you to review the document that

Page 15

1  I put before you.
2      A.  Okay.
3      Q.  We understand from Mr. Robertson's deposition
4  yesterday that there are three basic groups of sites.
5  And I think you mentioned them earlier; is that correct?
6      A.  Yes.
7      Q.  Did Miss Breslin, during her career, work across
8  all three site types?
9      A.  Yes.
10      Q.  Now.  This is an E-mail from October of 2001.  My
11  question is:  What projects was she responsible for based
12  on your review of this document?
13      A.  Based on my review of this document, all of these
14  projects.
15      Q.  Okay.  And with these projects, she served as the
16  project manager?
17      A.  Correct.
18      Q.  What is the difference between a remedial site
19  and a pre-remedial site?
20      A.  A pre-remedial site is a site investigation that
21  is done for the EPA under an EPA grant, our pre-remedial
22  grant.  And there is a prescribed work plan that consists
23  of doing soil borings and ground water wells for the
24  purpose of collecting soil samples and water samples to

Page 16

1  kind of get an overall characterization of a site.
2          Remedial work is entirely different.  It is
3  very intense.  You have to have a full understanding of
4  the hydrological conditions, the geologic conditions of
5  the site and a work plan is designed by the project
6  manager in conjunction sometimes with consultants to
7  fully characterize a site.
8          So it's different.  There is the initial
9  characterization that occurs for an EPA pre-remedial
10  site.  And then there is the full characterization or
11  site investigation that is done when you are in a
12  remedial process.  That goes through a whole bunch of
13  different steps before you reach a completion and closure
14  for that particular site.
15          Ann was adept at taking a site through the
16  entire process with ease.  There is no issue, no problem.
17  And as you can see from the list here in the E-mail,
18  there are a number of big sites, high level
19  responsibility.  They went across all of our programs,
20  Voluntary Clean-Up, Brownfields, HSCA as well as NPL
21  sites.
22          Some of these are national priority lists,
23  priorities lists sites or NPL sites that the state
24  performs oversight with the EPA on.  These are the

Page 17

1  highest priority sites that we have to deal with in the
2  nation.  And we have several, unfortunately, in the State
3  of Delaware.
4          And Ann has, according to what I'm looking
5  at, there are a number.  The NVF site.  I think the
6  electric hose and rubber became an EPA removal site,
7  although not an NPL site.  12th Street Drum, removal, EPA
8  removal.  Yeah, she has quite a few.
9      Q.  And these are remedial sites?
10      A.  Remedial sites, yes.
11      Q.  At some point during Ann's career, did she work
12  with -- did the two students from the University of
13  Delaware work under her as interns?
14      A.  Yes, as interns.
15      Q.  And did they receive credit for school?
16      A.  Yes, they did.  In addition, as I mentioned
17  previously, to mentoring a number of the new
18  environmental scientists and engineers who came to the
19  program, she also mentored the interns and was
20  responsible for their job duties every day.
21      Q.  Now, was that something that most of the senior
22  scientists did?
23      A.  No, actually not.  Some of them were better than
24  others.  Ann happened to be particularly good at

5 (Pages 14 to 17)

B-0164

Breslin
Christina Wirtz

v.   State of Delaware, Department of Natural Resources & Environmental Control
C.A. # 05-290                                      June 27, 2006

Page 18

1  mentoring. A few other environmental scientists -- I
2  think Larry Jones would do some mentoring. Karissa, in
3  the interim, Hendershot, has done some mentoring. But
4  some people just were better at it. And Ann was one of
5  those people.
6      Q.  Put that document aside.
7      A.  I recognize this.
8          (Wirtz Deposition Exhibit No. 3, Memorandum
9  to HR from Paul Will Dated May 7, 2001, was marked for
10  identification.)
11  BY MS. BREWINGTON:
12      Q.  Take a look at this document for me. I'm going
13  to ask you a few questions about it.
14      A.  Yes.
15      Q.  Okay. What is this document?
16      A.  This is a memo to our HRO from me regarding Ann's
17  advanced hire request. This is a draft that I edited
18  quite extensively. This is Ann's first draft, I believe,
19  with my edits throughout.
20      Q.  Is that your handwriting?
21      A.  It is my handwriting, yes.
22      Q.  And did you support Ann's request for an advanced
23  hire?
24      A.  I was not at the branch at the time her request

Page 19

1  for an advanced hire went through. That was prepared by
2  Carl Kalbacher who was a program manager I at the time
3  under a different program manager II, N.D. Romen.
4          However, when I first came to the branch,
5  there were a number of what appeared to be inequities.
6  And this was one of the inequities. Ann made me aware of
7  the situation. She presented the documentation regarding
8  the advanced hire request that she had submitted and
9  also, with Keith Robertson's permission, the advanced
10  hire request that he had submitted both in 1996. That of
11  course, predated my time considerably.
12          However, in the review of the documents, I
13  was concerned that the state may have been in a
14  vulnerable position regarding sex-based or biased wages
15  because there seemed to be a discrepancy between how
16  Ann's advanced hire was treated and how Keith's was
17  treated.
18      Q.  Now, are we talking about gender discrimination?
19      A.  Yes.
20      Q.  And if you look over to the right, it's the first
21  bullet on the --
22      A.  At the top?
23      Q.  Is that "main thrust should be sexual
24  discrimination?"

Page 20

1      A.  Absolutely.
2      Q.  Did you believe that the main thrust of this
3  request should be sexual discrimination?
4      A.  Absolutely. Not only was I concerned for Ann,
5  but I was also concerned for myself because with my
6  responsibilities as a manager came the responsibility of
7  ensuring that everything was done in accordance with
8  Delaware and federal law. I signed off on pre-remedial,
9  core grants, Brownfields grants three times every year
10  stating that we did everything in accordance with Equal
11  Opportunity Employee Equal Opportunity objectives.
12          And the state feels very strongly about
13  this. The state has just recently -- the governor has
14  signed an executive order, 81, that there shall be no
15  discrimination across the board. So this was very
16  important to me to have our HRO office review because I
17  could not see why one advanced hire was granted and the
18  other was rejected.
19      Q.  Based on your review of both advanced hire
20  requests?
21      A.  Correct, correct, exactly.
22      Q.  Were you concerned that perhaps the state's
23  implementation of its own policy concerning advanced hire
24  requests was, in fact, discriminating against Ann Breslin

Page 21

1  as a woman?
2      A.  I had those concerns.
3      Q.  How about the bullet underneath that, "His
4  Master's counted; yours did not," question mark, "or just
5  lab experience." Do you remember what you may have meant
6  by that?
7      A.  Yes. Both received Master's Degrees in very
8  similar fields. And I was concerned that Keith had
9  received credit for his Master's Degree while Ann had
10  not. I was not sure what the difference had been based
11  on, why one had received the advanced hire, the other had
12  not. So these were notes to review with Ann to ask her
13  these questions.
14      Q.  Do you know who in human resources made the
15  determination in 1996 that Ann would not receive an
16  advanced hire request but Keith would?
17      A.  I believe Sharon Tanzler? I may have to look it
18  up.
19      Q.  Tazelaar perhaps?
20      A.  Yes. Thank you.
21          MS. CSIZMADIA: T-A-Z-E-L-A-A-R .
22      Q.  Is she still with DNREC?
23      A.  I don't think so.
24      Q.  Are you aware of any illness that she may have?

6 (Pages 18 to 21)

Wilcox & Fetzer, Ltd.            Professional Court Reporters

B-0165