Page 26

1  Q.  And why did you feel that way?
2  A.  I reviewed the minimum requirements for an ES
3  III. And her experience and knowledge did exceed the
4  minimums.
5  Q.  Do you know whether, at this time, she was being
6  paid entry level for an ES III?
7  A.  I believe she was.
8  Q.  Skip down to where it says, "Ann's seven months
9  work experience at the Chesapeake Bay foundation as a
10  wetlands scientists is directly applicable to the work
11  performed at SIRB." Do you stand by that statement?
12  A.  I certainly do.
13  Q.  And can you tell me again, because I know I'm
14  sure I asked you this, how is this work experience at
15  Chesapeake Bay Foundation related to her work as an ES
16  III?
17  A.  It related directly because she was working as a
18  wetlands scientist. And at the branch, we do what's
19  called wetlands mitigation. And Ann was in charge of
20  handling the majority of our wetland mitigation projects.
21  It was directly applicable to the work that she did and
22  we do currently and then at SIRB.
23  Q.  And the next paragraph there, "Ann also worked
24  for 1.66 years as a laboratory assistant." And then it

Page 27

1  goes on to next paragraph, "Based on this previous work
2  experience, Ann should have been credited with a minimum
3  of 2.243 years of experience." Do you agree with that
4  statement?
5  A.  I do agree with that.
6  Q.  Is it your understanding that she was not
7  credited for this 2.243 years of experience?
8  A.  I'm not sure why one advanced hire was approved
9  and the other was not approved. I would assume, based on
10  review of the documents, that this work experience was
11  not credited.
12  Q.  If this work experience was not credited, is it
13  your opinion that that was discriminatory?
14  A.  That is why I wrote this memo, to determine that.
15  I did not know all the circumstances associated with each
16  advanced hire. And I wanted our HRO office to review in
17  detail their decision and make sure that this was not a
18  discriminatory situation.
19  Q.  Take a look at the first page again. At the
20  bottom towards the right it begins with "these", I
21  believe. I would like to you read that for me.
22  A.  It is "there." "There appears to be a
23  significant discrepancy between these two actions which
24  may be considered a sexual discrimination." On mine, I

Page 28

1  think sexual is cut off.
2  Q.  It's cut off on my mine too. I wasn't sure what
3  the word was.
4  A.  I have the original. You can look. "May be
5  considered as sexual discrimination."
6  Q.  And that's based on your reading of the original
7  document?
8  A.  Correct.
9  Q.  You can put that document aside.
10  (Wirtz Deposition Exhibit No. 4, E-Mail to
11  Alex Rittberg from Christina Wirtz Dated May 7, 2001, was
12  marked for identification.)
13  BY MS. BREWINGTON:
14  Q.  I have just put before you a document that we are
15  going to mark as Wirtz 4, I believe. This is an E-mail
16  dated May 17th, 2001, and which is also the same day as
17  the previous exhibit, the draft of the advanced hire
18  request.
19  The top portion of this document is what I
20  would like you to focus on. It's from you and it's to
21  Alex Rittberg, Ann Breslin and Paul Will. And the
22  subject is "here you go." Have you had an opportunity to
23  are read it?
24  A.  I have.

Page 29

1  Q.  Is it fair to say that this E-mail is in
2  reference to the draft of the May 17, 2001, advanced hire
3  request?
4  A.  Correct.
5  Q.  Was it your opinion that although Ann was
6  accomplished, she was not being compensated accordingly
7  by DNREC?
8  A.  It was my opinion, yes.
9  Q.  Did you believe that was, in part, because of her
10  gender?
11  A.  Yes.
12  Q.  And did you have concerns that DNREC may not be
13  following federal law?
14  A.  And state law.
15  Q.  And state law. Okay.
16  (Wirtz Deposition Exhibit No. 5, Memorandum
17  to HRO from Paul Will Dated May 17, 2001, was marked for
18  identification.)
19  BY MS. BREWINGTON:
20  Q.  I just put before you what we are going to have
21  marked as Wirtz 5. Is this the final draft of the memo
22  that was sent to human resources?
23  A.  Let me look. MS. BRESLIN: Can we take a break?
24  (Thereupon, a short recess was had.)

8 (Pages 26 to 29)

Breslin
Christina Wirtz

v.

C.A. # 05-290

State of Delaware, Department of Natural Resources & Environmental Control

June 27, 2006

Page 22

1    A.  I had heard that she was on disability.  But that
2    was not conveyed officially.  It was just a rumor.
3    Q.  Do you know when Sharon Tazelaar consulted with
4    anyone from your department concerning the advanced --
5    A.  I don't know the circumstances.
6    Q.  Do you know whether that is part of the policy?
7    A.  I'm not sure if that's part of the policy.  I
8    would think that that's something that should be done.
9    And I do believe there was some conversations with Carl
10   Kalbacher because I remember he was Ann's program manager
11   I.  And he fully supported an advanced hire for Ann.  And
12   I had heard that he was quite outraged when it had been
13   turned down.  So my assumption is that there were
14   conversations.  I do not know.  I was not there at the
15   time.
16   Q.  Take a look at this second paragraph on the first
17   page.  It says quote, "According to conversations with
18   her former manager at the time of the original advanced
19   hire request (see attached memo dated November 13th,
20   1996) her work experience as a botany laboratory
21   assistant and wetlands scientist was not considered
22   applicable to the position.  And as such, her advanced
23   hire request was denied."  Did I read that accurately?
24   A.  Yes, you did.

Page 23

1    Q.  And this was also in reference to the 1996
2    advanced hire request?
3    A.  Exactly.
4    Q.  Was it your understanding that her previous work
5    experience did not count, however, Keith's did?
6    A.  That was my understanding.
7    Q.  And what was the basis of this understanding?
8    A.  Review of associated documents, Keith's advanced
9    hire request that was prepared by Jamie Rutherford, I
10   think subsequent correspondence between perhaps Sharon,
11   HRO documents that came out about this.
12   Q.  And what, based on your review of the documents,
13   what was your understanding of why Ann Breslin's request
14   was denied?
15   A.  I didn't fully understand it, which is why I
16   wrote or helped Ann write this memo.  And my supervisor
17   at the time, the director of the Division of Air and
18   Waste Management, John Blevins, didn't understand it
19   either based on our review of these documents.
20   Q.  Now, was it a problem that Ann did the original
21   draft of this document as opposed to maybe you writing it
22   or John Blevins or someone else?
23   A.  No, that was not a problem.  It's standard
24   operating procedure at the state for the project managers

Page 24

1    to draft documents for the program managers.  It's done
2    all the way up the ladder.  I draft memos for my
3    supervisor, the director, for his signature.  He drafts
4    memos for his supervisor, the secretary of DNREC.  So
5    this is standard operating procedure.
6         Ann would have been familiar with her
7    career, with her experience.  And also it was her
8    responsibility, if she wanted to pursue this, to draft it
9    for my review.
10   Q.  Take a look at where it says -- it's in that
11   second paragraph and it begins with the "during the same
12   time frame," comma.  It says "Keith Robertson was
13   completing a career ladder process for promotion to ES
14   III and was approved an advanced hire on the basis of his
15   graduate school coastal geology experience."
16        My question is:  Did his coastal geological
17   experience count towards his advanced hire and Ann's
18   didn't for some reason?
19   A.  I don't believe Ann had coastal geology
20   experience.  She had wetlands and biology experience.
21   They are very comparable.  But Keith also had archeology
22   experience that was counted.  And that's pretty far
23   removed from what we did at the branch.
24   Q.  And why is that?

Page 25

1    A.  The type of work -- archeology is almost a
2    different field from geology and biology.  It is a
3    different field.  So the type of work that the branch did
4    centered on geology, hydrology, as well as environmental
5    geology, biology and wetlands type work.
6    Q.  So that I understand it, the coastal geology
7    experience that Keith had was directly comparable to the
8    wetlands and botany laboratory experience that Ann had?
9    A.  Absolutely.
10   Q.  Based on your written statements in this
11   document, at the bottom right above the word
12   justification, Mr. Robinson was making $3,591.67 per
13   month while Miss Breslin was making $3,199.25; is that
14   correct?
15   A.  In my notes, is that what you mean down here at
16   the bottom?
17   Q.  Yeah.  Is that your writing?
18   A.  Yes, Mr. Robertson now makes -- yes, that is my
19   writing.
20   Q.  Turn to the next page for me at the top.  Would
21   you agree with that first sentence there that Ann
22   Breslin's experience and knowledge clearly exceeded the
23   minimum requirements for an ES III?
24   A.  Yes.

7 (Pages 22 to 25)

Page 30

1   BY MS. BREWINGTON:
2       Q.   Back on the record. I just showed you a
3   document. And I think my question was: Was this the
4   final of the document that I just presented to you?
5       A.   I would say no. This document the, May 17th,
6   2001, memorandum was actually the version that I had
7   marked up, which is the draft.
8       Q.   What is that marked?
9       A.   Exhibit 3.
10      Q.   I'm looking at Exhibit 5 now. Am I correct in my
11  understanding that this memo was drafted first and you
12  actually marked up this memo?
13      A.   Correct.
14      Q.   And Exhibit 3 would be the marked up exhibit --
15      A.   Exactly.
16      Q.   -- of 5?
17      A.   Exactly.
18      Q.   So 5 came before 3?
19      A.   Yes.
20      Q.   And 3 was used for what?
21      A.   3 was used to generate the memo from me to my
22  director, John Blevins, dated December 10th, 2001,
23  requesting a review of Ann Breslin's advanced hire
24  request dated November 13th, 1996.

Page 31

1       Q.   And we'll get to that. Is it fair to assume,
2   going back to Exhibit 5, that Paul Will's advanced hire
3   request for May 17th, 2001, was rejected?
4       A.   Yes.
5       Q.   Do you know why this advanced hire request was
6   rejected?
7       A.   No.
8       Q.   Did you take part in drafting Exhibit 5 at all?
9       A.   I reviewed it, I believe, at some point. But I
10  can't be sure. Because my initials aren't even on it.
11  Alex initialed it. Like somebody initialed for both Paul
12  and I.
13      Q.   Do you know whether Alex was involved in the
14  drafting of this document?
15      A.   It looks like Alex's initials. I'm not sure.
16      Q.   And, again, that would be entirely proper?
17      A.   Yes.
18           (Wirtz Deposition Exhibit No. 6, Memorandum
19  to John Blevins from Christina Wirtz Dated November,
20  2001, was marked for identification.)
21  BY MS. BREWINGTON:
22      Q.   You can go ahead and review this document for me.
23      A.   All right.
24      Q.   Is this your handwriting on this document?

Page 32

1       A.   It is.
2       Q.   Now, it's dated December 5th, this document.
3   When did this document come into play?
4       A.   I believe it was also a draft for the December
5   10th, 2001, official document that went to John Blevins.
6       Q.   So we have two drafts of the official document --
7       A.   Correct.
8       Q.   -- that went to John Blevins?
9       A.   Correct.
10      Q.   And the first draft is Wirtz 3?
11      A.   Correct.
12      Q.   And the second draft is Wirtz 6?
13      A.   Correct.
14      Q.   And John Blevins is the director?
15      A.   Correct.
16      Q.   And was this memo sent in an effort to revisit
17  the 1996 advanced hire request of Ann Breslin?
18      A.   Yes.
19      Q.   And was the basis of this request a concern for
20  equal opportunity?
21      A.   Yes.
22      Q.   And tell me all of those who were responsible for
23  or who assisted in drafting this document.
24      A.   Of course, me, my director may have viewed a

Page 33

1   draft before it came to him, John Blevins. I believe
2   Alex helped. I'm not sure if Paul did any work on it
3   other than review it.
4       Q.   I want to take you to a portion of the document.
5   It is in the second paragraph and it begins with "in
6   addition," comma. Do you see where it says that?
7       A.   Yes.
8       Q.   I'm going to read that to you. Quote, "In
9   addition, all other environmental scientist III's in SIRB
10  are being compensated at varying levels that are greater
11  than Miss Breslin's salary level. There appears to be an
12  equity issue between Mr. Robertson and Miss Breslin's
13  salaries which may be considered sex discrimination."
14  Did I read that accurately?
15           MS. CSIZMADIA:  Where are we at?
16           THE WITNESS:  It's this draft. Wirtz 6.
17  You read everything correctly except for, perhaps, the
18  first word. In addition -- I think I crossed out "all,"
19  that little slash mark. I said, "In addition, other
20  environmental scientists III's in SIRB are being
21  compensated at varying levels that are greater." And
22  then everything else is right.
23      Q.   So at the time of drafting this memo in 2001, Ann
24  was being paid less than all other environmental III's in

9 (Pages 30 to 33)

B-0168

Page 34

1  SIRB?
2     **A. Yes.**
3     Q. How about the next paragraph there? I'm going to
4  read it to you and let me know if I'm reading it
5  accurately.
6        "Currently, Miss Breslin is the only female
7  environmental scientist III in SIRB and is being
8  compensated significantly less than her male
9  counterparts. In addition, she has several more years of
10 seniority in the State of Delaware service than two other
11 environmental scientist III's in SIRB." Is that correct?
12    **A. Almost correct. I think, "in addition,**
13 **Miss Breslin." I don't have "she." I think you said**
14 **she.**
15    Q. Okay. Miss Breslin.
16    **A. Has several more years of seniority.**
17    Q. I would like to take that piece by piece and ask
18 you about it. The first sentence, "Miss Breslin is the
19 only female environmental scientist in SIRB and is being
20 compensated significantly less than her male
21 counterparts;" is that an accurate statement?
22    **A. Yes.**
23       MS. BREWINGTON: Off the record.
24       MS. CSIZMADIA: You didn't read III again.

Page 35

1  You said she's the only female environmental scientist in
2  SIRB.
3        MS. BREWINGTON: Thank you. I'm going to go
4  back on the record and read it again.
5  BY MS. BREWINGTON:
6     Q. "Currently, Miss Breslin is the only female
7  environment scientist III in SIRB and is being
8  compensated significantly less than her male
9  counterparts."
10       Okay. My question is: Is that a true -- I
11 know that I'm reading it correctly. But my question is:
12 Is that true?
13    **A. Yes.**
14    Q. In addition, Miss Breslin has several more years
15 of seniority in State of Delaware service than two of the
16 environmental scientist III's in SIRB; is that also
17 correct?
18    **A. Yes.**
19    Q. Was it your belief that the discrepancies in
20 salary between Robertson and Breslin may be considered
21 sex discrimination?
22    **A. It was my concern.**
23    Q. Take a look at the bottom where it indicates
24 "another equity issue was." Can you just tell me what

Page 36

1  that may say?
2     **A. I don't have a copy of the original of this. So**
3  **I am guessing as to the very last line on the document.**
4  **"Another equity issue was created as a result of a**
5  **limited maintenance review."**
6     Q. Do you know what you meant by that?
7     **A. Yes. There was a limited maintenance review of**
8  **the environmental scientists I, II and III classes. This**
9  **was an effort to level up environmental scientists. And,**
10 **unfortunately, the way Ann's salary was treated, because**
11 **she was making less than Keith Robertson, he received**
12 **additional compensation that she did not receive. She**
13 **was still making less. In fact, the disparity, the gap**
14 **was even wider. It created and even wider gap in**
15 **compensation.**
16    Q. Is that because Keith Robertson received an
17 increase of five percent do you know?
18    **A. I believe that is the case.**
19    Q. And in terms of Ann's increase, did it only bring
20 her up to entry level?
21    **A. I think it was midpoint, which is entry level.**
22    Q. So as of the limited maintenance review, and I
23 believe that was in 2000 -- I'm not sure -- she would
24 have still been making entry level?

Page 37

1     **A. Correct.**
2        **(Wirtz Deposition Exhibit No. 7,**
3  **Confidential Memorandum to Merrilyn Ramsey from John**
4  **Blevins Dated December 10, 2001, was marked for**
5  **identification.)**
6  BY MS. BREWINGTON:
7     Q. I just put in front of you Wirtz 7.
8     **A. Yes.**
9     Q. It seems to be, to me, several different memos
10 if you look through the document.
11    **A. That is correct.**
12    Q. The first memo is to Merrilyn Ramsey from John
13 Blevins. It's dated December 10th, 2001.
14    **A. Correct.**
15    Q. The second one is to Merrilyn Ramsey from John
16 Blevins and it's dated December 17th, 2001.
17    **A. Correct.**
18    Q. And the third memo is from yourself to John
19 Blevins. It's dated December 10th, 2001; is that
20 correct?
21    **A. Correct.**
22    Q. Now, if we look at the last memo, is this the
23 final draft of the memo that was sent to John Blevins?
24    **A. From me, correct.**

10 (Pages 34 to 37)

B-0169

Page 38

1   Q.  So we looked at two drafts of this final
2 document?
3   **A. Previously, yes.**
4   Q.  Take a look at the first page of this exhibit,
5 the memo from John Blevins to Merrilyn. I'm going to ask
6 you first who Merrilyn Ramsey is.
7   **A. She is the personnel administrator for the Human**
8 **Resource Office.**
9   Q.  And Sharon Tazelaar, was she in that same
10 position in 1996 do you know?
11   **A. I don't think so. But I don't know.**
12   Q.  Do you know what her title was, Sharon Tazelaar?
13   **A. No, I don't. I could probably find it.**
14   Q.  Would you, please, read for me John Blevin's memo
15 to Merrilyn Ramsey?
16   **A. "Attached is a confidential memorandum from**
17 **Miss Christina Wirtz requesting a review of the previous**
18 **advanced hire request for Miss Breslin dated November 13,**
19 **1996. In appears that there may be an equity issue in**
20 **the consideration given to a male employee for a Master's**
21 **Degree and related previously experience but denied to**
22 **Miss Breslin. Please, provide us with the basis for**
23 **these decisions and an opinion on the equal employment**
24 **opportunity issue raised by Miss Wirtz.**

Page 39

1   Q.  Okay. Would you agree with me that, based on
2 your review of this memo, that John Blevins was also
3 concerned about an equity issue between --
4   **A. Yes. On this memo and the one that went with it,**
5 **December 17th, 2001, that he also authored.**
6   Q.  That's the next page?
7   **A. Exactly.**
8   Q.  Let's turn to it. Now, did he send two memos to
9 Merrilyn Ramsey?
10   **A. The first dated December 10th is considered a**
11 **cover. And then the confidential memorandum is the one**
12 **dated December 17th.**
13   Q.  Is that his signature?
14   **A. Yes, it is.**
15   Q.  First paragraph, last sentence, "Christina also
16 believes that the department may be vulnerable to a
17 sexual discrimination charge based on specifics of the
18 situation." My question is: What were you specifically
19 concerned about with respect to the vulnerability of the
20 department and sex discrimination?
21   **A. Can you rephrase?**
22   Q.  Yeah. The statement indicates that Christina
23 also believes that the department may be vulnerable to a
24 sex discrimination charge based on the specifics of the

Page 40

1 situation. I guess what my question is: What specifics
2 in this situation had you concerned that the department
3 may be vulnerable to sexual discrimination?
4   **A. As detailed in my memo, which is also attached,**
5 **dated December 10th, 2001, conversations with her former**
6 **manager at the time of the original advanced hire, her**
7 **Master of Science Degree in Geo-Environmental Sciences,**
8 **and related work experience as a botany laboratory**
9 **assistant and wetlands scientist were not considered**
10 **applicable to the position. And, as such, her advanced**
11 **hire request was denied.**
12   Q.  The next paragraph on John Blevins' memo it says,
13 quote, "I am impressed that Christine has brought this
14 situation to my attention. Since trying to adjust the
15 situation, it is not in the path of least resistance."
16 Did you have conversations with Mr. Blevins about Ann
17 Breslin's situation?
18   **A. Yes, I did.**
19   Q.  Can you tell me what, in your opinion, he may
20 have meant by the path of least resistance?
21      MS. CSIZMADIA: I'm going to object on the
22 grounds of speculation.
23 BY MS. BREWINGTON:
24   Q.  You can go ahead and answer.

Page 41

1   **A. I believe he meant that it would just be easier**
2 **to let it go and not bring it to anyone's attention.**
3 **That would be the path of least resistance.**
4   Q.  Easier for who?
5   **A. Easier for me to do.**
6   Q.  Why would it be easier for you to do that?
7   **A. I think a memo of this type can be considered a**
8 **career killer. It is a memo that questions how decisions**
9 **were made previously, even though those decisions had**
10 **been questioned already by the memo that Paul Will had**
11 **drafted.**
12   Q.  Were you concerned about your career when
13 drafting this memo?
14   **A. I was concerned about my career. However, I felt**
15 **that it was important to do the right thing, that I**
16 **signed off on official federal and state documents**
17 **stating that we were doing everything within the letter**
18 **of the law. And I felt it was important that this be**
19 **resolved and that we have an answer that addresses this**
20 **situation.**
21   Q.  The next sentence, "Based on my reading of the
22 facts presented, I concur with Christina that the reason
23 for an advanced hire request denial for Ann is not
24 apparent when compared to the approval of an advanced

11 (Pages 38 to 41)

Page 42

1  hire request for Keith Robertson."  Do you know whether
2  John Blevins reviewed any documents before writing this
3  memo?
4        MS. CSIZMADIA:  Again, I'm going to object
5  on the basis of speculation.
6        THE WITNESS:  Because John Blevins states
7  that based on his reading of the facts presented, I
8  believe that he did review the documents.
9  BY MS. BREWINGTON:
10    Q.  The reading of the facts presented is what it
11  says.  Do you know whether that was the advanced hire
12  request of Ann and Keith in 1996?
13    **A.  I would believe that is the case.**
14    Q.  Do you know of any other facts that he may have
15  read?
16    **A.  I'm not aware of other facts.  Although, as the**
17  **director, he may have been privy to more information from**
18  **HRO than I would have been as a program manager.**
19    Q.  Based on your reading of this memo, did you feel
20  that John Blevins felt the same way that you did?  And
21  when I say that, I mean in terms of whether the reason
22  why Ann did not receive an advanced hire request wasn't
23  apparent.
24        MS. CSIZMADIA:  I'm going to, again, object.

Page 43

1  You keep asking for Mr. Blevins' motivation.  The writing
2  is in front of you.  But go ahead.
3        MS. BREWINGTON:  I'm, actually, asking what
4  her understanding is based on her review of his writing.
5        MS. CSIZMADIA:  Right, her understanding of
6  his thoughts.
7        MS. BREWINGTON:  Her understanding of her
8  review of the memo.  It's his memo.  What does she
9  understand based on what he wrote?
10        THE WITNESS:  Can you rephrase it one more
11  time?
12  BY MS. BREWINGTON:
13    Q.  We are looking at the second paragraph.  And we
14  are looking at the second sentence.  And it says, "Based
15  on my reading of the facts presented -- and we've already
16  talked about that -- I concur with Christina that the
17  reason for an advanced hire request denial for Ann is not
18  apparent when compared to the approval of an advanced
19  hire request for Keith Robertson."
20        And my question is:  Would it be fair to say
21  that, based on your reading of this sentence, that John
22  Blevins also had the same concern that you did with
23  respect to whether it was actually clear as to why Ann
24  didn't receive an advanced hire request and Keith

Page 44

1  Robertson did?
2    **A.  Yes.  He states I concur with Christina.  In**
3  **addition, he was fully supportive of my effort.  I had**
4  **discussed it at great length with him.**
5    Q.  So not only are you basing this on what you are
6  reading here, you actually talked with him about this
7  same issue?
8    **A.  Absolutely.**
9    Q.  How about the third paragraph?  It's the last
10  sentence.
11        MS. CSIZMADIA:  Can we read the whole thing
12  for completeness?
13        MS. BREWINGTON:  When you ask your
14  questions, you can certainly ask her to read the whole
15  thing for completeness.
16        MS. CSIZMADIA:  Sure.
17  BY MS. BREWINGTON:
18    Q.  The last sentence, "Additionally, I am also
19  concerned that we do have some vulnerability on a sexual
20  discrimination basis and do not believe that this is a
21  message we, the department, want to send."  Did I read
22  that accurately?
23    **A.  Yes.**
24    Q.  Based on your review of the memo, would it be

Page 45

1  fair to say that Blevins had some concerns about sexual
2  discrimination in the department as well?
3    **A.  Yes.**
4    Q.  The next paragraph, it's the first sentence.
5  Quote, "I have been spreading the message to my staff
6  that we need to ensure that we are doing the, quote,
7  right thing, end quote, not just doing things, quote,
8  right, end quote."  Did I read that accurately?
9    **A.  Yes.**
10    Q.  What did he mean by this?
11        MS. CSIZMADIA:  Speculation.  I object.
12        THE WITNESS:  Answer anyway?
13        MS. CSIZMADIA:  Uh-huh.
14        THE WITNESS:  John Blevins was very
15  concerned that we do the right activity and not just
16  follow what we believe are the right rules or the right
17  procedures, that it is truly what we believe is the right
18  thing to do.  And sometimes those can differ.
19  BY MS. BREWINGTON:
20    Q.  And did you have conversations with John about
21  this in particular?
22    **A.  He had conversations with all of the program**
23  **managers about this.  I remember him drawing a diagram**
24  **showing you can do the right thing but do it the wrong**

12 (Pages 42 to 45)

B-0171

Page 46

1  way. You can do the wrong thing but do it in the right
2  way. So this was one of his messages to his program
3  managers and other staff at the division, to be conscious
4  of that, that there is a difference.
5      Q. Between doing things right and doing the right
6  thing?
7      A. Between doing what is right and doing what may be
8  the right procedure or the right process. You have to
9  always make sure that you are actually doing the right
10  thing. You may follow the right process. But is the end
11  result the right thing to do?
12      Q. Would that be with respect to policies and
13  procedures?
14      A. With respect to all things. He believed it was a
15  good lesson, a good life lesson to follow, so with
16  respect to work as well as personal issues, one of those
17  golden rules.
18      Q. The second page of the memo, "The ideal cure
19  would be to retroactively apply the advanced hire salary
20  amount and any subsequent salary adjustments to that
21  amount. If that is not technically feasible, I believe
22  that applying an advanced hire amount now to Ann's
23  current salary would be the appropriate cure. I know
24  that the division has the funding to support this action

Page 47

1  and I believe we could implement the corrective action
2  without modifying the current advanced hire policy."
3          How was John Blevins suggesting that the
4  department remedy this situation?
5      A. As detailed in his memo, he gave two options.
6  The ideal cure, to retroactively apply the advanced hire
7  salary and any subsequent salary adjustments. However,
8  he qualifies it, if technically not feasible, just
9  applying an advanced hire amount now.
10      Q. Is it fair to say, based on your review of this
11  memo, that there was funding to support an action to make
12  Ann's pay comparable?
13      A. Yes.
14      Q. Actually, take a look at this document. We are
15  going to mark that as Wirtz 8 I believe.
16          (Wirtz Deposition Exhibit No. 8,
17  Confidential Memorandum to John Blevins from Christina
18  Wirtz Dated January 31, 2002, was marked for
19  identification.)
20  BY MS. BREWINGTON:
21      Q. What is this document?
22      A. This document dated January 31st, 2002, is a
23  request to provide additional information regarding Ann
24  Breslin's advanced hire request. I think Merrilyn Ramsey

Page 48

1  had requested the additional information. This memo was
2  the cover memo that supplied that information.
3      Q. So it's your understanding that Merrilyn Ramsey
4  received the memo of December 10, I believe, 2002?
5      A. Correct.
6      Q. And requested additional information?
7      A. Correct.
8      Q. Do you know whether she sent a memo to request
9  this information or she spoke with anyone verbally about
10  it?
11      A. I'm not sure at this time.
12      Q. But she didn't speak with you?
13      A. I'm not sure of that even at this time.
14      Q. But are you sure that she requested information?
15      A. Yes. Because I would not have said pursuant to
16  Merrilyn Ramsey's request at the very beginning of this
17  memo unless she had actually requested this information.
18      Q. Would it be fair to say that Merrilyn Ramsey was
19  reviewing the request from 1996?
20      A. Yes.
21      Q. Did you provide any other additional documents
22  besides this memo?
23      A. I'm not sure what else. I mean, the memo lists
24  the additional information that was provided. But

Page 49

1  subsequent to this memo, I'm not sure what else we
2  provided.
3      Q. This memo is dated January 31st, 2002. Do you
4  know when Ann or yourself or anyone received a response
5  from human resources?
6      A. I'm not -- well, I have some documents.
7      Q. That's okay if you don't know off the top of your
8  head.
9      A. I don't know off the top of my head.
10          (Wirtz Deposition Exhibit No. 9, E-Mail to
11  Christina Wirtz from Ann Breslin Dated March 9, 2002, was
12  marked for identification.)
13  BY MS. BREWINGTON:
14      Q. Take a look at the document I put before you. I
15  think it's Wirtz 9.
16      A. Yes.
17      Q. Would it be fair to say that as of March 19th,
18  2002, Miss Breslin still did not receive a response to
19  her request to revisit the 1996 advanced hire request?
20      A. Based on this E-mail, yes.
21      Q. Do you recall receiving this E-mail?
22      A. Actually, I don't recall having received it. I
23  didn't have it in my file.
24      Q. Do you know whether or not you followed up with

13 (Pages 46 to 49)

B-0172

Breslin
Christina Wirtz

v.

State of Delaware, Department of Natural Resources & Environmental Control
C.A. # 05-290    June 27, 2006

Page 50

1  John Blevins?
2  **A. Yes, I did follow up.**
3  Q. Can you tell me about that conversation?
4  **A. I don't think I can at this point. I know that**
5  **there were a lot of subsequent E-mails. There were a lot**
6  **of back and forth. It seemed that a decision took a**
7  **while. And both John and I were concerned that it was**
8  **taking so long. But I don't remember the actual details**
9  **of our conversation.**
10  Q. When you said that E-mails went back and forth,
11  were they E-mails between HR and John or you and Ann
12  or --
13  **A. I think there was a lot of E-mail traffic. I can**
14  **only refer to the E-mails between Ann and I and John and**
15  **I.**
16         (Wirtz Deposition Exhibit No. 10, E-Mail to
17  John Blevins from Christina Wirtz Dated June 28, 2002,
18  was marked for identification.)
19  **BY MS. BREWINGTON:**
20  Q. Take a look at this document for me. We are
21  going to mark that as Wirtz 10. And there is, actually,
22  two E-mails on this document. The first one is at the
23  bottom. And it was to you from Ann Breslin dated June
24  28, 2002. And the second E-mail, which is at the top, is

Page 51

1  to John Blevins from you also dated June 28th, 2002, less
2  than, I guess, 10, 20 minutes later?
3  **A. Right.**
4  Q. Is it fair to say that her message to you was a
5  follow-up on the advanced hire request?
6  **A. Yes.**
7  Q. So as of June 28th, 2002, she still had not
8  received a response from human resources?
9  **A. Based on this E-mail, yes.**
10  Q. Do you know why there was such a delay in
11  responding to Ann?
12  **A. No, I do not.**
13  Q. If you take a look at Ann's E-mail, I'm reading
14  with the 2002, it's kind of in the middle. It says,
15  "With the 2002 two percent pay raise, the pay gap to the
16  next lowest paid ES III is now greater than 5,000. Per
17  month, that is approximately $350 more. That would make
18  the quality of life different for me. That would keep me
19  from having to depend on my parents for money during
20  certain times."
21         Do you know whether Ann was making
22  approximately $5,000 less than the next lowest paid ES
23  III?
24  **A. I believe that is the case.**

Page 52

1  Q. Did you think there was a problem with that?
2  **A. Yes, I had a great concern regarding that.**
3  Q. Did you think that there may be discrimination as
4  a result of that?
5  **A. I felt that the state was definitely vulnerable**
6  **with that situation.**
7  Q. How about if we take a look at the beginning, the
8  first part of the E-mail? And, again, it's an E-mail
9  from you to John. And it says, "John, I talked to
10  Merrilyn last week about this when I had her on the phone
11  regarding her HRO issues. She said she thought that this
12  had been addressed already and would look into it for us.
13  Although you have told us that there is not much that can
14  be done about at this time, we would really like
15  something in writing from Merrilyn giving us HR's
16  official position on. Ann would like to contact her
17  directly. I'm fine with it. HR should serve the
18  employees' needs."
19         Do you remember talking with Merrilyn about
20  this issue?
21  **A. I don't remember it. But if -- according to this**
22  **E-mail, I certainly did have a conversation with her**
23  **about this issue.**
24  Q. Now, do you remember whether John responded to

Page 53

1  you?
2  **A. I believe he did.**
3  Q. Do you recall his response?
4  **A. I don't remember exactly what his response was.**
5  **But I think there were some subsequent conversations and**
6  **also E-mails.**
7  Q. And you didn't have a problem with Ann contacting
8  Merrilyn directly?
9  **A. I did not.**
10  Q. Why is that?
11  **A. I felt Ann could ask her questions directly and**
12  **would be able to follow up with Merrilyn in whatever area**
13  **she needed to and I would not be the go between. It**
14  **would be a much better more direct way of addressing**
15  **Ann's concerns.**
16         (Wirtz Deposition Exhibit No. 11, E-mail to
17  Merrilyn Ramsey from Ann Breslin Dated July 24, 2002, was
18  marked for identification.)
19  **BY MS. BREWINGTON:**
20  Q. I believe I just put in front of you Wirtz 11.
21  It's an E-mail from Ann Breslin to Merrilyn Ramsey. It's
22  dated July 24th, 2002.
23  **A. That is correct.**
24  Q. Go ahead and read it for me.

14 (Pages 50 to 53)

Breslin
Christina Wirtz                                      v.     State of Delaware, Department of Natural Resources & Environmental Control
                                              C.A. # 05-290                                    June 27, 2006

Page 54

1    A. "Good afternoon. I'm following up on Christina's
2    call to you the last week of June concerning my memo of
3    January, 2002, regarding pay equity issues. I was
4    wondering when I would receive a written response from
5    DNREC personnel. Thanks, Ann."
6         There are some tracking notes at the bottom.
7    Recipient, Merrilyn Ramsey. Received at 7/24/2002.
8    Christina Wirtz received it 7/24/2002 at 2:26 as well.
9    Differences on the reading, those were the delivery
10   dates, the reading dates. Merrilyn, 7/25/2002, 10:54
11   a.m. Christina Wirtz, 7/24/2002 at 2:55 p.m.
12        Q. Based on your review of this E-mail, would it be
13   fair to say that as of July, 2002, HR still had not
14   responded to her concern?
15        A. That would be correct.
16        Q. I don't know if I asked you this, but do you have
17   any reason to know why there was such a delay in
18   responding?
19        A. I do not understand why there was a delay in
20   responding.
21        Q. Is that normal human resources procedure?
22        A. I don't think a request like this had come
23   through HRO before. So I would not know what was normal
24   for them.

Page 55

1         (Wirtz Deposition Exhibit No. 12, E-Mail to
2    Christina Wirtz from Ann Breslin Dated July 30, 2002, was
3    marked for identification.)
4    BY MS. BREWINGTON:
5         Q. Take a look at Wirtz 12.
6         A. Okay.
7         Q. It's an E-mail from Ann to you dated July 30th,
8    2002.
9         A. Correct.
10        Q. It says, "Christina, thanks for talking to me. I
11   am going to contract state personnel to see if they can
12   help me. Ann."
13        A. That's correct.
14        Q. Do you think as of July 30th, 2002, Ann received
15   some sort of response from human resources?
16        MS. CSIZMADIA: I'm going to object on the
17   basis of speculation, but go ahead.
18        THE WITNESS: Based on this E-mail, I think
19   that would be correct.
20   BY MS. BREWINGTON:
21        Q. Do you think -- or I don't know. But did you
22   talk with her about their response? Do you remember
23   this?
24        A. I don't remember our conversations. I'm sure

Page 56

1    that I did talk to her about it though.
2         Q. Now, I'm trying to understand like normal
3    department procedures. Would this be something that John
4    Blevins would discuss with you and then you would discuss
5    it with Ann?
6         A. Correct.
7         Q. Is it fair to say that that happened in this
8    situation?
9         A. Yes. Except Ann may have contacted Merrilyn
10   directly. I'm not sure if that occurred.
11        THE WITNESS: Can we take a break?
12        MS. BREWINGTON: Yes.
13        (Thereupon, a short recess was had.)
14        (Wirtz Deposition Exhibit No. 13, Memorandum
15   to Christina Wirtz from Merrilyn Ramsey Dated August 16,
16   2002, was marked for identification.)
17   BY MS. BREWINGTON:
18        Q. Exhibit 13 is a memo from Merrilyn Ramsey, human
19   resources manager, to you it. Says through John Blevins.
20   And it's CC'd to Ann Breslin, Ali --
21        A. It was passed down. It's kind of like the
22   routing. Before I received it, John Blevins received it.
23        Q. It's CC'd to Ann Breslin, Ali --
24        A. Mirzakhalili.

Page 57

1         Q. -- Paul Will, Marjorie Crofts. It's dated August
2    16th, 2002. Is all that correct?
3         A. That is correct.
4         Q. Have you seen this document before?
5         A. Yes, I have.
6         Q. Would it be fair to say that Ann finally received
7    a response to their request for a review of the advanced
8    hire --
9         A. Yes.
10        Q. Let me finish the question. -- from 1996 in
11   August, 2002?
12        A. Oh, no. I think this is the response to our
13   request to reevaluate the advanced hire. And our request
14   was dated December, 2001, I believe, December 10th, 2001.
15        Q. So the December, 2001, request was a request to
16   revisit the 1996?
17        A. Exactly.
18        Q. And would it be fair to say that this August 16,
19   2002, document is Merrilyn Ramsey's response to your
20   request to review the 1996 request?
21        A. Yes. Okay.
22        Q. I want to ask you to review this document and
23   then I want to ask you a question about it.
24        A. Okay.

15 (Pages 54 to 57)

Page 58

1    Q.   As I understand it, one of the concerns that you
2    had was that Mr. Robertson's work experience seems to
3    have counted in his request for an advanced hire but Ann
4    Breslin did not.  Is that an accurate statement?
5    **A.   Yes.**
6    Q.   Does this memo address your concern?
7    **A.   It is an attempt to address my concern.**
8    Q.   What do you mean by that?
9    **A.   Although the memo speaks to issues of equity,**
10   **there are many unexplained situations, or as Merrilyn**
11   **refers to them, as variables which impact an employee's**
12   **salary.  And even with this memo, I did not fully**
13   **understand those variables when applied to Ann's**
14   **situation.**
15   Q.   Now, are you speaking about the third paragraph
16   where it says, "With regard to the issue of equity, there
17   are many variables which impact an employee's salary,
18   i.e., timing into state employment, the number and amount
19   of general increases, whether there was an advanced
20   salary, Selective Market Variation, the incumbent's
21   experience date, et cetera."  Did Merrilyn Ramsey explain
22   any of these variables in this memo?
23   **A.   No, she did not explain specifically what**
24   **occurred with respect to Ann's advanced request, advanced**

Page 59

1    hire request.
2    Q.   Did she explain anything about what had occurred
3    with Keith's advanced hire request?
4    **A.   A little more.  She has the opinion that -- she**
5    **states that, "While these two employees have similar**
6    **experience and credentials, that Mr. Robertson has more**
7    **creditable, applicable experience, one of the factors**
8    **attributable to his concurrent salary.  Miss Breslin's**
9    **salary falls within the range of others with her**
10   **experience and credentials."**
11   Q.   Let me take it sentence by sentence.  The first
12   sentence there, take a look at that.  And I want to ask
13   you if you agree with that statement.
14   **A.   I don't agree with that statement.**
15   Q.   Tell me why not.
16   **A.   Because I believed when I helped originate the**
17   **memo that they both had creditable, applicable**
18   **experience.  And it was not fully explained in this memo**
19   **why his was considered more creditable and applicable.**
20   Q.   Were you of the opinion that Mr. Robertson had
21   more creditable, applicable experience?
22   **A.   I was not of the opinion.**
23   Q.   The second sentence, "Miss Breslin's salary falls
24   within the range of others with her experience and

Page 60

1    credentials."  Now, did Miss Breslin's salary fall below
2    the others with her experience and credentials?
3    **A.   Within the Site Investigation and Restoration**
4    **Branch, which I managed, her salary fell below the range**
5    **of others within the branch.**
6    Q.   And when it indicates here in the memo from
7    Merrilyn Ramsey that Miss Breslin's salary falls within
8    the range of others with her experience and credentials,
9    do you think she's referencing those in SIRB?
10   **A.   I believe, based on this memo, that she is not,**
11   **that she must be referring to the rest of the division or**
12   **perhaps the entire department, but certainly not SIRB.**
13   Q.   And the basis of your opinion is that she
14   couldn't be basing it on SIRB because that would be
15   inaccurate?
16   **A.   Can you rephrase?**
17   Q.   Yeah.  That was kind of confusing.  You said that
18   she must be referring to the division or the department.
19   And I guess I'm trying to understand the basis of your
20   opinion that she must be referring to.
21   **A.   Because my knowledge of salaries within my branch**
22   **was such that I knew Ann's fell below others with her**
23   **same level of experience.**
24   Q.   Do you think it is important to compare Ann

Page 61

1    Breslin with respect to her salary with people within her
2    same branch?
3    **A.   I think so.  If someone is doing the same job as**
4    **the others within the same branch, that would be a**
5    **comparable situation.**
6    Q.   Would it be fair to say that the other branches,
7    the other environmental scientists in the other branches
8    are not doing similar jobs?
9    **A.   I think that would be fair to say.**
10   Q.   The first sentence of that next paragraph, "While
11   I certainly appreciate your concern for your employees, I
12   also assure that HRO historically and will continue to do
13   all we can to ensure internal equity."
14          In your opinion, did HR do all it could to
15   ensure internal equity?
16   **A.   Can you rephrase?**
17   Q.   I guess what I want to know is:  According to
18   Merrilyn Ramsey and based on this memo, her position is
19   that human resources did all it could to ensure internal
20   equity in the department.  And my question to you is
21   whether you believe that the department did all it could
22   to ensure internal equity.  And I guess I mean HR,
23   because she actually references HR specifically.
24   **A.   I believe that it is very important to HR to do**

Page 62

1  everything to ensure internal equity. However, in this
2  situation, I don't think everything was done to ensure
3  that equity was, an equitable situation was arrived at.
4      Q. And what would be an equitable situation in your
5  opinion?
6      A. In my opinion, it would be that Ann would be
7  compensated fairly for the work that she was performing.
8  The work was comparable to Keith Robertson's work at that
9  same time. And her salary should have reflected the same
10  amount as his.
11      Q. And it's fair to say that, in your opinion, she
12  should not have been making entry level as of the date of
13  this memo, which is August 16, 2002?
14      A. That is correct.
15          (Wirtz Deposition Exhibit No. 14, Delaware
16  Department of Natural Resources & Environmental Control
17  Administrative Policies and Procedures, was marked for
18  identification.)
19  BY MS. BREWINGTON:
20      Q. Have you ever seen this document before?
21      A. Oh, yes.
22      Q. Tell me what it is.
23      A. DNREC or the department has administrative
24  policies or procedures. This particular policy is the

Page 63

1  advanced salary policy, which is D-0918. And it details
2  the criteria for obtaining an advanced salary for
3  different situations.
4      Q. And towards the middle of the first page it says,
5  "Subject to available funding, advanced salaries shall be
6  primarily used for, A, retention."
7          Do you see where it says that?
8      A. Correct.
9      Q. It says, "Excluded would be career ladder
10  promotions."
11      A. Correct.
12      Q. Do you know whether this was a policy that was
13  created in October of 2001 or whether this policy had
14  already been in place?
15      A. There may have been an advanced salary policy.
16  There are always additions and revisions. I would not
17  know when this occurred.
18      Q. And how about this second page where it says
19  "internal equity," what is this section of the advanced
20  salary request for?
21      A. It states, "To maintain internal equity to the
22  degree possible, the following criteria and/or actions
23  are implemented. No advanced salary will be permitted
24  for those incumbents whose critical reclassification

Page 64

1  request results in a promotion greater than three paid
2  grades. Technical positions are a priority. The
3  department will selectively use a peer review process to
4  scrutinize education, experience and training to support
5  a request."
6      Q. Do you know whether a peer review process was
7  used to scrutinize Ann Breslin's request for an advanced
8  hire?
9      A. I am not aware of any peer review.
10      Q. I just asked you whether you knew whether a peer
11  review process was used for advanced hire request. But I
12  wasn't specific as to which request I was speaking of.
13  Do you know whether an advanced hire request was used for
14  her 1996 advanced hire request -- that didn't make sense.
15  Let me ask it again.
16          Do you know whether a peer review process
17  was used for her 1996 advanced hire request?
18      A. I'm not aware of a peer review having been used
19  in 1996 for her advanced hire request.
20      Q. Are you aware of a peer review process being used
21  at any time to consider any of Miss Breslin's advanced
22  hire requests?
23      A. I am not aware of a peer review having been done
24  at any time for Ann Breslin's request.

Page 65

1      Q. Do you know whether or not it would have been
2  proper for them to consider a peer review process?
3      A. I don't know. I'm not that familiar with HR's
4  procedures.
5          (Wirtz Deposition Exhibit No. 15, Letter to
6  Alex Rittberg from Ann Breslin Dated February 11, 2003,
7  was marked for identification.)
8  BY MS. BREWINGTON:
9      Q. Take a look at this document. It's been marked
10  as 15.
11      A. Yes.
12      Q. This is Ann Breslin's resignation letter and it's
13  addressed to Alex Rittberg. Have you ever seen this
14  document before?
15      A. I'm sure I did at one time. I did not have a
16  copy in my file.
17      Q. Based on your review of this document, would you
18  agree that Ann Breslin left DNREC because of the
19  inequities in her pay?
20      A. Yes.
21      Q. And how did you feel about Ann Breslin's
22  resignation?
23      A. I was disappointed. I felt I had failed her as a
24  manager, that I was not able to resolve this situation in

17 (Pages 62 to 65)

B-0176

Breslin                                                    State of Delaware, Department of Natural Resources & Environmental Control
Christina Wirtz                          C.A. # 05-290                          June 27, 2006

Page 66

1  a fair manner. And I felt that it was a loss to the
2  State of Delaware and to our branch to lose an
3  experienced person. I was happy for Ann that she was
4  able to continue her career with the EPA in Philadelphia.
5  And I felt that she would receive acknowledgment for her
6  experience and her education with the EPA.
7        MS. BREWINGTON: I don't have anything
8  further.
9              EXAMINATION
10 BY MS. CSIZMADIA:
11   Q. What is the last time that you talked to Ann,
12 Christina?
13   A. Probably in the last day or so.
14   Q. And would that be this morning, last night?
15   A. Yesterday.
16   Q. Yesterday. And how long did the two of you talk?
17   A. Maybe 5, 10 minutes.
18   Q. You talked about your testimony today?
19   A. Yes, and other subjects.
20   Q. You indicated earlier that John Blevins'
21 philosophy was to do the right thing and not necessarily
22 just to follow the right procedure; didn't you?
23   A. Correct.
24   Q. And is that an accurate characterization?

Page 67

1   A. Of what?
2   Q. Of the philosophy that you said he --
3   A. Yes.
4   Q. And did you agree with that?
5   A. Yes.
6   Q. And do you think it's more important to follow
7  the right procedure or to do the right thing?
8   A. I would hope that they are both one in the same.
9   Q. And if, in your personal opinion, they are not
10 the same, which do you think should happen? Should you
11 follow the right procedure or should you do what you
12 personally believe is the right thing?
13   A. I would want to pursue doing the right thing.
14   Q. And is that what you did in this case with your
15 memos to John Blevins and your support of Ann's request
16 to receive more money?
17   A. I believe that this was done in both respects,
18 that this was the right procedure, that we followed the
19 procedures that had been laid out for this type of
20 concern and that it was also the right thing to do.
21   Q. Now, you also said earlier that you are not that
22 familiar with all of human resources' procedures?
23   A. Correct.
24   Q. Are there pieces of advanced hire requests that

Page 68

1  human sources does and that you, as a manager, don't
2  touch?
3   A. Yes.
4   Q. Would that be a salary comparison?
5   A. Department wide, yes.
6   Q. Is that something that you believe human
7  resources does for positions?
8   A. Yes.
9   Q. You weren't really concentrating on the salaries
10 of environmental scientist III's in other divisions or
11 even beyond your branch at SIRB; were you?
12         MS. BREWINGTON: Object to form. You can go
13 ahead and answer.
14         THE WITNESS: Correct.
15 BY MS. CSIZMADIA:
16   Q. So when you say she was paid less than any other
17 environmental scientist III, referring to Ann, you are
18 talking only about SIRB?
19   A. Correct. That is what I had knowledge of.
20   Q. And you said that you believed that you had
21 failed Ann as a manager?
22   A. Yes.
23   Q. And that's because you didn't get her salary
24 increased to Keith's?

Page 69

1   A. That is because I was not able to remedy a
2  situation that I felt was inequitable.
3   Q. You took it fairly personally that you couldn't
4  fix the situation; didn't you?
5   A. I took it both professionally and also
6  personally.
7   Q. I think you said earlier that you believe it is
8  very important for human resources to ensure internal
9  equity in the department.
10   A. Yes.
11   Q. So their focus is a little different from your
12 focus in this situation; isn't it?
13   A. Yes, it could be. I would think, again, it's one
14 in the same though. Their focus should be on making sure
15 that there is equity within the branches themselves as
16 well as across the department.
17   Q. But that's your opinion and that's not normally
18 the piece you are involved in?
19   A. Correct. I am not involved in human resource
20 evaluations at all.
21   Q. Now, John Blevins took your concerns very
22 seriously; didn't he?
23   A. Yes.
24   Q. And I want you to read, if you don't mind, his

18 (Pages 66 to 69)

Page 70

1  whole memo. I think the context of the whole memo is
2  important. And that would be Wirtz 7, the second page.
3      A. "Attached is a confidential memorandum from
4  Christina Wirtz bringing to my attention a personnel
5  issue within her group, SIRB. Christina is concerned
6  that an inequity occurred within the department when the
7  advanced hire request for Ann Breslin was processed and
8  denied. Christina also believes that the department may
9  be vulnerable to a sexual discrimination charge based on
10  the specifics of the situation. I am impressed that
11  Christina has brought this situation to my attention
12  since trying to address the situation is not in the path
13  of least resistance.
14      Based on my reading the facts presented, I
15  concur with Christina that the reason for an advanced
16  hire request denial for Ann is not apparent when compared
17  to the approval of an advanced hire request for Keith
18  Robertson. If it is true that Ann's experience and
19  educational background were not considered and that they
20  should have been, as were Keith's, then I believe that
21  we, the department, had made a mistake and that we should
22  acknowledge and correct to the best of our ability. If
23  Ann should have been afforded an advanced hire request
24  according to the policy at the time, then I believe we,

Page 71

1  as a department, owe it to her.
2      Additionally, I'm also concerned that we do
3  have some vulnerability on a sexual discrimination basis
4  and do not believe that this is the message we, the
5  department, want to send. I have been spreading the
6  message to my staff that we need to ensure that we are
7  doing the right thing, not just doing things right. I
8  hope that we will do the right thing in this instance. I
9  do recognize that there may be other facts that impact
10  this case. But until I am aware of them, I do believe we
11  need to reconsider the case. If the facts bear out a
12  mistake was honestly made, I recommend that we address it
13  as soon as possible.
14      The ideal cure would be to retroactively
15  apply the advanced hire salary amount to any subsequent
16  salary adjustments to that amount. If is that is not
17  technically feasible, I believe that applying an advanced
18  hire amount now to Ann's current salary would be the
19  appropriate cure. I know there division has the funding
20  to support this action. And I believe we could implement
21  the corrective action without modifying the current
22  advanced hire policy. Please, review the attached
23  document and my request and advise me of the next steps.
24  I am more than willing to discuss this with you, Steve or

Page 72

1  Dave or Nick. Thanks for your help and consideration."
2      Q. Would it be fair to say that this memo indicates
3  that John Blevins is concerned if it's true that Ann has
4  been treated unfairly?
5      A. That is correct.
6      Q. Would it be fair to say that John is concerned
7  with doing the right thing?
8      A. That is correct.
9      Q. Would it be fair to say that he believed a cure
10  was possible and available?
11      A. That is correct.
12      Q. Are you aware of who the first step of Ann's MERB
13  should be, her grievance proceeding would be before, who
14  her hearing was before?
15      A. I believe it was John Blevins.
16      Q. So John Blevins was in a position to cure a
17  problem in the grievance position if a mistake had been
18  made; is that correct?
19      A. I'm not sure if that's correct.
20      Q. Do you know what decisions that he made, if I
21  represent to you that he was the hearing officer for her
22  grievance, do you know what the decision was?
23      A. I know that it was not favorable to Ann's
24  request.

Page 73

1      Q. And how would you square that with his
2  willingness to look at the issues and to do the right
3  thing?
4      A. I'm not sure what his role was in the MERB
5  procedure.
6      Q. Okay. Now, drawing your attention to Wirtz
7  Number 14, that was the policy for advanced hires.
8      A. Do we have a date on that? Because I think that
9  was revised several times.
10      Q. Wirtz 14, the one that's marked.
11      A. Is it dated?
12      Q. It's dated November 13. It says revised November
13  13, 2001. There is a note after Subparagraph A. Could
14  you read the note for us, please?
15      A. "Note, excluded would be career ladder promotions
16  and promotions as a result of a maintenance review."
17      Q. I'm trying to find the exhibit that was your
18  memorandum, the official. It's part of Wirtz 7. The
19  last paragraph of Wirtz 7, next to the last page is Wirtz
20  7, the last line on it.
21      A. In addition another equity issue?
22      Q. Yes. You refer to the results of a maintenance
23  review in that confidential memo, correct?
24      A. Correct.

19 (Pages 70 to 73)

Page 74

1   Q.   And you also say that resulted in your opinion in
2   additional inequity?
3   A.   Correct.
4   Q.   Can you read the last sentence of that paragraph
5   for me, please?
6   A.   "Though this was a considerable increase and was
7   greatly appreciated, it created a situation which a new
8   hire with no state experience as an environmental
9   scientist III could be hired and immediately make as much
10  money as Miss Breslin who has over five years of
11  experience at the ES III level in SIRB."
12  Q.   Can you explain that to me, why a person could be
13  hired in as a new hire and make the same amount that Ann
14  was making at that time?
15  A.   New hires without an advanced hire would be given
16  a salary that was called midpoint of the range for an
17  environmental scientist III.  With the maintenance
18  review, because Ann's salaries was so low, it only
19  brought her up to that midpoint.  So new hires, after
20  that maintenance review, would come in at the same salary
21  that Ann was making.
22  Q.   Was that true for all the positions that you
23  supervised?  You said you supervised about 30.
24  A.   Correct.

Page 75

1   Q.   If you hired anyone, if they didn't receive an
2   advanced hire, would they come in at that same percentage
3   at midpoint?
4        MS. BREWINGTON:  Objection.  Calls for
5   speculation.  You can answer.
6        THE WITNESS:  Rephrase.
7   BY MS. CSIZMADIA:
8   Q.   If you hired any person in a position, would they
9   come in at the same percentage of midpoint?  Or when you
10  hired any person.
11  A.   It would depend on their experience level because
12  they would be considered, if they had experience, for an
13  advanced hire.
14  Q.   Right.  So barring an advanced hire, how were
15  people paid when they were hired?
16  A.   They would be hired in at midpoint.
17  Q.   Okay.  And that's for all the positions that you
18  supervised?
19  A.   Correct.
20  Q.   And an advanced hire is not something a person is
21  entitled to; is it?
22  A.   It is based on their experience level.
23  Q.   And are there merit rules that govern when a
24  person can get that and cannot?

Page 76

1   A.   I believe there are.
2   Q.   Drawing your attention to Wirtz Number 13, the
3   last paragraph on that page, as you discussed with
4   Miss Brewington, does that indicate that Miss Ramsey says
5   that Mr. Robertson had more creditable, applicable
6   experience, which was one of the factors attributable to
7   his currently making more than Miss Breslin?
8   A.   That's not the last paragraph.
9   Q.   Of the first page I'm sorry.
10  A.   Can you repeat the question, please?
11  Q.   Does this memo indicate that human resources did
12  review your letter and review the documents that you had
13  submitted concerning Ann's pay?
14  A.   I think this paragraph and this sentence actually
15  is confusing.  Because it starts out with "while these
16  two employees have similar experience and credentials."
17  And then it says Mr. Robertson has more creditable,
18  applicable experience.  If they have similar experience
19  and credentials, it's kind of hard to read.
20  Q.   Is it fair to say that you are confused by that?
21  A.   I question it.
22  Q.   And is it fair to say that human resources are
23  the people who apply their policies and practices more
24  often than the managers?

Page 77

1   A.   That's fair to say.
2   Q.   Now, you said earlier, I believe, that there were
3   environmental scientist III's throughout the whole
4   department in natural resources?
5   A.   Yes.
6   Q.   Do you know how many employees there are at
7   DNREC?
8   A.   A little over 700.
9   Q.   Are you familiar with all the jobs done by
10  environmental scientist III's throughout the whole
11  department?
12  A.   I am to a certain level, uh-huh.
13  Q.   Are you familiar with them to the same level that
14  you are familiar with Ann's job when she worked for you?
15  A.   No.
16  Q.   And, in fact, Ann was a step down or you
17  supervised the person who supervised Ann, correct?
18  A.   I was responsible for all employees.  Ann's
19  direct supervisor actually changed several times.
20  Q.   And the same thing with Keith, you supervised the
21  person who supervised him?
22  A.   I was responsible for Keith as well.  But there
23  was a level of management in between us.
24  Q.   Would the level between you and Keith and between

Page 78

1  you and Ann, perhaps, have more hands-on knowledge of
2  exactly what they were doing at that time, Keith and Ann?
3    **A. Not necessarily.**
4    Q.  Not necessarily?
5    **A. No. I think I was a very involved manager.**
6    Q.  Now, you've said that you thought the state was
7  definitely vulnerable to a charge of gender
8  discrimination. Can you explain to me what you think is,
9  would be the basis for a charge of gender discrimination?
10   **A. Can you repeat the question?**
11   Q.  What did you mean when you said that you thought
12 the department was vulnerable for a charge of gender
13 discrimination?
14   **A. Based on my knowledge of salaries and positions**
15 **within the branch, I felt that there was a disparity**
16 **between Ann Breslin's salary and Keith Robertson's salary**
17 **that could not be explained based on education, previous**
18 **experience, et cetera.**
19   Q.  Okay. And that was based on your review of
20 Keith's experience before he came to the department,
21 correct?
22   **A. Correct.**
23   Q.  And your review of Ann's experience when she came
24 to the department?

Page 79

1    **A. Correct.**
2    Q.  You weren't there at the time; were you?
3    **A. No, I was not.**
4    Q.  I think somewhere in one of the documents it
5  references conversations with Ann's former manager to be
6  Carl Kalbacher. Did you talk to Carl about the advanced
7  hires or would that be secondhand?
8    **A. I'm not sure.**
9    Q.  You are not sure?
10   **A. I'm not sure at this point.**
11   Q.  Did you ever talk to the Keith's supervisor, at
12 the time, about the advanced hire that was granted to him
13 initially?
14        MS. BREWINGTON: Object to form. But you
15 can answer.
16        THE WITNESS: Repeat. And can you name
17 names?
18 BY MS. CSIZMADIA:
19   Q.  Keith's manager, I believe, was Jamie Rutherford,
20 when he received his advanced hire. I believe it's Jamie
21 Rutherford. Do you know her last name now?
22   **A. No, I don't.**
23   Q.  Well, she was Jamie Rutherford. I think she has
24 a new last name. Did you ever talk to Jamie about

Page 80

1  Keith's advanced hire when it was granted in '96?
2    **A. I'm not sure. I can't recall.**
3    Q.  Now, in fact, when did you start your state
4  employment?
5    **A. I started in 2000, October, 2000 -- November,**
6  **2000. Sorry.**
7    Q.  And when did you send the memo asking --
8    **A. 2001, December.**
9        MS. BREWINGTON: Can she finish her
10 question?
11 BY MS. CSIZMADIA:
12   Q.  The memo expressing your concerns about
13 Christina's pay.
14   **A. That was in December of 2000. Ann's pay.**
15   Q.  So it was about a year after you started your
16 employment with the state?
17   **A. Correct.**
18   Q.  Had you worked for the State of Delaware before
19 that?
20   **A. No.**
21   Q.  Were you acquainted with the merit rules before
22 that?
23   **A. No.**
24   Q.  What about the practices of the department with

Page 81

1  respect to implementing the merit rules?
2    **A. No.**
3    Q.  So --
4    **A. Before that, no.**
5    Q.  So you only had one year's worth of experience
6  with the system?
7    **A. Correct.**
8    Q.  Is it technical?
9    **A. It was technical.**
10   Q.  Is the merit rules and the system technical?
11        MS. BREWINGTON: Object to form.
12        THE WITNESS: I don't know if they are
13 technical. I wouldn't call that technical.
14 BY MS. CSIZMADIA:
15   Q.  Can they be complicated or are they very simple?
16   **A. I would hope that they are laid out very clearly**
17 **and that it's a standardized process.**
18   Q.  Do you know how thick they are?
19   **A. Oh, I wouldn't hazard to guess.**
20   Q.  Would it surprise you if I suggested they printed
21 out, they were perhaps an inch thick?
22   **A. That would not surprise me. But I don't think**
23 **anywhere in the merit rules they allow discrimination or**
24 **promote discrimination; in fact, the reverse.**

21 (Pages 78 to 81)

B-0180

Breslin
Christina Wirtz

v.

State of Delaware, Department of Natural Resources & Environmental Control
C.A. # 05-290                                    June 27, 2006

Page 82

1   Q.  They do absolutely prohibit discrimination; do
2   they not?
3   A.  Yes.
4   Q.  Yes.  And I'm simplifying what you said before.
5   And if I get it inaccurately, please, correct me.  But is
6   it fair to say that you thought because Ann was paid less
7   than Keith and you thought they were doing the same work
8   that you thought she was discriminated against because of
9   her sex?
10          MS. BREWINGTON:  I'm going to object to
11  form.
12          THE WITNESS:  I would also throw in the fact
13  that the way her advanced hire had been treated and Keith
14  Robertson's advanced hire had been treated are different.
15  BY MS. CSIZMADIA:
16  Q.  Can you explain that a little bit more?
17  A.  I think, based on my review of both advanced hire
18  packages that were completed in 1996, that Ann's advanced
19  hire request was treated differently for some reason than
20  Keith Robertson's.
21  Q.  And do you think the reason that it was treated
22  differently was because she was a female and he was a
23  male?
24  A.  I think that, though it may not have been

Page 83

1   intentional.  I do believe that that may have occurred.
2   Q.  Did you get an advanced hire?
3   A.  I did get an advanced hire.
4   Q.  And who was your manager?
5   A.  Denise Ferguson-Southard.
6   Q.  She was the division director before John
7   Blevins, correct?
8   A.  Correct.
9   Q.  And you just said, based on your review of the
10  documents, all the opinions that you have given today on
11  the credentials were your opinions, correct?
12  A.  Correct, based on my professional experience and
13  managerial experience at the state.
14  Q.  And did you have any managerial experience before
15  you came to work for the state?
16  A.  Yes.
17  Q.  And how much?
18  A.  Probably about seven years.
19  Q.  Now, you referred earlier to Ann's experience at
20  the Chesapeake Bay Foundation.  And you said it was
21  equivalent, in your opinion, to work as an environmental
22  scientist III.  Do you have any direct knowledge of what
23  she did there?
24  A.  I have the knowledge of conversations with Ann

Page 84

1   about what she did.  I also have the knowledge of what
2   was included in the advanced hire packages.
3   Q.  And you have said it's standard operating
4   procedure for people at DNREC to draft things for other
5   people's signature, correct?
6   A.  Yes.
7   Q.  Wouldn't that depend on the manager?
8   A.  No.
9   Q.  No?
10  A.  No.
11  Q.  You don't think there is any managers who don't
12  generally, that as a practice, don't have people draft
13  things for their signature?
14  A.  The knowledge that I have is of the branch and
15  the practices that occurred at the branch.  And at that
16  level, I know that it was standard operating procedures,
17  procedure, sorry, for employees, project managers to
18  draft memos, documents, et cetera, for their manager's
19  signature.  I also have knowledge at the divisional level
20  that this practice was also standard operating procedure
21  as well as at the secretary level.
22  Q.  Jane Biggs-Sanger, was she an environmental
23  scientist III in SIRB?
24  A.  She started before I actually came.  And then she

Page 85

1   was out for a period of a little over two years, I
2   believe, and then she was reinstated while I was at SIRB.
3   Q.  What does reinstated mean?
4   A.  The state allows, in certain conditions, for an
5   employee who has terminated their employment with the
6   state to be reinstated back into their same position and
7   they receive benefits as if they had just continued their
8   service.
9   Q.  Is it possible that it not only allows that but
10  the merit rules require it if you have been gone for less
11  than a specific period of time?
12  A.  I think it's two years.  And Jane, I think, was
13  outside of that two-year period.  But I believe special
14  consideration was given to Jane because of the fact that
15  there was a hiring freeze that had occurred during that
16  time.
17  Q.  Keith Robertson left and came back?
18  A.  Correct.
19  Q.  And was he required to be reinstated at the
20  amount he would have been making if he had continued his
21  employment?
22  A.  I'm not sure what the circumstances were with
23  Keith.  I know that he was reinstated.  But I'm not sure
24  what the --

22 (Pages 82 to 85)

Wilcox & Fetzer, Ltd.                    Professional Court Reporters

B-0181

Breslin
Christina Wirtz

State of Delaware, Department of Natural Resources & Environmental Control
C.A. # 05-290
June 27, 2006

Page 86

1    Q.  And drawing your --
2    A.  I think the advanced hire was above and beyond
3    that.  He received an advanced hire at that time and that
4    was above and beyond what the merit rules called for.
5    Q.  You are saying that when he came back, you
6    believe he received an advanced hire?
7    A.  Correct.
8    Q.  Drawing your attention to Wirtz Number 2, that
9    was the E-mail from Ann to Paul Will, the exhibit.
10   A.  Yes.
11   Q.  What does the first paragraph say?
12   A.  Are you counting the sentence at the top as the
13   first?
14   Q.  Yes.
15   A.  "Paul, here are the site summaries that you
16   requested prior to my vacation/training."
17   Q.  And then I believe you and Lori talked about NVF
18   100 Walnut Street, electric hose and rubber, and 12th
19   Street Drum in particular; is that right?
20   A.  We didn't talk about 100 Walnut Street.
21   Q.  NVF Newark.
22   A.  12th Street Drum, yeah.
23   Q.  NVF Newark is the first one there?
24   A.  Correct.

Page 87

1    Q.  Can you read that paragraph to me?
2    A.  "Called Bob Kondelin requesting the O&M plan and
3    was told that they do not have authorization from the
4    client to send it our way but that it was just about
5    complete.  They requested a copy of the Bioassessment and
6    I told them that I would send it their way as soon as we
7    received the hard copy from Dover.  This site is just in
8    a holding pattern at this time."
9    Q.  Can you tell from the update there or the site
10   summary what program the NVF was in there?
11   A.  No.  I am basing my assessment of the site on my
12   own personal knowledge.
13   Q.  Could there be different stages with different
14   sites?
15   A.  Yes.
16   Q.  And O&M plan means Operations and Maintenance
17   Plan?
18   A.  Correct.
19   Q.  At what point would they be working on the
20   Bioassessment and the Operation and Maintenance Plan?
21   A.  I'm not familiar with the Bioassessment.  The O&M
22   Plan comes toward the completion of a project.
23   Q.  And it says the site's in a holding pattern right
24   then?

Page 88

1    A.  This is a common occurrence.
2    Q.  Drawing your attention to the paragraph on
3    electric hose and rubber, it says contact Larry Jones.
4    What does that mean?
5    A.  I think -- I'm not sure.
6    Q.  Would that mean that Ann was not the contact?
7         MS. BREWINGTON:  Objection.  Asked and
8    answered.
9         THE WITNESS:  I'm not sure.
10   BY MS. CSIZMADIA:
11   Q.  Okay.  Can you read the paragraph?
12   A.  "What can I say?  We are still waiting for Bob K.
13   and the attorney from Rittenhouse to finalize the VCP
14   agreement.  If, by some miracle, that happens, Larry will
15   send the work plan through TAG for review.  I called the
16   consultant, Joe Casey from Gilmore & Associates, and gave
17   them an update of the non-progress."
18   Q.  Bob K. is Bob Keel?
19   A.  Correct, yes.
20   Q.  And the VCP agreement is the Voluntary Clean-Up
21   Program agreement?
22   A.  Correct.
23   Q.  And the TAG is the Tactical Assistance Group?
24   A.  Technical Assistance.

Page 89

1    Q.  Thanks.  So who would send the work plan through
2    the TAG, the scientists who was assigned to overseeing
3    the project?
4    A.  Well, based on my recollection, Ann did a
5    tremendous amount of work on this particular project and
6    worked hand in hand with the EPA when they did a removal
7    of lead refuse, debris that was at the site.  I'm not
8    sure how the project was shared with Larry Jones.  I
9    don't know if this was a temporary situation while Ann
10   was on vacation.  I believe that Ann was the lead with
11   this project.
12   Q.  I'm just trying to understand the memo.  And what
13   about 12th Street Drum?
14   A.  "We are in pre-notice letter mode with these
15   guys.  And, hopefully, the review will be complete by the
16   time I get back from training.  Daneta has completed the
17   mail merge and the copies so all we are waiting for is
18   the letter of approval."
19   Q.  What does that mean?  What kind of stage is it
20   at?  What was going on?  Can you tell?
21   A.  Well, like most sites that Ann had, she was able
22   to get them wrapped up in a timely fashion.  Sometimes
23   sites can take a long time.  They can take years, decades
24   even that we have some that have been on the books.  But

23 (Pages 86 to 89)

B-0182

Breslin
Christina Wirtz

v.                                         State of Delaware, Department of Natural Resources & Environmental Control
C.A. # 05-290                                                            June 27, 2006

Page 90

1  Ann was of the type that tried to wrap up a site and move
2  it along. She liked to see completion and progress with
3  all of her sites.
4        So I believe this refers to -- letter mode.
5  She's working with potential, responsible parties. And
6  she has Daneta doing a major mailing and that they are
7  just simply waiting for letter approval on this
8  particular project.
9     Q.  Just maybe another question or two. You said
10 your intent, when you sent the letter to John Blevins,
11 was to get human resources to review the situation to
12 ensure that no discrimination occurred.
13    A.  Correct.
14       MS. BREWINGTON: Objection to form.
15 BY MS. CSIZMADIA:
16    Q.  I was going to say: Is that not what you said?
17    A.  That is correct.
18    Q.  And did you human resources review the situation?
19    A.  They did.
20    Q.  And you don't agree with their review; is that
21 correct?
22    A.  I am concerned about their review.
23    Q.  Does that mean that you don't feel strongly
24 enough to agree with me that you disagree with their

Page 91

1  review?
2     A.  Please, rephrase.
3     Q.  I asked if you disagreed with their review.
4     A.  I disagree with their review.
5     Q.  And that's based on your personal observations
6  and feelings?
7     A.  No. That's based on my professional experience
8  as a manager with years of service for the state as well
9  as other companies.
10    Q.  Okay.
11       MS. CSIZMADIA: Thanks.
12       MS. BREWINGTON: Just a few questions.
13       EXAMINATION
14 BY MS. BREWINGTON:
15    Q.  Jane Biggs-Sanger, is that who you just
16 mentioned?
17    A.  I believe Val mentioned her.
18    Q.  Am I saying her name right?
19    A.  Sanger, yeah.
20    Q.  Do you know whether she was seasonal at any time?
21    A.  Yes, I believe she was seasonal for a period of
22 time. I couldn't tell you how long it lasted or what the
23 start or end dates were.
24    Q.  Is it fair to say that, based on your review of

Page 92

1  the memo from Merrilyn Ramsey in August of 2002 that she
2  felt that Keith had more creditable, applicable
3  experience?
4     A.  Yes, based on that memo, that is what was stated,
5  even though it was in a contradictory sentence.
6     Q.  My question is: If we look at one of the
7  exhibits -- and I don't know what it's marked, but it's
8  that one right there. What is that marked?
9     A.  I.
10    Q.  Okay. -- marked 1. Both Ann and Keith were
11 making the same amount of money when they started working
12 at DNREC.
13    A.  Correct.
14    Q.  I want to know if you know the answer to my
15 question. And my question is: If Keith's previous work
16 experience was so crucial to his advanced hire, why was
17 he not credited with this experience in 1994?
18    A.  I don't know the answer to that.
19    Q.  You talked with Miss Csizmadia about the 12th
20 Street Drum, I believe. Can you take a look at that memo
21 right there?
22    A.  Yes.
23    Q.  Specifically, I want to refer you to the part
24 about contact Larry Jones. It was electrical hose and

Page 93

1  rubber, Brandywine Industrial complex; is that correct?
2     A.  Correct.
3     Q.  Do you know whether -- and, keep in mind, the
4  first sentence says, "Here are the site summaries that
5  you requested prior to my vacation/training." Could it
6  be that, although Ann was responsible for this site,
7  Larry Jones was the contact while she was on vacation?
8     A.  Yes, it could definitely be.
9     Q.  Now, was this a common occurrence to have someone
10 else in charge of your site when you are on vacation or
11 at training?
12    A.  Yes.
13    Q.  And I know there was some discussion with
14 Miss Csizmadia about the merit rules. And I believe both
15 you and Miss Csizmadia mentioned that the merit rules
16 prohibit discrimination on the basis of gender; is that
17 correct?
18    A.  That is correct.
19    Q.  In your opinion, did you feel that the department
20 may have been in violation of this part of the merit
21 rules with respect to Ann and Keith Robertson?
22    A.  In my opinion, yes.
23       MS. BREWINGTON: I don't have anything
24 further.

24 (Pages 90 to 93)

B-0183

Breslin
Christina Wirtz

v.

State of Delaware, Department of Natural Resources & Environmental Control

C.A. # 05-290

June 27, 2006

Page 94

1    (Thereupon, the deposition concluded at 1:00
2  p.m.)
3        INDEX TO TESTIMONY
4
CHRISTINA WIRTZ                         PAGE
5
   Examination by Ms. Brewington          2, 66
6  Examination by Ms. Csizmadia           91
              - - - - -
7       INDEX TO EXHIBITS
8  WIRTZ DEPOSITION EXHIBIT NO.           PAGE
9  1, April 2, 2004, Request for Additional
   Information...................................... 11:6
10 2, E-Mail to Paul Will from Ann Breslin Dated
   October 23, 2001 ............................ 14:17
11 3, Memorandum to HR from Paul Will Dated
   May 7, 2001..................................... 18:8
12 4, E-Mail to Alex Rittberg from Christina Wirtz
   Dated May 7, 2001............................. 28:10
13 5, Memorandum to HRO from Paul Will
   Dated May 17, 2001............................. 29:16
14 6, Memorandum to John Blevins from Christina Wirtz
   Dated November, 2001........................... 31:18
15 7, Confidential Memorandum to Merrilyn Ramsey
   from John Blevins Dated December 10, 2001....... 37:2
16 8, Confidential Memorandum to John Blevins from
   Christina Wirtz Dated January 31, 2002......... 47:16
17 9, E-Mail to Christina Wirtz from Ann Breslin
   Dated March 9, 2002............................. 49:10
18 10, E-Mail to John Blevins from Christina Wirtz
   Dated June 28, 2002............................. 50:16
19 11, E-mail to Merrilyn Ramsey from Ann Breslin
   Dated July 24, 2002............................. 53:16
20 12, E-Mail to Christina Wirtz from Ann Breslin
   Dated July 30, 2002............................. 55:1
21 13, Memorandum to Christina Wirtz from
   Merrilyn Ramsey Dated August 16, 2002........... 56:14
22 14, Delaware Department of Natural Resources &
   Environmental Control Administrative Policies and
23 Procedures...................................... 62:15
   15, Letter to Alex Rittberg from Ann Breslin Dated
24 February 11, 2003............................... 65:5

Page 95

1
2
3
4  REPLACE THIS PAGE
5
6  WITH THE ERRATA SHEET
7
8  AFTER IT HAS BEEN
9
10 COMPLETED AND SIGNED
11
12 BY THE DEPONENT.
13
14
15
16
17
18
19
20
21
22
23
24

Page 96

State of Delaware )
              )
New Castle County )
       CERTIFICATE OF REPORTER
   I, Anne L. Adams, Registered Professional
Reporter and Notary Public, do hereby certify that there
came before me on the 27th day of June, 2006, the
deponent herein, CHRISTINA WIRTZ, who was duly sworn by
me and thereafter examined by counsel for the respective
parties; that the questions asked of said deponent and
the answers given were taken down by me in Stenotype
notes and thereafter transcribed into typewriting under
my direction.
   I further certify that the foregoing is a true
and correct transcript of the testimony given at said
examination of said witness.
   I further certify that I am not counsel,
attorney, or relative of either party, or otherwise
interested in the event of this suit.


        Anne L. Adams
        Certification No. 105-RPR
        (Expires January 31, 2008)

25 (Pages 94 to 96)

Case 1:05-cv-00290-GMS    Document 51-5    Filed 09/29/2006    Page 20 of 27

# STATE OF DELAWARE MERIT RULES
Adopted by the Merit Employee Relations Board
Effective January 1, 2004

Statutory Authority: 29 Delaware Code,
Section 5914 (29 **Del.C.** §5914)

**Chapter Index**

1.    Introduction
2.    Non-Discrimination
3.    Classification of Positions
4.    Pay Plan
5.    Employee Benefits
6.    Recruitment and Application Policies
7.    Examinations and Registers
8.    Certification
9.    Probation
10.   Other Appointments
11.   Layoff Procedures
12.   Employee Accountability
13.   Performance Review
14.   Employee Development and Communications
15.   Employee Responsibilities
16.   Human Resource Records
17.   Payroll
18.   The Grievance Procedure
19.   Definitions

## 1.0 Introduction

1.1  Pursuant to 29 **Del.C.** Chapter 59, these Rules apply to initial probationary, Merit and limited term employees, except as otherwise specified, and shall continue in effect until such time as they are amended or modified by the Merit Employee Relations Board ("Board") or are amended, modified or superseded by amendment to 29 **Del.C.** Chapter 59.

1.2  In the event of conflict with the Delaware Code, the Code governs. In the event of conflict with individual agency regulations, these Rules take precedence. In the event of conflict with Intergovernmental Merit System Standards, the Standards govern federally funded positions subject to the provisions of the Intergovernmental Personnel Act. Federal laws supersede any conflicting state laws.

1.3  If a subject is covered in whole or in part by a collective bargaining agreement, 29 **Del.C.** §5938(d) provides that the Merit Rules shall not apply to such subject matters. These Rules govern in matters of: classification, uniform

1

B-0185

pay and benefits, examination, rejection of candidates, appointment, paid leave, promotional requirements and standards, and veteran's or resident's preference. Collective bargaining agreements may govern matters of bargaining unit-specific pay and benefits, probation, emergency employment, transfer and promotional selection processes, reinstatement, performance records, layoff, fines, discipline up to and including dismissal, grievances, work schedules and working conditions.

1.4 The State has the exclusive right to manage its operations and direct employees except as specifically modified by these Rules.

1.5 The Director of State Personnel ("Director") may issue Rule interpretation and application guidelines consistent with these Rules. The Director is authorized to establish committees to make recommendations about Human Resources issues.

## 2.0 Non-Discrimination

2.1 Discrimination in any human resource action covered by these rules or Merit system law because of race, color, national origin, sex, religion, age, disability, sexual orientation, or other non-merit factors is prohibited.

## 3.0 Classification Of Positions

3.1 The Director shall establish and maintain a method of classifying and reviewing all positions. Positions substantially alike in duties and responsibilities and requiring essentially the same knowledge, skills and abilities shall be grouped into the same class and pay grade.

> 3.1.1 Class specifications shall contain the title and code identifying the class, give examples of the characteristics and indicate duties and responsibilities that may be assigned to positions of the class and set forth uniform job related minimum qualifications and the knowledge, skills and abilities required to do the work.

> 3.1.2 Class specifications shall be mainly descriptive and not restrictive. References to particular characteristics or examples of duties shall not exclude others of similar kind and quality.

3.2 Employees may be required to perform any of the duties described in the class specification, any other duties of a similar kind and difficulty, and any duties of similar or lower classes. Employees may be required to serve in a higher position; however, if such service continues beyond 30 calendar days, the Rules for promotion or temporary promotion shall apply, and they shall be compensated appropriately from the first day of service in the higher position.

2

# DEPARTMENT OF NATURAL RESOURCES & ENVIRONMENTAL CONTROL
## DIVISION OF AIR & WASTE MANAGEMENT
### SITE INVESTIGATION & RESTORATION BRANCH

## MEMORANDUM

TO:        Sharon M. Tazelaar, Personnel Office

FROM:     Jamie H. Rutherford, Program Manager

RE:        Additional Information for Justification of Applicable Work
           Experience for Advance Promotion of Keith J. Robertson

DATE:      September 13, 1996

Per our phone conversation today, I have provided below further clarification on Keith's past work experience as a Geoarchaeolgist at the Rhode Island Center for Public Archaeology and as a Coastal Geologist at the Institute of Marine Science. If you should need further clarification or information please let me know. Thank you in advance for your expeditiously review.

While Keith was employed with the University of Rhode Island Center for Public Archaeology, he gained abundant experience in the development, implementation and conclusion of multi-media environmental investigations under Section 106 of the National Historic Preservation Act.

As the only geologist with the Center, his expertise and responsibilities embodied more of a consulting nature, assisting in the development of experimental design and establishment of project goals, as well as ensuring implementation and measuring progress of the investigation from a geologic perspective through oversight of site excavation and artifact collection, while simultaneously developing statistical analyses on the data collected (e.g. areal and temporal artifact distribution).

His personal technical responsibilities included soil classification and profiling, topographic mapping utilizing transit, stadia and automatic level and finally, stratigraphic interpretation and correlation of boreholes and test units. Keith ultimately compiled all of this information into a comprehensive palaeoenvironmental reconstruction for the area. Combined with the information provided by his identification of lithic (i.e. stone tool) source areas obtained from lithic thin-sectioning coupled with a relevant literature search, a fairly detailed geoarchaeological history of the area was reconstructed. The information generated by this project resulted in the re-routing of a proposed highway which would otherwise have destroyed this valuable piece of New England Native American history.

The skills obtained during his tenure at URI are directly applicable to the field sampling and data analysis with which Keith is involved during DNREC Superfund Investigations.

Memorandum

September 13, 1996
Page 2

While employed by the University of North Carolina, Keith was a project manager for a 14-month field study of shoreline dynamics along Topsail Island, North Carolina, and was fully responsible for the design, development, implementation and conclusion of the project. Technical aspects of the project included monthly land surveying of five kilometers of shoreline; collection, characterization and statistical data analysis of sedimentologic and oceanographic data; and interpretation and analysis of historical aerial photographs. Additionally, the project involved an evaluation of the North Carolina Coastal Area Management Act (CAMA) and the Federal Coastal Barrier Resources Act (COBRA) as they pertained to, and how they affected, the historical development of Topsail Island. Final conclusions and recommendations included in the report involved future development planning on Topsail Island, Emergency Management Response (i.e. island evacuation) and environmental impacts of future development.

Following the project's completion, Keith's research was utilized by the North Carolina Division of Coastal Management in planning future development of the Onslow Bay section of the North Carolina coastline. Additionally, both the information gleaned from the Topsail project as well as the design approach have been incorporated into course material for a summer graduate course offered through both Duke University and UNC. Two publications have been generated from this report. It should be noted that the stretches of beach identified as potential areas of concern in this project in 1994 were indeed the areas of greatest erosion and damage following the recent Hurricanes Bertha and Fran (1996).

JHR:dmg
JHR96060

cc:     N. V. Raman

# DEPARTMENT OF NATURAL RESOURCES & ENVIRONMENTAL CONTROL
## DIVISION OF AIR & WASTE MANAGEMENT
### SITE INVESTIGATION & RESTORATION BRANCH

## MEMORANDUM

TO:        Sharon M. Tazelaar, Personnel Office

VIA:       Nicholas A. DiPasquale, Director
           Leilani M. Wall, Personnel Liaison
           N. V. Raman, Manager

FROM:      Jamie H. Rutherford, Program Manager

RE:        Request for Advance Promotion for Career Ladder Promotion of
           Keith J. Robertson

DATE:      September 17, 1996

### Background

Keith Robertson (Position # 62830) was recommended by the June, 1996, Career Ladder Board for promotion from an Environmental Scientist II (ES II) to Environmental Scientist III (ES III). His promotion is retroactive January 16, 1996.

### Salary Request

Approval is requested for a salary of 91.8% of midpoint at the ES III pay grade for Keith Robertson. This will be a salary of $36,147.00 x .918 = $33,182.94 per year using the FY 96 payscale. His salary is funded from the Federal Remedial Support Agency Cooperative Agreements.

### Justification

Keith Roberston has earned a Master of Science degree in Marine Geology and a Bachelor of Science degree in Geology. Keith Robertson has worked in the Site Investigation and Restoration Branch (SIRB) since February 1, 1994. In addition to his 2.5 years of environmental scientist experience within the SIRB, Keith Robertson has 4.75 years of related experience:

- .5 year - Rhode Island Center for Public Archaeology - Geoachaeologist;
- 3.16 years - Institute of Marine Science - Coastal Geologist; and,
- 1.0 year - University of Delaware Center for Archaeological Research-Geoarchaeolgist.

Keith Robertson's total professional experience of 7.25 years represents a higher experience level than is required for the ES III. Keith Robertson has proven that he can successfully perform at the ES III level and is currently handling an intensive workload at full ES III responsibility level. He has demonstrated excellent project management and organization skills in managing his assigned Superfund Sites.

B-0189

Sharon M. Tazelaar
September 17, 1996
Page 2

While Keith was employed with the University of Rhode Island Center for Public Archaeology, he gained abundant experience in the development, implementation and conclusion of multi-media environmental investigations under Section 106 of the National Historic Preservation Act. As the only geologist with the Center, his expertise and responsibilities embodied more of a consulting nature, assisting in the development of experimental design and establishment of project goals, as well as ensuring implementation and measuring progress of the investigation from a geologic perspective through oversight of site excavation and artifact collection, while simultaneously developing statistical analyses on the data collected (e.g. areal and temporal artifact distribution).

His personal technical responsibilities included soil classification and profiling, topographic mapping utilizing transit, stadia and automatic level and finally, stratigraphic interpretation and correlation of boreholes and test units. Keith ultimately compiled all of this information into a comprehensive palaeoenvironmental reconstruction for the area. Combined with the information provided by his identification of lithic (i.e. stone tool) source areas obtained from lithic thin-sectioning coupled with a relevant literature search, a fairly detailed geoarchaeological history of the area was reconstructed. The information generated by this project resulted in the re-routing of a proposed highway which would otherwise have destroyed this valuable piece of New England Native American history.

The skills obtained during his tenure at URI are directly applicable to the field sampling and data analysis with which Keith is involved during DNREC Superfund Investigations.

While employed by the University of North Carolina, Keith was a project manager for a 14-month field study of shoreline dynamics along Topsail Island, North Carolina, and was fully responsible for the design, development, implementation and conclusion of the project. Technical aspects of the project included monthly land surveying of five kilometers of shoreline; collection, characterization and statistical data analysis of sedimentologic and oceanographic data; and interpretation and analysis of historical aerial photographs. Additionally, the project involved an evaluation of the North Carolina Coastal Area Management Act (CAMA) and the Federal Coastal Barrier Resources Act (COBRA) as they pertained to, and how they affected, the historical development of Topsail Island. Final conclusions and recommendations included in the report involved future development planning on Topsail Island, Emergency Management Response (i.e. island evacuation) and environmental impacts of future development.

Following the project's completion, Keith's research was utilized by the North Carolina Division of Coastal Management in planning future development of the Onslow Bay section of the North Carolina coastline. Additionally, both the information gleened from the Topsail project as well as the design approach have been incorporated into course material for a summer graduate course offered through both Duke University and UNC. Two publications have been generated from this report. It should be noted that the stretches of beach identified as potential areas of concern

B-0190

Sharon M. Tazelaar
September 17, 1996
Page 3

in this project in 1994 were indeed the areas of greatest erosion and damage following the recent Hurricanes Bertha and Fran (1996).

Keith's knowledge of the principles and practices of the life, natural and/or physical sciences have been utilized daily for the last 7.25 years of employment.

Keith's ability to communicate effectively both orally and in writing has been demonstrated in past work experience through written technical reports and as an outside editor to the Journal of Coastal Research, lab reports, and his rapport with consultants, clients, and regulatory agencies.

Accordingly, his professional and technical skill should be considered fully adequate and relevant, far beyond the entry level, to the requirements of the ES III for which he has been recommended.

## Salary Comparison
The following is a salary comparison with other ES III positions in the Division of Air and Waste Management:

| Position Number | Service Date | Current Salary ($) |
|---|---|---|
| 8288 | 010188 | 35409.12 |
| 8298 | 121878 | 34137.12 |
| 8302 | 011686 | 38689.92 |
| 8355 | 102189 | 33483.12 |
| 56690 | 031387 | 34137.12 |
| 57071 | 040187 | 35577.12 |
| 58597 | 121385 | 41076.96 |
| 58681 | 090983 | 43374.96 |
| 58682 | 030194 | 33429.12 |
| 58684 | 010193 | 38689.92 |
| 58685 | 030289 | 40734.00 |
| 59363 | 011687 | 40744.08 |
| 59381 | 061990 | 38466.96 |
| 59382 | 092485 | 38890.09 |
| 59712 | 060187 | 35657.04 |
| 60827 | 020189 | 35515.92 |
| 61677 | 091683 | 35580.00 |
| 61801 | 020189 | 38466.96 |
| 62650 | 061690 | 38466.96 |
| 63224 | 040193 | 39030.00 |
| 63455 | 012591 | 37927.92 |
| 64355 | 071692 | 33286.08 |
| 64885 | 071681 | 43374.96 |
| 64888 | 040193 | 35693.04 |

Sharon M. Tazelaar
September 17, 1996
Page 4

## Recommendation

Keith Robertson is strongly recommended, without reservation for a salary of 91.8% of midpoint for the ES III paygrade for which he has been recommended for promotion.

Request approved by:_____ at _____% of midpoint.

JHR:dmg
JHR96053.kr2

B-0192